**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **THE ELIJAH GROUP, INC.** | § | |
|     **Plaintiff** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. SA08CA0907** |
| | § | |
| **THE CITY OF LEON VALLEY, TEXAS** | § | |
|     **Defendant** | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW, DEFENDANT THE CITY OF LEON VALLEY, TEXAS, (hereinafter referred to as "Defendant" or "City") in the above styled cause and files this Motion for Summary Judgment and would show the court as follow:

**STATEMENT OF THE CASE**

    1.    This is a religious land use case where the Plaintiff, a religious group organized as a non-profit named the Elijah Group, Inc. ("Elijah Group"), asserts that the City of Leon Valley's decision not to rezone property at their bequest violates their rights guaranteed by the First Amendment to the U.S. Constitution and is in violation of the Religious Land Use and Institutionalized Person's Act ("RLUIPA"). There is no prohibition under the law which prevents a City from leaving a law "as is" and refusing to rezone property solely for the Plaintiff's benefit, especially when the requested legislation is inconsistent with decades of an established planning concept. Plaintiff seeks a declaratory judgment to invalidate the City's zoning ordinance, brings claims the City's actions are in violation of RLUIPA, violates their religious assembly rights under the First Amendment and Texas Constitution, violates their freedom of speech rights under the First Amendment and Texas Constitution, and violates the

1

Equal Protection clause of the U.S. and Texas Constitutions. The Defendant City asserts the Plaintiff is not entitled to force a legislative change to fit its financial needs and therefore its claims for relief should be dismissed.

## SUMMARY OF THE ARGUMENTS

2.     The collection of Free Exercise arguments advanced by the Plaintiff run the gambit of alleged violations for any Free Exercise restriction. However, under RLUIPA, TxRFRA, and the First Amendment, no substantial burden has been placed upon the Plaintiff's free exercise of religion.   The Elijah Group is renting property located at 6401 Bandera Road, Leon Valley, Texas, which is located in a B-2 zoning classification.  Ex. A, Crain Depo p. 62, lines 5-11, p. 136, lines 5-6; Ex. B; Ex. J.  Within that zone, the Plaintiff can perform a large number of religious activities such as providing counseling, providing day-care services, and operate its Texas Christian Athletic League ("TCAL"), which provides religious schools with coordinated extra-curricular activities state wide. Ex. A, Crain Depo pp. 29-38.  According to Elijah Group's Pastor and Director, Pastor Daryl Crain, all of these activities and functions are integral parts of their religious mission.  Ex. A, Crain Depo pp. 29-38.  All of these activities are currently permitted in the B-2 zone and the Elijah Group is utilizing these permitted uses. Ex. B; Ex. C Def Leon Valley Bates No. 0102-0109.

3.     The only use which is not permitted in a B-2 zone which the Plaintiff wishes to perform is the ability to hold church services at that location. Ex. C Def Leon Valley Bates  No. 104. Zoning by itself is not a substantial burden. *Petra Presbyterian Church v. Village of Northbrook,* 489 F.3d 846, 851 (7th Cir.2007). The ban on churches in a particular zone cannot, in itself, constitute a substantial burden on religion, because "then every zoning ordinance that didn't permit churches everywhere would be a prima facie violation of RLUIPA." *Id.* at 851.

Much more is required.     Other locations exist which permit the Plaintiff to hold church services within the City. Ex. A, Crain Depo p. 247.  In fact, the Plaintiff had a lease at another location which permitted church services up until February of 2009, when it voluntarily relinquished the lease.  Ex. A, Crain Depo pp. 181-183.  The Plaintiff is not precluded from holding services within the City, only within the B-2 zone.

4.     According to the Plaintiff, it was not cost effective to utilize any other locations or to continue with a secondary lease. However, no case applying any of the Free Exercise tests holds that a City is required to change its laws in order to allow a more economical use of property for religious purposes.  Simply because an option is not cost effective for a religious organization does not mean it creates a substantial burden.   A substantial burden is one which renders religious use of the property effectively impractical under the regulations. The ability to perform all but one of their desired religious activities and still having alternative locations to hold church services does not equate to a substantial burden on the Plaintiff under the law.

5.     Further, under RLUIPA, no individualized assessment existed with regards to the Bandera Road property.  Without even having to analyze the "substantial burden" requirement, if no individualized assessment occurred regarding a land use regulation, one of the primary protections under RLUIPA disappears.  The Plaintiff is correct in that no Specific Use Permit ("SUP") is possible for church services in the B-2 zone.  Churches are allowed anywhere within a B-3 zone as a matter of right.  The current owner of the Property, Gold Star Trust, on behalf of the Plaintiff, filed for an application to rezone (essentially a request to change the law as it currently exists) from a B-2 zone to a B-3 zone.  A request to change the law from its current status (i.e. rezone) is not an individualize assessment.

6.    Additionally, the zoning classifications designed by the City are focused on keeping like uses together, a foundation point to zoning. The reclassification of various different uses (churches and others) out of the retail zone and into the more similar commercial zone, does not amount to discrimination, unequal terms, or an Equal Protection violation. A comparison of the different uses shows no similarly situated uses are treated better than the Plaintiff's desire for church use along a primarily retail oriented corridor.

## BACKGROUND AND FACTS

7.    The City of Leon Valley is a general law municipality duly incorporated under the laws of this State, and its territorial limits are completely encircled by the City of San Antonio, Texas. Ex. B. The City currently has a population of 9,239 and is relatively small in size. Ex. B.

8.    In 1996, a religious organization known as "Church on the Rock" requested a SUP allowing them to construct a church building and administration building on the property located at 6401 Bandera Road, in the City of Leon Valley, Bexar County Texas. Ex. B. At the time the property was zoned "B-2" and a church could only operate in that location by obtaining a SUP. Ex. B; Ex. D Def Leon Valley Bates No. 00449. The B-2 zone is now, and always has been, a retail zone. On June 18, 1996, the City Council approved Special Use Permit 96-141 for the Church on the Rock and it operated as a church at that location for several decades. Ex. B. The property consisted of a domed shaped building as the main auditorium, an administration building, and a parking lot. Ex. A, Crain Depo, p. 59 [Exs. 1-4 of Depo].

