1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

THE ELIJAH GROUP, INC.    )
                          )
Plaintiff                 )
                          )
vs.                       )    CIVIL ACTION NO. SA08CA0907
                          )
THE CITY OF LEON VALLEY,  )
TEXAS                     )
                          )
Defendant                 )

COPY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL VIDEOTAPED DEPOSITION

DARRYL W. CRAIN

MAY 13, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL VIDEOTAPED DEPOSITION OF DARRYL W. CRAIN,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above-styled and

numbered cause on the 13th day of May, 2009, from

9:33 a.m. to 4:34 p.m., before ELENA MALONEY, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

offices of DENTON, NAVARRO, ROCHA & BERNAL, P.C., 2517

N. Main Avenue, San Antonio, Bexar County, Texas 78212,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

2

1                              A P P E A R A N C E S

2

3

    *FOR PLAINTIFF:*
4
          DANIEL P. WHITWORTH
5         STUMPF & FARRIMOND
          Attorneys at Law
6         112 East Pecan Street, Suite 700
          San Antonio, Texas  78205
7         Telephone: (210)231-0919
          Fax:  (210)231-0004
8
    *FOR DEFENDANT:*
9
          RYAN S. HENRY
10        MIGUELANGEL MATOS
          DENTON, NAVARRO, ROCHA & BERNAL, P.C.
11        2517 N. Main Avenue
          San Antonio, Texas  78212
12        Telephone: (210)227-3243
          Fax:  (210)225-4481
13
    *ALSO PRESENT:*
14
              PATRICK KNAPICK, Videographer of
15            Federal Court Reporters;

16            DARRYL W. CRAIN,
                  The Witness;
17
              ELENA MALONEY, CSR,
18                Certified Shorthand Reporter;

19

20

21

22

23

24

25

3

1

2                              INDEX

3                                              PAGE

4   DARRYL W. CRAIN

5   Examination by Mr. Henry ...........................6
    Further Examination by Mr. Whitworth .............300
6   Signature Page  ..................................302
    Court Reporter's Certificate .....................304
7

8                    REQUESTED ON THE RECORD

9                                              PAGE

10  No. 1 Signed Copy of Purchase and Sale Agreement   100

11  No. 2 Signed Copy of Lease Agreement               139

12  No. 3 Second Electrician's Name                    216

13  No. 4 File on Location of Locating New Church       242

14  No. 5 Written Agreement with GoldStar on           273
          Attorney's Fees
15
    No. 6 Lease Agreement for 8323 Culebra Road        276
16

17                           EXHIBITS

18

19  EXHIBIT              DESCRIPTION             PAGE

20  1             Xerox Color Aerial Photograph     59

21  2             Xerox Color Aerial Photograph     60

22  3             Xerox Color Aerial Photograph     64

23  4             Xerox Color Aerial Photograph     64

24  5             Purchase and Sale Agreement       95

25

4

1                          **EXHIBITS** (cont.)

2    EXHIBIT                    DESCRIPTION                    PAGE

3    6              Certification of Formation,           105
                    Nonprofit Corporation
4
     7              Application for Zoning Change,         113
5                   Case No. ZC

6    8              Second Amendment of Purchase           132
                    Agreement
7
     9              Lease Agreement                        136
8
     10             Certificate of Occupancy               162
9                   Application

10   11             Inspection Report                      163

11   12             Inspection Report                      164

12   13             2/11/09 Letter                         185

13   14             Certificate of Occupancy               192

14   15             Xerox Color Photograph                 223

15

16

17

18

19

20

21

22

23

24

25

5

1           *THE VIDEOGRAPHER:*  In the matter of The

2   Elijah Group, Incorporated versus the City of Leon

3   Valley, Texas, in the United States District Court for

4   the Western District of Texas, San Antonio Division,

5   Civil Action Number SA08CA0907, this is the deposition

6   of Pastor Darryl Crain recorded on the 13th day of May

7   2009.

8           Present today, would counsel for the

9   plaintiff please introduce themself.

10          *MR. WHITWORTH:*  Dan Whitworth on behalf of

11  The Elijah Group, Inc.

12          *THE VIDEOGRAPHER:*  Counsel for the

13  defense.

14          *MR. HENRY:*  Ryan Henry on behalf of Leon

15  Valley and Miguel Matos is here as well.

16          *THE VIDEOGRAPHER:*  Our court reporter

17  today is Ms. Elena Maloney with Federal Court Reporters

18  of San Antonio.  I'm the videographer, Patrick Knapick,

19  also with Federal Court Reporters of San Antonio.  The

20  time right now is 9:33 a.m.  We are on the record.

21          Madam Court Reporter, please swear in our

22  witness.

23

24

25

6

1                    **DARRYL W. CRAIN,**

2      having been first duly sworn, testified as follows:

3                       **EXAMINATION**

4          Q.    *(BY MR. HENRY)* Good morning, Pastor Crain.

5          A.    Good morning.

6          Q.    Okay.  Could you please state your full name

7      for the record.

8          A.    Darryl Wayne Crain.  Don't ask.

9          Q.    Okay.  Now, you're a -- you're a pastor,

10     correct?

11         A.    Yes, sir.

12         Q.    So it's appropriate for me to call you pastor,

13     correct?

14         A.    Yes, sir.

15         Q.    Is that fine?

16         A.    Yes, sir.

17         Q.    Okay.  Pastor Crain, have you ever been deposed

18     before?

19         A.    Yes.

20         Q.    You have been deposed before?

21         A.    Uh-huh.

22         Q.    How many times?

23         A.    Once.

24         Q.    Once before.  And what was the purpose of that

25     deposition?

7

1     A.   We were in a legal matter about some land a few

2  years back.

3     Q.   Okay.  And when you say we, you mean who?

4     A.   The church.

5     Q.   The church.  And was that The Elijah Group?

6     A.   No.  That was when we were Redemption

7  Tabernacle Ministries.

8     Q.   Okay.  And you were the pastor of Redemption

9  Tabernacle --

10     A.   Yes.

11     Q.   -- Ministries?  Okay.  So you have been through

12  a deposition before?

13     A.   Uh-huh.

14     Q.   Okay.  So I won't need to go through all of the

15  basics of it, but I'll will just touch base with you and

16  maybe it's a refresher course for you.

17     A.   Okay.

18     Q.   You understand that The Elijah Group has

19  brought a lawsuit against the City of Leon Valley,

20  correct?

21     A.   Yes, sir.

22     Q.   Okay.  And that's what this deposition is in

23  reference to.  Do you understand that?

24     A.   Uh-huh, yes, sir.

25     Q.   Okay.  You understand I represent the City of

8

1 Leon Valley, correct?

2     A.    Yes, sir.

3     Q.    Okay.  I'm not your lawyer, right?

4     A.    Right.

5     Q.    Okay.  Your lawyer is sitting across from you?

6     A.    The good looking one.

7     Q.    The good looking one, that's right.  During the

8 deposition you are under oath and you have promised to

9 come here and tell the truth while I ask you questions.

10 You understand that, right?

11     A.    Yes, sir.

12     Q.    All right.  Now, the courter reporter is taking

13 everything you say down.  And so even though it's being

14 recorded on video, I still need you to give me a verbal

15 answer because she can't take down head nods or head

16 shakes.

17     A.    Yes, sir.

18     Q.    Okay.

19     A.    I understand.

20     Q.    Now, if during anytime during this deposition

21 if I ask you a question that you don't understand, I

22 want you to stop me and -- because I don't want you to

23 answer a question that you don't understand.  Okay?

24     A.    Yes, sir.

25     Q.    Okay.  And so can I have your promise that you

9

1   are going to do that?

2      A.   Yes, sir.

3      Q.   Okay.

4      A.   If I don't understand something, you will be

5   the first to know.

6      Q.   Okay.  And can I assume that if you answer the

7   question, that you have understood it?

8      A.   Yes, sir.

9      Q.   Okay.  Now, if at any time during the

10  deposition you need to take a break and go to the

11  bathroom or talk to your lawyer or whatever, just let me

12  know.  Okay?

13     A.   Yes, sir.

14     Q.   Okay.  You have given us your full name.  What

15  is your address?

16     A.   10815 Hunters Way, Helotes, Texas 78023.

17     Q.   Okay.  Is that a residence?

18     A.   Yes, sir.

19     Q.   Okay.  Now, I thought I remembered something in

20  your discovery responses that the church actually owns

21  that house; is that correct?

22     A.   Yes, uh-huh.

23     Q.   Okay.  And that's The Elijah Group that owns

24  that house?

25     A.   Yes, sir.

10

1    Q.    Okay.  And how are you employed?

2    A.    By The Elijah Group.  I'm the pastor of the

3    church.  That's my full-time job.

4    Q.    Okay.  Now, The Elijah Group is a nonprofit

5    corporation, correct?

6    A.    Yes, sir.

7    Q.    Okay.  And it's a religious entity, correct?

8    A.    Yes, sir.

9    Q.    Okay.  Before we get into issues with The

10   Elijah Group, I want to ask a little bit more about

11   yourself.  Okay?

12   A.    Okay.

13   Q.    Okay.  How old are you?

14   A.    I'm under oath.  Forty.  I just turned 40 last

15   week or two weeks ago.

16   Q.    Okay.  Well, happy birthday.

17   A.    Thank you.

18   Q.    Are you married?

19   A.    Yes, sir.

20   Q.    And what's your wife's name?

21   A.    Christine.

22   Q.    Christine?

23   A.    Crain.

24   Q.    Crain.  Okay.  And how long have you been

25   married?

11

1    A.    Fifteen years.

2    Q.    Fifteen years.  Okay.  Congratulations as well.

3    A.    Thank you.

4    Q.    Okay.  Have you ever been married before?

5    A.    No.

6    Q.    Okay.  So Christine has been your only wife?

7    A.    As far as I know.

8    Q.    Okay.

9    A.    Yes.  Yes, she has been my only wife.

10   Q.    Okay.  Do you have any kids?

11   A.    Oh, yes.

12   Q.    How many?

13   A.    We have six children.

14   Q.    Six children.  Okay.  Names and ages

15 respectively.

16   A.    Tristyn is 14.  Kailie is 12.  Davilyn is ten.

17 Zoe is eight.  Javen is three, going to be four in

18 two -- in three weeks.  And my sixth child, Savae, is

19 seven months.

20   Q.    Seven months.  Okay.  Congratulations again.

21 Not a lot of sleeping at night, are you?

22   A.    Yes.  We have -- My wife is a professional.

23 She is not -- We -- we sleep just fine.

24   Q.    Okay.  Now, what does your wife do?

25   A.    My wife is a homemaker for the most part, but

12

1  she helps out in ministry stuff as well.

2      Q.   Okay.  And is she technically employed by The

3  Elijah Group at all?

4      A.   Not at the moment.  She -- she was while we had

5  had our school.  We are a day care, a child care

6  facility, and she was employed while we had that, but we

7  haven't reopened it yet, so she is not officially

8  employed.

9      Q.   Okay.  Who are the directors of The Elijah

10 Group?

11     A.   Myself, my wife, my mother, my father, Irma and

12 W.J. Crain respectively, and a woman named Julie Cortez.

13     Q.   Okay.  And who is Julie?

14     A.   Julie is a member of -- of our church.

15     Q.   Okay.  Now, who were the directors of

16 Redemption Tabernacle -- Tabernacle?

17     A.   I need to make a clarification just so -- so

18 you know --

19     Q.   Okay.

20     A.   -- what of kind the distinction is.  I think,

21 you know, it will help us.  Redemption Tabernacle was a

22 denominational church.  It was under the auspices of the

23 Nazarene denomination.  So because it was a part of that

24 denomination, the -- the directorship or the leadership

25 was structured very differently.

13

1          What I mean by that is we -- we were

2   incorporated as a Church of the Nazarene.  It wasn't

3   just, you know, like -- what we would be considered now

4   is a nondenominational, you know, Christian church

5   but --

6       Q.    You mean The Elijah Group?

7       A.    The Elijah Group, yes.

8       Q.    Okay.

9       A.    Redemption Tabernacle was incorporated as a

10  Church of the Nazarene.  And the directors basically is

11  you have to go by their manual.  So it was myself as the

12  pastor of the church and then a church elected or a

13  church appointed board.

14      Q.    Uh-huh.

15      A.    So the directorship that we have now, I just

16  basically tell -- you know, it's my mom, my dad, my

17  wife, and a lady from our church.  Whereas prior to, it

18  was an elected board according to the denomination --

19  according to the rules of the denomination we were a

20  part of.

21      Q.    Okay.  And who were the directors of --

22      A.    If I'm not mistaken, the board is what it's

23  actually called.  It was myself, my dad, a man named

24  T.A. Littlefield, Fructuoso Delgado, Rey Trejo and Larry

25  Esquivel I think are the ones.  It's on the paperwork

14

1   that -- that -- that we gave you guys back...I believe.

2       Q.   Okay.

3       A.   The actual names.

4       Q.   I just need to make sure I understand the

5   corporate distinctions.

6       A.   Okay.  Go ahead.

7       Q.   The Church of the Nazarene is a national or

8   international --

9       A.   Right.

10      Q.   -- religious organization?

11      A.   Yes.

12      Q.   Okay.  And actually let me -- let me back up

13  real quick.  When I was going through some of the basics

14  of the depo, I did skip one and I apologize.

15           During the deposition, I don't want to

16  sound rude or anything and I like having, you know, a

17  conversational tone with you, but I need to make sure

18  that the court reporter -- she can only take down one of

19  us talking at a time.

20      A.   Okay.

21      Q.   So I promise to let you finish answering a

22  question before I ask the next one if you promise to let

23  me finish asking my question before you start to answer.

24      A.   Don't interrupt is what you are saying.

25      Q.   That's exactly what I'm saying.

15

1      A.    Okay.  I get it.  Yes, sir.

2      Q.    Okay.  All right.  So the Church of the

3  Nazarene is a -- is it national or international?

4      A.    International.

5      Q.    International religious organization.  And as a

6  denominational church of the Nazarene, you basically had

7  to abide by their tenets and --

8      A.    Right.

9      Q.    -- their directives?

10     A.    Uh-huh.

11     Q.    Is that correct?

12     A.    Yes.  Yes, sir.

13     Q.    Okay.  And Redemption Tabernacle -- is it

14  Tabernacle?

15     A.    Yes, sir.

16     Q.    Okay.  Was incorporated as part of that

17  denomination?

18     A.    Yes, sir.

19     Q.    Okay.  And then you formed The Elijah Group

20  later; is that correct?

21     A.    Yes, sir.

22     Q.    Okay.

23     A.    But there is some back story there, and I can

24  kind of give it to you.

25     Q.    Why don't you go ahead and expand.

16

1      A.    All right.   Basically what happened was the --
2   the Nazarene church is where I started going as a child,
3   you know, years ago.

4               And long story short, they had asked me to
5   start a church for them in -- in the San Antonio area.
6   I agreed and, you know, we started the church.

7      Q.    About what time was that?

8      A.    That was around the year 2000.

9      Q.    Okay.

10     A.    Okay.   In 2004, the man who had asked me to
11  start the church -- they have a hierarchy, and basically
12  they have a man who his position is called the district
13  superintendent.   He's in charge of all the churches of
14  south Texas -- he was retiring and a new guy was coming
15  in.   That coupled with -- I --

16              Our church for the Nazarene
17  denomination -- our church was not, you know, a mega
18  church or anything like that.   But for the Nazarene
19  denomination, it was one of the bigger ones in -- in
20  this area.

21              And I had brought in a gentleman, a guy,
22  to help me who was -- I'm not very -- I was not very
23  familiar with the tenets and all of the things that I
24  was supposed to be doing as a pastor of the Nazarene
25  denomination, so I brought in somebody who -- who was

1  very familiar with that.

2              The thing was he and I just did not -- you

3  know, we just didn't -- didn't mesh.  So, you know, long

4  story short, the denomination basically decided to use

5  him to start another -- another church, and we felt best

6  that it would be good if I went my own way.

7              So we had -- for a period of about six or

8  seven months, we really didn't know -- I didn't know if

9  -- because our church went from 200 to about 100 and

10  then to about 50.  And, you know, we were very, very

11  small for -- and that was around 2005.  And we really

12  didn't know what was going to happen.

13              So we didn't do anything as far as the

14  incorporation or anything like that because we really

15  didn't know if the whole thing was going to dissolve or

16  if it was even going to be able to continue to go.

17              We met in the afternoons at another church

18  building and then we got a lease on Culebra Road.  And

19  even then while we were leasing on Culebra Road, the

20  church was not growing or anything like that.  I mean,

21  it was just really just barely making it.  Excuse me.

22      Q.    So at that point you weren't really an entity

23  yet?

24      A.    No.

25      Q.    Okay.

1      *A.*    And -- But as we -- we are about a year into

2    this, I start realizing, okay, you know, whether we are

3    good, bad, small or big, we need to organize ourselves a

4    little bit better than what we are.

5              So we had a board meeting with -- with

6    people that -- that we elected.  We dissolved the

7    previous corporation.  I don't even know if we needed to

8    do that because I think the Nazarene denomination

9    departed, but we had official minutes to do that because

10   we were going to incorporate.

11             We were going to incorporate as Redemption

12   Tabernacle Ministries.  But when we checked into it, we

13   couldn't use that name because it was also incorporated

14   as Redemption Tabernacle Ministries, Church of the

15   Nazarene.  You know, it was too close or whatever.

16             So we just kind of let it sit until we

17   were purchasing the house and until this -- You know,

18   I'm skipping about two years now.  You know, the church

19   grew and we were purchasing this property.  So we --

20     *Q.*    Are you talking about the 6401 Bandera Road?

21     *A.*    Right, the 6401 Bandera Road.  We had -- we had

22   won that bid.  And at that point, I knew, look, we need

23   to really get our ducks in a row here.  And so we

24   incorporated, and I tried to incorporate as Redemption

25   Tabernacle Ministries first, but that name of course was

19

1   taken, so we used that Elijah Group.  That's how that

2   whole thing came -- came about.

3       Q.   Okay.  So let me -- let me back up just a

4   little bit.

5       A.   Sure.

6       Q.   When you were a denominational Church of the

7   Nazarene, basically it came to a point where you and the

8   Nazarene church decided it was probably best for

9   everybody if you split --

10      A.   Right.

11      Q.   -- and both went your separate ways?  So when

12  you split, your -- your congregation shrunk?