9.    On November 4, 2003 the City amended its Master Plan which clearly indicated it desired to have a focused retail corridor along Bandera Road. Ex. J; Ex. L Def Leon Valley Bates No. 00562. However, that Master Plan was more general in nature and the City began wanting

even more focus so it directed staff to revise the plan to include comprehensive steps and an action plan to promote solutions to infrastructure problems, economic development including retail development, enhance public safety, and adapt the plan to the current development trends being experienced by the City, including more specific zoning direction and encouragement of like uses.  Ex. J.  As part of this initiative, on March 3, 2007, the City Council amended the Leon Valley Zoning Code (Ordinance 07-13) which specifically revised the B-2 use classification and, among other things, prohibited church use in any B-2 retail district zone.  Ex. C Def Leon Valley Bates No. 104; Ex. J.  Churches were not the only use reclassified out of the B-2 zone. Numerous land uses previously allowed under the prior Zoning Codes were reclassified in 2007 out of the B-2 zoning district, such as churches, outdoor theaters, ambulance services, cemeteries, suite hotels, and air conditioner repair.  Additionally, uses previously precluded or restricted in the B-2 zone were allowed as a matter of right such as book stores, grocery stores and convenient stores.  Ex. C Def Leon Valley Bates No. 102-109; Ex. J.

10.     Churches are now only allowed in B-3 commercial district zones, which were better suited for higher congestion. Ex. B; Ex. C Def Leon Valley Bates No. 104; Ex. J. Churches tend to be more akin to commercial establishments in relation to parking, occupancy, and traffic impact.[1]  The make-up of the Bandera Road area had changed since the zoning classification was originally designed. Ex. B.  As a result, a more focused retail corridor was desired so the City Council altered the B-2 classification accordingly.

11.     Even though church use was no longer permitted in a B-2 zone, since the Church on the Rock had obtained a SUP, their use was considered pre-existing.  Ex. J.  The Church on the Rock was allowed to continue the use until such time as the use expired.  On July 1, 2007,

---

[1] There is a large practical difference on the effects from a retail establishment which has a certain number of visitors throughout the entire day, and a establishment such as a church which can have a large number of people arrive at exactly the same time and leave at exactly the same time.

due to financial difficulties, the Church on the Rock abandoned the church at that location.  Ex. B; Ex. J.   According to Pastor Crain, they relocated to another area of San Antonio where rent was cheaper.  Ex. A, Crain Depo p. 84-85.  On September 4, 2007, through a foreclosure process, Happy State Bank d/b/a Gold Star Trust Company ("the Bank") took ownership of the property.  Ex. B.  However, the Bank was unable to either sell or lease the property to allow the church use to continue within the allowed time window.  As a result, under Section 30.405 of the City's Zoning Code, on October 1, 2007, one hundred and twenty (120) days after the Church on the Rock abandoned the use, the use lapsed.  Ex. B; Ex. C Def Leon Valley Bates No. 048.

12.    The Bank was none too happy about the lapse in use and sent numerous letters challenging the lapse asserting RLUIPA violations, even when no religious organizations with standing to make such a claim were involved.  Ex. B.  Despite the lapse in the 1996 Special Use Permit, the Bank put the property up for auction in October of 2007 and solicited churches.  Ex. A, Crain Depo p. 83 & pp. 86-89.   The Bank received several bids ranging from $575,000 from non-religious organizations and $1,330,000 from the Plaintiff.  Ex. E.  On January 4, 2008, the Bank and the Plaintiff entered into a contract for sale of the property. Ex. A, Crain Depo p. 95 [Ex. 5 to Depo].  The anticipated closing date was forty-five days from the date of acceptance. Ex. A, Crain Depo p. 95 [Ex. 5 to Depo].  The contract was contingent, however, upon the Bank obtaining a zoning change to permit the Plaintiff to operate a church at that location. Ex. A, Crain Depo p. 95, pp. 101-102, pp. 129-131 [Ex. 5 to Depo].  If the Bank is unable to obtain the zoning change, the Plaintiff is relieved of its obligation to purchase the property. Ex. A, Crain Depo pp.108-110.

13.    According to Pastor Crain's testimony, the Elijah Group knew going into this arrangement that zoning was going to be an issue.  Ex. A, Crain Depo pp. 101-102, & pp. 129-

131.    This is not a situation where the Church purchased the property and simply was not aware of the City's zoning restriction.  The Plaintiff knew before it even bid on the property that church use was prohibited at the Bandera Road property and that there would be legal issues regarding that use.  Ex. A, Crain Depo pp. 101-102, p. 104, lines 18-24, p. 109, lines 1-5, p. 110, lines 8-11 & pp. 129-131.

14.    On November 29, 2007, pursuant to its agreement in the purchase contract, the Bank filed an application to rezone the property from a B-2 retail district zone to a B-3 commercial district zone.  Ex. A, Crain Depo, p.106. lines 8-13; Ex. B.  Pastor Crain admitted that he understands that a zoning ordinance is, in fact, a law and that he and the Bank were asking the City to change the law.  Ex. A, Crain Depo p. 113.  However, this application was not to include churches in the B-2 zoning classification but was a request to change the property's zone entirely to B-3, a zone which has never applied to that property. Ex. B.

15.    At the Zoning Commission meetings, Pastor Crain testified there was considerable public outcry against the rezoning from citizens.  Ex. A, Crain Depo p. 108.  He noted it was the citizens who commented on the loss of tax revenues due to the church use as grounds to deny the request.  Ex. A, Crain Depo p. 107-08; Ex. M.  However, Pastor Crain felt that since the Commissioners listened to the citizens and ultimately denied the request, that reasoning must have been part of the basis.  Citizens also commented that they did not want the property zoned B-3 as it would allow other types of uses such as strip clubs or refineries should this church also fail. Ex. A, Crain Depo pp. 127-128.   As the minutes of that meeting indicate, citizens did make comments regarding tax exempt status, but also made comments regarding allowing other uses from B-3 into the area. Ex. M. The Commissioners noted that the City worked long and hard on the zoning districts and it made no sense to change the Bandera Road

corridor to a B-3, which it had never been. Ex. M. Vice-Chair Phelps noted that the determination to remove churches from B-2 was also made based on placing all like uses with large gatherings of people into the same district. Ex. M. Staff noted that all assembly and gathering types of uses were grouped into B-3. Ex. M.

16.     City Staff noted for the Commissioners that rezoning the property to B-3 was inconsistent with the Master Plan of the City.  Ex. A, Crain Depo p. 108, lines 3-8; Ex. B; Ex. M. Specifically, B-3 is for commercial use and is designed for heavier congestion.  Ex. B; Ex. C. Def Leon Valley Bates No. 093-95; Ex. J.  The B-3 commercial classification is primarily located inside Loop 410 and along Reindeer Trail, Wurzbach and Crissom roads.[2] Ex. J; Ex. K. The Bandera Road corridor was always designed to be a retail corridor.  Ex. J.  The City Council had a specific vision of having the corridor retail the standard for that area. Ex. J; Ex. K.