13      A.   Uh-huh.

14      Q.   Is that correct?

15      A.   Yes.

16      Q.   Okay.  Down to about 50?

17      A.   Maybe even less.

18      Q.   All right.

19      A.   Because, you know, you figure, my family is --

20  you know, we are ten of us or eight of us.

21      Q.   Okay.

22      A.   So it was probably a little less than that.

23      Q.   A little less than that.  Okay.  And you

24  weren't -- Were you still incorporated as the Nazarene

25  or you weren't sure if you were?

20

1    *A.*    You know, I don't know if we were or not.

2    *Q.*    Okay.

3    *A.*    We signed paperwork with the denomination when,

4  you know, their -- They moved their headquarters.  They

5  had a head -- The guy that I worked with had his

6  headquarters here in San Antonio.  When he retired, they

7  merged.

8    *Q.*    What was that guy's name?

9    *A.*    His name was Dr. Jim Blankenship.

10    *Q.*    Okay.

11    *A.*    When he retired, another gentleman took over

12  and his headquarters were in Houston.  So the

13  communication was a lot more difficult.  But finally one

14  day, I went over to Houston.  We, you know, had a very

15  long meeting.

16            And basically what the denomination said

17  is, you know, if you are thinking about like leasing

18  another property or anything like that, don't use our

19  name, you know.  So you can't, you know, operate in a

20  denomination if -- if you can't use their name --

21    *Q.*    Right.

22    *A.*    -- because it just -- it just doesn't work that

23  way.  So, Ryan, I think we probably operated in a very

24  gray area for about six months to a year.

25            But when I would talk to our accountant,

21

1  because we have an accountant, she would -- she told me,

2  well, technically churches don't have to incorporate

3  anyway, but, you know, you want to do that.

4          But for those six months, a year maybe, we

5  really don't know from, you know, one month to another

6  if our church was even going to be viable.  So it really

7  wasn't a priority.

8      Q.    And what time -- time period was that?

9      A.    2005, 2006, early 2007, something like that.

10     Q.    Okay.  So in 2005-2006, you were in this --

11  this limbo --

12     A.    Right.

13     Q.    -- for lack of a better word?

14     A.    Right.  That would be a great word.

15     Q.    Okay.  And so once -- Did things start to

16  stabilize for you?

17     A.    Yeah.  And what we did was we opened a day care

18  facility which supplemented our income.

19     Q.    Okay.

20     A.    You know, and within a -- within, I would say,

21  six months -- well, about a year, it took about a year

22  to get to full capacity.

23          And once that was at full capacity, the

24  church was not growing exponentially by any stretch of

25  the imagination, but we had, you know, a real 50 people

22

1   there, you know, and people were getting involved and,

2   you know, so it was -- We couldn't have sustained the

3   lease with just the church.  So...

4       Q.    Okay.

5       A.    But because we had the day care now, we had at

6   least -- You know, we still didn't know if we were a

7   growing church, but at least we had a viable business to

8   operate and, you know, things of that nature.

9       Q.    Okay.  And this was the lease that you had on

10  Culebra Road?

11      A.    Yes, sir.

12      Q.    Okay.  And how big was that facility?

13      A.    Well, we started with -- when we got in there

14  when we signed the lease, we were the only tenants in

15  the building.  There was a bar right next door to us.

16  And that could have explained a little bit of our church

17  growth or lack thereof.

18            But anyway, the bar was right next to us,

19  and we were the only tenants in the building.  And the

20  owner was from California.  And he basically -- he -- he

21  didn't have any problem with us using the whole facility

22  which was probably a little over 20,000 square feet.  We

23  did not use the whole facility by any stretch of the

24  imagination.  We just used probably about eight to

25  10,000 square feet.

23

1    *Q.*    Okay.

2    *A.*    Within three months of us purchasing -- I mean,

3    signing this lease agreement with this guy, three to six

4    months, I don't remember, this was in 2005, he sold it

5    to somebody else, and that person moved in and moved

6    from California to San Antonio, and they, you know, were

7    on site, and they gave us parameters and everything like

8    that.

9    *Q.*    Okay.

10    *A.*    I think we had probably about 8,000 square feet

11    at that time and then we continued to shrink because we

12    would give them back different property -- I mean,

13    different parts of the -- of the building to -- to

14    lessen our lease.

15    *Q.*    Okay.  So you wouldn't be charged as much --

16    *A.*    Right.

17    *Q.*    -- if you weren't using as many square feet?

18    *A.*    Right.

19    *Q.*    Okay.  So do you remember the address for

20    Culebra Road?

21    *A.*    8323 Culebra Road, Suite 102.

22    *Q.*    Okay.

23    *A.*    78251.

24    *Q.*    Okay.  So --

25    *A.*    250.  It was 250.

24

1     *Q.*  Okay.  250.  And if anything during the

2  deposition, if you think you made an error and want to

3  correct your testimony, just let me know.

4     *A.*  Okay.

5     *Q.*  Okay.  So you moved in in roughly '05.  And

6  when you signed the lease, did you sign the lease with

7  them as Redemption Tabernacle?

8     *A.*  Yes.

9     *Q.*  Okay.  You are not sure if that was right or

10  not, but that's what was signed?

11     *A.*  It was okay for me to do that because I talked

12  to our accountant and, --

13     *Q.*  Okay.

14     *A.*  -- I mean, legally it was okay, but, you know,

15  we were not incorporated as that name or anything like

16  that.

17     *Q.*  Okay.  And you had already separated from the

18  Church of the Nazarene at that point?

19     *A.*  Yes.

20     *Q.*  Okay.  And so you had -- You were using the

21  facility.  When did you begin day care services?

22     *A.*  Probably 2006, the end of 2006.

23     *Q.*  Okay.  Now, just for clarification, for church

24  use only, before you began using it for a day care

25  facility, the church is sustained financially how?

25

1    A.    Through the contributions of its members.

2    Q.    Okay.  So you are sustained through donations?

3    A.    Yes, sir.

4    Q.    Okay.  And with a smaller congregation, you

5 don't get as many donations?

6    A.    You are sharp, Ryan.

7    Q.    That's the way it normally works?

8    A.    Yeah, that's the name of -- yeah.

9    Q.    Okay.  And so the more members you have --

10   A.    Right.  Your contributions go up.

11   Q.    -- your contributions go up?

12   A.    Right.

13   Q.    Okay.  So the contributions really weren't what

14 they were when you were with Nazarene?

15   A.    Right.  Right.

16   Q.    Okay.  Now, did you -- When you were with

17 Nazarene, did you have to give a portion of those

18 contributions to the denomination?

19   A.    You were required to.

20   Q.    Okay.

21   A.    But because we were a new church, a new church

22 is given a three to five-year window before they have to

23 start doing that.  After that three to five years, you

24 are going to be giving about 20 percent of your total

25 contributions to the denomination, ten percent for local

26

1    and then ten percent for international probably.

2        Q.    Okay.  So when -- time-wise when you -- You

3    started doing this in what, 2000?

4        A.    2000.  We never got to that point.

5        Q.    Okay.

6        A.    We never started -- you know, we were never

7    required to give -- You know, right when we were about

8    to do that is when our church -- we went a different

9    direction.

10       Q.    Okay.

11       A.    Not because of that, but just --

12       Q.    Just coincidence.  That's the way the time

13   went?

14       A.    Right.

15       Q.    Okay.  So you got -- You started a church doing

16   just church services --

17       A.    Uh-huh.

18       Q.    -- at the Culebra Road location?  And then

19   about in '06, you needed to supplement the income so you

20   started doing a day care facility; is that correct?

21       A.    Yes, sir.

22       Q.    Okay.  So what were the -- the parameters of

23   the day care facility, what were you doing?

24       A.    What?

25       Q.    Did you have any restrictions?

27

1      A.    We -- I don't understand what you are saying.

2  As far as like who we could watch?

3      Q.    Yes.

4      A.    Okay.  The -- we had -- Our license comes from

5  San Antonio, and we were licensed to watch newborn

6  children to 12 years old.

7      Q.    Okay.

8      A.    But with the space that we had, we were

9  limited to -- limited to 44 children on premises at the

10 same time.

11     Q.    Okay.  So now you started this in '06.  Did you

12 get a license from the state to do day care facilities?

13     A.    Ryan, I don't know.  I don't know if the -- I

14 believe it comes through the state, but you go through

15 the city.

16     Q.    Okay.

17     A.    Whatever the proper licenses were, we -- we

18 went -- we did it all, I mean.

19     Q.    Okay.  Now, did you apply for it yourself?

20     A.    Yes.

21     Q.    You are the one that signed it?

22     A.    Yes.

23     Q.    All right.

24     A.    Because you have to -- you have to have a

25 designated director that has -- and it just so happened

1  that, you know, some of my freshman college courses

2  allowed me to, you know, have enough child psychology or

3  whatever it was, enough hours there, plus, you know,

4  other work I did ministry-wise qualified me to get a

5  directorship. So I was the actual director of the

6  facility. And myself or what they call a designee which

7  would be my wife or another young lady in any our

8  church, we -- either all of us or one of the three of us

9  signed all the paperwork.

10     Q.   Okay. So just to make sure I understand, you

11  actually had the qualifications to get a directorship

12  from the state?

13     A.   Yes, sir.

14     Q.   Okay. And so you applied for a directorship?

15     A.   (Witness nodding).

16     Q.   And for a license to operate a day care

17  facility?

18     A.   Yes, sir.

19     Q.   All right. And this was in '06?

20     A.   Yes, sir.

21     Q.   Okay. And so if I remember correctly, in order

22  to get the license, you have to already have the

23  facility in place. You already have to have a lease

24  somewhere?

25     A.   Right.

29

1      Q.    Okay.  And so you told them, look, we are at

2   the Culebra Road location.  This is where the day care

3   facility is going to be.

4              And so did you section off a portion of

5   that or was technically the whole thing --

6      A.    No.  We sectioned off a portion of it.

7      Q.    Okay.  So how much -- What size portion was for

8   day care?

9      A.    I would say 3,300 -- well, 2,300 square feet

10  maybe.

11     Q.    2,300 square feet.

12     A.    I might -- That's a guesstimation.

13     Q.    That's fine.

14     A.    It's somewhere between --

15     Q.    I'm not going to hold you to a specific square

16  footage.

17     A.    -- 2,500 and 3,000 square feet, something like

18  that.

19     Q.    Okay.  All right.  And then the rest was used

20  for church services?

21     A.    Right.

22     Q.    Okay.  Now, what -- what city is that in?

23     A.    San Antonio.

24     Q.    It's in San Antonio.  Okay.  So you got the

25  proper licensing for day care?

1    A.    Uh-huh.

2    Q.    Now, the day care services, is that part of

3    your religious mission?

4    A.    Yes.  Yes.

5    Q.    Okay.

6    A.    What we do specifically is we take care of --

7    Because -- because the church was on premises, we could

8    actually decrease the tuition rate from our competitors

9    in the immediate area.  And what we would do is we would

10   charge 20 to $30 less per week for -- you know, for our

11   services.

12           And that was based on a survey we did

13   several years ago about the greatest need in -- in the

14   demographic that we are there for.  The demographic that

15   we are trying to reach.  The greatest need in that

16   demographic was for affordable child care.

17           So we lowered our -- our rates to do that.

18   And through our day care center, we absolutely did get

19   people to start coming to our church.  And that's one of

20   the reasons our church began to grow.

21   Q.    Okay.

22   A.    And through our day care center, we would -- we

23   have a lot of single mothers and a lot of young families

24   and those are usually the targets that we are trying to

25   reach because those are the ones usually with, you know,

1  marital problems and other issues that we believe that
2  God has called us specifically to address.
3            So, I mean, absolutely, it works hand in
4  hand with what we are doing.  We are trying to, you
5  know, reach the families, you know, in every capacity.
6  So it was a good in for us to get into the family, --
7       Q.   Okay.
8       A.   -- to serve in that capacity.
9       Q.   Okay.  Now, in order to provide day care
10 services to someone, they didn't have to be a member of
11 your church?
12      A.   No.
13      Q.   Okay.  But members of your church were using
14 the day care facility?
15      A.   A few of them, yes, sir.
16      Q.   Okay.  Now, let's talk a little bit about, you
17 know, the -- your church whether it was -- you know,
18 after you separated from the Church of the Nazarene,
19 whatever it was called until it was incorporated as The
20 Elijah Group.
21            .    What were some of the main, you know,
22 religious tenets that you followed?
23      A.   That is a question that can go in 150,000
24 different directions.
25      Q.   Okay.

1       A.    I'll just give you the basic answer.

2       Q.    Okay.

3       A.    We are a basic vanilla Bible believing church.

4  We believe in all of the -- what we would call the

5  traditional or fundamental beliefs of scripture.  If you

6  want me to expand on those, I will have to take up an

7  offering after I that do.

8              No.  But, I mean, basically we teach the

9  basic tenets of Christianity with a -- I guess if we

10  have a specialty, we are trying to bring about what

11  we -- what we have defined as restoration to people

12  which means --

13              You know, a lot of the people that we --

14  that come into our church are usually what I would call

15  unchurched people or CEO, Christmas and Easter only,

16  kind of people.  And when they -- when they come into

17  our congregation, this is their first experience of a

18  Christian church.

19              So, you know, we're -- we're geared more

20  toward that demographic as opposed to, you know, people

21  that are used to, you know -- and that was one of the

22  reasons we didn't ultimately mesh with the Nazarene

23  denomination because the people that we attract are what

24  we would call unchurched individuals.

25              But what we teach is -- You know, we are

1  not teaching anything differently than, you know, your

2  basic accepted traditional Christian values and biblical

3  principles.

4      Q.   Okay.  So let me see if I understand and you

5  tell me if my understanding is incorrect.  You are

6  spreading the Christian faith?

7      A.   Yes, sir, hopefully.

8      Q.   Okay.  And that's part of the purposes of your

9  religious organization?

10     A.   Right.

11     Q.   Okay.  And you have found that you're spreading

12 it and you attempt to spread it towards a particular

13 demographic or as you said unchurched people?

14     A.   Uh-huh.

15     Q.   And kind of bring them into the faith?

16     A.   Right.

17     Q.   Okay.  And other than spreading the Christian

18 belief through church services, okay, you found that

19 providing day care services is part of your religious

20 mission?

21     A.   Right.

22     Q.   Okay.  Are there any other activities?

23     A.   Avenues in which we are trained?

24     Q.   Right.

25     A.   Yes, there are.  We have a counseling service

1   that's -- that we -- that we used that -- Actually, one

2   of the justices of the peace in Leon Valley came out to

3   our church a few years back, and we just asked her to

4   speak to us on Memorial Day, and she approached us after

5   seeing some of the things.

6            *THE WITNESS:*  Thank you, sir, or is this

7   for you?

8            *MR. WHITWORTH:*  No.  I got one.

9            *THE WITNESS:*  And she offered to make our

10  church -- We had to fill out some paperwork or whatever.

11  And again, I thought in college, I was just -- you know,

12  I played basketball in college, so I did not take any of

13  the courses with any kind of forethought in mind, but I

14  was able to be a counselor for the -- for the -- what we

15  would call at risk youth high school students that

16  are -- that are usually in nonviolent trouble.

17            You know, they are -- they have said a

18  curse word or they have consistent tardies or absences

19  and things of that nature and, you know, basic -- basic

20  issues that are not -- you know, don't have any kind of

21  criminal attachment to them usually.

22            And those people are referred to us.  And

23  they have been being referred to us for about three or

24  four -- well, probably about four or five years now.

25  And it started off kind of slow.

35

1          But, you know, now we are -- You know,
2    usually around this time of the year until July or
3    August until right about when school is starting, you
4    know, we have a pretty full docket of counseling that we
5    give to kids and also the justice of the peace, not only
6    Ms. Weiner, but her -- her colleagues.  We will do, you
7    know, parental classes.
8          And then we have been -- from that, we are
9    able to give drug counseling to -- from the City of
10   San Antonio.  We work with probation people, nonviolent
11   offenders.
12         I mean, you know, this -- that part of our
13   ministry although I never -- While the church was not
14   really growing, all these other avenues opened up for
15   us.
16         And, you know, we weren't -- you know, we
17   were not inundated with people by any means.  But a real
18   ministry has developed there that we get phone calls on
19   a daily basis for, and it has evolved from just youth
20   counseling into now adult counseling, and now we are
21   about to offer parental classes to the North Side
22   Independent School District, you know.  So it's a whole
23   gamut.  That's one avenue.
24   Q.    (BY MR. HENRY) Okay.
25   A.    All right.  Another avenue is --

1    Q.    Let me interrupt --

2    A.    Yes, sir.

3    Q.    -- and then we will go to the other avenue.

4  This is also part of your religious mission?

5    A.    Yes, sir.

6    Q.    Okay.  So you are providing day care services.

7  You are providing counseling service?

8    A.    We are not providing day care services at the

9  moment.

10   Q.    Okay.  You were --

11   A.    We were.

12   Q.    -- providing day care services?

13   A.    Right.

14   Q.    That is still part of your --

15   A.    Right.

16   Q.    -- religious purpose?

17   A.    We -- we are in the process.  We have been

18  licensed by the City of San Antonio to again, you know,

19  open up a day care facility.

20   Q.    At the --

21   A.    6401 --

22   Q.    -- Bandera --

23   A.    -- location, yes, sir.

24   Q.    Okay.  And we will get to that in a minute.

25   A.    Okay.

37

1    *Q.*    Okay.  But that's part of your religious

2    purpose, and giving counseling is also part of your

3    religious purpose?

4    *A.*    Yes, sir.

5    *Q.*    Okay.  Now, what was the other avenue?

6    *A.*    The other avenue is prior to me being -- going

7    into pastoring a church into the full-time ministry of

8    pastoring a church, I ran an organization for the

9    Christian schools of Texas called Texas Christian

10   Athletic League or TCAL.

11            And when I left, that was basically my

12   full-time job.  It was the second largest organization

13   of its kind in the nation.  It was a very -- it was a

14   very, very involved job.  When I took -- when I became a

15   pastor however, I let that organization go.  I resigned

16   it, and I gave it to a couple of other people.

17            Two years ago, I talked with the -- the

18   people that were operating it which my father-in-law was

19   one of the main ones.  And I had lunch with him and I

20   just asked him about it.  And he basically asked me, he

21   said, well, how would you like to take it over again

22   which told me it wasn't doing all that great.

23            When I left, there was 100 to 120 schools.

24   And I think there was like seven or eight left.  And

25   so -- but I saw an opportunity.  So we went ahead and

38

1  basically purchased that organization again and that

2  was --

3      Q.    And when you say we, was it The Elijah Group

4  that purchased it?