17.     On February 28, 2008, the City's Zoning Commission recommended denial of the rezoning request. Ex. M.  On March 4, 2008 the Leon Valley City Council upheld the Zoning Commission's recommendation and denied the request. Ex. B.  After the denial, the Plaintiff approached the Bank about leasing the property as opposed to purchasing it.  Ex. A, Crain Depo pp. 135-136.  The Plaintiff and the Bank apparently now have an agreement to lease the property for $1,000 per month, until such time as the issue of church use is resolved in this litigation. Ex. A, Crain Depo p.141.

18.     Given the financial hardship of the prior tenant (i.e. Church on the Rock), regular maintenance and repairs were neglected for the property and it had fallen into disrepair.  Ex. A,

---

[2] Several B-3 parcels which were zoned years ago, still remain on Bandera Road due to existing uses which have not changed and many are retail in nature which were allowed in either B-2 or B-3 at the time of their development. Such straggling B-3 parcels on Bandera Road are few and far between and have simply not been rezoned to date due to various factors including minimal impact on the Bandera Road corridor. Had the Bank been able to continue the use without it lapsing, the church use would have been permitted to continue, even though it was inconsistent with the Master Plan.

Crain Depo pp. 90-91.  Additionally, as the buildings located on the property had sat vacant for over a year, they became the victims of vandalism. Ex. A, Crain Depo pp. 91-92.  Several minor structural points were damaged, such as broken windows, doors and locks.  However, the most severe vandalism was the fact all of the copper wiring had been stripped from the building and needed to be replaced. Ex. A, Crain Depo pp. 91-92 & p. 142.

19.    On September 9, 2008, the Plaintiff, under the name "Restoration d/b/a RTM INC. Alwar," filed an application for a certificate of occupancy to use the administration building on the property as an elementary school and daycare for educational training.  Ex. A, Crain Depo pp. 171-173; Ex. B.  At that time, no application was made for use of the domed building.  Regardless of whether or not the ownership is a religious organization or not, day care use is permitted in the B-2 zone. However, before repairs could be made on the property, the owner/tenant must obtain a certificate of occupancy so utilities can be connected. Ex. B.

20.    On a side note, for the court's edification and a preemptive explanation to some confusion in the exhibits, the Elijah Group Inc. had not been incorporated at the time of the certificate of occupancy application. Ex. A, Crain Depo p. 173.  Pastor Crain was the prior director of Redemption Tabernacle Ministries, Inc. which was a denominational branch of the Church of the Nazarene. Ex. A, Crain Depo p.13.  Pastor Crain and his congregation split from the Nazarene Church and created a non-denominational church, but did not incorporate initially. Ex. A, Crain Depo pp. 17-19.  The contract for purchasing the Bandera Road property and the lease afterwards are not in Elijah Group's name, but are in fictitious names with no legal entity connection. Ex. A, Crain Depo [Exs. 5, 6, 8, 9 to Depo].    When Pastor Crain was informed by the Nazarene Church that his new congregation could not use the name Redemption Tabernacle Ministries, Inc., he and his group went back and forth regarding what name to use, before

eventually settling on the Elijah Group. Ex. A, Crain Depo pp. 20-21. As a result, numerous documents within this lawsuit have multiple names attached, other than the Elijah Group.[3]

21.     Prior to moving into the Bandera Road property, the Plaintiff had a lease located at 8323 Culebra Road, where they had operated since 2006.  Ex. A, Crain Depo p. 17 & p. 23. Both church and day care services were being conducted on Culebra Road. Ex. A, Crain Depo pp. 21-22.   When the Plaintiff relocated to the Bandera Road location, it kept the month-to-month lease on Culebra Road and continued to operate its day care service from that location. Ex. A, Crain Depo p. 186.  However, nothing prevented the Plaintiff from also using the Culebra Road building for church services.  Ex. A, Crain Depo pp. 186.  Plaintiff continued to retain and utilize the Culebra location even after it filed this lawsuit.  It was not until February 1, 2009 that the Plaintiff voluntarily relinquished the lease, despite requests from the landlord to enter into a written lease. Ex. A, Crain Depo pp. 181-183 & p. 186.  In February 2009 the Plaintiff sold the Culebra Road day care and lease to Pastor Crain's Father-in-Law for $2,250 who continues to operate the day care at that location to date.  Ex. A, Crain Depo pp. 187-188.

22.     With regards to the Bandera Road location, the City's Building Inspector, Bruce Bealor, granted a <u>temporary</u> certificate of occupancy for the administration building on Bandera Road in order to allow repairs on September 14, 2009 with the final certificate being contingent upon approval by the City's Fire Marshal.  Ex. A, Crain Depo p. 177.  According to Pastor Crain, the Fire Marshal would not inspect the property so he went ahead and moved his congregation into the Bandera Road property anyway.  Ex. A, Crain Depo p. 167 & p. 180.  Fire Marshal

---

[3] This raises a standing issue as to whether or not the only named Plaintiff, Elijah Group, Inc. has standing to assert all of the various claims and rights.  It is the Plaintiff's burden to establish standing. The entities involved, while all apparently run by Pastor Crain, are either separate legal entities or non-existent jural entities which cannot bring suit.
[4] It is important for context to note that Civil Liberties started out as a challenge under both the substantial burden provision as well as the discrimination provision based on the SUP application.  However, afterwards, the City of Chicago amended hits zoning ordinances and placed all churches on equal footing, thereby eliminating the discrimination claim under RLUIPA. *Id* at 762.

Valdez testified that since church use was not authorized, he was instructed not inspect the facility until an application designating the proper use was submitted.  Ex. F pp. 28-29.  Pastor Crain testified he always intended to use the facility for church services, (as well as day care services), even after losing the request to rezone. Ex. A, Crain Depo p. 176, lines 2-4.  As a result, Fire Marshal Valdez was justified in not inspecting at that time.  However, later, Fire Marshal Valdez was informed by the Plaintiff that they only intended to conduct day care services, with no church services. Ex. F pp. 29-31. As a result, made plans to inspect the property.

23.    However, instead of conducting day care services, as applied for and told to Fire Marshal Valdez, they began conducting church services.  Ex. A, Crain Depo p. 180, lines 17-22. Fire Marshal Valdez even witnessed church services being conducted prior to his fire inspection. Ex. F p. 31, lines 9-13.  The Plaintiff never applied for a certificate of occupancy for church use at all. Ex. A, Crain Depo p. 197, lines 11-15.  At that time, neither use had received and passed a fire inspection.  The Plaintiff was putting its congregation at risk.