5      A.    You know, I don't know if we were -- No.  We

6  were not The Elijah Group at that time.

7      Q.    Okay.

8      A.    No, we weren't.  By purchasing it, I meant -- I

9  mean that he kept all the money that they had in

10 exchange for just letting me operate it.

11     Q.    Okay.

12     A.    That's all there is to it.  Now, since then, we

13 have kind of folded it and done d/b/a's or whatever we

14 are supposed to do.

15          But anyway, the point is, is that we took

16 that organization over.  And basically what we do with

17 that is, that is an organization of Christian schools of

18 Texas.  We will start the 2009-2010 school year with

19 around 50 schools, plus or minus a few, you know.

20          And we provide -- it's basically a mirror

21 of what UIL is here in Texas which is the

22 interscholastic league for the public schools.  We

23 provide districts, regions for athletic competition,

24 basketball, volleyball, you know, track, baseball,

25 softball, six-man football, cheerleading.  You know, the

39

1  whole gamut of extracurricular activities.  Organize

2  academic meets, that kind of thing.  We organize that

3  for the Christian schools so they can do extracurricular

4  activities as well.

5       Q.    All right.  Let me see if I get this straight.

6  There are Christian schools out there.  These are

7  private schools, correct?

8       A.    Yes, sir.

9       Q.    Okay.  And so you --

10      A.    Texas is the just --

11      Q.    Go ahead.

12      A.    I'm sorry.  Texas is the -- There's more

13 Christian schools in Texas than there is in any other

14 state in the union.

15      Q.    It wouldn't surprise me.

16      A.    Okay.  Go ahead.

17      Q.    Okay.  And it's not just the schools that have

18 signed up with you are not necessarily just in the

19 San Antonio area or are they all over Texas?

20      A.    All over.

21      Q.    All over Texas.  Okay.  So they sign up for

22 your organization.  And you kind of help divide them

23 into districts and --

24      A.    Right.

25      Q.    -- for extracurricular activities such as

40

1    football, basketball, other types of sports?

2        A.    Exactly.

3        Q.    You organize events, competitions, tournaments,

4    things like that?

5        A.    Yes, sir.

6        Q.    Okay.  Any other part of that that I'm missing?

7        A.    No.

8        Q.    Okay.  And do they -- When they sign up, do you

9    get money from the schools or is it the individual

10   participants that pay you or how does that work?

11       A.    Right now, it's the schools.  The schools pay a

12   $350 annual fee.

13       Q.    Okay.

14       A.    And from that, we -- Before we took the

15   organization, I talked with some of the people at the

16   church, and I said, you know, it's going to probably

17   take three years for this to be a profitable entity, but

18   we were willing to make a financial commitment to it,

19   and this will be the third year, and it will be

20   profitable this year.

21       Q.    Okay.

22       A.    Which by profitable, I mean, it can pay for

23   itself without the church, you know, helping -- helping

24   it.

25       Q.    Okay.  So now who are the employees of that?

41

1      A.   We -- myself is -- You know, I do a lot of that

2   work as well as a gentleman named Jason Balli,

3   B-a-l-l-i.  And I hired him for a whopping $500 a month.

4   I just happened to catch him at a good time in his life.

5   And he has been employed since the beginning of this

6   school year which would be -- we are at 2000 -- since

7   about August, July 2008, somewhere around there.

8      Q.   Okay.  Now, is he technically employed by The

9   Elijah Group?

10      A.   Yes, sir.

11      Q.   Okay.  So The Elijah Group is his employer?

12      A.   Yes, sir, I believe so.  Yeah, because if we

13   are a head of TCAL, yeah, it would be the same thing,

14   yes, sir.

15      Q.   Okay.  So The Elijah Group is the one that's a

16   head -- that owns and runs TCAL?

17      A.   Yes, sir.

18      Q.   Okay.  And so The Elijah Group is the one that

19   receives any funds from TCAL?

20      A.   No.

21      Q.   Okay.

22      A.   The -- We have a separate account set up for

23   Texas Christian Athletic League and the money goes

24   into -- into that account.

25      Q.   Okay.

42

1      A.    And when we do accounting and things of that

2  nature, even if the church has to contribute,

3  there's a -- there's an accounting for that because we

4  are expecting that TCAL organization to pay the church

5  back.   No interest, but just at least pay them back.

6      Q.    Okay.

7      A.    We will do that.

8      Q.    For the accounting purposes, you are keeping

9  the accounts separate?

10     A.    Right.

11     Q.    But The Elijah Group is the one that controls

12 the accounts?

13     A.    Yes, sir, that's correct.

14     Q.    Okay.   You decide where the money goes?

15     A.    Right.

16     Q.    Okay.

17     A.    Yes, sir.

18     Q.    But you are keeping them in separate accounts?

19     A.    Yes, sir.

20     Q.    Okay.   It's probably advisable.   All right.   Do

21 you have -- Now, is TCAL, would you consider that part

22 of your religious purpose?

23     A.    Absolutely.

24     Q.    Okay.   How so?

25     A.    In that -- Again, don't let me get to wordy

43

1   here, okay, but you are asking me things that, you know,

2   are very, very crucial to what -- what we feel like the

3   vision, for lack of a better word, that we are trying to

4   accomplish.

5            But Christian school students have -- we

6   have a low -- we have low recidivism.  That's the wrong

7   word.  We have a low -- We cannot seem to keep Christian

8   school students in church.

9            Less than 50 percent of Christian school

10  graduates end up serving the Lord, is what we would call

11  it, are in church five years after they have graduated

12  from high school.

13            What TCAL is, is trying to use Christian

14  schools and athletic competition to enhance the

15  Christian school's ability to keep these students

16  involved in -- in church.  And we will do that through,

17  you know, summer programs that we have.

18            We have worked -- we have worked with

19  cities in the past where cities will actually pay us to

20  have a tournament in their -- in their town.  Pay us.

21  What I mean is pay our expenses.

22       Q.   Uh-huh.

23       A.   Then we will -- in exchange for something like

24  that, we will bring back Christian school students to go

25  into the city and like provide basketball clinics free

1  of charge for children 12 and younger, something like

2  that.

3            And it gives kids that are involved in,

4  you know, Christian schools an outlet to practice, you

5  know, some of the things that they have been -- that

6  they have been exposed to. And that's kind of what I

7  was doing before.

8            Up until now, it's not been big enough to

9  even think about doing anything like that, but we are

10  getting that in place. Beginning in July, we will have

11  a three-week program that we are going to use, just a

12  handful of students, to go and do things, you know, in

13  the neighborhoods, go to hospitals, things of that

14  nature, to just get them -- you know, get this program

15  going so that in the upcoming years, we can continue to

16  do that.

17      Q.    Okay. So let me make sure -- I want to kind of

18  get a good understanding of the scope of The Elijah

19  Group as it exits today.

20      A.    Okay.

21      Q.    Okay. So you -- The Elijah Group, as a

22  religious organization, you want to be able to provide

23  church services?

24      A.    Uh-huh.

25      Q.    Day care services, counseling services?

45

1     *A.*   Right.

2     *Q.*   And TCAL services?

3     *A.*   TCAL services, that's right.

4     *Q.*   Okay.  Any other services?

5     *A.*   If anything comes up, man, we are ready.

6     *Q.*   Okay.  Any other services that you currently

7 are providing?

8     *A.*   Marriage counseling.  Would that be different

9 than just regular counseling?  We --

10    *Q.*   Okay.  I will -- I guess that counts.

11    *A.*   Yeah, that fits in.  We are not -- we are

12 not -- we don't advertise for that, but we get a lot of

13 people from our church come for marriage counseling

14 specifically.

15    *Q.*   Okay.  Well, as you said, your demographic,

16 that's --

17    *A.*   Right.

18    *Q.*   -- that's a high probability, isn't it?

19    *A.*   Yes.

20    *Q.*   Okay.  Now, The Elijah Group -- Where are your

21 central offices located?

22    *A.*   6401 Bandera Road.

23    *Q.*   Okay.  And are all of these activities run out

24 of that?

25    *A.*   Yes, sir.

46

1    *Q.*    Okay.  Now, I'll get to a little bit more of

2   that address in -- in a minute, but just for preliminary

3   purposes, there are technically two buildings at that

4   address?

5    *A.*    Right.

6    *Q.*    There is what I'll call an admin building.

7    *A.*    Okay.

8    *Q.*    And a dome shaped building.

9    *A.*    Right.  Okay.

10    *Q.*    Okay.  What do you call the admin building?

11    *A.*    Children's.

12    *Q.*    Children's?

13    *A.*    Yeah.

14    *Q.*    Okay.

15    *A.*    Yeah.

16    *Q.*    Now, do you know how big that building is?

17    *A.*    That building is 8,500 square feet, give or

18   take.

19    *Q.*    Okay.  And then we will have what we call the

20   dome shaped building.

21    *A.*    Uh-huh.

22    *Q.*    Do you know which one I'm talking about?

23    *A.*    Yes, sir.  I do know which one you are talking

24   about.

25    *Q.*    It's pretty obvious, isn't it?

47

1    A.    Yes, sir.

2    Q.    Okay.  How big is that one?

3    A.    15,500, give or take.

4    Q.    15,500 square feet.  Okay.

5    A.    Both of them total 23,000, give or take.

6    Q.    Okay.  And I'll have ask you more about the

7  specifics of that location and kind of how you got to it

8  in a minute, but I want to back up.

9              You had mentioned several things to me

10  about, you know, just the way fate turned out, you are

11  able to do a lot of these things because of your

12  education and training.  And it maybe not have been your

13  forethought, but you have been able to utilize it that

14  way, right?

15    A.    Right.

16    Q.    Well, talk to you a little bit about your

17  education and training.

18    A.    I wish I could -- there was a lot to talk

19  about, but there really isn't.  My education as far as

20  collegiately began right after high school.  I had

21  offers from very small colleges, you know, to play

22  basketball and I kind of just picked the one I thought

23  was going to allow me to play at the highest level, and

24  that was a small college in Louisiana.  I went there for

25  one semester.

48

1              After the first semester, I realized that

2    the -- that college was Baptist Christian College and in

3    a sense turned into a very reputable Bible institute

4    that mostly services online postgraduate degrees.  But

5    when I went there, that was not their forte.

6         Q.    When did you go there?

7         A.    In 1987.

8         Q.    Okay.  When did you graduate high school?

9         A.    '87.

10        Q.    '87.  So then you went there?

11        A.    I went there.

12        Q.    For one semester?

13        A.    One semester.

14        Q.    Okay.  Then what happened?

15        A.    Then what happened is I knew I was going to be

16   in the ministry and somehow there was a Bible college in

17   Baton Rouge, Louisiana called Jimmy Swaggart Bible

18   College.  That same guy.  And we -- I had heard through

19   the grapevine that they were wanting to start an NCAA

20   program and that several guys were transferring over

21   there.

22              And I made a visit.  And they said that

23   that could be a reality for me.  I was coming during the

24   second season, but I would -- I would basically what's

25   called red shirt for the rest of that year, and I would

49

1  start the next year without losing a year of
2  eligibility.
3            I went there in that semester.  Jimmy
4  Swaggart was caught in all kinds of scandalous things,
5  so that whole idea went south.
6            I don't even remember what classes I took.
7  I just took, you know, whatever -- In that situation,
8  you know, you take the basic stuff and you go around
9  your practices and everything else.
10           From there, I went to a college in
11 Missouri because of basketball.
12    Q.    What was it called?
13    A.    It was called Central -- Central Bible College.
14 And they didn't have any scholarships there that they
15 were going to offer me, but they said that we have one
16 available for a walk-on, you know, and if you feel like
17 you can do that...  And I felt like at a Bible College,
18 if I can't walk on, I'm pretty pathetic, and that's what
19 we did.  And I stayed there.
20           And then rightly or wrongly, my
21 father-in-law had these aspirations of starting a
22 university.  So I don't know how he did it, but he
23 convinced me to leave there and come to San Antonio and
24 help him start a school.
25           By helping him, I don't mean I was

50

1    involved in any of the administrative things.  I meant

2    by getting him students through basketball.  He felt

3    like if he could get a bunch of guys to come play

4    basketball, you know, that would be a good nucleus to

5    start a university body.

6                    Okay.  I -- I got a degree from that place

7    that I -- I don't tell anybody about.  I don't publicize

8    it.  I don't say anything because there's all kinds of

9    issues that ended up going on with that that, you

10   know --

11       Q.    And what was the degree in?

12       A.    Pastoral ministry probably.

13       Q.    Okay.

14       A.    And biblical philosophy, something like that.

15       Q.    Okay.

16       A.    But again, you know, I want for the record that

17   I do not at all espouse that or anything else.

18       Q.    Okay.  I won't hold it against you.

19       A.    And then when I got involved in the Nazarene

20   denomination years later, they require you to take -- to

21   be ordained, you have to have basically like an

22   associate's degree type of a thing.  So I had to take

23   classes for two years with them, but I crammed that into

24   about nine months until I was able to get ordained by

25   them as well.

1    Q.    Okay.

2    A.    That -- that's not something that would be a

3    recognized degree.  But as I'm looking into getting a

4    master's or a Ph.D. later on, the colleges that I'm

5    looking at will take all of that stuff, you know.  But I

6    couldn't transfer that like to UTSA or UT or anything

7    like that.

8    Q.    Okay.  So you don't have a degree from a state

9    college?

10    A.    Absolutely not.

11    Q.    Okay.  Do you have any degree other than from

12    your father in-law's college from any other college?

13    A.    No.

14    Q.    Okay.  Now, you said that you --

15    A.    I might have an associate's degree from the

16    school in Missouri because I have seen my name on their

17    list, but I don't ever remember receiving something.

18    Q.    Okay.  Don't remember walking down the aisle?

19    A.    I don't remember walking down the aisle.  I

20    don't remember any of that.

21    Q.    Okay.  You had mentioned that because of

22    certain classes you took, counseling and things like

23    that, you were able to get the day care license?

24    A.    License.

25    Q.    Do you require any license to do the youth

52

1    counseling or the marriage counseling or anything like
2    that?

3        A.    No, because we are not -- There's a lot of
4    leeway for counseling as long as you can show them a
5    program that you are having.  And as long as you make
6    sure -- you know, of course we can't prescribe any
7    medications or anything like that, but --

8              And, you know, we let the perspective
9    clients know exactly who we are, what we are doing.  We
10   require them to come to church during their counseling
11   time.

12       Q.    Uh-huh.

13       A.    I mean, you know, they know exactly what they
14   are getting into.  So we -- we meet the basic prescribed
15   tenets of a counseling service.

16             I am not, you know -- and I think I'm sure
17   we have disclaimers that say I'm not a psychiatrist.
18   I'm not, you know, a psychologist.  We don't, you know
19   --

20             If -- if children or parents have been
21   diagnosed with any type of malady or emotional things,
22   you know, one of the things that we do precursorly is we
23   say, you know, I can't talk to any of this.  You know,
24   I'm not qualified to speak to...  Because we have
25   disclaimers in place to make sure that they know what

1  you are getting is counseling.

2      Q.    Okay.   Correct me if my understanding is wrong,

3  but my -- the general impression I'm getting is you give

4  counseling through just basically education in the

5  Christian faith.   You are using the Christian faith to

6  help them with their problems?

7      A.    Yes and no.

8      Q.    Okay.

9      A.    What we do is, is we do not -- we don't go that

10 route.

11     Q.    Okay.

12     A.    That would be -- that would be -- We go a more

13 subtle approach.

14     Q.    Okay.

15     A.    What we call it is a character packet.   And we

16 use character qualities.   There's nine -- seven to nine

17 character qualities depending on the individual as I

18 hear their story that we tell them to concentrate on.

19                You know, of course we -- we require them

20 to come to church.   But in the counseling services

21 themselves, very little proselytizing, if I can use that

22 word, is going on.

23                Basically I'm talking to them about these

24 character -- these character qualities.   How if they

25 change these behaviors, it helps them develop this type

1  of a character quality, habits, thought processes,

2  things of that nature.

3           And we find that that's a lot more

4  successful than trying to, you know, talk to them about,

5  you know, biblical themes or something like that

6  because, you know, I have been absent from school.  What

7  does Paul the Apostle have to do that?

8       Q.   Okay.

9       A.   You know, I need -- I need to know how to wake

10 my child up in the morning.  How is that going to work?

11 So we -- That's how we do it.  And because we do it that

12 way, we have just been -- there's a -- I'm not sure if

13 it's -- if it's in Leon Valley or not, but there is a

14 Adolescent Recovery Center which is like a Charter Real

15 or something like that that's on Huebner Road, not too

16 far from us, and they've -- they've brought ten girls on

17 two different Sundays to our -- to your church service

18 and are talking about us bringing our character packet

19 to them and training them in -- in those kind of things

20 as well.

21      Q.   Okay.  Now, these character qualities, are they

22 derived from some of the basic religious principles that

23 you are talking about?

24      A.   I mean, you can say yes.

25      Q.   Okay.

1    *A.*    But, I mean, basically what they are is

2  honesty, integrity, initiative.  I mean, you know, you

3  can say yes -- of course I'm going to have a scriptural

4  principle and a biblical precedent for it, but it's

5  something that's also you can look at and say, well, I

6  need -- yes, my kids needs the initiative.  Yes, they

7  need to be more honest.  You know, respect, loyalty, you

8  know, things of that nature.  They can be, you know,

9  just as welcome in the secular community as well.

10            *MR. HENRY:*  Okay.  Let's take a real quick

11  break.  Okay?

12            *THE WITNESS:*  Go ahead.

13            *THE VIDEOGRAPHER:*  We are off the record

14  at 10:22 a.m.

15            *(Short break from 10:22 to 10:32)*

16            *THE VIDEOGRAPHER:*  We are on the record at

17  10:32 a.m.

18    *Q.*    *(BY MR. HENRY)* All right.  Pastor Crain, I want

19  to back up one minute before I go onto the next area.

20  You had mentioned you had a deposition before?

21    *A.*    (Witness nodding).

22    *Q.*    And it was for a dispute over some property.

23    *A.*    (Witness nodding).

24    *Q.*    Okay.  Why don't you tell me a little bit about

25  that dispute.