24.    Once the City discovered the Plaintiff was conducting church services in the prohibited zone and without a fire inspection or certificate of occupancy, the City advised the Plaintiff of the violation. Ex. B.  The City's Fire Marshal inspected the property and noted numerous fire violations (some very minor, others not so minor) for the day care use and did not authorize the certificate of occupancy for day care use. Ex. B [Fire Inspection Report].  One of the most notable was the need for a sprinkler system. Ex. B.  Further, even though the application did not list church services as a use, the Fire Marshal noted the property was unsafe for even church use as the facility did not have a working, inspected or monitored fire alarm.  Ex. F, pp. 13-14, 22-24.   Should a fire erupt at the location, anyone on the property could be in

danger since no fire department would be called, even if the alarm itself is sounding. However, despite this dangerous situation and numerous warnings from the City, the Plaintiff continued to conduct church services at that location.

25.    Even after this court ordered all services to cease pending fire code compliance, and a written agreement between attorneys, the Pastor Crain connected electrical lines to pull power from the building and conducted church services in the parking lot. Ex. A, Crain Depo pp. 200-201& 203-205; Ex. G. However, after approximately two weeks, the Plaintiff was able to get a monitored fire alarm and the court's temporary restraining order lapsed. [Docket 8, Ex. A]. The Plaintiff did not install a sprinkler system, so no day care services, as applied, could proceed. [Docket 8, Ex. A]. However, the Fire Marshal advised the Plaintiff that no sprinkler system is required if the day care use only serves children over the age of two and one half years old. Ex. A, Crain Depo. p. 182, lines 1-7. The Plaintiff modified its application for a certificate of occupancy for a day care only with this restriction and the City granted the certificate for that use. Ex. H.

26.    Despite not having a certificate of occupancy for any church use, the Plaintiff continues to conduct church services at the Bandera Road location to date. The City has not written any citations against the Plaintiff as it seeks to resolve the right of use in this litigation. Ex. B.

27.    In addition to conducting church services on Sundays and Wednesdays, the Plaintiff conducts numerous other religious activities at the Bandera Road location which are permitted under the City's zoning classifications. The Plaintiff offices its TCAL activities out of the Bandera Road location, which is permitted. Ex. A, Crain Depo, pp. 37-44, 173, & 220.    The City granted a certificate of occupancy for day care services in February of 2009 and the Plaintiff

is permitted to conduct such activities at that location under current zoning regulations. Ex. C Def Leon Valley Bates No. 0104; Ex. H.  The Plaintiff has not opened the day care yet as it wishes to wait for the next semester to begin. Ex. A, Crain Depo, p. 219, lines 18-21.  The Plaintiff conducts numerous types of counseling services at the Bandera Road location including juvenile, adult, marriage, and even substance abuse counseling.  Ex. A, Crain Depo pp. 33-34, p. 36, lines 3-5, p. 37, lines 1-4, pp. 44-45, p. 75, p. 219, pp.  225-227 & pp. 236-37.   The Plaintiff was granted a temporary certificate of occupancy for administrative offices in the domed building and at the time of Crain's deposition, was awaiting final approval once certain fire code violations are cured.  Ex. A, Crain Depo, p. 220, lines 15-25.  Final certificate has since been issued and the domed building is authorized for administrative use to handle all of the Elijah Group's religious administrative needs. Ex. I. However, despite the ability to conduct numerous religious activities at the Bandera Road location, the Plaintiff insists that the City's prohibition on conducting church services creates a substantial burden on its religious practices. Such is not the case.

## ARGUMENTS AND AUTHORITIES

### A.    RLUIPA - NO SUBSTANTIAL BURDEN

28.    The Plaintiff can still conduct numerous religious activities which are part of its religious purpose (i.e. day care, counseling, and TCAL administration) at the Bandera Road location.  The Plaintiff has several alternative locations in order to conduct church services besides the Bandera Road location.  In fact, the Plaintiff maintained a lease on Culebra Road and was requested by the landlord to sign a written lease locking in the location prior to filing this lawsuit.  Church services could have continued to occur at that location.  However, the Plaintiff chose not to do so, citing financial reasons.  The Elijah Group's current lack of a location to hold

church services is entirely a situation caused by the Plaintiff which did not need to exist and did not exist at the time suit was filed.

29.     Pastor Crain noted there were two other locations which could serve the Plaintiff's church needs; specifically an old Petco building and a warehouse. Ex A, Crain Depo, p. 243 & p. 247.   However, to him, the cost to renovate either building was too expensive. Ex A, Crain Depo, p. 247.   Pastor Crain made it clear the primary need for the Plaintiff to have THIS building on Bandera Road and conduct all activities thereis simply a matter of dollars.   Ex A, Crain Depo, p. 247.

30.     If the Plaintiff is unable to obtain the legal right to use the Bandera Road property for church use, the Plaintiff is not locked into a large mortgage.   The Plaintiff is free to walk away from the purchase all together or re-negotiate the price consistent with the allowed uses. Ex. A, Crain Depo, p. 108, lines 18-24, p. 109, lines 1-5, & p. 110, lines 8-11.   However, the current owner, Gold Star Trust ("the Bank") does not want its deal to fall through.

31.     According to the Bank's documents produced in discovery, the non-religious bidders on the property were offering less than half ($575,000) of what the Plaintiff offered for the purchase ($1.33 Million).   Ex. A, Crain Depo, p. 88, lines 13-14; Ex. E.   There were non-religious entities bidding for the property, as well as religious entities desiring to use the property for classrooms.   Ex. A, Crain Depo, p. 89, lines 16-23 & p. 90. The Bank wishes for the sale to go through in order to maximize on the purchase price.   More than likely, this is one of the primary reasons the Bank is paying for the Plaintiff's attorney's fees in this case.   Ex. A, Crain Depo. p. 272, lines 8-18.

32.     However, the ability to maximize profits or the fact that certain legal land use requirements make a desired activity more expensive, even cost prohibitive, does not equate to a

substantial burden under RLUIPA.  A land-use regulation that imposes a substantial burden on religious exercise is one "that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property for the purpose thereof within the regulated jurisdiction generally-*effectively impracticable*." *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003)(Emphasis Added).   In the "Free Exercise" context, including RLUIPA jurisprudence, the Supreme Court and various courts of appeal have made clear that the "substantial burden" hurdle is high and that determining its existence is fact intensive. *Living Water Church of God v. Charter Tp. of Meridian*, 258 Fed.Appx. 729, 734, 2007 WL 4322157 *5.