56

```
1       A.    While we were with the Nazarene denomination,
2  we -- the gentleman that I had mentioned before,
3  Dr. Blankenship, had told me one of the last things that
4  he was going to do before he retired was to assure that
5  our church had a -- had a place.  So right off of Heath
6  Road, which we were renting a facility there --
7       Q.    Do you remember the address for Heath Road?
8       A.    No, I do not.
9       Q.    Okay.
10      A.    Heath Road is a small place.  It's, you know --
11 it's off of Heath and Grissom.
12      Q.    In San Antonio?
13      A.    In San Antonio.
14      Q.    Okay.
15      A.    Anyway, right down the street, a large tract of
16 land, 20 to 30 acres, something like that, was going on
17 auction.  And we went to the action and we won it at
18 $150,000 for 20 acres.  The denomination approved us
19 because they have to approve everything.  They approved
20 it.
21            At the auction, the owner was there, and
22 he approved it, and we signed documents.  We put down
23 $15,000.  You had to put down $15,000.  A guy came up
24 and gave us a check for $5,000 to help us because we
25 were $5,000 short.
```

57

1          Anyway, so we get to the place where we
2   are now going to close and the owner basically says, I
3   want more money.  You know, I'm not going to do it for
4   this $150,000.  I want more money.  And he had private
5   meetings with me and said, look, I will finance you, but
6   you have got to give me at least $200,000.

7          The denomination decided we wanted to --
8   we wanted to pursue this legally.  We got to the place
9   where we went to mediation.  And before mediation, I was
10  deposed, I believe.

11     Q.   Okay.

12     A.   I don't remember if it was prior to or
13  whatever.  But we got to the place of mediation.  And in
14  mediation, we agreed on $190,000.  But at closing, they
15  would give us $20,000 back.  Okay.

16     Q.   Okay.

17     A.   But the caveat to that deal was we had to close
18  in 30 days, and that was, you know, their lawyer
19  outsmarting me because there was -- you know, once I got
20  into it, there was no way we were going to close in 30
21  days.  You know, the bank -- You have to have appraisals
22  and soil samples and, you know, all kinds of things.

23          So it was right around that time also that
24  our church was beginning, you know, leadership
25  directions and things were going, you know, different.

1  So we had it all worked out for the best, but that's

2  basically that whole story.

3       Q.   Okay.  So ultimately, you did not end up -- the

4  Church of the Nazarene didn't end up purchasing --

5       A.   Right.

6       Q.   -- that property?

7       A.   ·Right.  The 30 days -- As soon as I got back to

8  the office and we started investigating this, we knew

9  that there would be no way, even if everything went

10  right, we would be able to do it in 30 days.

11       Q.   Okay.

12       A.   Yeah.

13       Q.   But you had already signed the mediation?

14       A.   We already signed the mediation, and we

15  tried -- you know, we couldn't afford good lawyers like

16  you guys.  You know, we were just, you know, the guy.

17  He should -- he should have caught that, but we didn't.

18       Q.   Okay.

19       A.   But anyway...

20       Q.   Well -- So you had been through a property

21  auction purchase before?

22       A.   Yes.

23       Q.   Okay.  Let's talk about the property that's the

24  basis of this lawsuit today.  Okay.  And what is the

25  address that property?  And we have mentioned it a

1    couple of times.

2       A.    6401 Bandera.

3       Q.    Okay.  And that is in Leon Valley, Texas?

4       A.    Yes, sir.

5       Q.    Okay.  Now, I'm going to show you just as kind

6    of a preliminary point.

7             MR. HENRY:  Can I get this marked as

8    Exhibit 1, please.  Dan, here's one for you.

9             *(Exhibit 1 marked)*

10      Q.    (BY MR. HENRY) Pastor Crain, you have been

11   handed Exhibit 1.  Can you tell me if you recognize

12   that?

13      A.    Hold on a second.  Oh, okay.  Yes, I do.

14            MR. WHITWORTH:  Ryan, is this going to be

15   my copy?

16            MR. HENRY:  Yeah.  That's your copy.

17            MR. WHITWORTH:  Okay.

18            *THE WITNESS:*  Yes, I do.

19      Q.    (BY MR. HENRY) Okay.  Can you tell me what that

20   is?

21      A.    This is an aerial photograph of the basic area

22   in which the property at 6401 is located?

23      Q.    Okay.  And I'll represent to you that this is

24   an aerial photograph taken off of Google.  Okay?

25      A.    Okay.

60

1      Q.    And there is a little bubble with an "A" marked

2    on it.  Do you see that?

3      A.    Yes, sir.

4      Q.    And does that accurately identify where 6401

5    Bandera Road is located?

6      A.    Yes, sir.

7      Q.    Okay.  And it looks like it's right along

8    Bandera Road which is also marked as 16?

9      A.    Yes, sir.

10     Q.    And it actually notes not too far away is

11   Interstate 410, the Loop 410?

12     A.    Yes, sir.

13     Q.    Is that correct?

14     A.    Uh-huh.

15     Q.    And does that accurately represent where that

16   property is located?

17     A.    Yes, sir.

18     Q.    Okay.

19              MR. HENRY:  Can you mark this as Exhibit

20   2, please.

21              (Exhibit 2 marked)

22     Q.    (BY MR. HENRY) You have just been handed what

23   the court reporter has marked as Exhibit 2, Pastor

24   Crain.  Can you tell me if you can identify that?

25     A.    Yes, sir.

61

1     Q.   And what is it?

2     A.   The same photograph except this one is zoomed

3    in --

4     Q.   Okay.

5     A.   -- to highlight the property --

6     Q.   Okay.

7     A.   -- at 6401.

8     Q.   Okay.  And you can see the two buildings there?

9     A.   Uh-huh.

10    Q.   Which are marked next to the "A"?

11    A.   Uh-huh.

12    Q.   I think the "A" is right over the dome shaped

13   building?

14    A.   You are correct.

15    Q.   Okay.  And that's the dome shaped building we

16   mentioned before?

17    A.   That's the same.

18    Q.   All right.  And there's a -- it looks like a

19   little -- or a pretty good size building right next to

20   it that has kind of a bluish-purplish roof?

21    A.   Right.

22    Q.   Is that the one that you called the children's

23   building?

24    A.   Yes.

25    Q.   Okay.  And the parking lot surrounding that, is

62

1   that all of your parking lot?

2       A.   Except on the lower right-hand corner, you will

3   see a convenience store.  But we -- we own all of that,

4   yes, we do.

5       Q.   Okay.  Now, you say you own all of that.  Have

6   you actually closed on that property yet?

7       A.   You are correct.  We have not closed on the

8   property.  We do not own it.

9       Q.   Okay.  You are currently leasing it?

10      A.   Yes, sir.

11      Q.   Okay.  And we will get into some specifics of

12  that in a minute, but this is the property --

13      A.   Property, yes, sir.

14      Q.   -- that we are talking about for this lawsuit?

15      A.   Yes, sir.

16      Q.   Okay.  Now, you mentioned the lower, I guess,

17  right-hand corner or left-hand corner?

18              MR. WHITWORTH:  Yeah.  The convenience

19  store.

20              THE WITNESS:  Right.

21      Q.   (BY MR. HENRY) That's just a much smaller

22  building with a bluish roof?

23      A.   Right.

24      Q.   Okay.  And that's on a separate -- is that on a

25  separate tract?

1     A.    Yes, sir.

2     Q.    Okay.  What convenience store is that?

3     A.    Chevron.

4     Q.    Chevron.  Okay.  And it looks to me like you

5  have got residential housing behind you; --

6     A.    Yes, sir.

7     Q.    -- is that right?  It comes all the way around?

8     A.    Uh-huh.

9     Q.    And then you have got Bandera Road.  And what's

10 right across the street from you on Bandera Road?

11     A.    The water tower and a car lot.

12     Q.    A car lot.  Is that a Dodge dealership?

13     A.    I believe you are, right, yes, sir.

14     Q.    Okay.  And does that accurately represent

15 what --

16     A.    Yes, sir.

17     Q.    -- it looks like?

18     A.    Yes, sir.

19     Q.    Okay.

20     A.    It's several years old, but it does accurately

21 represent.

22     Q.    The photo is several years old?

23     A.    Yes.

24     Q.    Okay.  It hasn't changed much, has it, from the

25 outside?

64

1     *A.*  No, but the property on the far left has been

2 developed.

3     *Q.*  Okay.  And what has that been developed into?

4     *A.*  A strip center --

5     *Q.*  A strip center?

6     *A.*  -- where various businesses are.

7     *Q.*  Okay.  And that would be, I guess, north of

8 your property?

9     *A.*  Yes, sir.

10     *Q.*  Okay.

11           *MR. HENRY:*  Can you mark these the next

12 two exhibits, please.

13           *(Exhibits 3 and 4 marked)*

14     *Q.*  *(BY MR. HENRY)* And I believe that's Exhibit 3

15 that she just handed you --

16     *A.*  Yes, it is.

17     *Q.*  -- and 4?  And I'll represent to you those were

18 also taken off of Google?

19     *A.*  Yes.

20     *Q.*  Okay.  And can you identify those?

21     *A.*  That is the -- looking -- that is the view from

22 Bandera Road going north looking in our parking lot.

23     *Q.*  Okay.  And both Exhibit 3 and Exhibit 4

24 represent --

25     *A.*  The same.

65

1  Q. -- the same thing?

2  A. The same thing.

3  Q. Okay.  And does that accurately represent

4 what --

5  A. Yes, sir.

6  Q. -- the property looks like today?

7  A. No.

8  Q. No?

9  A. We have fixed it up a lot since -- since these

10 pictures were taken.

11  Q. Okay.

12  A. But other than that, yes, they do.

13  Q. Okay.  And what have you done to fix up the

14 property?

15  A. Well, landscape work, trimmed the trees, you

16 know.

17  Q. Uh-huh.

18  A. There was a lot -- that property -- These

19 pictures are old and it was dilapidated.

20  Q. Okay.

21  A. The property was dilapidated.

22  Q. Now, let's talk a little bit about how you

23 acquired the property.  And you kind of acquired the

24 property in a little bit of a dilapidated state, did you

25 not?

1    A.    Yes, sir.

2    Q.    Okay.  Now, before bidding on the property, you

3    were in the Culebra Road location?

4    A.    Yes, sir.

5    Q.    Okay.  And you hadn't incorporated as Elijah

6    Group yet?

7    A.    No, sir.

8    Q.    Okay.  You were still in that limbo period?

9    A.    Yes, sir.

10   Q.    Okay.  When did you decide you were going to

11   need a larger facility?

12   A.    I'm still thinking.  It wasn't -- It was

13   equal -- it was equal concerns.  It wasn't just the

14   largeness of the facility.  It was the amount of rent

15   that we were paying.

16   Q.    Okay.

17   A.    Our lease had expired in February of 2008.

18   Q.    Uh-huh.

19   A.    And because we were one of the larger square

20   footage facilities in our -- in our building, we -- we

21   continued to stay there.  But the rent was -- it was --

22   it was a lot of money.  It was --

23   Q.    How much was it?

24   A.    About $8,000 a month.

25   Q.    Okay.

1    A.    That included electricity however, but it

2    still -- That was a big chunk of change.    So what we did

3    is around the time we started to -- like I told you

4    prior to, we started giving back little sections that we

5    could, but, I mean, we couldn't really do -- we

6    couldn't -- we would give back a section and maybe save

7    $500 a month.

8    Q.    Okay.

9    A.    So, you know, that was one of the things.    And

10   our day care facility was already at capacity.    We were

11   right at 40 kids.    And there was no way we could -- we

12   couldn't move anywhere in the building.    Because by this

13   time, other tenants had come to sign leases as well.

14          And although our landlord graciously -- in

15   the beginning of our lease, we fell behind several times

16   and graciously allowed us to stay there probably because

17   we were still one of the only ones there.    We were

18   paying something anyway.

19          But by this time, you know, he made no --

20   he made no secret that he wanted us to leave as soon as

21   possible because he could divide our space into several

22   smaller spaces and make more money.

23          And, you know, that relationship was

24   strained, you know, because just, you know, the

25   personality that he was, you know.    And he had -- he

1  would come in -- And we -- we didn't have a signed

2  agreement.  We did not have a signed lease from two --

3  from February 2007 until when we moved out.  We did not

4  have a signed lease.  It was a month-to-month thing.

5          And he could come in, and he did several

6  times, and say, look, if you don't give me $4,000 by the

7  end of the day, you are out, you know.

8          And we would -- you know, we would look at

9  each other and look at the bank statement and just pray.

10  And, you know, a couple of times miraculously, you know,

11  $3,800 would come in from stuff we would have, but --

12          So we were -- we were -- The church was

13  not exponentially growing.  And it just wasn't that we

14  needed more space.  It was we were growing a little bit

15  and also we were looking at something that was going to

16  be a little bit financially, you know, more doable.

17      Q.   Okay.  So it wasn't so much your growth.  Just

18  financial considerations is why you needed to get out of

19  there?

20      A.   It was -- I mean, I don't -- I don't want to

21  give the impression that we were -- You know, by this

22  time, the church was just exploding.  That is not what

23  was going on.  But we were growing a little bit and we

24  were boxed in, you know.  There was nothing that we

25  could do.

69

1          And we couldn't do anything with our day

2     care facility because there was no more classrooms to

3     open up.  We had our playground in a parking lot.

4          Q.    Uh-huh.

5          A.    That, you know -- so it was -- You know, we

6     were growing a little bit.  We could use more space, you

7     know.  That would have been nice.  But, you know,

8     several different things contributed to this.

9          Q.    Okay.  Let's talk about that just a little bit.

10    Now, you had said that when you moved into the Culebra

11    property, you had a round -- a little less than 50?

12         A.    Yes, sir.

13         Q.    Okay.

14         A.    Probably a lot less than 50.

15         Q.    A lot less than 50.  Definitely not over 50?

16         A.    No.

17         Q.    Okay.  And in February of 2008, how big was

18    your church congregation?

19         A.    The church congregation had probably gotten

20    close to like, say, 75, 80, 90 people.

21         Q.    Okay.

22         A.    You know, that fluctuation.

23         Q.    Okay.  So no more than 90?

24         A.    Well, sometimes there might be.

25         Q.    Okay.

70

1      A.    But not on a regular basis, no.

2      Q.    Okay.  And you had maxed out on your capacity

3   for kids in the day care?

4      A.    Yes.

5      Q.    Which was 40 you said, correct?

6      A.    Forty-four.

7      Q.    Forty-four.  Okay.  And that -- Was that a

8   certificate of occupancy or a fire code restriction or

9   what was that?

10     A.    Well, not the certificate of occupancy.  The

11  fire code -- and it wasn't a fire code.  It was from

12  licensing themself.  The San Antonio --

13     Q.    Okay.

14     A.    -- licensing, they take the square footage in

15  your classrooms and then they give you, this is how many

16  kids you can have because of the square footage that you

17  have.

18     Q.    Okay.  It was tied to your license?

19     A.    Yes.

20     Q.    Okay.  And were you having people, you know,

21  families that wanted to come in and expand your day care

22  that still wanted you to have more room to have more

23  kids?

24     A.    Yes, absolutely.

25     Q.    Okay.  So you really could have used more

71

1  space?

2      A.    Absolutely.

3      Q.    Okay.  But your licensing wasn't permitted

4  based on your square footage?

5      A.    Right.  And there is another thing I need to

6  address too.  We had a bar right next to us.  Okay.  We

7  opened up a child care facility.  And, I mean, they

8  weren't in operation at the same time.

9            But when parents would pick their kids up

10 at six o'clock, especially on Fridays, the bar was right

11 on the other side of the wall.  And every Monday morning

12 we would come in and it would be -- it would smell like

13 cigarette smoke.  Every Sunday morning we would come in

14 into the sanctuary and it would smell like cigarette

15 smoke.

16     Q.    Okay.

17     A.    I mean -- And during the time that we were

18 there, a tattoo parlor opened up, a pornography shop

19 opened up.  There was already a liquor store, but I

20 figured, man, you know, what does it matter, a liquor

21 store.  We are right next to a bar.  But, you know, it

22 just -- it became, you know, the environment.  So we

23 were definitely looking for something.

24     Q.    Okay.  So when did you decide you needed to

25 find something else?

72

1    A.    There was not a time frame per se because --

2    that gets into a whole different thing.  We know we

3    wanted to find something.  It's just everything had to

4    work into can we afford it?  How are we going to get it?

5    You know, is building an option?  You know, is land --

6    You know, all these different variables.

7                So it wasn't more like, okay, we have

8    decided today we need a new place.  It was, man, we sure

9    could use a new place, you know.  But we, you know --

10    Q.    When was the first time you took steps to find

11    a new place?

12    A.    Ryan, as a pastor, you are also taking steps to

13    find a new place.  Okay.  There is not a one time.  You

14    are always.  You are consistently doing it.

15    Q.    Okay.

16    A.    It's not something -- I mean, I have a file

17    from I-10 to 151, 1604 to 410.  And maybe not in the

18    last 12 months, but prior to that, you could ask me

19    about every, almost every, vacant warehouse, tract of

20    land, you know, anything that I would have some basic

21    information about that.

22    Q.    Okay.  And how long had you been collecting

23    that information?

24    A.    Eight years.

25    Q.    Eight years.  Okay.  So you were always aware

73

1  of different locations you may be able to move into?

2      A.    Right.   Our church is in our eighth building.

3  We started in a school -- well, started in a house.   We

4  moved to a school.   We moved to another leased facility.

5  We moved to the one on Heath Road which was a leased

6  facility.   Now, all of those things were in the Nazarene

7  denomination.

8              We then -- when our church went through

9  that period I told you about in 2004-2005, we then moved

10 into another church building.   They let us have services

11 in the afternoon, and then we moved to Culebra and from

12 Culebra to Bandera.

13     Q.    Okay.   Just out of curiosity on a side

14 question, when did your home in Helotes, when was that

15 purchased?

16     A.    2007, I believe.

17     Q.    2007.   Okay.   And was that purchased -- that

18 was purchased by the church?

19     A.    Yes.

20     Q.    Okay.   But you weren't incorporated as The

21 Elijah Group yet?

22     A.    No.

23     Q.    Okay.   When did you decide to incorporate as

24 The Elijah Group?

25     A.    When -- We had been contacted by the auction

74

1  company to purchase the 60 -- 6401 building.  And when

2  those things looked like they were falling into place, I

3  told the people -- and by this time, the church was

4  solid, you know, very -- It wasn't as fluid as it was

5  before.  And it was just time.  It was time for to us do

6  it, you know, because we were growing.  The day care was

7  growing, you know.  We just wanted to have our -- Again,

8  churches don't have to incorporate, but it's a lot

9  better when you do.

10      Q.   Okay.  So when did you find out about the

11  auction where the Bandera Road property was up for sale?