33.     In *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752 (7th Cir.2003), the Seventh Circuit applied RLUIPA's  "substantial burden" provision in the context of requests by Chicago area churches for special use permits.[4]   The churches claimed that the City's zoning ordinance violated RLUIPA's  "substantial burden" provision by requiring them to obtain special use permits in order to establish a church in any of the non-residential districts of the City. *Id.* at 755. They argued that the scarcity of affordable land available for development in R zones, along with the costs, procedural requirements, and inherent political aspects of the approval processes for special use permits, imposed a substantial burden on the free exercise of religion within the meaning of RLUIPA. *Id.* at 761. But while the Court acknowledged that the conditions cited may have made the religious exercise of their members more difficult, it rejected the claim that the burden created by the City's zoning code was substantial. *Id.*

34.     Based upon this definition of "substantial burden," the *Civil Liberties* court concluded that the plaintiffs' claim failed stating:

> [W]e find that these conditions-which are incidental to any high-density urban land use-do not amount to a substantial burden on religious exercise. While they

may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago. *Id.*

35.    The Court found it significant that each of the churches had managed to find other locations. The fact they expended considerable time and money to do so did not entitle them to relief under RLUIPA.

36.    In *Petra Presbyterian Church v. Village of Northbrook,* 489 F.3d 846 (7th Cir.2007), the Court rejected a church's claim that a zoning ordinance that excluded churches from industrial zones violated RLUIPA.   The Court noted that zoning itself cannot be a substantial burden. *Id* at 851.   "When there is plenty of land on which religious organizations can build churches (or, as is common nowadays, convert to churches buildings previously intended for some other use) in a community, the fact that they are not permitted to build everywhere does not create a substantial burden." *Id.*

37.    Numerous Free Exercise cases hold over and over again that mere expense or inconvenience does not amount to a substantial burden. *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *see also  Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 987 (N.D.Ill.2003) (holding that "monetary and logistical burdens do not rise to the level of a substantial burden"); *Vision Church v. Village of Long Grove,* 468 F.3d 975, 999 (7th Cir.2006); *Calvary Temple Assembly of God* at *9 (holding that cost and inconvenience do not rise to the level of a substantial burden); *Stuart Circle Parish v. Board of Zoning Appeals of Richmond,* 946 F.Supp. 1225, 1237 (E.D.Va.1996) ("It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'") (quoting *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6

L.Ed.2d 563, (1961) (plurality opinion)).

38.    The Bandera Road location has not been rendered "effectively impractical" for use by a religious organization.  *Civil Liberties,* 342 F.3d at 761.  The Plaintiff is currently utilizing the property to operate its TCAL religious activities, its counseling activities, and has authority for use as a day care.  These uses are consistent with the retail corridor concept of the City.  Pastor Crain testified the Elijah Group voluntarily relinquished a location it could have utilized for church meetings and which offered to sign a written lease, but which the Plaintiff chose not to take.  He also testified to at least two other locations which could be converted but which were too expensive.  The fact the Plaintiff desires to utilize this property and only this property because he feels it is the only "perfect" property out there does not amount to a substantial burden.

39.    Further, contrary to the Plaintiff's assertion, the City's reasoning for prohibiting churches in the B-2 zone is not focused on tax revenue.  The mere fact that the Plaintiff is permitted to conduct numerous other religious activities (day care, counseling, have administrative offices) for which the City still does not receive any property tax revenue eliminates the Plaintiff's argument.  If the Plaintiff ends up purchasing the property from the Bank the Plaintiff should be exempt from property taxes and permitted to continue with the legal uses listed above.

40.    The City removed churches from the B-2 retail zone as a matter of right years prior to the Plaintiff's bid.  The City removed them entirely from the B-2 retail zoning classification in July of 2007, as it was attempting to focus the Bandera Road corridor as a pure retail area.  Ex. C; Ex. J. As the City's zoning map indicates, Bandera Road is primarily retail.  Ex. J; Ex. K.  B-3 zones, which permit churches as a matter of right, are geared more towards

like uses, with heavier congestion. Ex. J.  Protecting the character, stability, order, and efficient development of varied areas, preventing overcrowding, limiting street congestion, and conserving "the taxable value of city land" have all been held to be legitimate and important governmental interests and constitutionally permissible regulations for zoning. *Civil Liberties* 342 F.3d at 766.  As a result, even if tax revenue were the primary motivation, which it is not*, such a purpose is still permissible under RLUIPA, TxRFRA and the First Amendment.  The City is entitled to create a retail corridor for retail purposes and to not rezone sections of that corridor inconsistent with its purpose.

41.    Cities are permitted to create districts and zones through their zoning power to advance specific governmental interests.  *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3rd Cir. 2007).  In *Lighthouse*, the City of Long Branch adopted a redevelopment plan "in order to achieve redevelopment of an underdeveloped and underutilized segment of the City. *Id* at 258.  It strictly limited the use of properties in the "Broadway Corridor" and focused the corridor for retail and entertainment purposes. *Id*.  The City aimed to encourage a "vibrant" and "vital" downtown community centered around main street.  Primary uses in that sector included theaters, cinemas, culinary schools, dance studios, music instruction, theater workshops, fashion design schools, and art studios and workshops.  Restaurants, bars and clubs, and specialty retail (including book and craft stores), among others, were allowed as secondary uses.  Churches were not listed as a permitted use, nor were schools or government buildings; the Design Guidelines under the Plan provided that "[a]ny uses not specifically listed" were prohibited. *Id*.  The Lighthouse Institute of Evangelism sued under both the substantial burden provision and the unequal terms provision of RLUIPA for not permitting churches in the Broadway Corridor.  The Third Court of Appeals held that the church use was inconsistent with

the legitimate and stated goals of the corridor plan and did not amount to a violation of any Free Exercise of religion.[5]

42.     The City of Leon Valley created the Bandera Road corridor as THE primary retail corridor in the City.  It is undisputed that church use is not a retail use.  As illustrated by the zoning map, Bandera Road is the main retail corridor for the entire City. Ex. K.  Keeping the corridor retail in nature without rezoning to commercial is within the powers and the purpose of the zoning classification and is not inconsistent with RLUIPA.  The City has not only a legitimate, but a compelling governmental interest in keeping like uses in the same zone.

**B.     RLUIPA - NO INDIVIDUALIZED ASSESSMENT**

43.     Even if the City's restrictions were to impose more than merely a monetary burden or inconvenience on the Plaintiff, the substantial burden prohibition under RLUIPA still does not apply to them in this case.  RLUIPA specifically states the substantial burden prohibition only applies when "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, *individualized assessments* of the proposed uses for the property involved." 42 U.S.C. 2000cc(A)(2)(c)(emphasis added).  The failure to rezone property is not an individualized assessment.