12      A.   Sometime in the summer of 2008, I believe.

13      Q.   Okay.

14      A.   I got a flier.

15      Q.   Okay.  And what did the flier say?

16      A.   Church building for auction.

17      Q.   Okay.  Now, is there a particular reason -- You

18  had given me some boundaries where you were constantly

19  looking for areas.

20           Was there a particular reason you were

21  restricted to those boundaries or you wanted to be

22  restricted to those boundaries?

23      A.   Well, no.  Just, you know, a feel for where we

24  are comfortable ministry-wise.  I grew up on the

25  northwest side of San Antonio.  I'm comfortable with

1  that.  I have, not connections, but, you know, I have a

2  lot of people on that -- on that side.  The majority of

3  our church come from the Leon Valley/San Antonio area.

4           So, you know, it would be -- it wouldn't

5  make sense for us to move, you know, to another part of

6  the city.  We would -- we would be servicing the

7  community that we are in.

8           And also, a big part of that was the

9  connections we had in Leon Valley through the counseling

10  service.  I didn't want -- You know, if we were way on

11  the other side of town, we would lose those connections.

12      Q.   Now, when you were in the Culebra location,

13  were you doing counseling?

14      A.   Yes.

15      Q.   Okay.  And when would you normally do

16  counseling?

17      A.   Tuesdays and Thursdays.

18      Q.   Tuesdays and Thursdays.  Okay.  Was this just

19  the youth counseling?

20      A.   It was at the beginning, but then it evolved

21  into parental counseling, adult drug counseling.

22      Q.   I'm talking about while you were still in

23  Culebra?

24      A.   Yes.  Yes.

25      Q.   Okay.

1    *A.*    It then evolved into where even Child

2    Protective Services would contact us for our day care

3    facilities.  And they would place kids that are at

4    risk -- you know, their children, toddlers, infants,

5    whatever into our day care facility.  And then their

6    parents would come to us for counseling.

7        *Q.*    Okay.

8        *A.*    So --

9        *Q.*    So you received a flier about the Bandera Road

10    property?

11       *A.*    Uh-huh.

12       *Q.*    And what did you do with it?

13       *A.*    I didn't do anything with it --

14       *Q.*    Okay.

15       *A.*    -- because it was an auction.  And because of

16    our experience in the previous auction, I knew that we

17    were going to have to have ten percent of the money up

18    front.

19       *Q.*    Okay.

20       *A.*    That's a normal auction principle.  Instead of

21    giving -- instead of giving a down payment, you have to

22    have -- in the other auction that we were involved in,

23    you had to have $5,000 to even bid.  You had to show

24    them a cashier's check for $5,000.

25                So I didn't do anything with it because I

1   knew we did not have -- the bid they said was going to

2   start about $1.3 million or something like that.  So I

3   figured it would -- it would end up there.  That's the

4   auction company wanting to start somewhere.  But usually

5   where they want to start is where it's going to end.

6           So I just knew, you know, we don't have

7   $130,000.  We don't have $100,000.  We don't have

8   $50,000.  We don't have $30,000.  We are not going to do

9   this.  I mean, there is no need --

10          You know, by this time, hopefully as I'm

11  getting a little older, there is no need to, you know,

12  waste everybody's time.  It's not going to happen.

13      Q.   Okay.  Well, let me ask you this.  At the time

14  you received this flier, about how much was the church

15  bringing in?

16      A.   The church was probably bringing in close to

17  $100,000 a year.  And the day care was probably bringing

18  in close to 300 -- 300 to $325,000 a year.

19      Q.   Okay.  And what were your expenses running?

20      A.   I didn't make a lot of money, so I knew that --

21  I mean, we were probably -- the thing is, Ryan, that's

22  not the way ministries work.  I mean, I can bring a

23  balance sheet and, you know, we have an accounting for

24  all that stuff.

25          But, you know, when -- when you have a

1   business, you have -- you have a set of expenses.   Okay.

2   And you have -- you know, you have to a ministry.   But

3   whenever you have, you know, more money than you do in

4   another month, usually you are catching up with bills

5   that you were behind with something.

6          Because remember, no matter what, you are

7   depending on, you know, guys like Ryan to come every

8   week and give a contribution.   And sometimes Ryan was

9   sick or sometimes I don't like you anymore, Pastor, or

10  we went to John Hagee's church.   They have, you know,

11  whatever.

12         All those things are real.   So, you know,

13  you have fluctuating things.   So, you know, when you

14  make more in one month, you are usually catching up for

15  the month that you are there.

16     Q.   Right.

17     A.   But I would guess that we had, you know, after,

18  you know, our profits were -- Let me give you a number

19  instead of a percentage point.   I would say somewhere

20  between ten and 25 percentage on a margin level speaking

21  in business terms.

22     Q.   Okay.

23     A.   Yeah.

24     Q.   But you definitely didn't have $100,000 lying

25  around?

79

1      A.    Oh, no.   No, no.

2      Q.    Okay.   And you are technically a nonprofit

3   organization, correct?

4      A.    We are.   Not just technically, we are a

5   nonprofit organization.

6      Q.    Okay.   Or a lack of -- or a negative profit

7   organization at times?

8      A.    Sometimes, yes, sir.

9      Q.    Okay.   Okay.   So you didn't do anything when

10   you first got the flier?

11      A.    (Witness nodding).

12      Q.    Okay.   When did you decide you could do

13   something about it?

14      A.    I got another one.   Okay.   And pastors and

15   Christian people, you know, we are a little mystic even

16   though we try not to -- try not to be.   And I wanted to

17   know they knew I was -- where I was.   Because having

18   leased a building and having leased prior to, I had made

19   a commitment.   Unless the church is just blowing up, I'm

20   not going to spend a dime in this place, in a leased

21   facility.

22          Prior to, I had spent, you know, tens of

23   thousands of dollars when we were with the denomination

24   on leased space that we didn't end up, you know,

25   keeping.   So we didn't even -- Ryan, we don't -- we

80

1  didn't even have a sign up for our church at the Culebra

2  location.

3            Our thing was, if you want to come, you

4  are going to have to find us, you know and -- so we

5  didn't have a sign.  I didn't -- We were -- we were not

6  at all, you know, what we would call evangelizing.  You

7  know, we weren't telling people that we were here.  We

8  were just kind of taking people as they -- as they come

9  through, whatever.

10           And many times, people would come and they

11  would knock on all the doors in our little center and

12  tell us they would come to our church.  Oh, there's

13  where you guys are.

14           Well, we finally went there because I got

15  two or three of these fliers.  And then I talked with my

16  wife about it.  And I said, you know, maybe we will just

17  go look inside of it because she had always liked that

18  building for some unknown reason.

19  Q.    Now, were you aware that that building was

20  previously a church?

21  A.    Yes.

22  Q.    Okay.  Had you ever attended that church?

23  A.    No.  I hadn't, no.

24  Q.    Okay.  Had any members of your congregation?

25  A.    Yes.  Yes.

1    *Q.*   Okay.  And did they tell you about it?

2    *A.*   Yes -- Well, no, not that it was up for

3    auction, but they told me, you know, in speaking.  That

4    church went through some issues as well and, you know,

5    people would say this happened and, you know, they would

6    tell me.

7    *Q.*   Well, the church actually -- The property was

8    foreclosed on, correct?

9    *A.*   Right.

10   *Q.*   Because the church -- I believe it was the

11   Church on the Rock; is that correct?

12   *A.*   Yes.

13   *Q.*   Okay.  They went through their own financial

14   problems?

15   *A.*   They built that dome.

16   *Q.*   But they weren't able to make their mortgage?

17   *A.*   Right.

18   *Q.*   Okay.  And do you know when the bank

19   foreclosed?

20   *A.*   No, I don't.

21   *Q.*   Okay.  But was it apparent from the flier you

22   received that it was a foreclosure --

23   *A.*   Yes.

24   *Q.*   -- sale?

25   *A.*   Yes.

82

1    Q.   I'm sorry.  Let me finish so she can -- and I

2    don't mean to be rude, but she --

3    A.   Are you right.

4    Q.   -- she has -- she has to type only one of us at

5    a time.  Okay.  The flier was obviously a foreclosure

6    sale?

7    A.   Yes.  Yes, sir.

8    Q.   Okay.  And who was conducting the auction?

9    A.   Sherwood -- I can't remember the name.

10   Anderson.  Some company from Chicago.

11   Q.   Okay.

12   A.   I forget what the name -- name was.  It's on

13   all of the paperwork though, I mean.  I forget what the

14   auction company's name was.

15   Q.   Okay.  So was it clear in your mind that the

16   bank had the building and they were trying to sell it

17   through an action?

18   A.   Absolutely.

19   Q.   Okay.  And so when was the auction?

20   A.   Sometime in December of 2007, I believe.

21   Q.   Okay.  I thought you said you got the flier in

22   the summer of 2008?

23   A.   Did I say that?  Then it was the summer of

24   2007.  I'm sorry.

25   Q.   Okay.  So you got the flier in the summer of

83

1  2007?

2      A.    2007, yes, sir.

3      Q.    Okay.  Are you sure about that?

4      A.    Yes.

5      Q.    Okay.

6      A.    That's right.  Because if we got -- we got the

7  flier in 2007 and the auction was slated for the end --

8  that's -- that's right.  I made a mistake.  Because the

9  auction was set for, I believe, October of 2007 was the

10  first one.

11          The action company set up viewings in

12  which they invited the people that got the fliers.  And

13  we decided to go on the last day of -- of one of the

14  viewings.  And we looked at it.  And of course, you

15  know -- you know, it was perfect.

16      Q.    Okay.

17      A.    But, you know, we -- again, I had said, well,

18  we are not going to do anything with this because -- and

19  I didn't even tell anyone in the church about it because

20  it was being auctioned, and I knew the rules of the

21  auction.

22          And the guy at the auction company, he

23  walked me around and he was one of the vice-presidents

24  or something.  And he said, Pastor Crain, this is your

25  place.  I can tell, you know.  And of course I tell him,

84

1    you tell that to everybody, you know.  So that was it.

2                We went to see it.  I believe we went to

3    see it one time.  And then I took my dad because they

4    didn't get that much interest in it, I guess.  I believe

5    they had three viewings.  And of those three viewings,

6    they were three or four days apiece where you could come

7    and look at it and whatever, and we went twice in that

8    period.

9        Q.    Okay.  Do you remember when that was, was that

10   in October, was that in November?

11       A.    No, it was prior to.  It was probably again

12   August, September of 2007.

13       Q.    Okay.  So in the summer of 2007, you got the

14   flier which noted that this was a foreclosure sale,

15   right?

16       A.    Right.

17       Q.    All right.  Now, had you already been aware

18   that the Church on the Rock had stopped conducting

19   services there?

20       A.    Yes, because a friend of mine was going to that

21   church.  A pastor -- a pastor friend of mine actually

22   was attending that church.

23       Q.    Okay.

24       A.    So he was --

25       Q.    Do you remember his name?

1    A.   Jim Kingery.

2    Q.   Okay.  So he was going to that church and he

3  told you they were no longer conducting services?

4    A.   No.  It wasn't like that.  It was, I called him

5  one day, and he said, oh, yeah.  We are meeting over

6  here now.

7    Q.   Okay.

8    A.   And I said, meeting over where?  What are you

9  talking about?  And they were meeting at a location on

10  Fredericksburg.

11    Q.   Okay.

12    A.   And I didn't really go into any -- what

13  happened or anything like that.

14    Q.   Okay.

15    A.   He didn't tell me anything about the

16  foreclosure or anything like that.  He wasn't that

17  involved where he may or may not know that information.

18    Q.   Okay.  So he told you, look, we have moved.  We

19  are over here --

20    A.   Yeah.

21    Q.   -- on Fredericksburg?  And when you received

22  the flier, were you able to put two and two together?

23    A.   Well, yeah.

24    Q.   Okay.

25    A.   I mean, I knew -- you know, I knew that they

1    where struggling because, you know, just like you guys

2    talk among your profession, pastors -- pastors talk

3    among their profession as well.  And we knew that that

4    was a huge payment, you know, and, you know, they were

5    struggling to make it.  And, you know, to have a payment

6    that big, you have to have a very, very large church,

7    you know.  Anyway...

8         Q.   Okay.

9         A.   But I was absolutely certain that that --

10   somewhere the bank had foreclosed and that this was an

11   auction sale, absolutely.

12        Q.   So you went to a couple of viewings, but really

13   didn't tell anybody about it, right?

14        A.   Family.

15        Q.   Okay.  So when did you decide to bid on it?

16        A.   I didn't --

17        Q.   Okay.

18        A.   -- decide to bid on it for the reasons I have

19   talked to you about.  The auction company contacted me

20   through the vice-president.  And I thought -- I honestly

21   thought he was just being a salesman, you know, as he

22   would be.

23             And he said, you know, Pastor Crain, I can

24   just see you doing so well here, a young guy, blah,

25   blah, blah.  And I said, whatever.  I said -- You know,

87

1    we looked at it.  And I looked around at it.

2               And I talked with my friend.  And I said,

3    what do you know about the building?  And he told me,

4    you know, the positives and the negatives.  And the date

5    was moved from October, the original auction date, to

6    November and then to December.

7       Q.   Okay.

8       A.   It was moved three times.  And I believe it had

9    to do with the interest in the building and then the

10   legal issues as well.

11      Q.   Okay.

12      A.   And I'm telling you all I know about that.    I

13   don't know exactly why it was moved because we didn't

14   bid on any of the dates.

15      Q.   Okay.

16      A.   The final date came and the -- you know, the

17   date came, and I didn't bid because we don't have the

18   ten percent to put down.

19               Somewhere they called us and they said,

20   look, forget the ten percent.  Can you come up with

21   $60,000?  And I said, well, no, but I have a pastor

22   friend of mine who -- who is -- is wealthy.  And I ran

23   it by him.  And he said, I don't think you should put

24   any money down.  You don't know what's going to happen.

25               So I called him back and said, I don't

1  have $60,000.  This was on the day of the auction.  And

2  they said, Pastor Crain, please just send in a bid.

3  Would you please just send in a bid.  A guy called me

4  and told me that.

5              And so I called my wife.  I said, look,

6  these guys are calling me.  They want me to send in a

7  bid.  And so now I'm thinking maybe this is something we

8  need to pursue.

9              So I called my dad and I called my wife

10  back, and we put in a bid, and we faxed it.  And I think

11  ten minutes later they called us back.  Congratulations,

12  Pastor Crain.  You won.

13     Q.   Well, how much did you bid?

14     A.   $1.33 million.

15     Q.   Okay.  Anything down?

16     A.   They wanted something down, but I told them at

17  the beginning, you know, we are not going to put

18  anything...  He coached me how to fill out the bid on

19  the paperwork.

20     Q.   The gentleman from the auction?

21     A.   From the auction company.  I told him, well, we

22  can't put any money down.  And I think -- I don't

23  remember what I did.  You will have the paperwork, but I

24  don't remember if I put zero down or $60,000 down.  It

25  was depending upon what he said.

1              And he said -- if you did tell me that --

2    I think I remember him telling me, but I'm not for sure.

3    He said, Pastor Crain, just put $60,000 down on paper,

4    and we will worry about it later.  And I don't remember

5    if I put 60 or zero.  But anyway, we faxed it to him.

6    And they called us back and said, congratulations,

7    Pastor Crain.  You won.

8        Q.    Okay.

9        A.    Get ready for the ride of your life.

10       Q.    All right.  Do you remember -- And this was in

11   December of '07?

12       A.    Yes, sir.

13       Q.    Okay.  So you were encouraged, almost sought

14   after, in order to bid on the property?

15       A.    Yes.

16       Q.    Okay.  Now, at the time of the bid in December,

17   were you aware of the -- the dispute regarding the

18   zoning?

19       A.    Yes, absolutely.

20       Q.    Okay.  When did you become aware of that?

21       A.    As soon as we went to look at it.  They -- as

22   soon as the first viewing was there, they had other

23   entities, nonchurch entities, looking at it.

24       Q.    Okay.

25       A.    I felt like the gentleman -- I don't remember

90

1   what his name was, but I felt like he was being pretty

2   straightforward with me, saying, you know, we have this

3   company is looking for it, this company.  And what he

4   basically was saying is they are not going to get it

5   because it's going to cost too much money to renovate it

6   to what they -- they want to do.

7                   And there was some larger churches that

8   were looking to purchase this facility to make them

9   second campuses.  But because of the legal issues, they

10  didn't want to get involved.

11      Q.    Okay.  Now, during the viewings -- You said you

12  went to two viewings?

13      A.    I believe so.

14      Q.    Okay.  Did you become aware at that time that

15  the property had been vandalized?

16      A.    Yes.

17      Q.    Okay.  Or that the property was dilapidated?

18      A.    I want to back up.

19      Q.    Okay.

20      A.    I was not aware that it had been vandalized.  I

21  was aware that it had been dilapidated.

22      Q.    Okay.

23      A.    The church prior to, probably for the last 18

24  months that they had it, was just paying the interest on

25  the note, and they weren't able to -- you know, a

1  property like that, you -- it costs several thousand
2  dollars every couple of months to, you know, just keep
3  it up like anything else.  And they hadn't kept it up.
4  You know, they were having all kinds of problems.
5      Q.    Okay.  So because of the prior tenants, they
6  weren't keeping it up.  So it was kind of in --
7      A.    Disrepair.
8      Q.    Disrepair.  Okay.  Good word.  When you viewed
9  it, you noted it was in disrepair?
10     A.    Yes.
11     Q.    Okay.  At that time, did they tell you it had
12 been vandalized?
13     A.    I don't believe so.
14     Q.    Okay.  When did you discover it had been
15 vandalized?
16     A.    Ryan, I don't exactly remember, but it was
17 somewhere around the time prior -- we went to turn on a
18 light switch and nothing happened which was not unusual
19 because the electricity might be off.
20          Okay.  But then upon further
21 investigation -- and I don't remember if the auction
22 company told us this or not or we may have learned about
23 this after we bought it.  I don't remember the time.
24 But we found out that all of the electrical wiring for
25 both buildings had been taken out.

1     *Q.*   Okay. All the copper wiring?

2     *A.*   All the copper wiring, yeah.

3     *Q.*   Okay. It had been stripped?

4     *A.*   (Witness nodding).

5     *Q.*   Verbal answer. Sorry.

6     *A.*   Yes, sir. It had been stripped.

7     *Q.*   Okay. And did you -- They didn't want to give

8 an explanation to you about what happened or why there

9 was no cooper wiring in there?

10     *A.*   No, sir.