44.     While no U.S. Fifth Circuit case or Texas case has addressed this exact issue, other courts have.  In *Greater Bible Way Temple of Jackson v. City of Jackson*, 733 N.W.2d 734 (Mich. 2007), the Michigan Supreme Court decided a RLUIPA case where a religious

---

[5] The court specifically held that the zoning law was neutral and generally applicable, and thus was subject to rational-basis rather than strict-scrutiny standard in free exercise challenge, in that it was not developed with aim of infringing on religious practices, and, although it allowed certain categories of secular assemblies, it applied evenly to all uses that were not likely to further city's goal of revitalized downtown. *Lighthouse* at 275.

organization filed suit against the city after the city denied the landowner's rezoning request. After a detailed analysis the Court noted that a rezoning request was not an individualized assessment for RLUIPA purposes. *Id* at 743. Zoning, by definition, applies to the entire community, not just a particular property owner. *Id.* A request to rezone a particular piece of property may be differentiated on the basis that such a determination is narrowly confined to a particular piece of property, however, it still applies to the "entire community." *Id* at744 fn. 12. That is, the "entire community" would be bound by the city's decision to rezone or not rezone the property. An "individualized assessment" is an assessment based on one's particular circumstances, not one which affects the entire community. *Id*. at 743. The court, citing to the Ninth Circuit, noted that "RLUIPA applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use." *Guru Nanak Sikh Society of Yuba City v. Sutter Co.,* 456 F.3d 978, 986 (C.A.9[th] 2006). Rezoning applications are not individualized assessments for RLUIPA purposes.

45.    The Bank filed an application to rezone from B-2 to B-3. This was not an SUP application or a variance affecting only the Bank's property. It was not a request limited only to use by the religious organization known as the Elijah Group. The Bank did not request the church use be reinserted into the B-2 zone (which would still not be an individualized assessment). The Bank requested that the law applicable to a large variety of properties (B-2) be altered and that the Bank's specific piece of property be rezoned as B-3. The City determined it was in the City's best interest to leave the law "as is." It is not an individualized assessment to deny a change in the zoning law to something it has never been before. This was not a subjective assessment just for the Bank. A change in zoning to B-3 would open the property to any B-3 use, not just church use, including refineries and topless strip clubs. Even Pastor Crain admitted

20

that was a concern expressed during the Zoning Commission Meetings.  Ex. A, Crain Depo pp.

127-128.

## C.    RLUIPA – NO DISCRIMINATION

46.    Realizing the Plaintiff has an uphill battle under the substantial burden claims, the

Plaintiff turns to essentially all other provisions of RLUIPA trying to force a rezoning. The

Plaintiff asserts the City is treating other assemblies better than the Plaintiff.  However, none of

the other non-religious entities listed by the Plaintiff are "similar" in proposed use as required

under RLUIPA and numerous higher congestion, non-retail oriented assemblies are likewise not

permitted in B-2.  Numerous uses, including churches, were reclassified out of the B-2 retail

zone definition, including outdoor theaters, cemeteries, suite hotels, printing and reproduction

services and other assemblies.  Ex. J. The purpose of the reclassification was to narrow the retail

focus in the B-2 zone, as well as group larger uses with higher congestion into B-3 areas.  Ex. J.

Small inns are allowed in B-2, while larger hotels and motels are not. Ex. C. Def Leon Valley

Bates No. 00106.  Dance halls are not permitted in a B-2 retail zone. Ex. C. Def Leon Valley

Bates No. 00104. Indoor and outdoor entertainment uses are only allowed with a SUP to ensure

compatibility with the retail corridor zoning concept.  Ex. C. Def Leon Valley Bates No. 00105.

Vocational and university schools are also not permitted in the B-2 retail zone.  Ex. C. Def Leon

Valley Bates No. 00108-09.  The uses permitted and not permitted in the B-2 retail zone stem

from the retail nature and are not discriminatory in nature.  Church use tends to mirror larger

commercial effects such as increased parking, traffic congestion and occupancy.  Further, the use

is not retail in its nature.  However, the day care services, counseling services and administration

uses permitted are closer to retail and are therefore permitted regardless of the religious nature.

47.     The Plaintiff states that if the bowling alley is in the same B-2 zone as the Plaintiff, then the Plaintiff should still be permitted as a church.  Ex. A, Crain Depo p. 250.  The bowling alley in question has been around for decades and is pre-existing; however, it is an indoor entertainment allowed only with an SUP to allow conformity with the retail concept.  Ex. C. Def Leon Valley Bates No. 105. The Plaintiff also believes that if the Taco Cabana, Pizza Hut, and game shops seen on Bandera Road can exist as assemblies, so should the Church.  Ex. A, Crain Depo p. 252, lines 3-7.   These are not similarly situated assemblies; they are retail oriented in nature, unlike church use.  The effects on parking, traffic and occupancy are nothing like that generated by the Plaintiff's congregation.

48.     The City has not enacted a land use regulation which discriminates against a religious organization.  In fact, as already argued, the Plaintiff, as a religious organization, can still conduct numerous religious activities at the Bandera Road location including counseling, day care, and TCAL administration.  Even though the activities are religious in nature, they are more aligned with retail uses (if they were performed by for-profit, secular entities) and therefore are entitled to remain in the B-2 zone.  As a result, no discrimination has occurred.

## D.    RLUIPA – EQUAL TERMS

49.     "For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is 'similarly' situated to the other, as in our familiar equal protection jurisprudence." *Konikov v. Orange County,* 410 F.3d 1317, 1324 (11th Cir.2005).  Under RLUIPA's Equal Terms provision a plaintiff must do something more than identify *any* nonreligious assembly or institution that enjoys better terms under the land-use regulation; it must point to a secular comparator that proposes the same combination of uses.  *Lighthouse*, 510 F.3d at 264.  Plaintiff cannot point to

any secular comparator.

50.    In *Lighthouse*, the City of Long Beach permitted assemblies such as theaters, entertainment stores, restaurants, bowling alleys and other commercial uses in the Broadway Corridor, but excluded churches and other non-commercial uses. *Id.* at 257.  As the Third Circuit Court of Appeals noted:

> [W]hen drafting the Equal Terms provision, Congress intended to codify the existing jurisprudence interpreting the Free Exercise Clause. *See* 146 Cong. Rec. S7774 (July 27, 2007) (Senate Sponsors' statement) (sections 2(b)(1) and (b)(2) "enforce the Free Exercise rule against laws that burden religion and are not neutral and generally applicable"). Under Free Exercise cases, the decision whether a regulation violates a plaintiff's constitutional rights hinges on a comparison of how it treats entities or behavior that have the same *effect* on its objectives.
>  *Id* at 264.