11     *Q.*   Okay. So you never found out when that

12 happened or how it happened?

13     *A.*   Well, we found out once we began to -- once we

14 won the auction and began to go in there and look at it,

15 we -- you know, we have tradesmen in the congregation,

16 electricians, plumbers that, you know, go through things

17 and look at it. We realized that there was no copper

18 wiring.

19              The air conditioners were nonfunctional

20 because of that, you know, and we thought originally

21 that it was just the wiring to the -- to the -- what

22 they call the panel box on the outside. But we later

23 found out that they had actually got in the building

24 and -- from the roofs and, you know, it was very, very

25 extensive.

93

1    *Q.*   Okay.  So basically -- And forgive me if my
2   paraphrasing is inaccurate, and you can clarify it,
3   please.  All the copper wiring had been removed from the
4   buildings or most of it had?
5    *A.*   Yes, sir.
6    *Q.*   Okay.  So you had no electricity for either the
7   children's building or the dome building?
8    *A.*   Yes, sir, that's correct.
9    *Q.*   Okay.  And you weren't aware of this prior to
10  your purchase?
11   *A.*   I -- I may have been, but I don't think so
12  because I don't think it had happened yet because I
13  remember going into the dome building and the lights
14  being on.
15   *Q.*   During one of the viewings?
16   *A.*   During one of the viewings.
17   *Q.*   Okay.
18   *A.*   I thought, you know, the lights were on
19  because, you know, the dome building is very dark
20  without any kind of -- because there's no windows.
21   *Q.*   Okay.
22   *A.*   And the lights were on there.  So it must have
23  happened after that.
24   *Q.*   Okay.  Now, let's clarify some things, the
25  timing and the legal issues.

94

1      *A.*    Okay.

2      *Q.*    You bid on the property in December of '07,

3   correct?

4      *A.*    Yes, sir.

5      *Q.*    And did you negotiate a contract for the

6   purchase of the property?

7      *A.*    Wouldn't that be the same thing as me bidding

8   on it because the auction company -- you're -- they are

9   the real estate agent per se, and we had a real estate

10  agent ourselves.  And I think that the actual contract

11  that we were filling out with the auction company, isn't

12  that the negotiated --

13     *Q.*    Well, you tell me what your understanding is.

14     *A.*    That's what my understanding was.

15     *Q.*    Okay.

16            *MR. WHITWORTH:*  Yeah.  And let me object

17  to the question also.  Just objection, form, that it

18  calls for a legal -- legal response which he is not

19  qualified as -- as an attorney to give.  Go ahead.

20            *MR. HENRY:*  That's why I clarified as his

21  understanding afterwards.

22            *THE WITNESS:*  Yeah.  And -- Right.

23     *Q.*    (BY MR. HENRY) Okay.  So your understanding was

24  you would enter into a contract to buy it when you

25  placed your bid?

1    *A.*   Yes.

2    *Q.*   Okay.  All right.

3           *MR. HENRY:*  Can I have this marked as the

4   next exhibit, please.

5           *(Exhibit 5 marked)*

6    *Q.*   *(BY MR. WHITWORTH)* Can you tell me which

7   exhibit -- I think that's five.  Is that the one that

8   she gave you?

9           *MR. WHITWORTH:*  Yeah.

10         *THE WITNESS:*  Yes.  My -- I want to just

11  say something.  I said $60,000, but I wrote on the thing

12  $2,000.

13    *Q.*   *(BY MR. HENRY)* $2,000.  Okay.

14    *A.*   It's right here.

15    *Q.*   When you were handed Exhibit 5, that refreshed

16  your memory?

17    *A.*   Yes.

18    *Q.*   Okay.  Can you tell me what Exhibit 5 is?

19    *A.*   This is the -- I don't know if it's a contract.

20  It's a purchase and sale agreement it says right here

21  that the auction company gave us.

22    *Q.*   Okay.

23    *A.*   We -- we looked through it and basically we had

24  our real estate agent look through it, and we knew that

25  there were going to be legal issues as -- as part of,

96

1  you know, the deal.  We knew that there were zoning

2  grievances and so forth and so on.  But this is that

3  agreement that we signed with the auction company.

4      Q.    Okay.  Now, does this fairly and accurately

5  represent what you remember signing, the exhibit in

6  front of you?

7      A.    Yes.  I believe this is a copy that.

8      Q.    Okay.  Now, is this what you faxed in as your

9  bid?

10     A.    This page only.

11     Q.    Okay.  And what page is that?

12     A.    This would be Page 2.

13     Q.    At the very bottom --

14     A.    Sheldon Good & Company.

15     Q.    Okay.  That was the auction company?

16     A.    (Witness nodding).

17     Q.    Okay.  And you looked at the bottom of that

18 page and noted the footnote or the footer; is that

19 correct?

20     A.    Yes, sir.

21     Q.    Okay.  At the bottom of that page, it says

22 P-00011.  Do you see that?

23     A.    Yes, sir.

24     Q.    Okay.  That is the page that you are

25 referencing?

97

1      A.    Yes, sir.

2      Q.    Just for your edification, when your counsel

3   produced these to us, that's called a Bates stamp.

4      A.    Okay.

5      Q.    And they stamp all the numbers -- all the pages

6   of all the documents they gave us.  So this was the 11th

7   page that he gave us.

8      A.    Okay.

9      Q.    And you faxed in just this page?

10     A.    To the auction company.

11     Q.    To the auction company?

12     A.    Yes.

13     Q.    Okay.  Did you fill out anything else at that

14  time?

15     A.    I may have filled this out but --

16     Q.    Page P-000 --

17     A.    10.

18     Q.    10?

19     A.    Yes, sir.

20     Q.    Okay.

21     A.    But I know that I did not fax this whole

22  packet.

23     Q.    Okay.

24     A.    Because the guy called me specifically, and he

25  said, don't fax me the whole thing.  Just pick this page

98

1  out.  Write your bid.

2      *Q.*    Okay.

3      *A.*    We talked about earnest money, and -- and he

4  was wanting $60,000.  He said, just put something or

5  whatever.  And I thought I put either zero or 60, but I

6  guess I put two.

7      *Q.*    Okay.

8      *A.*    And I faxed that page to him only.

9      *Q.*    Okay.  And then about ten minutes later he

10  called and said, congratulations.  You won?

11      *A.*    You won.

12      *Q.*    Okay.  So at what time did you actually sign

13  this entire agreement, do you remember?

14      *A.*    I think we signed it prior to the auction being

15  done because my real estate agent -- This is my

16  understanding.  I'm not sure if this is right or not.

17      *Q.*    That's all I want is your understanding.

18      *A.*    This is my understanding.  This from our real

19  estate agent is the purchase agreement.  This is the

20  stuff you sign.  This is what it was.  It had a couple

21  of more -- There was a book that went along with this

22  that described...  I mean, it was a novel that described

23  the different things of the building.  But it was my

24  understanding this was the purchase agreement.

25              *MR. HENRY:*  Okay.  Let's change tapes real

1   quick.

2      Q.   *(BY MR. HENRY)* On the exhibit, if you will go

3   to P-00028.

4      A.   (Witness complies).

5      Q.   That actually says seller and purchaser. Do

6   you see that on top?

7      A.   Yes, sir.

8      Q.   Is that your signature under purchaser?

9      A.   Yes, it is.

10      Q.   Okay. And do you see the date there?

11      A.   Yes.

12      Q.   What does it say?

13      A.   January 4th, 2008.

14      Q.   Okay. Would that have been the date you signed

15   this?

16      A.   Yes.

17      Q.   Okay. So if you bid in December, you came back

18   and signed the whole thing on January 4th?

19      A.   Yes, sir.

20      Q.   Okay. Did you ever get a signature from the

21   seller?

22      A.   Yes, sir, we did.

23      Q.   Okay.

24      A.   I don't see it on this one because this is the

25   one that we sent to the auction company. And somewhere

1  down the line, the auction company dropped out and we

2  were just dealing with the bank.

3    Q.   Okay.  But do you have a signed copy from the

4  seller?

5    A.   Ryan, I don't know now that I think about it --

6    Q.   Okay.

7    A.   -- because -- I don't know if we do or not.  It

8  seems like we would.  But I was doing this on the behest

9  of our real estate agent working with the auction

10 company.

11            And when we -- when we did this in

12 January, we -- we -- the bid was made in middle to late

13 December.  Okay.  And the reason this wasn't signed is

14 because they wanted some money down.  And we wouldn't

15 have any money down.  I told him we are not going to put

16 any money down.  I don't even think that I can come up

17 with 2,000 that I wrote down.

18            If I'm not mistaken -- And again, I think

19 what they said, look, you just sign it and send it back

20 to us.  We will get them to sign it and whatever.  After

21 that, I don't remember what happened.

22    Q.   Okay.  Will you do me a favor and look to see

23 if you have a copy?

24    A.   Yes, I will.

25            *(Information to be supplied)*

1    *Q.    (BY MR. HENRY)* Okay.  And if you have a copy,

2  you can give it to your lawyer and he can give it to us.

3    *A.*    Yes, sir.  Yes, sir.

4    *Q.*    Okay.  But as far as your understanding goes,

5  you have a valid contract with the bank?

6    *A.*    Yes.

7    *Q.*    Okay.

8    *A.*    Absolutely.

9    *Q.*    And when you said the seller, you are talking

10  about the bank, right?

11    *A.*    Yes.

12    *Q.*    The bank that foreclosed on the property?

13    *A.*    Yes.

14    *Q.*    Is that GoldStar Trust?

15    *A.*    Yes.

16    *Q.*    Okay.  Now, on this exhibit, I want you to turn

17  to, let me find it myself, the page right before the

18  signature page, P-00027.

19    *A.*    Okay.

20    *Q.*    Okay.  Do you see Section 59?

21    *A.*    Uh-huh.

22    *Q.*    Okay.  Special provisions?

23    *A.*    Uh-huh.

24    *Q.*    It has two spaces there, and one of them has an

25  X next to it.  Do you see that?

1    *A.*   Yes, sir.

2    *Q.*   Can you read that X for me?

3    *A.*   It says purchaser acknowledges that the current

4 zoning on the property does not allow for use of the

5 property as a church.  Purchaser elects the following.

6            Seller, at seller's expense, will rezone

7 the property for use as a church prior to closing.

8 Closing may be extended in accordance with the provision

9 of Paragraph 8.

10    *Q.*   Okay.  And did you negotiate that with the

11 bank?

12    *A.*   Yes.

13    *Q.*   Okay.  Prior to you signing it?

14    *A.*   I don't know if I directly negotiated with the

15 bank.  All I know is the real estate agent was saying

16 this is an issue, you know, and they are going to -- you

17 are going to enter in with them or they are going to or

18 you are going to.  There is going to be a legal issue.

19 And we were fully aware of that prior to, you know, us

20 coming in there.

21    *Q.*   Okay.  Who was your real estate agent?

22    *A.*   J.J. Arrida, A-r-r-i-d-a.

23    *Q.*   And is J.J. still your real estate agent?

24    *A.*   For whatever practical purposes there -- you

25 know, when we need him.

1    Q.    Okay.  Did you have a particular agent helping

2  you?

3    A.    Him.

4    Q.    Him.  Okay.  I'm going to -- in that exhibit,

5  I'm going to refer you to Page 12, P-00012.

6    A.    Okay.

7    Q.    Okay.  Do you see down at the bottom Section 8?

8    A.    I'm on the wrong page.  Tell me one more time.

9    Q.    P-00012.

10    A.    12.  Okay.  Yes.

11    Q.    Okay.  That's the closing date?

12    A.    Yes.

13    Q.    Okay.  And it says closing will be -- what does

14  it say the closing date will be?

15    A.    Forty-five days following seller's acceptance

16  of this agreement.

17    Q.    Okay.  Do you remember when the seller accepted

18  this agreement?

19    A.    No, I don't.

20    Q.    Okay.

21    A.    I remember this being pointed out to me though

22  in accordance to what you just read.

23    Q.    Okay.

24    A.    My real estate agent was saying that these two

25  things can be pushed back depending upon the -- the

1  legal issues.

2      Q.   Okay.

3      A.   And basically he wanted us to know that this

4  may not happen in 45 days.  And quite frankly, we didn't

5  expect it to.

6      Q.   Okay.

7      A.   We were -- we were okay with that.

8      Q.   Okay.  So you entered into this agreement

9  knowing that you couldn't -- the property wasn't zoned

10 to use as a church anymore?

11     A.   Yes.

12     Q.   Okay.  And that's why you asked them to have it

13 rezoned?

14     A.   Right.

15     Q.   So you could use it as a church?

16     A.   Right.

17     Q.   Okay.  And you wanted to use it for Elijah

18 Group purposes, correct?

19     A.   We weren't Elijah Group at that point.

20     Q.   Okay.

21     A.   But yes.

22     Q.   Okay.  So when did you actually become The

23 Elijah Group?

24     A.   Probably September, October 2008, something

25 like that.

1          *MR. HENRY:*  Okay.  Let's mark this as the

2     next exhibit, please.

3               *(Exhibit 6 marked)*

4          *Q.*   *(BY MR. HENRY)* You have just been handed what's

5     been marked as Exhibit 8 -- 6, I'm sorry.  Can you tell

6     me if you recognize that?

7          *A.*    These are the incorporate -- incorporation

8     papers from the State of Texas.

9          *Q.*    For?

10         *A.*    The Elijah Group.

11         *Q.*    For The Elijah Group.  Okay.  And the first

12    page notes it's for The Elijah Group.  It notes on the

13    top, you know, filed in the office of the secretary of

14    the State of Texas.  Do you see that?

15         *A.*    Yes, sir.

16         *Q.*    And what's the date on there?

17         *A.*    October 22, 2008.

18         *Q.*    Okay.  Is that an accurate date --

19         *A.*    Yes, uh-huh.

20         *Q.*    -- now that you have seen this document?

21         *A.*    (Witness nodding).

22         *Q.*    I'm sorry.  I need a verbal answer.

23         *A.*    Yes, sir.  I'm sorry.

24         *Q.*    Okay.  So you became incorporated in October of

25    '08?

106

1    A.    Yes, sir.

2    Q.    Okay.  Now, you entered into the contract to

3    purchase the property.  From your understanding, that's

4    what it is, right?

5    A.    Yes.

6    Q.    In January of '08?

7    A.    Yes.

8    Q.    Okay.  And then the bank, GoldStar, did they

9    take steps to do what they said they were going to do

10   and try and rezone the property?

11   A.    Somewhere around that time frame, the document,

12   Exhibit 5, is a document that was generated by the

13   auction company.

14   Q.    Okay.

15   A.    Okay.  Somewhere around that time frame, I

16   stopped dealing with the auction company.  I don't know

17   exactly what happened there, and I was dealing with

18   GoldStar and their representative, and then I began to

19   deal with the lawyer, Patrick Christensen.

20          And Patrick and I met.  And basically he

21   said he was doing the zoning things.  He needed my

22   input.  We began to talk.  And he said the first step to

23   this before we file legal action is to go to the zoning

24   commission which we did.

25          And we had one public hearing which went

1  pretty good, I thought.  They couldn't do anything right

2  there, the zoning commission.  But Patrick and my

3  realtor was there as well.  They said, the best thing we

4  can hope for is we are not going to do anything.  We are

5  going to go back and talk to people and next month we

6  will revisit it, and that's what we got.

7           The next month they came back and they,

8  you know, denied it and said -- you know, talked about

9  that.  And basically everyone was of the same opinion at

10  that meeting.

11          The zoning concerns were we are losing,

12  you know, a massive tax revenue, a tax generating

13  property.  And the citizens that spoke, none of them --

14  well, one lady was, but the citizens that spoke by and

15  large said, we don't have an issue with a church being

16  there, but we need to be conscious of the fact that we

17  are losing a tax revenue base, and they were -- they

18  didn't want us to go under again.

19          You know, the church, you know, built this

20  thing and there was some bitterness because of the

21  building of the dome, you know.  The people that live

22  right behind the dome had a very nice view of the city

23  and then they built this dome there.

24          Anyway, so we were there and then

25  basically, you know, everyone's concerns were the same.

1 | We are going to be losing, you know, a large tax
2 | generating facility.
3 | One person, I don't remember if it was a
4 | zoning commissioner or one of the -- or one of the
5 | citizens, said this is right now the most valuable piece
6 | of property we have in Leon Valley, you know.  And with
7 | the highway going in, they made reference to that, we
8 | just do not want to lose it.
9 | And, you know, at that point, one of the
10 | ladies that was -- that's a staffer there for Leon
11 | Valley recommended that, you know, they deny that zoning
12 | based on -- based on that.  And everybody -- I think one
13 | person voted not to do it, but pretty much everybody
14 | voted to do it.
15 | Q.  Was that at the zoning commission or the
16 | council?
17 | A.  Zoning commission.
18 | Q.  Okay.  So let me see if I -- I understand this
19 | correctly.  You entered into the contract to purchase
20 | the property?
21 | A.  Right.
22 | Q.  Contingent upon GoldStar getting the property
23 | rezoned?
24 | A.  Yes, sir.
25 | Q.  Okay.  And was it your understanding that if

109

 1   they could not get the property rezoned, you were

 2   relieved of any obligations?

 3        A.   Yes.

 4        Q.   Okay.  Under the contract?

 5        A.   Right.

 6        Q.   Okay.  So GoldStar moved forward, and GoldStar

 7   paid for Patrick Christensen, correct?

 8        A.   Yes.

 9        Q.   You didn't pay for him, correct?

10        A.   No.

11        Q.   Okay.  Did you have a lawyer on your end

12   helping you at all?

13        A.   No.

14        Q.   Okay.  So you were dealing with Patrick

15   Christensen.  Now, he's with Brown, P.C.?

16        A.   Hold on a second.

17        Q.   Yeah.

18        A.   I want to clarify something.  I believe that

19   Patrick Christensen was my lawyer per se.  Although I

20   didn't hire him, I believed he was, you know -- that he

21   was our lawyer, I believed.

22        Q.   Okay.  Your understanding was he was your

23   lawyer, but he was being paid --

24        A.   Right.

25        Q.   -- by GoldStar?

1      A.   Yes.

2      Q.   And he was being paid to take care of the

3  zoning issue?

4      A.   Yes.

5      Q.   Okay.  That both you and the bank wanted

6  accomplished?

7      A.   Yes, sir.

8      Q.   Okay.  Because if the rezoning didn't occur,

9  then the contract could technically go away.  Your

10  understanding?