51.    Under the Equal Terms provision of RLUIPA a court must take into account the challenged regulation's objectives: a regulation will violate the Equal Terms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose. Id* at 266.  In *Lighthouse*, the bowling alley, restaurants and other permitted assemblies were geared towards the purpose of the downtown area, while churches were seen as inconsistent with the entertainment purpose of that area.  As a result, churches were not similarly situated to the other assemblies based on the regulatory purpose and no unequal terms existed. *Id*.   In this case, the Taco Cabana, bowling alley, and other assemblies listed by the Plaintiff are not similarly situated to the church use.  They are more in line with the retail corridor and like uses desired by the City.

52.    Further, the alleged "better treated" uses listed by the Plaintiff are all B-2.  The Plaintiff is arguing the City did not rezone the proper in question to B-3 (Commercial).  If Plaintiff believes it is entitled to be B-3, it cannot utilize B-2 assemblies as a comparator.  The

Plaintiff has been unable to point to a similarly situated like use which is entitled to better terms than the Plaintiff along the Bandera Road corridor.   The Plaintiff is entitled to lease the property on Bandera Road and conduct religious activities which are similar to B-2 activities, such as day care, counseling, and TCAL administration.  The Plaintiff is not entitled to conduct B-3 activities (church sermons and assemblies) in the Bandera Road retail corridor.  The Plaintiff can conduct B-3 church assembly activities in any of the B-3 zones within the City.   Requiring this distinction to advance the retail corridor is not an Equal Term's violation.

### E.      NO UNREASONABLE LIMITATION

53.     The City's zoning regulations do not place any unreasonable limitations on the Plaintiff's ability to conduct religious activities.  As noted numerous times, they can still conduct various religious activities at the Bandera Road location.  They can relocate to any B-3 zone. They voluntarily relinquished a lease which permitted them to conduct church services.  The limitations placed upon the Bandera Road properties are consistent with the retail corridor concept.  The Plaintiff is not entitled to change the entire retail corridor concept by forcing a rezoning to B-3 commercial in order to hold church services in that specific location.  The limitations based on the land use regulations are not unreasonable and do not unreasonably limit the Plaintiff's religious abilities within the entire jurisdiction.

### F.      NO TxRFRA VIOLATION

54.     Plaintiff brings claims under the Texas Religious Freedom and Restoration Act ("TxRFRA").  The Plaintiff makes no additional allegations as to why there is a violation of TxRFRA separate and apart from the alleged violations of RLUIPA.  As already indicated, the City has not violated RLUIPA and therefore the same defenses apply to TxRFRA, particularly the "substantial burden" analysis.

55.     In the recent Texas Supreme Court case of *Barr v City of Sinton*, -- S.W.3d --, No 06-0074, slip op., 52 Tex. Sup. Ct. J. 871, 2009 WL 1712798 (June 19, 2009), the Court noted that the proper test under TxRFRA was to focus on the "degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression." *Id* at *10.  The Court, citing to U.S. Fifth Circuit precedent noted that a "government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Id* (citing *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). The Court noted the burden on religious exercise are "practical matters to be determined based on the specific circumstances of a particular case." *Id* at *12.

56.     Here, whether it is under RLUIPA, TxRFRA or the First Amendment, no substantial burden exists. The Plaintiff can utilize the property for religious purposes, can relocate to any B-3 zone within the City, testified that it was aware of at least two other locations to locate, and voluntarily gave up a location it could conduct services at AFTER it filed this lawsuit.  Under these circumstances the regulation is not "truly pressuring" the Plaintiff to significantly modify its religious behavior or beliefs. Under Free Exercise precedent, no substantial burden exists in this case.

## G.     FIRST AMENDMENT – NO RELIGIOUS DISCRIMINATION

57.     The First Amendment prohibits Congress from enacting any laws "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I.  The Free Exercise Clause applies to states and local governments through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The right to free exercise of religion is "first and foremost, the right to believe and profess

whatever religious doctrine one desires." *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990). The City's regulation do not prevent the Plaintiff from practicing its religion.

58. Unlike RLUIPA, which explicitly defines as religious exercise: "The use, building, or conversion of real property for the purpose of religious exercise," the Free Exercise Clause does not define land use as a religious exercise. *Lighthouse* 510 F.3d at 274. Numerous circuits have held that, when the plaintiff does not show that locating its premises in a particular location is important in some way to its religion and the area from which plaintiff's building is excluded is not large, there is no constitutionally cognizable burden on free exercise. *Id*; See also *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 654 (10th Cir.2006) (inability on the part of a church to open a day care center in a particular district did not constitute "more than an incidental burden on religious conduct"); *Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 824-25 (10th Cir.1988) ("[a] church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases"; it did not matter that the zoning regulations at issue had the incidental effect of making the church's exercise of religion more expensive because it was compelled to build elsewhere in the county); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 306-07 (6th Cir.1983) (where construction of building for worship had no ritualistic significance, a zoning ordinance prohibiting its erection in a residential district did not impose a substantial burden on the exercise of religion); *See Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 654 (10th Cir.2006) (inability on the part of a church to open a day care center in a particular district did not constitute "more than an incidental burden on religious conduct").

59.    The Plaintiff already testified that the primary reason for wanting to locate its church assemblies at this location is that it is the most economical choice for the Plaintiff because the location is "perfect."  Ex. A, Crain Depo pp. 268-269. The First Amendment does not guarantee the right to a perfect fit or use.  No religious connection is made to the specific location.  The Plaintiff can still conduct numerous religious activities at that location, just not holding services.  Services can be held in numerous alternative locations.  The Plaintiff actually voluntarily gave up a viable location after the filing of suit.  The City's zoning regulations are directly related to the retail corridor concept and further that concept with no similarly situated assemblies treated more favorably.  Rezoning a portion of the corridor is against that primary concept.  As a result, the Plaintiff's Free Exercise arguments under the U.S. and Texas Constitutions must fail.