11     A.   Yes.  Yes, sir.

12     Q.   Okay.  So you met with -- with Patrick.  Now,

13 like I said, I don't think I got an answer from you,

14 he's with Brown, P.C., correct, that's the name of the

15 firm he works for?

16     A.   I have no idea, sir.

17     Q.   Okay.  But you know he's a lawyer?

18     A.   Yeah.  And it seems like I saw that somewhere.

19     Q.   Okay.  But you are not certain?

20     A.   No, I'm not.

21     Q.   Okay.  And how many times did you meet with

22 him?

23     A.   Three or four.

24     Q.   Three our four.

25     A.   Three or four different times.

1    *Q.*   Okay.  And what was the -- I guess the scope of

2    his representation for you?

3    *A.*   Basically, Pastor Crain, I'm Pastor Chris --

4    I'm Patrick Christensen.  I'm with -- he, if I'm not

5    mistaken, represented -- when he was introduced, I

6    represent GoldStar.  You know, tell me what you know.

7    Show me what you have done.  Show me your paperwork,

8    that kind of thing.

9              This is what we are going to try before we

10   do litigation.  Before we do anything, we are going to

11   try to do it through the zoning commission.

12             And the first time he said a victory for

13   us will be that they will want to hear the case.  That

14   they will have 30 days or whatever it was until their

15   next meeting and that's what we got the first time.

16             And then I met with him -- I talked with

17   him on the phone a few times, you know, met with him

18   briefly, and then we went to the zoning commission the

19   next time, and they went the other direction.

20   *Q.*   Okay.  Now, when -- You said you met at the --

21   did you meet at the zoning commission twice --

22   *A.*   Yeah, we met at the zoning --

23   *Q.*   -- or just once?

24   *A.*   No.  We met at the zoning commission twice.

25   *Q.*   Okay.  And how many times did you go before

1  city council?

2      A.    None.

3      Q.    None?

4      A.    No.  We ever went before city council.

5      Q.    Okay.  Do you know if your application to

6  rezone went before city council?

7      A.    No, I don't because that would speak to the

8  process of the City of Leon Valley which I'm not aware

9  of.  But this is -- I can tell you what my understanding

10 of it was.

11     Q.    Okay.

12     A.    Based on what Christensen Patrick told me --

13 Patrick Christensen told me, he said basically that the

14 city council was going to take its cue from the zoning

15 commission.  If the zoning commission recommended that

16 they rezone it, then we still were not guaranteed, but

17 we had a good chance that they would rezone it.

18            But he said if the zoning commission

19 recommends that we do not rezone it, he said, you are

20 virtually, you know -- then it's virtually impossible

21 unless the city council just decides to do something

22 completely different.  So there was no need for us to go

23 to the city council from what -- what he advised me.

24     Q.    Okay.  So that was your understanding?

25     A.    Yes.

1    Q.    Okay.   Are you aware of a three-quarter

2  majority override vote?

3    A.    No, I am not.

4    Q.    Okay.   Then I won't ask you about it.

5    A.    I know we got the names of the city council

6  people and prayed for them by name.   But, you know,

7  again, somewhere during that time, I don't remember the

8  exact dates, but I met with the mayor a couple of times.

9  And, you know, they were very cordial, professional,

10  non-vindictive or any -- anything like that.   They were

11  just very matter of fact, you know.

12          There's a financial issue we have to look

13  at here, I mean, and it's real.   You know, I understand

14  it.   We live in a little town, Helotes, and everyone is

15  always fighting against do we raise property taxes or do

16  we raise, you know, the taxes on our businesses?   And,

17  you know, they explained those things.

18          And they reiterated numerous times that we

19  are not doing this per se against churches.   We just --

20  you know, we just have a financial concern here.

21    Q.    Okay.

22          MR. HENRY:   Can you mark this as next

23  exhibit, please.

24          (Exhibit 7 marked)

25    Q.    (BY MR. HENRY) You have been handed what's been

1  marked as Exhibit 7.  Can you tell me if you recognize

2  that at all?

3            MR. WHITWORTH:  Take your time if you want

4  to.

5            THE WITNESS:  I want just to -- I don't

6  think my signature is on here anywhere, is it?

7      Q.   (BY MR. HENRY) Well, I'm asking you.  That's

8  actually going to be my next question.

9      A.   I don't recognize this --

10     Q.   Okay.

11     A.   -- per se, no.

12     Q.   So you don't remember ever seeing this

13 document?

14     A.   That doesn't mean I didn't see it.  I just

15 don't remember seeing it.

16     Q.   Okay.

17     A.   I want to make sure I didn't sign it before I'm

18 adamant.

19     Q.   I want you to take a look at it and tell me if

20 you see your signature anywhere on it?

21     A.   No, I don't.

22            MR. WHITWORTH:  Can I go to the bathroom

23 and take a short break?

24            MR. HENRY:  Yeah.  Let's go ahead and take

25 a short break so he can look at it.

1          *THE VIDEOGRAPHER:*  We are off the record

2    at 11:33 a.m.

3          *(Short break from 11:33 to 11:43)*

4          *THE VIDEOGRAPHER:*  This is Tape 2 of

5    Pastor Darryl Crain.  We are on the record at 11:43 a.m.

6      Q.   *(BY MR. HENRY)* Pastor Crain, before the break,

7    I had handed you Exhibit 7, and you said you didn't

8    remember seeing that document; is that correct?

9      A.   Yes, sir, that is correct.

10     Q.   And I asked you to look at the document and

11   tell me if you -- if your signature is on it anywhere?

12     A.   No, it is not.  I looked at it and I do not see

13   it anywhere.

14     Q.   Okay.  You did not actually fill out that

15   document at all, did you?

16     A.   Not that I know of, no, sir.

17     Q.   Okay.  Now, what does that document say on the

18   top of it?

19     A.   Application for zoning change.

20     Q.   Okay.

21     A.   Case whatever.

22     Q.   And I'm going to represent to you that that's

23   the application that GoldStar filed to rezone the

24   property on Bandera Road.  Okay?

25     A.   Yes, sir.

116

1     *Q.*   Okay.  Now, did you ever fill out any

2 application to rezone?

3     *A.*   I don't believe I did.  I believe that it was

4 my understanding that our attorney, at that time who was

5 Patrick Christensen, he was doing all of that for us.

6     *Q.*   Okay.  Now, GoldStar at that time still owned

7 the property?

8     *A.*   Yes, sir.

9     *Q.*   They just had a contract to sell it to you

10 under certain conditions?

11    *A.*   Right.

12    *Q.*   Okay.  And so they were trying to fulfill their

13 obligation by getting it rezoned?

14    *A.*   Yes, sir.

15    *Q.*   Okay.  And wanting the property with the

16 rezone, you helped and cooperated with that process,

17 correct?

18    *A.*   I understood it more as we were involved in

19 that process as -- as opposed to just kind of helping

20 cooperate whether it was right or wrong. I don't know

21 exactly where you are going, so let me just tell you

22 what I assumed.

23          I used that word one time in basketball

24 practice and -- But anyway...  The point is, is what my

25 assumption was, is that Patrick Christensen was

1  representing us, and he was doing this work for us.  And

2  I -- and I believe I talked with our realtor about that,

3  about him filing paperwork like this for us and things

4  of that nature.  And maybe that our real estate agent

5  suggested that that's the route we go as opposed to us

6  filling out things.  Letting them do it on our behalf.

7      Q.    Okay.

8      A.    That's what my assumption was, right or wrong.

9      Q.    Okay.  But you weren't paying Mr. Christensen?

10     A.    No, I was not.

11     Q.    Okay.  And do you know how he was getting paid?

12     A.    I do not know how he was getting paid.

13     Q.    Okay.  Assume Gold --

14     A.    Yeah.  I assumed GoldStar was, but I don't know

15 how he was --

16     Q.    All right.  Did you ever enter into a -- ever

17 get a letter of representation or a retainage agreement

18 with him?

19     A.    I don't remember.

20     Q.    Okay.

21     A.    I'm thinking I signed something, but that may

22 have been for the realtor, not him.

23     Q.    Okay.  Now, did you pay your realtor?

24     A.    No.

25     Q.    How was your realtor paid?

1      A.    When we closed.

2      Q.    Okay.  Now, technically you haven't closed yet;

3  is that correct?

4      A.    That's correct.

5      Q.    Okay.  But the contract -- the contract has

6  actually been extended; is that correct?

7      A.    Yes, sir.

8      Q.    Okay.  Exhibit 6, I believe?

9      A.    Right.

10     Q.    No.  Exhibit 5.

11     A.    Yes, sir.

12     Q.    Okay.  Now, when did you extend the contract?

13     A.    I would -- I have already messed up so many

14  dates as it is, I would -- you know, I would belie

15  myself to remember, but I don't know if we signed a

16  paper -- paperwork for that or just in communication

17  with Patrick and, you know, our real estate agent, and

18  the people from GoldStar, you know.  And by this time,

19  by the way, we had contacted financing companies.

20     Q.    Uh-huh.

21     A.    And the guy that we contacted, our financing

22  company, knew of Wanda, the representative from

23  GoldStar.  And so I was just kind of going along with

24  what everyone was saying.  You know, this was going to

25  be extended.  We went through the zoning process.  We

1    were denied.  Now we were going to whatever the next

2    phrase of this was.

3              We were -- I don't know if we ever signed

4    something of complicity, but we were fully aware that

5    this was -- you know, this -- we expected something like

6    this to happen.

7         Q.   Okay.

8         A.   I guess I'll put it that way.

9         Q.   So let's back up a minute.

10        A.   Okay.

11        Q.   I need to make sure I have got the chronology

12   down in my head.

13        A.   Okay.

14        Q.   In January of '08, you entered into the

15   agreement with GoldStar?

16        A.   Yes, sir.

17        Q.   Okay.  An application to rezone was filed?

18        A.   (Witness nodding).

19        Q.   You appeared before the zoning commission?

20        A.   Zoning commission, yes, sir.

21        Q.   Okay.  And you think you appeared before them

22   twice; is that correct?

23        A.   I know I did.

24        Q.   You know you did.  Okay.  Do you remember the

25   dates?

120

1    A.   No.

2    Q.   If I tell you they were in February of '08,

3    would that sound about right?

4    A.   I was thinking March.

5    Q.   Okay.

6    A.   So maybe.

7    Q.   Okay.  February, March, around that time

8    period?

9    A.   Yes.

10   Q.   Okay.  Maybe one in February, one in March?

11   A.   Maybe.

12   Q.   You don't remember?

13   A.   Well, the thing is I'm really self-conscious

14   now about dates because I messed up on that first one.

15   That was kind of a big one.  So I don't want to be under

16   oath and, you know -- It was right around that time.

17   I'm comfortable with saying that.

18   Q.   Okay.

19   A.   Somewhere right around there.  It was a month

20   or two, plus or minus.

21   Q.   Okay.  So you appeared before the zoning

22   commission?

23   A.   (Witness nodding).

24   Q.   And there were other property owners there?

25   A.   Yes.

1    *Q.*   At both meetings?

2    *A.*   Yes.

3    *Q.*   Okay.

4    *A.*   Excuse me.  They were there for -- there was

5    three or four, excuse me, residents there specifically

6    to give their opinion on our case.  And then there

7    were -- if I'm not mistaken in both meetings, there were

8    people there prior to our hearing to talk about

9    completely different things.

10   *Q.*   So when the zoning commission met, they weren't

11   just hearing your case?

12   *A.*   Right.

13   *Q.*   Okay.  They -- they had other zoning issues

14   coming up?

15   *A.*   Right.

16   *Q.*   Okay.  So the citizens that commented on your

17   case, you said that they had -- they had talked about

18   being disgruntled because of the dome; is that right?

19   *A.*   No.  They didn't talk about it at that meeting.

20   *Q.*   Okay.

21   *A.*   I just knew that because of, you know, talking

22   with some of the people in that neighborhood.  That

23   neighborhood is a little older demographic.

24           And like I suggested, where our church is,

25   it's a gorgeous view of the -- you know, of a whole

1  little valley there.  And the people that were right

2  behind us, no doubt, had a gorgeous view, and then they,

3  you know, built that dome, whenever they did it.  So I

4  have talked to them, but not at that meeting about that.

5      Q.   Okay.  Now, at this time period, you hadn't

6  moved into the Bandera building yet?

7      A.   Right.

8      Q.   Okay.  Could you have moved into it or was it

9  still dilapidated or not habitable?

10     A.   I don't know.

11     Q.   Okay.

12     A.   I don't know if -- when exactly the vandalism

13  happened.

14     Q.   Okay.  But you didn't have any electricity at

15  that time?

16     A.   I don't know.  I mean, that would probably be a

17  safe assumption though.

18     Q.   Okay.  So you are going through the -- the

19  zoning meetings.  And people had commented that they

20  have got -- there's a lot of work going on on Bandera

21  Road; is that correct?

22     A.   Right.

23     Q.   There's a lot of construction work going on on

24  Bandera Road?

25     A.   Yes.

1    Q.    Okay.   What are they doing to Bandera Road?

2    A.    They are expanding the north and south lanes,

3  and they are building a highway like we were talking at

4  the break that they are trying to do on 281.   They are

5  doing that at the Bandera/410 interchange.

6    Q.    Okay.   And that's a -- that's a large

7  interchange, is it not?

8    A.    Yes.

9    Q.    Okay.   And do you know who's financing that

10  corridor?

11    A.    No idea.

12    Q.    You don't know if it's the City of Leon Valley

13  or the State of Texas?

14    A.    No.

15    Q.    Okay.   You have got no clue one way or the

16  other?

17    A.    To be honest, that's the only thing I can for

18  sure say absolutely I have no idea about that.

19    Q.    Okay.   But it's obvious that's happening right

20  now?

21    A.    Yes.

22    Q.    Okay.   Now, you had mentioned earlier that the

23  property that's just north of you on Bandera --

24    A.    Yes.

25    Q.    -- has developed into a strip center?

124

1      A.    Yes, sir.

2      Q.    Has there been any other development around you

3  in that area along Bandera Road?

4      A.    I wouldn't call it new.  But because exactly

5  like they talked about in the zoning meeting, Leon

6  Valley is -- you know, the buildings that are there are

7  there and have been there, and there's not a lot of land

8  in Leon Valley for new businesses to move in.  That's

9  exactly one of their points of -- of caution were, is

10  that we don't have land on the Bandera -- I believe they

11  referred to it as the Bandera corridor to put new

12  businesses.

13            And the business that they got that's

14  right north of our facility is because the church prior

15  to us moving in there, trying to raise finances, sold a

16  little bit of their land.

17      Q.    Okay.

18      A.    But other than that, there is not like, you

19  know, open businesses and open things that people can

20  move into anyway on Leon Valley or Bandera Road.  It

21  pretty much and has been pretty much set for several

22  years, I would imagine.

23      Q.    Okay.  And when you say the church sold a

24  little bit of the property, you are talking about the

25  Church on the Rock?

1      A.    Yes, sir, the Church on the Rock.

2      Q.    The prior owners sold that property to help

3  raise funds?

4      A.    Yes, sir.

5      Q.    Okay.

6      A.    I assume that's what happened because I -- I

7  assumed that they owned that land from looking at the

8  original, you know, things.

9      Q.    Okay.

10            THE VIDEOGRAPHER:    Could you move your

11  mike to your jacket.

12            THE WITNESS:    (Witness complies).

13            THE VIDEOGRAPHER:    Thank you.

14            MR. HENRY:    Okay.

15            MR. WHITWORTH:    Do you need it a little

16  lower?   Is it too loud?

17            THE VIDEOGRAPHER:    No.

18      Q.    (BY MR. HENRY) Okay.  All right.  So you went

19  through the zoning process and you had opposition from

20  surrounding neighbors; is that correct?  Did the zoning

21  change?

22      A.    I wouldn't say opposition.   It's just caution.

23  But you know what, yes, there was a few ladies that were

24  absolutely opposed to it.

25      Q.    Okay.  And what was the basis of their

126

1  opposition?

2      *A.*    The tax generated revenue --

3      *Q.*    Okay.

4      *A.*    -- from what I understand.  And again, I didn't

5  know any of this prior to the zoning, but the ladies

6  that have been in there, all prefaced their comments by

7  saying, I'm so-and-so.  I have been here 25 years.  I

8  have been here X amount of years.  And all of them

9  were -- were very long time residents.

10            And they made reference to a school that

11 had just been built on Grissom Road that I learned that

12 day was -- was on -- in Leon Valley.  North side has two

13 large facilities there in Leon Valley.  One I believe on

14 the Wurzbach/Evers interchange and one on the

15 Grissom/Bandera interchange, you know.  And they just

16 made references to that.

17            And one of the ladies was, if I remember

18 right, a graduate from St. Mary's.  She said she had a

19 degree in economics.  And from what the zoning

20 commission and how they were responding, I assumed that

21 they were familiar with her.

22            And she said, you know, we are just -- we

23 are landlocked.  You know, we are letting in all these

24 churches which is what she said.  I think she said

25 there's like 40 churches in Leon Valley, and I think

1   there's 13 or 14, but still, you know...

2          And she says, where are we going to get

3   our tax revenue?  And her concern was you miss this and

4   then you are going to raise taxes on me.  You know, and

5   that's kind of -- everyone was at one point or

6   another -- at one level of contention or another, that

7   was their basic premise, give or take.

8   Q.   And when you say everyone, does that include

9   citizens and zoning commission members?

10  A.   I didn't hear from every zoning commission

11  member, but the zoning commission -- excuse me -- the

12  zoning commission was -- was hearing their -- their

13  constituents, for lack of a better word, and were

14  agreeable, you know, with that.

15         And to be honest, I can absolutely

16  understand.  I didn't realize you were talking about,

17  you know, I'm just a dumb, hick pastor.  What do I know

18  about anything?

19         But, you know, they started throwing out

20  real numbers.  You know, 75 or $80,000 a year and, you

21  know, something around there.

22         And then some of the concerns with the

23  residents were, okay, well, if we are not going to have

24  a church, I don't want, you know -- because they showed

25  some of the other things there could be.  And I don't

1 know which zoning, a B-3 or a B-2, whatever the one is

2 that it was rezoned.  Well, we don't want an oil change

3 place there or we don't want a strip place -- a strip as

4 in an adult --

5     *Q.*   A gentlemen's club?

6     *A.*   I won't call it that, but an adult sin factory

7 or whatever.  You know, they were saying that.  And the

8 zoning commission was saying, well, of course, we

9 wouldn't let anything like that in, you know.  And then

10 that's when the comments were made.  Well, the dome is

11 already there.  We don't want a bunch of other things.