## H.    FIRST AMENDMENT – NO FREE SPEECH VIOLATION

60.    The Plaintiff alleges the City's regulation interferes with their Freedom of Speech. However, when questioned as to how the zoning regulation impacts such freedom, the Plaintiff's response was that the fact Fire Marshal Valdez arrived at the Bandera Road location with a fire arm on his hip while they were conducting church services despite a court ordered injunction prohibiting such services until Fire Code violations were cured.  Ex. A, Crain Depo, p. 271. Pastor Crain testified he believes Fire Marshal Valdez had all the necessary authority and qualifications to have such a fire arm and that he never unholstered the fire arm.  Ex. A, Crain Depo pp. 202-203.   However, he believes that was a "major free speech" issue as he felt intimidated.  Ex. A, Crain Depo p. 202 & 271.

61.    The Plaintiff can practice its religion at the Bandera Road location and does so with its various permitted uses.  The fact an officer, who is authorized to carry a fire arm arrives

at the location, during an illegally held service and one which was specifically prohibited by court order to investigate, when the officer never draws the weapon and does nothing more than video tape the event, does not amount to an unreasonable restriction of the Plaintiff's Freedom of Speech.

62.    The Plaintiff was also unhappy the City made them get a sign permit and did not grant it a sign permit when requested.  Ex. A, Crain Depo p. 270.  The City did grant the Plaintiff a sign permit for their outside display.  Ex. A, Crain Depo 212; [Ex. 15 to Depo].  However, since the issue of church use was not authorized either by the Zoning Code or by the certificate of occupancy and no certificate of occupancy had been issued at the time, the banner sign request was denied.  The City still permitted the changeable copy sign to be utilized after the certificate of occupancy was issued.  Such a reasonable time, place, and manner restriction does not offend the First Amendment of the Plaintiff's Freedom of Speech.

## I.    FOURTEENTH AMENDMENT – NO EQUAL PROTECTION VIOLATION

63.    Enforcement of an otherwise valid zoning ordinance violates the Fourteenth Amendment's due process and equal protection clauses only if "(1) the decision of the particular zoning body is arbitrary; or (2) if the ordinance is applied or enforced with a discriminatory intent or purpose."  *Scudder v. Town of Greendale, Indiana,* 704 F.2d 999, 1002 (7th Cir.1983) (citation omitted). "A particular decision or action is 'arbitrary' if it is reached 'without adequate determining principle or was unreasoned.'"*Id.* (citation omitted). A reasoned application of a municipal ordinance is therefore not arbitrary. *Id.* at 1002.

64.    The City of Leon Valley has not only a legitimate but a compelling governmental interest in managing the overall plan and growth of the City through zoning regulations. The Bandera Road corridor has always been designed as THE retail corridor for the City and

connecting only like uses to that corridor is not only rationally related, but narrowly tailored to achieve that goal.  The decision to reclassify churches, as well as other assemblies into B-3 commercial is consistent with that goal.  Refusing to change the law and rezone the Bank's property to B-3 (a use it has never been zoned) so the Bank can maximize its profits by selling to a religious organization instead of a secular entity is not consistent with that legislative goal.  No unequal treatment occurred.  None of the other uses mentioned by the Plaintiff, (i.e. Taco Bell, game shops) are similarly situated to the Plaintiff.

## **CONCLUSION**

65.    The Plaintiff is correct in that the true motivation behind this lawsuit is financial; however it is the Bank's and Plaintiff's financial motivation that drives this case.  The Bank foreclosed on the Bandera Road location after the prior owner defaulted on its loan.  The Bank was unable to have a tenant resume the church use (which was grandfathered in after the 2007 zoning changes) within the one hundred and twenty (120) day window.  The use lapsed.  Fully aware, the Bank still specifically solicited the Plaintiff to purchase the property as it knew it would get over double the price offered from other secular entities.  The Plaintiff entered into the purchase agreement knowing full well the area was not zoned to allow church use and if a church use is not permitted after this litigation, the Plaintiff is free to walk away from the agreement.  The Bank is the one with the risk, which is why the Bank is paying for all the Plaintiff's attorney's fees.

66.    Over a year after abandonment of the property by Church on the Rock, the Plaintiff moved in and began conducting church services knowing it was illegal under the City's zoning regulations.  The Plaintiff moved in after the request to rezone from B-2 (retail) to B-3 (commercial) was denied.  The Plaintiff did this intentionally, knowing it would force the City's

29

hand for enforcement.  The Plaintiff filed suit, then, and only then, did it voluntarily abandon its Culebra Road location, at which it could have still conduct church services, in an attempt to position itself better in this litigation.

67.    The City of Leon Valley created the Bandera Road corridor as a retail corridor for the City.  The City refocused that effort with its 2007 Zoning change. The City reclassified churches and other inconsistent uses to B-3 to better service the corridor and the City.  The Plaintiff can still conduct numerous religious activities (and remains tax exempt for those activities) on Bandera Road.  The Plaintiff had another location to conduct church services and has other locations it could acquire for church services, but chooses not to for "financial reasons."

68.    The City's regulations do not place a substantial burden upon the Plaintiff's exercise of religion.  The refusal to rezone (i.e. change the law) from B-2 to B-3 (a zone it has never been) is not an individualized assessment triggering RLUIPA protection.  Given the purpose of the Bandera Road retail corridor, the reclassifications of various uses, including churches, does not amount to discrimination, an Unequal Terms violation, a violation of the Plaintiff's Free Exercise, Freedom of Speech, or Equal Protection guarantees.  This is simply a case where the Bank and the Plaintiff wish to maximize their own financial position, irrespective of the effect it has on the rest of the City.  Such is not a religious exercise violation under any statutory or constitutional analysis and the Plaintiff's claims should be dismissed with prejudice.

## **PRAYER**

WHEREFORE PREMISES CONSIDERED, Defendant City of Leon Valley prays that the Court grant its Motion for Summary Judgment in its entirety, dismiss all of the Plaintiff's

claims with prejudice and for such further relief, in law and in equity, as the Defendant may

show itself justly entitled.

SIGNED this 8th day of July 2009.

Respectfully Submitted

DENTON, NAVARRO, ROCHA & BERNAL
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas  78212
210/227-3243
210/225-4481 (Facsimile)
Lowell.denton@rampage-sa.com
Ryan.henry@rampage-sa.com

By:

LOWELL F. DENTON
State Bar No. 05764700
RYAN S. HENRY
State Bar No. 24007347
COUNSEL FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing instrument has been served upon the below named individual(s) as indicated, and according to the Federal Rules of Civil Procedure on the 8th day of July, 2009.

Daniel P. Whitworth                                      **E-Notification**
John G. George
STUMPF FARRIMOND, P.C.
112 E. Pecan Street, Suite 700
San Antonio, Texas 78205

LOWELL F. DENTON
RYAN S. HENRY

31