12 And so that's kind of where all that went, but everybody

13 was kind of on the same page.

14     *Q.*   That was your understanding?

15     *A.*   That was my understanding of it, yes, sir.

16     *Q.*   Okay.  So the zoning commission recommended

17 that the request to rezone that property be denied?

18     *A.*   Yes, sir.

19     *Q.*   Okay.  Now -- And you said you didn't quite

20 remember which zone was which.  Do you remember B-2 or

21 B-3, which zone applied?

22     *A.*   No, I don't.

23     *Q.*   Okay.  If I were to tell that you that the B-2

24 zone is what you are currently in, would that sound

25 correct, that does not allow church use?

129

1    *A.*    If you told me the B-3 zone was what I was in,

2    that would sound correct too.

3    *Q.*    Okay.

4    *A.*    So what I'm getting at, I don't know the

5    distinction.

6    *Q.*    Okay.  But the application to rezone asked that

7    the property at 6401 Bandera Road be rezoned to the zone

8    that allowed churches; is that right?

9    *A.*    Yes.  I believe what we were asking them to do

10   is keep it the zone that it had always been.  We didn't

11   want it to be changed to the new thing.  We wanted to

12   keep it, you know, the zone that allowed churches since

13   the church had been built.

14   *Q.*    Okay.  Is that what --

15   *A.*    That's my understanding.

16   *Q.*    -- Mr. Christensen explained to you?

17   *A.*    That, and I think my national Christian

18   university education allowed me to assume because

19   they -- it's been a church since its inception.  So

20   obviously something had changed, and we obviously were

21   finding the change.

22   *Q.*    Okay.

23   *A.*    We weren't trying to -- For instance, in the

24   property that we spoke about, in the -- in the zoning

25   for the land that we had bid on for auction, there was

130

1   going to have to be a change of zoning there.

2           It was my understanding -- and right or

3   wrong, I don't know, but it was my understanding is we

4   were trying to get them to keep the zoning the way it

5   has always been.

6           So I guess I'm coming from a viewpoint of

7   not changing it as opposed to changing it.  Do you

8   understand what I'm saying?

9       Q.   Yeah.  And so what --

10      A.   Whether that's right or wrong, I might be

11  completely wrong on how I'm looking at it, but in my

12  estimation, it's been a church since I think 1995, '96,

13  something like that, whenever they bought it.  And I

14  don't know when it changed, but just keep it the way

15  it's been.

16      Q.   Okay.  So your understanding was that at the

17  zoning commission meetings, you were trying to prevent

18  them from changing the law to prevent it from being a

19  church?

20      A.   No.  I knew that it had already been -- been

21  changed.

22      Q.   Okay.

23      A.   I'm just saying, I'm thinking more in terms of

24  changing it back as opposed to changing it into

25  something new.  That's the distinction -- distinction --

131

1  *Q.* So were you aware that the law changed?

2  *A.* Yes.

3  *Q.* Okay.  And you understand that a zoning law is

4 a law, right?

5  *A.* Yes, sir.

6  *Q.* Okay.  And so the law changed and said churches

7 can't be in this zone, whatever zone it is?

8  *A.* Yes, sir.

9  *Q.* Okay.  And so your understanding was you wanted

10 them to change it back to say churches can be in that

11 zone?

12  *A.* Yes, sir.

13  *Q.* Okay.

14  *A.* I would agree with that.

15  *Q.* Okay.  So that's your understanding of what

16 that process was?

17  *A.* Yes, sir.

18  *Q.* Okay.  Do you -- and you going to make

19 allowances for the fact -- Legally your lawyers may not

20 say, no, that's not exactly what we did, but that's

21 ultimately the requested result?

22  *A.* Yes, sir.

23  *Q.* Okay.

24  *A.* I think so.

25  *Q.* Okay.  Now, as of today, GoldStar still owns

132

1  the property; is that correct?

2      A.    Yes, sir.

3      Q.    Okay.  And you haven't closed on the property?

4      A.    That's right.

5      Q.    Has the closing date been moved?

6      A.    I think when we were speaking to our attorney,

7  Patrick Christensen, it was kind of an understood thing

8  that we are not going to put a closing date right now,

9  and we were -- Because of our prior experience, I wasn't

10 real excited about the process.

11     Q.    Okay.

12     A.    So we weren't looking -- you know, we -- In

13 conversation, we understood that, you know, there is not

14 a hard, fast closing date here.  This is going to take a

15 while to go through.

16          MR. HENRY:  Okay.  Would you mark this as

17 the next exhibit, please.

18          MR. WHITWORTH:  Thank you.

19          (Exhibit 8 marked)

20     Q.    (BY MR. HENRY) Pastor Crain, you have been

21 handed what's been marked as Exhibit 8.  Can you tell me

22 if you recognize that document?

23     A.    Yes.  I have seen this before.

24     Q.    You have seen it before.  Okay.

25     A.    If I'm not mistaken, it was -- these two things

133

1  were attached.  They were one thing.  I could be

2  mistaken though, but I have seen --

3      Q.   When you say these two things, you are talking

4  about Exhibit 8 and Exhibit 5?

5      A.   Five.  I thought they were -- Like we got this

6  one to replace this one, if I'm not mistaken.

7      Q.   Okay.

8      A.   We got Exhibit 8 and we were told Exhibit 8

9  replaces Exhibit 5.

10     Q.   Okay.  Well, on top of Exhibit 8, what does

11 that say?

12     A.   The second amendment of the purchase and sale

13 agreement is entered into blank date of August 2008 by

14 Happy State Bank, a Texas banking association, d/b/a

15 GoldStar, successor to Colonial Trust, acting solely in

16 its capacity as trustee for the benefit and the

17 bondholders of Church on the Rock (seller) and

18 Redemption Tabernacle Ministries, a Texas nonprofit

19 organization (purchaser).

20     Q.   Okay.

21         MR. WHITWORTH:  Real quick, do you wear

22 reading glasses?

23         THE WITNESS:  Yes.

24         MR. WHITWORTH:  Do you have those?

25         THE WITNESS:  No, I didn't -- I didn't

134

1   bring them.

2       Q.   (BY MR. HENRY) That's okay.

3       A.   I'm okay so far.  If it goes too far in the

4   afternoon --

5       Q.   And I apologize for my question.  Actually,

6   what I was looking for was just the heading on top, the

7   first paragraph.

8       A.   That's all right.  That's okay.  I'm going to

9   get a headache, but don't worry about it.

10      Q.   What does the heading on top say?

11      A.   Second amendment of purchase agreement.

12      Q.   Okay.  So this is an amendment to Exhibit 5?

13      A.   That's my understanding of it.

14      Q.   Okay.  Now, this was -- I'll represent to you

15  that this was produced to us by your attorneys --

16      A.   Okay.

17      Q.   -- in discovery?  I want you to turn to the

18  last page.  I guess it's second to the last page.

19      A.   Title exceptions.

20      Q.   Hold on.  On the bottom it says P-00054.

21      A.   Okay.

22      Q.   So I guess it's the third to the last page.

23      A.   Okay.

24      Q.   Okay.  It has signature lines there.

25      A.   Uh-huh.

1   Q.   But there's no signatures.

2   A.   Right.

3   Q.   Okay.  Did you ever sign this agreement?

4   A.   I do not -- I don't think so.

5   Q.   Okay.

6   A.   I think at this stage around August of 2008 is

7   when we were talking about the lease agreement.

8   Q.   Okay.

9   A.   Sometime around there.  Because basically what

10  we are saying is if this -- if this stretches into this

11  time period, would you guys be willing to lease it to us

12  for the duration of the -- of the litigation?

13  Q.   Okay.  And when you say you guys, you are

14  talking about GoldStar?

15  A.   Yes.  Yes, sir.

16  Q.   Okay.  Have you signed any document that

17  extends your closing date?

18  A.   Ryan, I don't remember.

19  Q.   Okay.

20  A.   If you told me I did, then I would agree with

21  you.  And if you told my I haven't, then --

22  Q.   Well, I'll represent to you when we asked your

23  lawyers for any document along that lines, they have not

24  produced any.

25  A.   Okay.  That's --

1     Q.   The only document produced is Exhibit 8 --

2     A.   Okay.

3     Q.   -- which you said you didn't sign.

4     A.   I would agree with that.

5     Q.   Okay.  Now, have you entered into a lease for

6   the property?

7     A.   Yes.

8     Q.   Okay.  And is it a signed written lease?

9     A.   Yes, it is.

10          MR. WHITWORTH:  Sorry.

11          THE WITNESS:  Are you starting that

12   fasting thing already?

13          MR. WHITWORTH:  No, not yet.  That happens

14   to me when I have a banana for breakfast.

15          MR. HENRY:  Mark that as the next exhibit,

16   please.

17          (Exhibit 9 marked)

18          MR. HENRY:  Here, Dan.

19          MR. WHITWORTH:  Thank you.

20     Q.   (BY MR. HENRY) Pastor Crain, can you tell me if

21   you recognize Exhibit 9?

22     A.   Yes, I do.

23     Q.   Tell me what that is.

24     A.   This is the lease agreement.  And I would like

25   to officially pat myself on the back for having the date

137

1  somewhat correct.

2      Q.    Okay.    This is the lease agreement that you say

3  that you entered into with GoldStar?

4      A.    Yes, sir.

5      Q.    In order to lease the property pending this

6  litigation?

7      A.    Yes.

8      Q.    Okay.

9      A.    And they put, if I'm not mistaken, a two-year

10  lease agreement basically giving it a 24-month period

11  for the litigation to play out.

12      Q.    Okay.    And is it your understanding that if the

13  litigation is decided in your favor, then you will close

14  and purchase the property?

15      A.    Yes, sir.

16      Q.    Okay.    But do you have any written document

17  that says that?

18      A.    I don't know if we do or not if it says it

19  exactly that way.    But, you know, I have no reason to

20  believe that the people I have talked to at GoldStar,

21  you know, would misrepresent anything like that.    That's

22  the general idea.

23      Q.    Okay.    That's your understanding --

24      A.    Yes.

25      Q.    -- of what your agreement is?

138

1    A.    Yes.

2    Q.    Okay.  Whether it's in writing or not?

3    A.    Right.

4    Q.    Okay.  Now, if you look at that exhibit that I

5    just handed you, the lease agreement, turn to P-00049,

6    the lease agreement, Page 13.

7    A.    Okay.

8    Q.    Again, there are lines for signatures but no

9    signatures.  Okay.  Did you, in fact, sign this lease

10   agreement?

11   A.    Yes, I did.

12   Q.    Okay.

13   A.    We -- Go ahead.

14   Q.    And did Wanda Perdue sign this lease agreement?

15   A.    I'm assuming she did as well.  I don't remember

16   if we have a copy of the -- of the signed one.  I'm sure

17   we do somewhere.

18   Q.    Okay.  Can you look for it for me?

19   A.    Yes.

20   Q.    Because I need to know if it's signed or not.

21   A.    The reason I'm saying yes is because when we

22   agreed to this, they FedEx'ed this to us in certified

23   mail, and we had to have it notarized and sent back to

24   them.

25                So, you know, there would be no -- no

1   reason why she wouldn't have signed it when they are

2   initiating, you know, this process.  I will look for it.

3   You know, I assume she signed it.

4       Q.   Okay.  Do you remember ever seeing a signature?

5       A.   No, I don't.

6       Q.   Okay.  Do you remember signing it yourself?

7       A.   Yes, I do.

8       Q.   Okay.  And did you keep a copy of it?

9       A.   Yes.  We have that somewhere.

10      Q.   Okay.  Can you produce that to me?

11      A.   Yes.  I will look for it.  The thing is we have

12  moved offices and things are a little discombobulated

13  still because of, you know, paperwork being there, but

14  we will look for that.

15               *(Information to be supplied)*

16      Q.   *(BY MR. HENRY)* Okay.  And I'll be very honest

17  with you, Pastor Crain.  I'm a little concerned about

18  the execution of this agreement because I have also sent

19  discovery requests through a subpoena to GoldStar, and

20  they produced all the documents they say they have.  And

21  they don't have a signed executed one in there.  I'll

22  represent that to you right now.

23      A.   Okay.

24      Q.   Okay.  So I want you to look to see if you have

25  a signed, executed agreement.

1     *A.*   If they wouldn't have one, I'm not going to

2  have one probably either --

3     *Q.*   Okay.

4     *A.*   -- because I'm getting my stuff from them.

5     *Q.*   Okay.  Would this have been the only written

6  lease agreement that you have?

7     *A.*   Possibly not.

8     *Q.*   Okay.

9     *A.*   And the reason is, is because during this time,

10  you know, right or wrong, we were getting so much stuff

11  from, you know, the realtor, these guys.  Every once in

12  awhile the auction company would be calling us.  So --

13  and -- and I would show this to our realtor and, you

14  know, we would X things out and whatever.

15     *Q.*   Okay.

16     *A.*   So I don't know if there is another one or not.

17  If you are telling me however they are saying that

18  I'm -- you know, I'm not here disputing anything.  I'm

19  just saying I don't remember.

20     *Q.*   Okay.

21          *MR. WHITWORTH:*  We'll -- we'll go back and

22  look for it.

23     *Q.*   *(BY MR. HENRY)* Okay.  Is it your understanding

24  you have a signed written lease agreement with GoldStar

25  for that property?

1    A.   Yes, sir.

2    Q.   Okay.  How much do you pay in rent per month?

3    A.   Well, they -- the agreement was -- and I'm not

4 sure if it's written.

5           *THE WITNESS:*  I'll give you a little

6 break.  It's Article VI on P-0039 (sic), maintenance and

7 repair of the premises.  Basically you will see on

8 P-0037 (sic) that they are saying -- they are charging

9 us a thousand dollars a month to be there.  That is dirt

10 cheap.  But we haven't paid them many times.

11          I should say this.  We have not paid the

12 rent that it deserves because we agreed to fix up the

13 building.  And we are taking that as a risk.  Because if

14 this doesn't turn out our way, then we have lost all

15 that money.  And there has been -- We have spent getting

16 close to $100,000 on this building, you know, already.

17    Q.   (BY MR. HENRY) Okay.  So your agreement with

18 GoldStar is you will pay them a thousand bucks a month,

19 but right know you are going to use that money to help

20 fix up the property?

21    A.   Right.

22    Q.   Okay.  And GoldStar has accepted that?

23    A.   Yes.

24    Q.   Okay.

25    A.   Absolutely.

1      *Q.*    They haven't tried to evict you at all?

2      *A.*    No.   They're -- and, you know, they -- Once

3    we -- once we got in there and realized our first --

4    just as an example, our first thought was that they --

5    that vandals had got in there and taken out the

6    connecting wires from the air conditioner, the

7    connecting copper to the panel boxes.

8              And in the smaller building, that was the

9    case.   But in the domed building, they had actually gone

10   to where the pole is, 30 feet high, cut that, taken out

11   every wire, and then they actually broke into the

12   building.

13             And for some period of time, people were

14   working to take these things out.   And it ended up an

15   estimate -- You know, our first estimate was like

16   $65,000 to replace the electrical wiring, and, you know,

17   we were able to -- to bring that down, but I mean, it's

18   been a bear.

19             And then, you know, flood damages and --

20   because the building underneath the prior tenants,

21   Church on the Rock, you know, I -- keeping up with the

22   leased facility is one thing, but keeping up with the

23   building is -- you know, you have to put up -- so

24   they -- they weren't able to -- to keep it up to par, I

25   guess.

143

1    Q.    Okay.  Did it have flood damage?

2    A.    Yes.

3    Q.    Okay.  As a result of the prior tenant not

4    maintaining it?

5    A.    I shouldn't say flood damage.  Water damage.

6    Q.    Water damage.

7    A.    Yes.

8    Q.    Okay.  What -- what was damaged?

9    A.    Where my office is right now, obviously there

10   has been water damage because we are going to have to

11   replace -- all of the sheetrock is all molded, you know,

12   and that's obviously not from the little bit of rain we

13   have had now.  That's from years ago.

14                There is a connecting porte-cochere on the

15   dome that wasn't sealed right, and there is water that

16   leaks into the bathrooms and has gotten on some of the

17   paneling that we have had to replace.

18                So the electrical wiring in there was

19   damaged that we have to replace.  I mean, there's --

20   there's all kinds of stuff.

21   Q.    Okay.  And you say where your office is

22   located.  Is that in the children's building?

23   A.    No.  We are not actually in these offices, but

24   when we get into the dome building, we have everything

25   there, and there is only a few more things we have to do

144

1  to have that.  It should be done this week to come up to

2  code, you know, different little things.

3              We have everyone's stuff there.  We have a

4  temporary certificate of occupancy to have our stuff in

5  there, but not --

6      Q.   This is the dome building?

7      A.   This is the dome building.

8      Q.   Okay.  Now, you actually have a permanent

9  certificate of occupancy right now for the children's

10 building?

11     A.   The other building, right.  And we are

12 anticipating this week to get our permanent certificate

13 of occupancy for the dome building.

14     Q.   Okay.  Let's back up just a minute --

15     A.   Okay.

16     Q.   -- because I don't want to get into those

17 issues just yet.  The bank still owns the building.

18 Under your original purchase agreement, the bank is the

19 one that pays the taxes on the building; is that

20 correct?

21     A.   If that's what you are telling me.  I mean,

22 someone is paying the taxes on it, and I know it's not

23 us.

24     Q.   Okay.

25     A.   Or they are taking it out of the money that we

1    give them.  I don't know.

2        Q.    Okay.  Have you actually paid the bank

3    anything?

4        A.    Yes.

5        Q.    Okay.  And how much have you paid them?

6        A.    I don't know exact numbers right now, but, you

7    know, we paid them for I think two or three months.  And

8    then again, you know, we told them, look, this is going

9    to be a lot more money than we thought, and, you know,

10   they're -- they understand that.

11       Q.    Okay.  Now, just for clarification, as a

12   religious organization, The Elijah Group is tax exempt;

13   is that correct?

14       A.    We are tax exempt from property tax and things

15   of that nature, yes, sir.

16       Q.    Okay.  What do you get taxed on?

17       A.    We have to pay Social Security to full-time

18   employees.  We are taxed on contents.  Sometimes if we

19   don't file right -- For instance, like you guys would be

20   taxed on your leased copy machines and things of that

21   nature.  If we do that, we can be taxed on that as well,

22   you know.  But for the most part, property -- well,

23   property tax and things of that nature, we are exempt

24   from.

25       Q.    Okay.  And as the -- When you were in the