146

1    Culebra location and you had the day care facility, were

2    you paying any taxes for that service?

3        A.    No.

4        Q.    Okay.  And so that service is not taxed?

5        A.    Well, the thing is, is that we don't pay -- If

6    you are leasing a facility, part of your lease payment

7    per month is to pay the taxes on that property.  Okay.

8    We are not exempt from paying those taxes because we are

9    a church because we are leasing.  The other guy still

10   has to pay the taxes.

11       Q.    The owner still has to pay the taxes?

12       A.    The owner still has to pay the taxes.  And just

13   because we are a religious organization, that does not

14   exclude him.

15       Q.    Right.

16       A.    So we pay the taxes third party that way.  But

17   once we are, you know, in a facility, you know, that's

18   in our name, we don't have to.  We are not --

19       Q.    I understand that.

20       A.    Okay.

21       Q.    And one of the things that I'm pointing at

22   right now, the bank owns the facility --

23       A.    Yes.

24       Q.    -- so they have to pay taxes?

25       A.    Right.  I would assume that they are doing

147

1   that.

2      Q.   Okay.  But when you were in Culebra, when --

3   did you have to pay any sort of retail or sales tax or

4   anything like that for the services?

5      A.   No.

6      Q.   Okay.  And is that because you are a religious

7   organization?

8      A.   Right.

9      Q.   Okay.

10      A.   Yes, sir.

11      Q.   Okay.  And I'm talking about for the day care

12   services?

13      A.   Right.  It still falls under the auspices of

14   the church.

15      Q.   Okay.  It's part of your religious mission,

16   right?

17            MR. HENRY:  Okay.  Why don't we go ahead

18   and break for lunch.  I think this is a good stopping

19   point.

20            THE WITNESS:  Okay.

21            MR. HENRY:  And we can pick up afterwards.

22   Is that okay with you, Dan?

23            MR. WHITWORTH:  Yeah.  You want to meet

24   back here at 1:00?

25            MR. HENRY:  Yeah.

148

1          MR. WHITWORTH:  Or do you want to take a

2   little longer?

3          MR. HENRY:  1:00 is fine with me.

4          THE VIDEOGRAPHER:  We are off the record

5   at 12:17 p.m.

6          (Short break from 12:17 to 1:33)

7          THE VIDEOGRAPHER:  We are back on the

8   record.  The time is 1:33 p.m.

9      Q.   (BY MR. HENRY) Pastor Crain, before our break,

10  we were talking about your purchase or your attempted

11  purchase and then your lease of the Bandera Road

12  property.

13     A.   (Witness nodding).

14     Q.   Okay?

15     A.   Yes, sir.

16     Q.   I want to kind of pick back up along those

17  lines.  You testified earlier that you appeared before

18  the zoning commission --

19     A.   Yes, sir.

20     Q.   -- on two separate occasions?

21     A.   Yes, sir.

22     Q.   And requested that the property at Bandera

23  County (sic) be rezoned?

24     A.   Yes, sir.

25     Q.   Okay.  Now, at both commission hearings, did

149

1   the council recommend denial?

2       A.    No, sir.

3       Q.    Okay.

4       A.    At the first -- not the council.  The

5   commission.  The city council is different.  The zoning

6   commission heard from the citizenry, heard from our

7   attorney, Patrick Christensen.  I was able to speak.

8               And at that meeting, our attorney,

9   Mr. Christensen, told us we are not going to win

10  anything at this meeting.  What we are wanting them to

11  do is either -- we are wanting them to take time to

12  think about it or to reconsider or something like that.

13              The -- There was a staffer, I don't

14  remember what her name was, from Leon Valley, and she

15  basically said that we are -- are -- going back to --

16  The original zoning does not fit with the current master

17  plan.  And she let them know about that, and they --

18  they heard, you know us.  They heard from the citizenry

19  and they heard her.

20              And they said, you know what, we will

21  think about it.  And basically I think they wanted to

22  talk to the attorneys is what they said, and, you know,

23  whatever.  So that's what we did.

24              Then we came the back the following month,

25  and we talked with them again and that's when they

150

1    denied it.  Well, they didn't say they would deny it.

2    They were going to recommend denial to the city council.

3        Q.    Okay.  So the first zoning commission hearing

4    was really -- that was the first public hearing that

5    they held, right?

6        A.    That was the first public hearing we attended.

7        Q.    Okay.

8        A.    I'm not sure if there was any prior to, but

9    that was the first one we attended.

10       Q.    Okay.  And then at the second zoning commission

11   hearing, they had a vote, correct?

12       A.    Yes, sir, I believe so.

13       Q.    And they voted to recommend to the city council

14   that the application to rezone that property be denied?

15       A.    Yes, sir.

16       Q.    Okay.  Now, did you attend any city council

17   meeting?

18       A.    No, sir, we did not.

19       Q.    Okay.  Not with regard to the application to

20   rezone?

21       A.    Not any -- not any of them.

22       Q.    Have you ever attended a Leon Valley City

23   Council meeting?

24       A.    I have gotten enough tickets there, but I don't

25   think I actually attended a city council meeting.

1    Q.   Okay.  So is your -- Go ahead.

2    A.   I'm sorry.  Earlier I talked about speaking

3  with the mayor and I spoke with the city manager, Lanny

4  Lambert, on two separate occasions.  It was not at the

5  city council meeting.

6    Q.   Okay.

7    A.   It was just meetings we had before.

8    Q.   You went into their office?

9    A.   Right.

10    Q.   Okay.  And so that wasn't a public meeting?

11    A.   No.

12    Q.   Okay.  Now, was that before or after the zoning

13  commission meetings or in between?

14    A.   In between, after.  It was right around that

15  same time -- that same time period.  One of them I

16  initiated and then one of them they initiated.

17    Q.   Okay.  And you weren't able to come to any sort

18  of --

19    A.   No.  It was -- Again, like I stated before,

20  they were very cordial.  They were not, you know -- they

21  are very, very nice people.  You know, we talked for a

22  while.  It's just -- we just couldn't see, you know, eye

23  to eye.  They were just very --

24         You know, they had taken the

25  recommendation of the -- the city staffer.  I can't

1  remember what her name is.  But in one of the meetings,

2  she was in there with us.  And basically they pulled out

3  the master plan, and they said, you know, this does not

4  fit in with having our retail on the Bandera corridor,

5  you know, by allowing a church to be there.

6              And I think we may have talked about a

7  variance to the -- to the zoning code like keeping it

8  the same code, but giving it a variance.  I think that

9  might have been kind of what I was there for, to see if

10 they would do that, but, you know, they just -- No one

11 was recommending to the mayor that that's what would be

12 done except me, you know, so...

13      Q.   Okay.  So what happened after the zoning

14 commission denied the application to rezone?

15      A.   As far as?

16      Q.   Well, what was the next thing you did with

17 regard to the building.

18      A.   Okay.  Well, let's see.  Around that time, when

19 they denied that, it was going to be another month I

20 think or another few weeks before -- When the zoning

21 commission denied it, it was going to be some time

22 before it went to city council.  There was -- there was

23 some time period in there.

24              So we were thinking.  But in your minds,

25 you know, this was just another part of the process.

153

1  And we figured that it was not going to be approved at

2  the city council meeting when it was disapproved in the

3  zoning meeting.

4        So we waited.  And, we -- you know, it

5  wasn't -- they -- The zoning commission recommended that

6  they not approve it, and they didn't.  And then when

7  they told us again, that's when I think we started

8  thinking in terms of leasing during this time.  It

9  wasn't immediately afterwards, but we started talking

10 about that.

11     Q.   Okay.  Now, do you know if Patrick Christensen

12 attended the city council meeting?

13     A.   No, I don't know that.

14     Q.   Okay.  He may have and you just don't know?

15     A.   Yes, sir, that's correct.  I don't know.

16     Q.   Okay.  So who told you that the city council

17 denied the request?

18     A.   I don't remember.

19     Q.   Okay.  But you were told at some point that the

20 city council had denied the request?

21     A.   Yes, sir, or -- yes, sir.  Some -- We found

22 that out somehow.

23     Q.   Okay.

24     A.   The reason I'm saying it like this, Ryan, is

25 because I remember thinking when we lost the zoning

154

1  commission, it was like, well, that's -- you know, if we

2  didn't win this, we are not going to win the other one.

3  So I think in my mind, if I just -- You know, that was

4  the final one for me, not the city council one.

5      Q.   Okay.  So you kind of already wrote it off?

6      A.   Right.  Exactly.

7      Q.   Okay.  At the end of the zoning commission

8  meeting?

9      A.   Right, yes, sir.

10     Q.   Okay.  So at that point, you actually had the

11  option to completely cancel the contract, correct?

12     A.   Well, I mean, technically, yes.  But now by

13  this point, we are being stressed at our current

14  location.

15     Q.   The Culebra Road?

16     A.   The current, the Culebra Road.  Right or wrong,

17  I'm now emotionally involved.  The building -- if I was

18  going to build a church, I'm not sure I would build a

19  dome, but everything else is just -- I mean, it's

20  like -- you know, it's made for exactly what we want to

21  do in the exact place we are doing it.

22          The majority of our kids come from the

23  Marshall High School, Warren High School, you know.  So

24  I think at that point, we were pretty much committed

25  that we are going to follow the process through.

155

1              But, you know what, your question was,

2    technically could we have gotten out of it, I think we

3    probably could have.

4        Q.    Okay.  But you choosed (sic) to continue

5    forward?

6        A.    We did choose to do that.

7        Q.    Okay.  And you discussed with GoldStar a

8    leasing option?

9        A.    Yes, sir.

10       Q.    Okay.  Did you come to an agreement with regard

11   to leasing before you moved in?

12       A.    Yes, sir.

13       Q.    Okay.  Do you remember having a signed lease

14   before you moved in?

15       A.    Again, when we were talking about that before,

16   I know they faxed us something, and we signed it.

17       Q.    Okay.

18       A.    And we sent them money, I mean.

19       Q.    Okay.

20       A.    But I think in speaking with Wanda, the thing

21   was, is when we started looking at it because we got --

22   the realtor had a key.  And by this point, one of the

23   doors had been vandalized, and you could go with a

24   combination and open it or whatever.  And we were

25   realizing --

156

1          And one of the other things I haven't

2    mentioned is I'm -- I'm -- this is -- I don't know of

3    this factually.  Okay.  But somebody -- because none of

4    the locks had changed, and there was stuff in the

5    buildings from the other church.  Okay.  And it was

6    evident as we would go look at stuff -- I mean, there

7    was still equipment in there.  There was still stuff in

8    there.  And sometimes we would go in there and it would

9    be gone, you know.  So someone was --

10         Q.   What stuff was it?

11         A.   Just church equipment, you know, like sound

12   stuff and -- just stuff.  I mean, I'm not real --

13         Q.   Like chairs?

14         A.   No, no, not chairs.  Like electronic equipment.

15   You know, churches have to have a fairly extensive

16   audio/visual kind of setup.  And there would be

17   equipment that we would notice because we would get

18   excited.  Wow!  We can use this when we get going.  And

19   then we would go back and it would be gone.

20              And there was no sign of break-in at that

21   point.  It was -- to me, it was obviously somebody, you

22   know, that didn't go to church anymore, I want to get my

23   stuff back and that kind of thing, but --

24         Q.   Did you ever find out who was taking it?

25         A.   No.  No.  And it wasn't -- I don't want to make

157

1  it seem like it was a repetitive thing.  It only

2  happened once or twice.  And once I kind of -- I went

3  back over there -- and I was telling Dan this.

4              I went over there one time just kind of

5  thinking -- I was in the area.  And I said, well, let me

6  go check on the building and make sure everything is

7  okay.  And one of the windows was out and the door to

8  the dome was open.

9              And I went into one of the buildings, and

10  I looked around and there was some equipment there.  And

11  I said, you know what, I need to get this equipment out

12  and put it in my car.  Somebody is going to come in here

13  and steal it.

14              And I said, no, because with my luck, I'm

15  going to be walking out of a window (sic) or something

16  with this equipment, and they are going to think I'm

17  stealing it.  And sure enough, there was a police

18  officer that was -- So I told him what was going on.

19  And after that, the building was -- was secured.

20              But during that time, like I think

21  vagrants were living in there for a short period because

22  there was no -- they didn't break in.  There was a door

23  that was ajar, but we went into one of the rooms and

24  there was, you know, vagrants in there so...  There was

25  just, you know --

158

1     Q.   About what time period was this?

2     A.   Around the summer of 2008.

3     Q.   Summer of 2008?

4     A.   Somewhere around there, yes, sir.

5     Q.   All right.  Like June, July of '08?

6     A.   That would be safe.

7     Q.   Okay.

8     A.   And at that point, that's when we started being

9 more serious about, look, we need to get in there

10 because, you know, they have already ripped out all of

11 the copper wiring.

12         We are seeing -- You know, there is a

13 Shipley Donuts place across the street.  We are seeing

14 Shipley Donut boxes and empty coffee cups.  You know, we

15 need to be in here and have a presence here before, you

16 know, more stuff is gone.

17     Q.   Okay.  Now, at this time, let's say, July of

18 '07 --

19     A.   '08.

20     Q.   -- '08, I'm sorry, the electricity hasn't been

21 repaired yet; is that correct?

22     A.   That's correct.

23     Q.   Okay.  And was plumbing operational?

24     A.   Yes.

25     Q.   Okay.

159

1    A.    The water was -- was still on.

2    Q.    Okay.  And was sewage okay?

3    A.    Yes, sir.

4    Q.    Okay.  Was there any other problems other than

5    electrical?

6    A.    Not -- You know, there was damage where someone

7    had tried to kick in a door.  There was a window that

8    was pried off, but nothing functional, just facial, I

9    guess.

10    Q.    Okay.  Cosmetic?

11    A.    Cosmetic.

12    Q.    Okay.  Okay.  So when did you decide to move

13    into the building?

14    A.    We talked with GoldStar and basically we

15    started these talks right around August.  And once --

16    once we agreed on that this is going to be a process,

17    this is not going to be over in months or two, you know,

18    this is going to be a long while, during that time --

19            Remember, we were month to month at our

20    other building.  And the church was growing, you know, a

21    little bit more.  But mostly our day care facility was

22    really growing.

23            So we basically made a decision...  And

24    also, our landlord at the other building was pressuring

25    us, rightly so, by the way.  You don't have a lease with

160

1    me.  You need to sign something or you're out.

2              And that relationship was being strained

3    because we didn't want to sign a lease because we were,

4    you know, waiting for this other thing to open up.

5              So all of that, you know, compiled made

6    the decision very, very easy for us.  We need move over

7    here and lease this building while the -- while the

8    legal process is -- is continuing.

9        Q.    Okay.  And by legal process, you mean the issue

10   with regard to the zoning?

11       A.    Zoning, yes, sir.

12       Q.    Okay.  So when did you actually move in?

13       A.    We moved in sometime in October?

14       Q.    Of '08?

15       A.    Of '08, yes, sir.

16       Q.    Okay.

17       A.    Sometime around there.

18       Q.    Okay.  Now, when did you begin making repairs

19   to the buildings?

20       A.    We applied for our certificate of occupancy in

21   September or October.  I don't remember the dates, but

22   somewhere around there.  And, you know, that's when the

23   fun began.  But we got -- I'm not expert at this.  I

24   just know that I have applied for six or seven C of O's

25   before in the leased buildings, but never with Leon

161

1 | Valley, but the process was -- was very similar.

2 |                You know, they give you a temporary one

3 | based upon, okay, you can be in here and be working or

4 | whatever.  And that was sometime in September or October

5 | because then the electricians started coming in and

6 | getting everything ready and things of that nature.

7 |    Q.   Okay.  So you started making repairs in

8 | September of '08; is that correct?

9 |    A.   September or October.

10 |    Q.   Okay.

11 |    A.   Depending upon when the -- we have, you know,

12 | the temporary C of O's whatever those dates are is when

13 | it would be.

14 |    Q.   Okay.  Did you begin making any repairs prior

15 | to getting a temporary certificate of occupancy?

16 |    A.   I had the window replaced.  There was a window

17 | that was knocked out that I told you -- Oh, no.  I

18 | didn't do that.  GoldStar did that.  So I guess, no, I

19 | didn't.

20 |    Q.   Okay.  GoldStar did make some repairs to the --

21 |    A.   Yes.

22 |    Q.   -- building?  Prior to you moving in, right?

23 |    A.   Well, as far as I know, it was just the window.

24 |    Q.   Okay.

25 |                MR. HENRY:  Mark this was the next

162

1    exhibit, please.

2                      *(Exhibit 10 marked)*

3        *Q.    (BY MR. HENRY)* You have been handed what has

4    been marked as Exhibit 10.   Can you tell me if you

5    recognize that?

6        *A.*    Yes, sir.

7        *Q.*    Tell me what that is.

8        *A.*    That is the certificate of occupancy

9    application.

10       *Q.*    Okay.   That you filled in.   What's the date on

11   top of that?

12       *A.*    September 9th; is that right?   September --

13   9/9/08.

14       *Q.*    September 9 of '08, yeah.

15       *A.*    Yeah.

16       *Q.*    September is the 9th, that's right.   Okay.   So

17   does that refresh your memory as to when you made the

18   application?

19       *A.*    Right.

20       *Q.*    Okay.   And then did you begin making repairs

21   shortly after that?

22       *A.*    Whenever we got -- Usually like I said, you do

23   this and then they give you a temporary thing.   And then

24   I remember this when we had to go through the

25   electric -- electrical department of the, you know, C of

163

1   O people.  They had to come out and make sure that the

2   electricians we had were -- you know, knew what they

3   were doing and all that.  So I would assume, yes.  That

4   was the reason that we applied for it so we could start

5   doing the repairs.

6              MR. HENRY:  Can you mark this as the next

7   exhibit, please.

8              (Exhibit 11 marked)

9   Q.    (BY MR. HENRY) I'm going to hand you  what's

10  been marked as Exhibit 11.  Can you tell me if you

11  recognize that?

12  A.    Yes, I recognize that.

13  Q.    Tell me what that is.

14  A.    That is the inspection report from the -- I

15  don't know who this is from.  I know it's from Leon

16  Valley, but I thought it was from the electrical guy.  I

17  don't think his -- his thing tagged, but I thought it

18  was the guy who came and basically said, you know,

19  everything is fine.  Have the fire marshal come out

20  here.  He's the final thing.

21  Q.    Okay.  What date is that?

22  A.    September 14th.

23  Q.    Okay.

24             MR. HENRY:  Mark one more.

25             (Exhibit 12 marked)

1     *Q.*   *(BY MR. HENRY)* I believe that's Exhibit 12; is

2  that correct?  Can you tell me if you recognize that?

3     *A.*   This is one -- this Exhibit 12 is one of the

4  inspection reports and this one is by the electrical

5  guy.  And I would like to note that the handwriting on

6  this inspector is the same on both of them.

7     *Q.*   At the bottom of 12, it lists the inspector's

8  name.  Can you tell me what that is?

9     *A.*   Oh, boy.  Bealor.

10     *Q.*   Bealor.  Okay.  I'll represent to you that

11  Bruce Bealor is the City of Leon Valley's building

12  inspector.

13     *A.*   Okay.

14     *Q.*   Does that sound about right to you?

15     *A.*   I trust you, Ryan.

16     *Q.*   Okay.  So Mr. Bealor came out and inspected

17  your panel to make sure that you could begin work; is

18  that correct?

19     *A.*   Not just the panel.  He inspected the whole

20  building.  And on that one, he -- he signifies that the

21  panel was okay.  And then on this one, he signifies that

22  everything else -- else was okay.

23     *Q.*   Okay.

24     *A.*   Pending the fire inspection.

25     *Q.*   Okay.  And that was going to be my next kind of

165

1  set of questions.  What is your understanding of the

2  process for the need for two people to come out and do

3  inspections to give you a certificate of occupancy?

4      A.   What is -- Repeat that question for me.

5      Q.   What is your understanding of the need for two

6  separate people to come out and give you an inspection?

7      A.   Okay.  We've -- like I stated prior, we have

8  been in leased buildings several times.  And it is not

9  unusual at all for several people to come out in the

10  City of San Antonio.

11              There is a plumbing guy, a sign guy, an

12  electricity guy.  When we have kitchens, there is a

13  health department guy.  I mean, that's not unusual at

14  all.  They are just doing their specific, you know --

15  and the idea of a temporary C of O in the past is like

16  Mr. -- what was his name, Bealor?

17      Q.   Uh-huh.

18      A.   Bealor comes out and usually he will find two

19  or three things.  Fix this and fix that.  And then the

20  fire marshal or somebody else will come by, and we've

21  never passed a fire marshal inspection the first time.

22  You know, they always find a couple of little things to

23  do, and that's normal, and that's kind of how that

24  process started with -- with Mr. Valdez.

25      Q.   And Mr. Valdez is the fire marshal?

1    A.   Fire marshal, yes, sir.

2    Q.   All right. Let's back up a little bit.  Go to

3  Exhibit 10.  Okay.  Now, you understand that you have to

4  have a certificate of occupancy in order to occupy the

5  building; is that correct?

6    A.   Yes.

7    Q.   Okay.  And you weren't trying to avoid getting

8  a certificate of occupancy in any respect, were you not?

9    A.   Absolutely not.

10    Q.   Okay.

11    A.   We spent all kinds of money making sure we

12  could get one of these.  So I want to emphatically say

13  that there is no way we did that.

14    Q.   Okay.  So you knew you needed a certificate of

15  occupancy to be in the building?

16    A.   Right.

17    Q.   And you had every intention of complying with

18  that requirement?

19    A.   I would say we did everything to inquire -- to

20  comply with that.

21    Q.   Okay.  You had no intent to try and circumvent

22  that?

23    A.   Absolutely not.

24    Q.   Okay.

25    A.   Like I said, we have been in a building before.

167

1    I mean, we know the process.  We were very familiar with

2    it.  And we knew -- we -- we picked up contributions and

3    offerings specifically to deal with the issues that we

4    knew that this building was going to need.

5        Q.    Okay.  So -- And you are talking about getting

6    contributions in September of '08.  Are you still housed

7    in the Culebra building?

8        A.    We were housed in there, and I don't know the

9    dates, until the week we got a temporary C of O, and we

10   were able to start working.  We stayed in our building

11   waiting for the fire marshal to come out.

12              The fire marshal in every building that we

13   have been in comes out the day after like everybody else

14   is done.  Weeks passed and this guy still hasn't shown

15   up.  We are going down there.  We are calling him every

16   day.

17              Finally we realize, you know, this is one

18   of these things.  And it was put to me, well, what do we

19   do?  I said, we are moving in there and they are going

20   to -- we are going to force them to -- because I knew we

21   were going to create some type of litigation.  And as

22   soon as we move in there, they are going to go to court,

23   and we want to go to court because we want this guy to

24   come out and inspect us.  And that's exactly what

25   happened.

168

1    And if I remember right, I might be wrong

2  on this, but remember Dan asking the fire marshal what

3  took him -- I think it was like five or six weeks for

4  him to finally come over there.  And he said, I was told

5  not to go.

6    Again, you know -- but that put us in --

7  we just couldn't be where we were anymore because the

8  guy is asking us, you know, for rent.  And it was very

9  apparent that -- that the fire marshal is not coming

10  out.

11    I have never been in a building where it

12  took six weeks or -- five or six weeks, whatever it was,

13  for a fire marshal to come out.  And you are talking

14  about -- well, not with this one.  But usually it's

15  replace exit signs, you know, blah, blah, blah, blah.

16  Nothing -- nothing major.

17    This one, it was a major, major situation

18  which we did.  We went above and beyond to meet

19  everything he wanted us to do.  And some of the things

20  that he wanted us to do were just -- I had never

21  experienced anything like that before.

22    But being the good Christian guy that I

23  am, the Bible is very specific about we are under

24  authority, I respect Mr. Valdez's position.  I have

25  never tried to circumvent or buck his authority.  He

169

1  told us -- because there were fire alarms, fire alarm --

2      *Q.*  Sensors?

3      *A.*  -- sensors.  Not sensors.  They were -- you

4  know, if there is a fire, they go off, sensors, I guess,

5  in our building, and there was eight of them.  And when

6  the previous tenant painted, they got some paint on

7  them.  And he said he did not like paint on them.  There

8  was no way we could get the paint off, so we had to

9  spend about $600 replacing those things which we did.

10      *MR. WHITWORTH:*  Smoke detectors?

11      *THE WITNESS:*  No.  They were fire alarm

12  sensors.  And the smoke detectors were something that we

13  were going to probably have to add anyway.  So I'm

14  not -- you know, we were going to have to add that.

15          I mean, that whole thing was a fiasco.

16  And, you know, I'm -- I didn't want -- I'm not going to

17  get into that.  That's what we paid Dan to get into.

18          But the day that you and I went down to

19  court, and Dan, we went down to court for this because

20  that's what we had to do, the judge stated, you know,

21  have they done everything to -- to operate as a church

22  in your estimation?  And under oath, he said, yes, we

23  have except we had not gotten our fire system monitored

24  by a phone.  On that day was the first day I had ever

25  heard about that.

170

1          On that Friday, we had never -- he said

2    that we had to do that, which we would have done, but we

3    never had heard things like that.  That's what I'm

4    saying.

5          It was just -- You know, just tell us what

6    we have to do like anything else.  This is our seventh

7    building, man.  You know, this is not our first rodeo.

8    We know what to do.  We know we are going to have to

9    spend money.

10         And we were -- You know, at that time, we

11   had money to spend.  So we were wanting to do that.  And

12   it took us several thousand dollars and weeks and weeks

13   and weeks, you know.  But we did go in there prior to

14   the final one being issued, absolutely.  And the reason

15   was because we knew it wasn't going to be issued.

16         And during that time, they called us and

17   said they were going to turn our lights off and, you

18   know, all this stuff that I thought was just silly.  But

19   the other thing -- Well, never mind.  I'm not going to

20   do that.

21   Q.    *(BY MR. HENRY)*  Go ahead.

22   A.    No.  I won't go there yet.

23   Q.    All right.

24   A.    I don't want to be -- I want to be cooperative.

25   Q.    Okay.  Well, why don't you look at Exhibit 10.

1        *A.*    Got it.

2        *Q.*    Okay.  Now, this is your application for

3    temporary certificate of occupancy, correct?

4        *A.*    Yes, sir.

5        *Q.*    Okay.

6                *THE WITNESS:*  No.  I'll use it in about

7    ten minutes.

8        *Q.*    *(BY MR. HENRY)* It notes name of applicant.

9    What does that say?

10       *A.*    RTM, Inc. Alward d/b/a Restoration is above

11   that and the business name Alward Elementary School and

12   Day Care.

13       *Q.*    Okay.  What is that?

14       *A.*    September, we had not decided -- or we had not

15   been incorporated yet.  We knew we had to.  And when

16   they came to me to do this -- This is going to take a

17   minute or two for me to explain.

18       *Q.*    Go ahead.

19       *A.*    When it came for the certificate of occupancy

20   because we had had a day care before, the -- the

21   regulations and the certificate of occupancy codes are

22   higher for a day care or elementary school than they are

23   for the church.

24                When we were going to open our day care at

25   our church on the Culebra facility, we brought them our

1  certificate of occupancy that said church and then they

2  denied us.  They said your C of O has to say day care.

3              We got licensing to come -- we had the

4  city come back again and issue us another C of O that

5  said church and day care.  We took it back to the city

6  and they said, we don't want to see church on here.  It

7  has to say day care and that it's because the day care

8  codes are a lot higher than the church codes are.

9              So when we applied, I applied purposefully

10 as our day care, knowing that if we can pass as a day

11 care, we are going to pass for a church.  Because when

12 we provide that license -- when we provide that C of O,

13 licensing wants to see day care.  That was taken in a

14 whole different direction from the City of Leon Valley.

15             They assumed I was trying to be deceitful

16 and move in as a school and really operate as a church

17 when, you know, I -- there is nothing that I have talked

18 to -- We send people down to their offices sometimes

19 twice, three times a week.  We never tried to make any

20 bones or anything about anything.  We knew what we were

21 doing.

22             The reasons that these names are so

23 frazzled is because I wanted to name it one thing and

24 everybody else wanted to name it something else.  So we

25 just kind of put this here.  RTM stands for Redemption

173

1  Tabernacle Ministries, Incorporated, and that was just

2  because the line was small.

3      Q.   Okay.  You had not actually issued any d/b/a's

4  yet or registered any d/b/a's yet?

5      A.   We registered TCAL by that time, but I doubt we

6  had registered anything else, no.

7      Q.   Okay.  Are you currently -- does The Elijah

8  Group currently have any registered d/b/a's?

9      A.   I believe TCAL is underneath them and

10  Restoration Center is underneath them as d/b/a's.

11      Q.   Okay.  At the time you made this application,

12  those were not registered?

13      A.   That would be a safe assumption.  If I go back

14  and look at the dates which I'm not great at obviously

15  with this chronology, we may have done it.  But even if

16  we did it, I don't think it would be valid because we

17  weren't incorporated yet.

18      Q.   And that was my next point.  The Elijah Group

19  wasn't incorporated at this point?

20      A.   Right, yeah.  So...

21      Q.   Okay.  So there really wasn't an entity --

22      A.   Well, I mean, remember -- remember, that as

23  churches, we don't have to incorporate.  As loose and as

24  strange as that sounds, we just don't have to.  So we

25  were an entity by the legal definition because we had a

174

1   church board.  We have bylaws.  We have a constitution,

2   you know, of those things.

3                 Were we incorporated, absolutely not.  We

4   as an entity, I would say, yes, we were.

5       Q.   Okay.  That's your understanding, right?

6                 MR. WHITWORTH:  Do you need him to speak a

7   little slower.

8                 THE REPORTER:  A little bit.

9                 THE WITNESS:  I have -- I have six women

10  at my house.  If you don't speak fast, you don't get a

11  word in.  I'm sorry.

12      Q.   (BY MR. HENRY) Overall on -- it says Section 2

13  which is parallel to Section 1, it says property owner.

14      A.   Yes, sir.

15      Q.   And you list GoldStar Trust?

16      A.   Yes, sir.

17      Q.   Okay.  And GoldStar Trust is still currently

18  the property owner, correct?

19      A.   Yes, sir.

20      Q.   Okay.  You list the business name which you

21  actually have never really assumed that name, have you?

22      A.   We haven't decided on that name yet.  I still

23  want to name it Alward Elementary School, but it's named

24  after a woman from England.  And we don't know if we use

25  her name, if we are going to get into issues.  So that's

1    still up in the air.

2        Q.    Okay.  Under the purpose of the certificate of

3    occupancy, you list educational training?

4        A.    Yes, sir.

5        Q.    Okay.  It's your understanding that that's what

6    you are required to do to list it as a day care?

7        A.    Yes, exactly.

8        Q.    Okay.  But you didn't list church anywhere on

9    this certificate of occupancy?

10       A.    Right.

11       Q.    Okay.  And you testified earlier that the

12   building and fire code -- or the code regulations, I

13   think you were just general, --

14       A.    Right.

15       Q.    -- are more strict for a day care than they are

16   a church?

17       A.    Right.

18       Q.    Okay.  So you are going to have to satisfy more

19   stringent codes to be a day care?

20       A.    Exactly.

21       Q.    Okay.  And if you can satisfy the day care

22   requirements, then you are going to satisfy the church

23   requirements?

24       A.    Exactly.

25       Q.    Okay.  So you applied for a day care?

1    A.    Yes, sir.

2    Q.    Okay.  But it was your intent to be both a day

3  care and a church?

4    A.    Yes, sir.

5    Q.    Okay.  So you got the temporary C of O which I

6  believe is number 11?

7    A.    No.  You haven't given it to us yet.

8    Q.    No.  The temporary C of O.

9    A.    Yes.  This is an inspection report.  That's not

10 how the C of O does it.  But what he did is he said,

11 okay, for temporary C of O.

12   Q.    Okay.  And that's Mr. Bealor, correct?

13   A.    Yes, sir.

14   Q.    Okay.  And then he says it's contingent upon

15 fire inspection approval?

16   A.    Yes, sir.

17   Q.    Okay.  So you -- The building inspector said

18 the building was safe to occupy?

19   A.    (Witness nodding).

20   Q.    And so you began to make repairs to the

21 building, correct?

22   A.    Right.

23        MR. WHITWORTH:  Let me make an object to

24 that last question.  It doesn't say contingent upon

25 department approval.  It says final upon department

177

1   approval.

2               MR. HENRY:  Okay.

3               MR. WHITWORTH:  I think that's two

4   different things.

5       Q.    (BY MR. HENRY) Well, whatever it says, let's go

6   with that.

7       A.    Right.  Yes.  Final with fire department

8   approval, yes.

9       Q.    Okay.  And your understanding was that means

10  it's temporary until the fire marshal approves it?

11      A.    Yes, exactly.

12      Q.    Okay.  Okay.  So you have permission to enter

13  the building and make repairs?

14      A.    Yes, sir.

15      Q.    Okay.  And so did you begin making repairs?

16      A.    Yes, sir.

17      Q.    What -- which building are we talking about?

18      A.    The -- the children's building, not the dome.

19      Q.    Okay.

20      A.    We are talking about that building.

21      Q.    Okay.  So this application for temporary

22  certificate of occupancy is only for the children's

23  building?

24      A.    Yes.

25      Q.    Okay.  I imagine making repairs can be rather

178

1   expensive?

2       A.    Right.

3       Q.    So you want to do one building at the time?

4       A.    That's the idea.

5       Q.    Okay.  So you are starting with the children's

6   building which is smaller?

7       A.    Right.

8       Q.    Okay.  Now, what repairs were needed?

9       A.    Basically all of the air conditioners and all

10  of the copper wiring into the building had been removed.

11  And then there were the various fire code violations

12  which were legitimate violations because the codes were

13  different now than they were when the building was

14  built.

15              There were a few other minor things.  But,

16  you know, the fire marshal gave us a very detailed

17  report about what we needed to correct when he finally

18  did come out there.  And basically what we do is we

19  just, you know, one by one start correcting them.

20      Q.    Okay.  Now, for a day care facility, you are

21  also required to have -- If you are going to be

22  servicing all ages of children, you have to have a

23  sprinkler system in place; is that correct?

24      A.    Yes, sir.

25      Q.    Okay.  And the children's building at the

179

1  Bandera location, at that time did not have a sprinkler

2  system?

3      A.    That's correct.

4      Q.    Okay.  Does it have a sprinkler system to date?

5      A.    No, it was does not.

6      Q.    Okay.

7      A.    The reason is, is we found out that that's a

8  Leon Valley -- it's a fire code that Leon Valley has

9  been the only one that we have run into that enforced --

10 enforced it that way.  But what we can have is children

11 two-and-a-half years and up, and that's what we told the

12 city we would do.

13     Q.    I'll get to that in a minute.

14     A.    Okay.  Go ahead.

15     Q.    Because when you made this initial application

16 in September, that was not an issue at that moment,

17 correct?

18     A.    What was not an issue?

19     Q.    You were told you needed a sprinkler system for

20 all ages; is that right?

21     A.    Yes, sir.

22     Q.    Okay.  And you didn't foresee that that would

23 be a requirement at that time?

24     A.    No, but we got bids and we were going to

25 install a sprinkler system, absolutely.

180

1    Q.    Okay.  Now, when did you actually move in?

2    A.    It was sometime in October when we realized

3 after a month or so the fire marshal is not coming.  We

4 have called him and, you know, he is not returning

5 calls.

6              And so we moved in.  And as soon as we

7 moved in, you know, Leon Valley said, well, we are going

8 to turn your electricity off.  And we weren't in there a

9 month.  But that was the expectation.  I mean, I'm

10 not -- We knew what was going to happen when we moved in

11 there.  We wanted that to happen.

12              And it was a month, maybe six weeks, some

13 short period of time -- and by the way, the fire marshal

14 still hadn't come out when we went to court.  And when

15 was that?  I don't remember.  Sometime in --

16    Q.    That was in December.

17    A.    December.  Okay.  So we must have moved in in

18 late October, and then we went to court in December.

19    Q.    Okay.  When did you begin conducting services?

20    A.    When we moved in?

21    Q.    In October.

22    A.    In October, late October.

23    Q.    Okay.  And by services -- What's your

24 understanding of my question when I say services?

25    A.    Church services, people showing up specifically

181

1  to worship the Lord Jesus Christ and hear me preach a

2  good sermon.

3      Q.    Okay.  And so how often did you hold services?

4      A.    Every Sunday, most Wednesdays.

5      Q.    Okay.  Any other services?

6      A.    No, for then because our counseling had -- had

7  a little window because our phone numbers had to change

8  and there were some different things we had to go

9  through that.  So really that's the only thing we were

10  doing.  We were doing that and preparing the building to

11  be inspected by child care licensing.

12      Q.    Okay.  So your licensing was still tied to the

13  Culebra Road building; is that correct?

14      A.    Yes, sir.

15      Q.    Okay.  So did you perform any day care services

16  on the Bandera Road location?

17      A.    No.

18      Q.    Okay.  Have you ever performed any day care

19  services?

20      A.    No, we have not.

21      Q.    Okay.

22      A.    We -- we -- we just got our license from the

23  city maybe three weeks ago.

24      Q.    Okay.  Now, you were told you couldn't be a day

25  care by the fire marshal, correct?

182

1    A.    No.  We were told we couldn't be a day care for

2 all ages of children unless we had sprinkler systems.

3 He then pointed out to us that we could without

4 sprinkler systems have two-and-a-half years and up.  And

5 we opted for now, that's what we would do so we could

6 get that processes started.  Because remember, we have

7 gone six months out without the income of our school.

8    Q.    Now, we are getting off of the chronology, but

9 that's okay.  So let's jump ahead to that point.

10    A.    Sure.

11    Q.    All right.  Now, we had a -- And we will come

12 back to the issue of the initial move in and the initial

13 injunction hearing.

14    A.    Okay.

15    Q.    Okay.  But after all of that -- I'm trying to

16 find my -- where my exhibits are -- it was pointed out

17 to you that you could have day care services at that

18 location as long as you were not servicing?

19    A.    Infants basically.

20    Q.    Infants, right.  And you didn't need a

21 sprinkler system in order to service children over the

22 age of two-and-a-half years; is that correct?

23    A.    Yes, sir.  That was my understanding.

24    Q.    So you could have a day care, not need a

25 sprinkler, as long as there was a restriction you are

183

1  not going to have anyone under two-and-a-half years of

2  age?

3      A.   Exactly.

4      Q.   Okay.  And so you made a new application for a

5  certificate of occupancy?

6      A.   Ryan, we have made so many applications for --

7  I mean, I'm serious.  If we made a half a dozen -- I

8  lost count.  I mean, it seemed like every week they

9  wanted us to make a new one.  And then they wanted us to

10  write a letter about why the old one was this.  And so I

11  would not be comfortable in saying if we did it then,

12  but we did it during this whole process.  So if we did,

13  yes.  But that was one of many.

14      Q.   Okay.

15      A.   And by the way, every time we went down there,

16  I think we got charged $60.  I'll just throw that in.

17      Q.   If I remember correctly, you filed a new one.

18  But then you asked -- you sought to amend the old one to

19  make a restriction?

20      A.   No.  We did not seek that.  They told us to do

21  that.

22      Q.   Okay.

23      A.   Leon Valley told us to do that.

24      Q.   Okay.  And was it Fire Marshal Valdez that told

25  you to do that?

184

1     *A.*   No.  I believe that mandate came from another

2  office.

3     *Q.*   Do you remember who?

4     *A.*   Community Development, I think.  But again, it

5  could have been the fire marshal, but I don't think he

6  would have done that.  He's -- Fire Marshal Valdez is --

7  is doing what he is told to do.  He's under the

8  authority of I think, you know, other individuals.

9            So we worked with Community Development.

10  And I think the thing with Community Development is when

11  the application -- I mean, the -- the request for a new

12  application or amended or whatever they wanted, I think.

13     *Q.*   Whatever we call it, you actually made some

14  form of application?

15     *A.*   Yes.

16     *Q.*   To say give us of a C of O to be a day care,

17  and we promise we are not going to have children under

18  the age of two-and-a-half years of age?

19     *A.*   In the day care part.

20     *Q.*   In the day care part?

21     *A.*   Right.  We could have children of two --

22  two-and-a-half years of age in our church.

23     *Q.*   Okay.  Well, we will get to that part in a

24  minute.

25     *A.*   Okay.

185

1              *MR. HENRY:* Can you mark that as an

2  exhibit for me, please.

3              *(Exhibit 13 marked)*

4       *Q.* *(BY MR. HENRY)* And I'm sorry.  What exhibit is

5  that?  It should be 13.

6       *A.* It is.

7       *Q.* Okay.  Do you recognize that?

8       *A.* Yes.

9       *Q.* Can you tell me what that is?

10      *A.* That is a letter that we were told to produce

11  for Leon Valley.  They actually wanted us to reapply,

12  but we didn't -- we weren't going to reapply because we

13  were going to resubmit.

14              We had applied by this time however many

15  times we have and spent, God only knows, how much money

16  on these silly -- Every time you go down there, you have

17  to pay something.  Anyway, the point is, is that we did

18  this letter on their behest.

19      *Q.* Okay.  They said if you want to restrict

20  yourself to day care services not -- and you are not

21  going to be caring for infants two-and-a-half years of

22  age, we need something in writing --

23      *A.* Yes.

24      *Q.* -- from you that says that?

25      *A.* Right.

186

1    Q.    Okay.  And so you wrote this letter or this

2    letter was written on behalf of the Restoration Center?

3    A.    Yes.

4    Q.    Okay.  Who is Trascilla --

5    A.    Trascilla Sauceda is our assistant director for

6    our day care and our education program.

7    Q.    Okay.  When did you stop providing day care

8    services on Culebra Road?

9    A.    February 1st, 2009.  For a while, we were

10   paying -- we were continuing to pay rent over there for

11   our day care.

12   Q.    Okay.  So when you moved into the Bandera Road

13   building in October of --

14   A.    '08.

15   Q.    -- '08, you were still paying rent on the

16   Culebra Road property?

17   A.    Yes, we were.

18   Q.    Okay.  Were any church services being conducted

19   on Culebra Road at that time?

20   A.    No.

21   Q.    Okay.  Did you utilize any extra room for day

22   care or did you leave the day care size the same?

23   A.    No.  We actually let families go because we

24   knew the bulk of our money was going to be tied up in

25   renovations.  And we also knew that we cannot afford to

187

1    continue this day care.

2            The idea was for us to continue that day

3    care, get this one, the one on Bandera Road going, and

4    then we just opened this one while we closed this one.

5    But the fire marshal and all of this other stuff made

6    sure we weren't going to be able to do that.

7            I mean, we -- we had to keep this one in

8    operation with -- with this one hanging in suspense, you

9    know, because you can't -- even though -- Licensing --

10   licensing will not come out to inspect us until we have

11   a certificate of occupation that says day care on it.

12           So, I mean, while we are fighting this

13   thing getting this thing going, we are still having to

14   pay rent over here.  So what we did was we let some of

15   the families go and kept it to just where it was break

16   even, and then I sold it to somebody, and they kind of

17   took it over.

18       Q.   Okay.  So when did you sell it?

19       A.   February 1st, 2009.

20       Q.   Okay.  So you sold the day care on

21   February 1st, 2009?

22       A.   Right.

23       Q.   Okay.  And I take it, you sold the license and

24   everything transferred at the same time?

25       A.   No.  That's not -- that's not how it goes.

188

1    Q.    Okay.

2    A.    It operates under our license.  We are still

3  responsible until they get their own license.  They have

4  to have inspectors come and inspect them all over again.

5  Once they have theirs, then the transfer can be

6  complete.

7    Q.    Okay.  Has that occurred yet?

8    A.    I do not believe so.  I think we are on the

9  last -- it may have occurred last week, but I think

10  there is still some paperwork that needs to be completed

11  on the purchaser's end.

12    Q.    Okay.  Who did you sell it to?

13    A.    My father-in-law.

14    Q.    Your father-in-law.  I can't remember.  Is he

15  on the board of Elijah Group?

16    A.    No.

17    Q.    So -- And how much did you sell it for?

18    A.    $2,250.

19    Q.    Okay.

20    A.    What a great guy I am.

21    Q.    What name was it sold under?

22    A.    What was our name or what was the new name?

23    Q.    Give me both.

24    A.    Glory Barn Christian Learning Center is what we

25  operated it as.  Temple of Praise Early Childhood

189

1   Developmental School, something like that, is what the

2   new name was.

3       Q.   Okay.  So your father-in-law purchased it from

4   you?

5       A.   (Witness nodding).

6       Q.   How did you come up with that dollar amount?

7       A.   He -- he had been asking me about this for a

8   long time.  And basically I took the -- the price of the

9   two most expensive items of furniture that we have in

10  there to replace and added them together.

11      Q.   So you sold him the assets basically?

12      A.   Well, I got, you know --

13              MR. WHITWORTH:  A couch and a chair?

14              THE WITNESS:  No.  It was cribs.

15      Q.   (BY MR. HENRY) Okay.

16      A.   Day care certified cribs are very expensive.

17  One is 1,250.  And then what they call a portable

18  sink...  You have to have water, but without plumbing.

19  That's about a thousand so...

20      Q.   (BY MR. HENRY) Okay.  And has he -- He has been

21  operating the day care?

22      A.   Right.

23      Q.   Under your license?

24      A.   Yes, sir.

25      Q.   Until he can get his own?

190

1      A.    Right.

2      Q.    Okay.  Now, you sent in the letter to the city.

3  So what made you decide to do this as opposed to getting

4  a sprinkler system?

5      A.    The cost.

6      Q.    The cost?

7      A.    We were already -- we were expecting to open

8  our child care facility sometime around the beginning of

9  the year, and we had already exhausted the finances that

10  we had to open the new one in paying for the old one.

11            And the congregation, when we moved in

12  there, did really start growing.  I mean, it was almost

13  an immediate jump.  And although, you know,

14  contributions and things have increased, Praise the

15  Lord, you know, you are talking about replacing a

16  business that's 350,000 a year.  That's not profit, but

17  that's a large chunk of money that we are out every

18  month because we cannot open this.  And not to mention,

19  we have to pay for the other one.

20            So we were going to do the sprinkler

21  system.  We were going to do that, but it became very

22  apparent we need to do this as quickly as possible.  And

23  either we are going to have the money to open this as

24  is, and then in a year or two, we will install the

25  sprinkler system, and we will -- you know, we will go

191

1    through that and we talked to -- talked to the fire

2    marshal, Mr. Valdez, about that very thing.

3                We said, you know what, we have kind of

4    run out of time here.  We need to open this thing up.

5    We are just going to do it this way that you have shown

6    us.

7        Q.   Okay.  So he basically said, look, if you have

8    a sprinkler system in there, you can have the

9    certificate of occupancy for all age groups, including

10   infants.  But if you want to get going now, you just

11   have to give us something in writing that says you are

12   not going to service infants.

13       A.   Right, up to two-and-a-half years old.

14       Q.   Up to two-and-a-half years of age.  And then

15   you don't need a sprinkler system and you can have your

16   certificate of occupancy?

17       A.   Yes, sir.

18       Q.   Okay.  And so you gave them this letter and

19   then he gave you a certificate of occupancy?

20       A.   Yes, sir.

21       Q.   Okay.

22                MR. HENRY:  Can you mark this as an

23   exhibit for me.  I believe that's Exhibit 14.

24                MR. WHITWORTH:  Yes.

25                (Exhibit 14 marked)

192

1      Q.    *(BY MR. HENRY)* Do you recognize that?

2      A.    Ours has a date on it.

3      Q.    Yours has a date on it.  Okay.

4      A.    I think.  I thought it did.

5      Q.    Well, yours should probably have a signature on

6   it too?

7      A.    Yeah.

8      Q.    Okay.  Absent the signature and date, what does

9   that appear to be to you?

10     A.    The certificate of occupancy.

11     Q.    Okay.  And absent the signature and date, does

12  it look --

13     A.    Yes.

14     Q.    -- exactly like your other one?

15     A.    I don't remember exactly.  But, you know,

16  looking over the information, this is the agreement that

17  we had with them.

18     Q.    Okay.  All right.  So you have been granted a

19  certificate of occupancy and that is for the children's

20  building as well?

21     A.    Yes, sir.

22     Q.    Or only?

23     A.    No, only.

24     Q.    Only.  Okay.  So you can actually have the day

25  care in the children's building right now?

193

1    A.    Yes.

2    Q.    Okay.  And do you remember when -- what date

3  yours actually has on it?

4    A.    No, but it was maybe a month ago.

5    Q.    Maybe a month ago?

6    A.    Maybe two.

7    Q.    Okay.

8    A.    It wasn't -- it was sometime, you know --

9    Q.    Was it in March or April of '09?

10    A.    Something like that.

11    Q.    Okay.  So you received a certificate of

12  occupancy.  And did you begin making steps to make the

13  application with the city and the state?

14    A.    We had already made all those steps.

15    Q.    Okay.

16    A.    And basically they were saying as soon as you

17  get your C of O, we will approve you.

18    Q.    Okay.  So right now, you are approved to start

19  operating your day care?

20    A.    Yes, sir.

21    Q.    Okay.  And that's going to be for the

22  children's building?

23    A.    Yes, sir.

24    Q.    Okay.  Now, you have also applied for the C of

25  O for the dome building; is that correct?

194

1    A.    Yes, sir.

2    Q.    And you have been granted a temporary C of O

3    for the dome building, correct?

4    A.    Uh-huh.

5    Q.    I'm sorry.  I need a verbal answer.

6    A.    Yes, sir.  I'm sorry.

7    Q.    Do you remember when that came in?

8    A.    No.  Probably in the last 60 days, I would -- I

9    would imagine.

10   Q.    Okay.  So?

11   A.    Sixty to 90 days.

12   Q.    Okay.

13   A.    I would feel safe with that.

14   Q.    Was it after the certificate of occupancy for

15   the day care?

16   A.    No.  We still hadn't got the day care when we

17   started this.

18   Q.    Okay.  So you got a temporary certificate of

19   occupancy for the dome building?

20   A.    Yes.

21   Q.    In order to begin repairs?

22   A.    Right.

23   Q.    Okay.  And did you begin repairs?

24   A.    Yes.

25   Q.    And what repairs are needed for the dome

195

1 | building?

2 | A. The electrical wiring was far more extensive.

3 | Like I said before, they actually went up to the CPS

4 | pole 30 feet in the air, cut the copper wiring, stripped

5 | it out of the -- of the box that leads to the building.

6 | The dome is obviously dome shaped.

7 | There's air conditioners on the left and

8 | the right-hand side, the north and the south side. They

9 | took people and pulled out the wires from the ground on

10 | the north side that were connected to the south side and

11 | did the same thing from the south side to this side.

12 | They broke in the building and got up on the panels.

13 | And every electrical box, they pulled out the copper

14 | wiring.

15 | Q. So you had to replace all the wiring?

16 | A. Oh, yeah.

17 | Q. All right. And how much has that cost you so

18 | far?

19 | A. Over $50,000.

20 | Q. Okay. Is the repair complete?

21 | A. Yes, according to the fire marshal. If I'm not

22 | mistaken, everything is done that he wanted except a box

23 | that they need for the fire department. In case there

24 | is a fire going on, there needs to be a secured box with

25 | a key in there that we have to pay them $200 for. And

196

1  some switches that to the touch were hot.  So we have

2  actually replaced all of those.

3      Q.  Okay.  And are those the only things holding up

4  a final certificate of occupancy?

5      A.  As far as I know.

6      Q.  Okay.

7      A.  But we send him tacos all the time, but I don't

8  know if that works.  As far as I know, that is.

9      Q.  Okay.  Now, what did you apply -- what was the

10 purpose of applying for a certificate of occupancy for

11 the dome building?

12     A.  Basically the children's building has a

13 sanctuary space in the middle and is surrounded by

14 classrooms.

15          As the church began to grow, people in the

16 congregation saw the need and began to volunteer their

17 time to come and be a secretary, you know, help out

18 in -- in various administrative duties.

19          The children's building only has one

20 workable office and five people were working out of that

21 office.  Our day care director moved into another --

22 into another small classroom, but, you know, it wasn't

23 working.

24          We are primarily right now using those --

25 we are going to use those -- there's offices in the

197

1  dome.  All the offices are in the dome building.  So we

2  would use those right now for administration for our

3  various ministries.

4      Q.   Okay.  Are you still conducting church services

5  in the children's building?

6      A.   Yes, we are.

7      Q.   Okay.  The certificate of occupancy, the one

8  that has been granted for the children's building, does

9  not authorize a church use; is that correct?

10     A.   No.  I don't believe it does.

11     Q.   Okay.  You have never applied for a certificate

12 of occupancy for church use for either the children's

13 building or the dome building; is that correct?

14     A.   No.  I don't think we have specifically done

15 that.

16     Q.   Okay.  Well, you already know you are not zoned

17 for it?

18     A.   Right.

19     Q.   So what's the purpose in applying for it?

20     A.   Right.  And the other thing was, I was -- the

21 reason I was -- I was thinking even at the beginning, I

22 wrongly assumed that the church would fall under the

23 auspices of the day care zoning -- I mean, certificate

24 of occupancy.

25          You know, I thought -- I knew we were

198

1  going to have a legal issue, but I thought, okay, if we

2  are going to be okay for a day care, we are going to be

3  fine for a church.  So that was the reason, but you are

4  right.

5          MR. WHITWORTH:  And let me object as

6  calling for facts not in evidence specifically.  I don't

7  believe there is an application process for applying for

8  church use in that zone, that district.

9          MR. HENRY:  Well, you apply for a

10 certificate of occupancy and you put church use.

11         MR. WHITWORTH:  Not for church use there

12 isn't.

13         MR. HENRY:  Well, that's going to be

14 denied.

15         MR. WHITWORTH:  Within the zoning

16 commission.

17         THE WITNESS:  Right.

18         MR. HENRY:  Yeah.

19         MR. WHITWORTH:  So if there is no

20 process...

21         THE WITNESS:  No, no.  I think we are on

22 the same -- basically the same page.  We did not specify

23 that we were applying for a church use.  No, we did not

24 do that.  And exactly, like you said, why would we?  We

25 know that we are in a legal battle to de -- determine

199

1    that.

2              What I did take however was what the judge

3    said.  You know, are you guys -- according to your

4    codes, are they able to have church in this building?

5    And he said, yes, if they do these different things

6    which we have done.

7         Q.    (BY MR. HENRY)  Let's back up one minute and

8    let's talk about that.  You were conducting church

9    services in the building.  You had been denied the

10   certificate of occupancy by the fire marshal in December

11   of '08, correct?

12        A.    Yes, sir.

13        Q.    And he said -- he gave you a long list of

14   things of why the certificate of occupancy application

15   that you applied for in September was denied -- or I'm

16   sorry -- yeah, in September.  And one of the big ones

17   was no sprinkler system?

18        A.    No.  It had nothing to do with it.

19        Q.    For the day care?

20        A.    No.  He -- remember, he -- he came out and the

21   sprinkler system wasn't part of the certificate of

22   occupancy.  When he came out, he was just doing -- he

23   wasn't even doing a certificate of occupancy inspection.

24              He was told, do not even -- he told us,

25   I'm not doing a C of O.  I'm just doing a general safety

1  inspection.  Okay.  He wrote a list of things for us to

2  accomplish.  We did every one of those things.

3          We brought him back.  And he said, no, you

4  don't have a fire -- your fire alarm is not hooked up to

5  a phone.  That is on the second thing that he gave us,

6  but it was never on the first one.  So we were stuck.

7          If you remember, we were on a Friday, and

8  we were holding services in there.  And the judge --

9  remember, he said, forget all this.  Are they -- Pastor

10  Crain, he asked me, are you guys -- do you guys qualify

11  or have you guys done everything on the C of O report --

12  I mean, that the fire marshal had given us.  And I said,

13  yes, because the phone thing was not written on there.

14          Okay.  Now, afterwards, he said, but as

15  part of the fire code, you have to have a phone line

16  hooked up to the fire -- which makes perfect sense.  He

17  just -- he just forget to tell us that or something.

18          So we did not have church in that -- we

19  did not have church that Sunday in the building because

20  the judge had told us that until that is remedied --

21  which we couldn't get the phone company to come out

22  right there.  You know, we were going to have to wait

23  until Monday or Tuesday.  Until that was remedied, we

24  couldn't have church in the -- in the building.

25          So that Sunday, we -- It was a Friday

201

1   night.  We couldn't call everybody from the church and

2   tell them, you know, no church on Sunday.  That was the

3   last thing we wanted to do anyway.  So we set up

4   outside.  And we had, you know, a good crowd.  Thank

5   God, it was a beautiful day.  We had a good service.

6                   And Fire Marshal Valdez comes with a side

7   arm.  He has a weapon.  A gun is what I'm trying to say.

8   And is he walking in the congregation with a video

9   camera.  I mean, you know, walking up to our

10  parishioners, videotaping them, videotaping me with a --

11  with a side arm.  I mean, it was surreal.  It was just

12  out there.

13                  And I tried to come up to him a few times

14  and say -- I don't think I would -- I wouldn't call him

15  Luis.  But I said, Mr. Valdez, what in the world are we

16  doing here?  And he just, you know, looked at me with a

17  look that told me, you know, I don't want a fellowship

18  right now.

19                  And, you know, that was just -- just to

20  me, it was just -- just behavior that I had never

21  experienced before.  Never experienced anything like

22  that before.  And I thought that was pretty harsh to

23  have a guy at a church service with a firearm.  That's

24  kind of intimidating I thought.  Why don't you talk to

25  him about that, Ryan.

202

1    *Q.*   Do you know what Fire Marshal Valdez's

2  qualifications are in order to entitle him to carry a

3  firearm?

4    *A.*   I'm absolutely positive he meets every single

5  one of them.

6    *Q.*   Okay.

7    *A.*   I would not at all question his

8  professionalism, his qualifications.  The dealings that

9  we have had with him when we had to deal with him, you

10  know, there's issues that are going on between the city

11  and us, but he knows what he is doing.  I have 100

12  percent confidence he knows what he is doing.  As far as

13  what he did that day, I don't know where that came from.

14    *Q.*   Okay.  Do you know if he carries his firearm

15  when he goes to most of his calls?

16    *A.*   He never had before.

17    *Q.*   He never had before?

18    *A.*   No.

19    *Q.*   Okay.

20    *A.*   And I have been in seven buildings.  I have

21  never had a fire marshal show up to a building to do an

22  inspection with a 9-millimeter.

23    *Q.*   Did he pull the gun out at all?

24    *A.*   No, he did not.

25    *Q.*   Okay.

1     A.   But my daughter took a picture of him for some

2  reason.

3     Q.   I think that's been produced in discovery.

4     A.   Cell phone cameras.

5     Q.   Now, you were ordered by the court not to hold

6  services?

7     A.   In the building?

8     Q.   And that's your understanding of what Judge

9  Garcia ordered you to do?

10    A.   Yes.

11    Q.   Okay.  So when we go in there -- Judge Garcia

12  knows what he ordered.  And you are going to go up and

13  tell him, that's what I understood you ordered me to do,

14  Judge?

15    A.   Yes.  And the thing is -- is -- is I wouldn't

16  even call what we did a service.  I mean, it's all

17  videotaped.  You are going to see it.  We had some

18  songs.  I gave a five minute -- five to ten minute talk.

19  And basically I told him, this is why we are outside.

20           We did this.  You know, we need the phone

21  lines, blah, blah, blah, blah, blah.  There is nothing

22  in there that violated a fire code.

23           The whole thing is, are you putting your

24  congregation in danger in case there's a fire?  If there

25  was a fire in the building, we would have been safe.  If

204

1  there was a fire in the dome, we would have been okay.

2  So we weren't violating any kind of fire, you know...

3              And we didn't -- you know, I didn't really

4  even go in there.  I mean, we didn't really have a

5  full-blown service anyway.  We just made the

6  announcement basically that because of the legal issues

7  that we're -- that we're involved in and, you know, so

8  forth and so on, this is why we are here.

9      Q.    The court ordered you not to conduct services

10  until the fire alarm you had had been inspected --

11      A.    No.

12      Q.    -- and it was monitored?

13      A.    Monitored.  That was the -- The alarm had

14  already been inspected, but it just wasn't being

15  monitored.

16      Q.    Okay.  And so by that Sunday, it was not

17  monitored?

18      A.    No.

19      Q.    Okay.  Now, you hooked power extension cords up

20  to that building in order to --

21      A.    Yes.

22      Q.    -- operate your --

23      A.    We were outside, yes, sir.

24      Q.    Okay.  But you ran power cable into the

25  building --

205

1    A.   Yes, sir.

2              *MR. WHITWORTH:*  Let him finish his

3 question.

4              *THE WITNESS:*  I'm sorry.

5    Q.   *(BY MR. HENRY)* It's okay.  So you were pulling

6 power from the building itself?

7    A.   Yes, sir.

8    Q.   And this is the children's building, correct?

9    A.   Yes, sir.

10    Q.   Okay.  And are you right, it is on videotape.

11 And you -- I'll disagree with you a little bit as to the

12 time period, but the videotape will speak for itself as

13 to how long you were out there and what was said.

14    A.   I would say maybe --

15              *MR. WHITWORTH:*  That's not a question.

16              *THE WITNESS:*  Oh, okay.

17    Q.   *(BY MR. HENRY)* How long do you think you were

18 out there?

19    A.   Thirty or 40 minutes, something like that.

20    Q.   Okay.  How long do your services normally last?

21    A.   And hour and a half --

22    Q.   And hour and a half.

23    A.   -- to two if I get long winded.

24    Q.   Okay.  Did you pass around the collection plate

25 afterwards?

206

1       A.    Absolutely.

2       Q.    Okay.  When you were outside?

3       A.    Absolutely.

4       Q.    Okay.  And the next week -- Well, you said you

5   have services -- you have services on Sunday and

6   Wednesday, right?

7       A.    Yes, sir.

8       Q.    Okay.  And was the fire alarm system monitored

9   by Wednesday?

10      A.    Yes, it was.

11      Q.    Okay.  So did you hold services on Wednesday?

12      A.    I believe we did.

13      Q.    And was the fire alarm service monitored the

14  following Sunday?

15      A.    Yes.  All that needed to be done was AT&T had

16  to come and hook up the phones.  We had already called

17  them to do that, so they were already on their way, and

18  they had given us a date of Monday.

19            And if you remember, the court was at

20  five o'clock on Friday.  And the Judge said, well, if

21  you can get these things fixed, you can go ahead and

22  have Sunday service there.  But, you know, we

23  couldn't -- There was no way we were going to be able to

24  get the phones hooked up for the building.  So we just

25  had services outside.

207

1    Q.    Okay.  So you had services -- The hearing was

2    on a Friday.  You did not have service -- or you had

3    services in the parking lot on Sunday?

4    A.    Uh-huh.

5    Q.    You got everything hooked up -- Your testimony

6    is everything was hooked up and ready to go Wednesday?

7    A.    Yes, because AT&T was coming out already to

8    hook up our phone lines that Monday.  It was just

9    coincidental that we needed him to hook up for the fire

10   alarm because we didn't -- that wasn't on the first

11   paper that he gave us.  But once they came out, it was

12   done by Monday or Tuesday.

13   Q.    So you had service on Wednesday?

14   A.    Yes, sir.

15   Q.    Now, at the hearing on Friday, if you remember,

16   the Judge said, Mr. Valdez, once you leave the hearing

17   now, everyone go out to --

18   A.    Right.

19   Q.    -- the Bandera Road property?

20   A.    Uh-huh.

21   Q.    And at that time, the alarm had not been

22   inspected.  You had an inspector out there when we got

23   there?

24   A.    Right.

25   Q.    Do you remember that?

208

1     A.    Yes, sir.

2     Q.    Okay.  So one of Marshal Valdez's issues was

3  also that it had to be inspected by a licensed alarm

4  technician?

5     A.    No.  It wasn't -- The guy was a licensed alarm

6  technician.  What it was, was the monitoring issue was

7  the issue.

8     Q.    Okay.

9     A.    And I think that -- I don't remember this, but

10  I think that while he was there, he went around the

11  building and picked up three or four more things that he

12  had missed the first time around which again that is not

13  unusual.  I have dealt with fire marshals before.

14           We have dealt with one that comes in and

15  he's -- he looks -- and I mean, he is there three

16  minutes and he leaves.  And then you have other guys

17  that are, you know, doing the same kind of thing.  They

18  are very, very meticulous.  Either way, you have to do

19  what they say.  We were not disputing that at all.

20           What we were disputing is get out here and

21  inspect us so we can, you know, get our operation going.

22           Anyway, the issue that day was the

23  monitoring.  There was going to be no monitoring.  There

24  was no way we were going to get it monitored that

25  weekend.

209

1            The fire alarm company could not then pass

2    the fire alarm system because it was not monitored.  So,

3    you know, that's -- I knew that as soon as the

4    monitoring was an issue.

5        Q.    Did you ever pay your fire alarm inspector?

6        A.    Pay the fire alarm inspector, like bribe?

7        Q.    No, no, no, no.  The guy that came out to work

8    on your fire alarm.

9        A.    Oh, yeah.

10       Q.    Okay.

11       A.    Yeah, $2,500 or something.

12       Q.    Okay.  So if he said he didn't get paid from

13   you, he would be inaccurate?

14       A.    I don't think we have paid them for the latest

15   work that we have done.  And it took us -- because they

16   have done work on the dome building, and I think we --

17   we owe them a couple hundred dollars probably on that.

18   And it took us probably a month to finish paying on the

19   job that you are talking about.

20       Q.    Okay.  So his work on the fire alarm for the

21   children's building, it took you a while to pay him off?

22       A.    Yes.

23       Q.    But you eventually did pay him off?

24       A.    Yes, we did.

25       Q.    Okay.  Now, you also need a monitored fire

210

1  alarm system for the dome building; is that correct?

2       A.   Yes, sir, uh-huh.

3       Q.   Okay.   And is it currently monitored?

4       A.   Yes.

5       Q.   Okay.   So you got that up and running?

6       A.   Yes, sir.

7       Q.   Okay.   Are you paying a subscription service

8  for the monitoring?

9       A.   Yes, we are.

10      Q.   Which service are you using?

11      A.   Them, Medina Valley Security, whatever their --

12      Q.   Okay.   And they are monitoring the fire alarm

13  systems?

14      A.   Yes, sir.

15      Q.   Do you have any burglar alarm systems?

16      A.   Yes.

17      Q.   Okay.   And are they monitoring those as well?

18      A.   Yes.

19      Q.   Did they install those?

20      A.   No.   I don't believe they did.

21      Q.   And where did you get those?

22      A.   No.   Those were already in the building when we

23  moved in.

24      Q.   Okay.

25      A.   They came in and, you know, updated them and

211

1   got them all up to code, but I don't believe that they
2   installed them.  They were already there.

3       Q.   I'm going to deviate real quick.  There was an
4   issue with regard to you putting up a sign.  Do you
5   remember applying for a sign permit?

6       A.   We went down there and we put a small banner
7   over one of the areas of the -- of our church.  And I
8   don't remember the chronology of this, but either the
9   banner was up and someone called us and said, you need a
10  permit for that thing or we went down there.

11          But whatever the case was, we went down
12  there.  My wife, I took her to lunch, and I said, you
13  know what, we are right here by Leon Valley.  Would you
14  mind going in there and write this check off so we can
15  get a permit for our little banner.

16          And she wrote the check.  And another lady
17  was about to hand her the permit and another lady, I
18  wasn't in there, said, no, no, no.  We are not doing
19  anything with that.  We are in litigation with them.  We
20  are not going to do anything.

21          So my wife said that the lady that was
22  about to issue the permit and said, okay, you know, not
23  ugly, not confrontational, she just said, sorry, I can't
24  help you.  So basically we went up and I think in a few
25  days took the banner down.

212

1    *Q.*    Okay.  What did the banner say?

2    *A.*    Restoration Center.

3    *Q.*    Did it say anything else?

4    *A.*    If you know it said something else, tell me.

5    That's what I remember.

6    *Q.*    Okay.  Do you remember it saying something

7    about when church services were going to be held?

8    *A.*    Not on the banner, no.

9    *Q.*    Okay.  Have you had a sign that says when the

10   church services are going to be held?

11   *A.*    We fixed -- There's a large sign that is on the

12   road.  Okay.  And we put something like -- something

13   very loving like God loves this city and so do we.  And

14   it had our church service times there.  But Leon Valley

15   sent us a picture and said, you have to remove that.

16   You don't have a permit for it.  But this time, they did

17   grant it.  When we went down there to get it, they did

18   grant a sign permit.  So we can put signage up now.

19   *Q.*    Okay.  If I remember correctly, that's a

20   changeable face billboard sign?

21   *A.*    Yes.  It's the old kind of --

22   *Q.*    Where you have got a big pole and you put up

23   each letter?

24   *A.*    Yeah.  I don't know if it's to our advantage to

25   even use it, but we do.

213

1     Q.    Okay.

2               MR. WHITWORTH:    That's the one the kids

3     steal the letters from, right?

4               THE WITNESS:    Yeah, or they throw rocks at

5     it.

6     Q.    (BY MR. HENRY)    Okay.    But the city did grant --

7     A.    Yes, they did.

8     Q.    -- you a permit?

9     A.    Yes, they did.

10    Q.    Okay.    But not for the banner sign?

11    A.    No.    That was -- The sign I'm talking about

12    there was probably within the first week or two we were

13    there.

14    Q.    Okay.    Now, you -- On the changeable billboard,

15    for lack of a better word, you also I guess stenciled or

16    painted on it the Restoration Center as well?

17    A.    Yes.

18    Q.    Okay.

19    A.    That was -- I thought I was being compliant to

20    the fire marshal.    It says the Restoration Center.    And

21    then underneath it, it says 6401 Bandera Road.

22    Q.    You need your address on it?

23    A.    And, you know, something that says your name

24    and your address in case we get a call they know from

25    the road.    This is the Restoration Center.    This is the

214

1  address.

2      Q.   Okay.

3      A.   And those are in six-inch letters that I had to

4  pay twice for because the first ones were only

5  five inches.  They had to be six.

6      Q.   Any other sign issues?

7      A.   No.  I mean, that seems to be -- The only sign

8  issues that we have now really is we are actually

9  purchasing a sign, but we have the initial permit.  But

10 permits that they will need for the sign, the sign

11 company takes care of all of that.

12     Q.   Okay.

13     A.   And we haven't decided on the logo or what we

14 are going to name the school and all of that.  So

15 that's --

16     Q.   You have had a lot of electrical work done on

17 both the dome building and children's building, correct?

18     A.   Uh-huh.

19     Q.   Okay.  Have they been performed by a licensed

20 electrician?

21     A.   The two on the outside -- there's two

22 licensed -- there's two licensed companies that did work

23 for these buildings.  The first guy was a licensed guy

24 and he -- because they have to go --

25               The electricians get the permits.  We

215

1  don't.  And they have to have an electrical license.

2  And then the next guy that did the dome, the same thing.

3      Q.   Who was the first guy, what was his name?

4      A.   Rodriguez, Johnny Rodriguez.

5      Q.   Okay.  Does he own his own company?

6      A.   Yes.

7      Q.   Does he work for a particular company?

8      A.   I don't remember what it's called.

9      Q.   Okay.

10     A.   But we have large checks that I can check out

11  where he was.  But -- but these guys did work in the

12  area and they knew -- they knew Mr. Bealor.  I mean,

13  they know the guy.

14     Q.   Okay.  So he was a licensed electrician.  What

15  about the second guy, what was his name?

16     A.   Yes.  He was absolutely licensed as well.  What

17  you are talking about is --

18     Q.   What was the second guy's name first?

19     A.   Luis -- I don't remember his last name.  I can

20  get it for you by the end of the day or first thing

21  tomorrow.

22     Q.   Well, if you can just tell your lawyer so he

23  can tell us.  I tell you what, we will leave a blank --

24          MR. WHITWORTH:  Leave a blank space.

25     Q.   (BY MR. HENRY) -- in the depo and then you can

216

1  write his name in.

2      A.    Okay.

3           *MR. WHITWORTH:*  Absolutely.

4

5           *(Information to be supplied)*

6           *THE WITNESS:*  One of -- Where Leon Valley

7  is, their contention is or Mr. Valdez's contention is

8  that Luis got the permit to do all of the work on the

9  outside.

10          We have a licensed electrician who is part

11 of our congregation who volunteered to do the internal

12 work which means I'm just going to run wires to the

13 boxes and then they hook up.

14          Mr. Valdez came and inspected, and he

15 said, who is the licensed electrician that's working on

16 this.  And our guy said, well, I am.  And Mr. Valdez

17 said, let me see your license, and he showed it to him.

18 And then later on he came back and said, no, you have an

19 apprentice license.  We need a journeymen's license for

20 this and for the work that you did.

21          Now, what we can do is -- you know, this

22 guy, the apprentice, was an employee of the first

23 electrician.  Okay.  And was an employee because I think

24 the second electrician paid him to help him do some of

25 that work.

217

1    *Q.    (BY MR. HENRY)* What is this congregate's name?

2    *A.*    Steven Hernandez.

3    *Q.*    Okay.  So go ahead.

4    *A.*    That was it.

5    *Q.*    Okay.

6    *A.*    That -- Mr. Hernandez showed him his

7    apprentice's license.  And then we got a phone call from

8    Mr. Valdez that says, no.  That was wrong and, you know,

9    made a big old fuss.  It should have been a journeyman's

10   license.

11              Now, if we want to make a contention out

12   of this, this guy may not have been on the payroll, but

13   they were absolutely in contact with each other on a

14   daily basis.  And I'm sure this Luis guy will testify

15   that I was in some type a supervisory role with him

16   because he wasn't doing anything else than his workers

17   were doing.  Luis would come, drop his electrical

18   workers off, and we wouldn't see him again.  I don't

19   think I saw him but twice.

20   *Q.*    Did you pay Mr. Hernandez directly?

21   *A.*    No.

22   *Q.*    How did you pay him?

23   *A.*    I didn't pay him.  He was a volunteer.  He's an

24   electrician in our church that volunteered to run all

25   the wiring, and that was a big blessing for us.

218

1    *Q.*    Okay.  But you didn't pay the Luis --

2    *A.*    Oh, yes, I did.

3    *Q.*    -- so-and-so for any internal work?

4    *A.*    Well, some because they have to hook out --

5    they have to -- they have to hook up because the -- Mr.

6    Bealor or someone has to come and inspect their work at

7    the box, and then in the inside box.  So they have to do

8    that.

9                What Mr. Valdez was talking about was

10    those light switches that would get a little bit hot,

11    and Steven did that work.

12    *Q.*    You didn't pay Luis, for lack of a better word,

13    the electrician named Luis, to do the light switches and

14    he contract with Mr. Hernandez?

15    *A.*    No.  That didn't happen.

16    *Q.*    Okay.

17    *A.*    No.

18    *Q.*    Okay.  Have you done any other electrical work

19    on the properties?

20    *A.*    None more than I have told you.

21    *Q.*    Okay.  Have you done any other modeling or

22    repair work?

23    *A.*    We have done landscaping.  No, nothing that,

24    you know -- There has been cleaning, but there hasn't

25    been any remodeling per say.

219

1    Q.   Any painting?

2    A.   Yeah, painting.

3    Q.   Okay.  Any drywall work?

4    A.   No.

5    Q.   Okay.  Any structural repair work?

6    A.   No.  We are getting bids for some of that

7    stuff, but we haven't done anything yet.

8    Q.   Okay.  Now, you haven't opened the day care

9    yet?

10   A.   No.

11   Q.   Okay.  When is your anticipated time to open

12   it?

13   A.   Well, what we are doing now because it's --

14   it's taken this long is we need to raise a little bit of

15   money to assure that we can have three months of -- you

16   know because when you open, you have to pay teachers and

17   things of that nature.

18              We were hoping to have everything done by

19   January so we could open up this semester.  But we will

20   probably start gearing up to open up in August for the

21   school year.

22   Q.   Okay.  Are you currently doing any counseling?

23   A.   Yes.

24   Q.   Okay.  And how long have you been doing

25   counseling in the Bandera Road location?

220

1    A.    I mean, we do counseling through -- we do

2    counseling through referrals from our congregants since

3    we got there probably.  But through the courts, we just

4    were able to start doing that probably two weeks ago.

5    Q.    Okay.  And is TCAL operational right now?

6    A.    Yes.

7    Q.    Okay.  And all of these are basically officed

8    out of the Bandera Road --

9    A.    Yes.

10    Q.    -- location?  Okay.  But you are hoping to move

11    offices from the children's building over to the dome

12    building?

13    A.    Right.  You know, everything is set up.  We are

14    just waiting to --

15    Q.    Okay.  For the dome building, you have a

16    temporary certificate of occupancy?

17    A.    Right.

18    Q.    And have you listed the same use for that dome

19    building?

20    A.    To be honest with you, I don't know what we

21    listed that as.  I think we put administrative offices.

22    Q.    Administrative offices.  Okay.

23    A.    Because for some reason, if we used the

24    classrooms in the children's building, we would --

25    our -- the number of children we would be able to

221

1    service would be lower.  So we -- we have to have the

2    offices over there.

3        Q.    Okay.  And correct me if I'm misinterpreting

4    your testimony.

5        A.    Okay.

6        Q.    I think my understanding is you want to have

7    the day care operational for the administrative -- for

8    the children's building, and then build up to putting

9    sprinklers in to expand to infants later; is that

10   correct?

11       A.    Yes.

12       Q.    Okay.  All right.  But right now, you are going

13   to be limited to children over the age of two-and-a-half

14   years?

15       A.    Yes.

16       Q.    Okay.  And you have, in fact, received your

17   license from the city?

18       A.    Yes, we have.

19       Q.    Now, is your understanding that the city is the

20   only regulatory agency you have to apply to?

21       A.    No.  It's the state.  The city -- the city is,

22   if I'm not mistaken, overseen by a state office because

23   we -- we send stuff to Austin and then we have stuff

24   here as well.

25       Q.    Okay.  So you apply to the city office, but

222

1  they coordinate with the state to get you your license?

2      A.    Yes.

3      Q.    And that's your understanding?

4      A.    Yes.

5      Q.    Okay.  And you have since received that

6  license?

7      A.    I believe we have.

8      Q.    Okay.

9      A.    I haven't physically seen it, but someone told

10  me the other day we -- the licensing representative went

11  ahead and approved us.  And that doesn't mean you get

12  the license.  That could mean the license is being

13  mailed.

14      Q.    Okay.  Did a member of your staff -- Who did

15  all the filling out of the --

16      A.    Trascilla Sauceda.

17      Q.    Okay.  So Trascilla is the one that basically

18  applied for everything, right?

19      A.    Yes.

20      Q.    Okay.  She did all the grunt work?

21      A.    Exactly.

22      Q.    Okay.  Now, she was the one helping out with

23  the day care over on Culebra, right?

24      A.    Right.

25      Q.    So she was already familiar with the way this

223

1   works?

2       A.   Exactly.

3       Q.   Okay.  So you just kind of let her do it?

4       A.   Exactly.

5       Q.   Okay.  How much involvement did you have with

6   that?

7       A.   I signed the piece of paper.

8       Q.   Okay.  And that was it?

9       A.   You know, every once in awhile -- and of course

10  arguing about the school name.

11      Q.   Okay.

12              MR. WHITWORTH:  And sign this check.

13              THE WITNESS:  Sign this check, amen to

14  that, every Monday.

15              MR. WHITWORTH:  Let me know when you get

16  to a good breaking point.

17              MR. HENRY:  Actually, right now is a good

18  point.  Let's go ahead and take a five minute break.

19              THE VIDEOGRAPHER:  We are off the record

20  at 2:54 p.m.

21              (Exhibit 15 marked)

22              (Short break from 2:54 to 3:03)

23              THE VIDEOGRAPHER:  This is Pastor Darryl

24  Crain Tape 3.  We are on the record at 3:03 p.m.

25      Q.   (BY MR. HENRY) Pastor Crain, you have been

224

1    handed an exhibit which is a photograph.  Can you tell

2    me what exhibit number is on the bottom of that?

3        A.    Fifteen.

4        Q.    Okay.  Do you recognize that?

5        A.    Yes, I do.

6        Q.    Okay.  Tell me what that is.

7        A.    That is a picture of the sign that I told you

8    that we put up.  And the city sent us this and said we

9    didn't have the proper permit so -- and we had ten days

10   to take it down which we did.

11       Q.    Okay.  You then applied for a permit and

12   received a permit?

13       A.    Right.

14       Q.    And that's for this sign, correct?

15       A.    Yes, sir.

16       Q.    This is a photo of that sign?

17       A.    Yes, sir.

18       Q.    Okay.  Does it accurately represent --

19       A.    Yes.

20       Q.    -- what the sign looks like?

21       A.    Uh-huh.

22       Q.    Okay.  This is really a follow-up question.

23             MR. HENRY:  Dan, there's your copy if you

24   want one.

25             MR. WHITWORTH:  Now, you threw me there.

225

1  It's not "the" sign.  It's a photo of the sign.

2        *MR. HENRY:*  A photo of the sign, that's

3  right.  I actually had a witness one time that would

4  clarify every single time I would say that.  Is

5  this a pic -- is this the car?  No.  This is a picture

6  of the car.

7        Q.  *(BY MR. HENRY)* All right.  Pastor Crain, I want

8  to talk a little bit about The Elijah Group as it exists

9  right now, --

10       A.  Okay.

11       Q.  -- today.  What is the children's building,

12  used for right now?

13       A.  The children's building -- building is being

14  used for children and services and everything that we

15  have been using it for since we got in there.

16       Q.  Okay.  So it's being used for church services?

17       A.  Yes.

18       Q.  It's the planned use for the day care?

19       A.  Yes.

20       Q.  Okay.  But you haven't started any day care?

21       A.  No.

22       Q.  Not as of today?

23       A.  We have not.

24       Q.  Hopefully in a little while?

25       A.  Yes.  What -- what we are doing is because of

226

1  the school, the age thing, we are looking at opening up

2  a school as opposed to just a day care where we would

3  have a kindergarten and things of the nature.

4      Q.   Okay.

5      A.   So we are still exploring those options, that's

6  why.

7      Q.   While church services are going on, are you --

8  are you having any baby-sitting services?

9      A.   We -- we call that, it's like a children's

10  church ministry.

11      Q.   Okay.

12      A.   Yeah.  And, yes, those things do go on.

13      Q.   Okay.  But those only go on when you are

14  holding the services?

15      A.   Right.

16      Q.   Okay.  Do they go on at any other time?

17      A.   No.

18      Q.   Okay.  And you are currently doing counseling?

19      A.   Yes.

20      Q.   Is that coming out of the children's building?

21      A.   Yes.

22      Q.   Okay.  That's where they are located?

23      A.   Well, right now.

24      Q.   Okay.

25      A.   We are hoping to move over there, but we

227

1   haven't done anything like that yet.

2        Q.   I understand.  I'm just talking about today.

3        A.   Yes.

4        Q.   As of today.  And the -- Was it TCAL (Tec/la)?

5        A.   Excuse me?

6        Q.   The T-C-A-L?

7        A.   TCAL (Tee/cal).

8        Q.   TCAL.

9        A.   Yes.

10       Q.   Thank you.  Their offices are operated out of

11  the children's building right now?

12       A.   Yes.

13       Q.   Okay.  And your -- The Elijah Group's

14  administrative offices are currently in the children's

15  building?

16       A.   Yes, sir.

17       Q.   Okay.  And your hope is to move the

18  administrative offices over to the dome building.

19       A.   Right.

20       Q.   Okay.  Are you going to move any church

21  services over to the dome building?

22       A.   Eventually.

23       Q.   Okay.  Are you hoping for that anytime soon?

24       A.   Yes.

25       Q.   Okay.

228

1    A.    As soon as possible.

2    Q.    As soon as possible.  All right.  How far

3 off -- Are you going to do any day care services in the

4 dome building?

5    A.    No.

6    Q.    Okay.  That's not your intended purpose?

7    A.    No.  And it -- it doesn't have the capacity for

8 that.

9    Q.    It's a lot bigger square footage, correct?

10    A.    Square footage.  But it's basically a large

11 sanctuary --

12    Q.    Okay.

13    A.    -- and several offices.  There's one usable

14 classroom in there for infants.

15    Q.    Okay.

16    A.    And we would just strictly use that on church

17 days.

18    Q.    Okay.  Are you going to do any counseling in

19 there?

20    A.    Yes.

21    Q.    Okay.  Are there any other activities that are

22 part of The Elijah Group right now that you plan on

23 using in either the children's building or the dome

24 building?

25    A.    We will do all kinds of things in those -- in

229

1  those buildings.  I mean, once we get our certificate of

2  occupancy which I'm expecting this week, you know, I'm a

3  creative guy, man.  We are going to do everything we can

4  think about doing in there.

5      Q.    Okay.  Do you have any plans for the moment for

6  any additional --

7      A.    Absolutely.

8      Q.    -- services or activities?

9      A.    I'll tell you a great thing we are going to do.

10      Q.    Okay.

11      A.    We are going to have a night to honor Leon

12  Valley in October.  And we are going to invite every

13  person in Leon Valley over the age of 60 to come to a

14  free dinner.  We will set up in the dome, a -- a

15  banquet.  And we will have, you know, catering and the

16  whole thing.  The church will pay for it.  It won't cost

17  anybody a dime.  And we will just honor the people of

18  Leon -- the people over 60 years old of Leon Valley.

19      Q.    Okay.

20      A.    And we plan when this is -- all of the

21  litigation is over and we have won, we will do the same

22  thing to the mayor and the city council and the police

23  department.  Give them a free -- and I don't mean

24  that -- you know, we are going to show them we are not

25  being --

230

1    Q.   No hard feelings?

2    A.   No.  More than that.  We are not -- not just no

3  hard feelings.  We take seriously your job and we

4  appreciate --

5              You know, I appreciate what they are

6  trying to do.  I can see their perspective.  I run a

7  business.  You know, if someone tells me you are going

8  to lose $80,000 -- 75, $80,000 a year, you have got to

9  take a hard look at that.  You know, that's real.  I

10 mean, I know that, and I appreciate where they are

11 coming from.

12             And when we do those things, we will do

13 that because we appreciate and we believe scripturally

14 that these people are put there by God, and we are

15 supposed to honor them.  And we are not only believing

16 that, we are going to do it.

17   Q.   Okay.  I know you had sent in some

18 correspondence, whether it was an e-mail or letter, I

19 don't recall, to the mayor or the city manager

20 regarding --

21   A.   Volunteer work.

22   Q.   Yes, volunteer work.  The court reporter is

23 going to kill you if you keep this up.

24             MR. WHITWORTH:  I was going to say that's

25 news to me.  Do you have a copy of that?

231

1          *THE WITNESS:*  No, I didn't -- I didn't --

2    Sorry about that.

3          *Q.*    *(BY MR. HENRY)* The -- the offer for volunteer

4    work, okay, did you receive a response?

5          *A.*    Yes, we did.

6          *Q.*    Okay.

7          *A.*    We received a response from Lanny Lambert and

8    basically said -- what we did was we just offered -- we

9    said, look, we are going to be in litigation here for a

10   while.  You know, we are getting our certificate of

11   occupancy in the dome.

12             While we are leasing it, at least, you

13   know, let us be of service to you, you know.  And we had

14   received a nice letter back that said we don't have

15   anything going on right now, but this is the gentleman

16   who coordinates our community volunteer thing.

17             And we called him.  And basically he said

18   the same thing.  We don't have anything going on right

19   now.  But if we need graffiti cleaned or trash picked up

20   or things of nature, we will give you a call.

21         *Q.*    Okay.

22         *A.*    And that's exactly what we wanted to do.

23         *Q.*    Okay.  So you made an offer to go out and help

24   with graffiti cleanup in other parts of the city?

25         *A.*    Or anything that they wanted us to do?

232

1    Q.    Okay.    Trash pickup in other parts of the city?

2    A.    Yes.

3    Q.    Okay.    Have you ever made any offer like that

4    before?

5    A.    No.

6    Q.    Okay.    Had you made any offer like that to

7    San Antonio when you were over on the Culebra Road?

8    A.    No.    And it's not because we are in legal

9    things with them.    It's because the City of San

10   Antonio -- You know, you are not going to have an affect

11   on the community like you are in Leon Valley.

12            And that's one of the reasons we are going

13   to enjoy being there so much is with the City of San

14   Antonio you say, hey, can we go clean up graffiti?

15   Sure.    On 1604 by Bulverde or, you know, who knows what

16   kind of response you are going to get.

17            It's just not something that is going to

18   achieve a goal.    And our goal is to honor those that are

19   in authority.    And we do that on the micro level at Leon

20   Valley a lot differently than we could for the City of

21   San Antonio.

22   Q.    Okay.    How many members of your congregation

23   are there right now?

24   A.    Members is a specific word because we have a

25   membership class.

233

1      Q.    Okay.

2      A.    Members in any church are not going to be

3  weekly attenders.  Weekly attenders right now, we are

4  probably a little over 150.

5      Q.    Okay.  What are your members?

6      A.    Seventy-five, something like that.

7      Q.    Is that different than the weekly attenders or

8  is that consumed into?

9      A.    Consumed into.

10     Q.    Okay.  And when you say members, what -- what

11  are those?

12     A.    Members are people that come to church on a

13  regular basis, and you offer a membership class which

14  means you go for a one-day basically seminar on the

15  beliefs of the church, what our vision is, what are

16  mission is.

17          We tell them all of the different

18  ministries that we are involved in and give them an

19  opportunity to meet me on a more personal level, you

20  know, and things of that nature.  And then we can

21  actually become a member so then we can actually begin

22  to plug them into ministry things.

23     Q.    Okay.  How many ministries do you have?

24     A.    Four basically.  Men, women, youth and

25  children.

234

1  Q. Okay.  And what do these ministries do?

2  A. They minister to men, they minister to women,

3 and the youth, and they minister to children.  And from

4 there, you know, if we have a men's ministry that may go

5 and they may meet, but they may go play basketball or

6 they may go do this or a couple of guys may go to a

7 hospital, that's not something that we are really

8 initiating.

9    What we try to do is just get a group of

10 guys together to initiate relationships and things of

11 that nature.  Guys, women, children, youth, things of

12 that nature.

13  Q. Okay.  And where do they normally meet?

14  A. In homes.

15  Q. In homes.  Okay.  So they don't meet on the

16 Bandera Road location?

17  A. Oh, I'm sorry.  The men and women usually meet

18 at homes.  The children meet at the church and the youth

19 meet at the church as well.

20  Q. Okay.  Currently are they meeting in the

21 children's building?

22  A. Yes.

23  Q. Okay.  And how often do those occur?

24  A. Once a week.

25  Q. Once a week.  Okay.  So walk me through real

235

1  quick your typical week.  What happens to you and The

2  Elijah Group in a typical week?  Start with Sunday.

3      A.   Sunday morning, we wake up at nine o'clock.

4  Excuse me.  Sunday morning, we wake up about six or

5  seven o'clock, and my wife kisses me all over my face

6  and tells me what a wonderful man and how lucky she is.

7           I take a shower.  I shave two days a week

8  and that's one of the days I shave.  I get dressed.  My

9  wife and I leave church -- leave our house, excuse me,

10  at about 8:45 to 9:15.

11           We arrive at the church.  My wife helps

12  lead music.  And there's a team of musicians that arrive

13  as well.  They go through some rehearsals.  We have a

14  service that lasts between 90 minutes and two hours,

15  depending on how excited I get.

16      Q.   And what time does the service usually start?

17      A.   10:30, and it's usually finished by 12:00 or,

18  like I said, 12:30 if I'm really on a roll.  And during

19  that time, the children are dismissed to different

20  classrooms where people teach them, you know, the basic

21  Bible curriculum for kids.

22           We do all that.  Usually go to lunch.

23  Usually I take a nap.  Usually Sunday nights, I hang out

24  with my kids or I go play basketball.  I stay up late

25  and I take Monday morning off.  I get to the office

236

1  about ten o'clock, 11 o'clock, 12:00, 1:00, kind of

2  depending on how tired I am.  We have staff prayer

3  from -- for about an hour or so.

4      Q.   How many employees do you have?

5      A.   That's a loose term because no one is actually

6  an employee.  They are just volunteered staff.

7      Q.   Okay.

8      A.   We pay the one gentleman from TCAL $500 a

9  month, but, you know, technically we don't -- we don't

10  even have to pay taxes on that because it's not enough.

11  But anyway...

12      Q.   You have a staff meeting?

13      A.   We have a staff meeting.  And then my day

14  begins with, Pastor Crain, this person called, this

15  person called, this person is this.  You know, Danny

16  Whitworth called, blah, blah, blah.

17          I hand out a to-do list to every one of

18  the volunteers that are there.  This is what I want us

19  to work on this week.  They begin making phone calls,

20  doing things, contacting people, so forth and so on.

21          Tuesdays and Thursdays, normally I see at

22  least two couples, sometimes more, for marriage

23  counseling.

24      Q.   Do you charge for marriage counseling?

25      A.   If they are nonmembers of the church, we charge

237

1    a 60-dollar fee.

2        Q.   Okay.

3        A.   All right.  And that's just basically to make

4    sure they come back.

5        Q.   Okay.

6        A.   But if they are members of the church, we don't

7    charge them.

8        Q.   And is it the member class only or returning --

9        A.   Member church.  What I mean by that is if they

10   are coming to church on a regular basis, we don't charge

11   them for counseling.

12       Q.   Okay.

13       A.   But if -- Normally, this is how they come to

14   church is through the counseling service.

15       Q.   Okay.

16       A.   So I'll meet with those people.  And then, you

17   know, just like anybody else, I get 30 or 40 or 50 calls

18   a days for various different things and coordinating

19   things and, you know, kids.

20       Q.   What happens on Wednesday?

21       A.   On Wednesday night, we get to -- get to -- get

22   to church about six o'clock.  The youth group meets in a

23   room.  Children will meet in a room.  I will meet with a

24   substantially smaller congregation than on a Sunday

25   morning, but we go through a systematic study of the

238

1  Bible or we have a prayer meeting, something along those

2  lines.

3              Thursday morning, I'm following up with

4  people.  Thursday I have counseling as well, most

5  Thursdays.  Fridays, you know, I'm getting ready for

6  Sunday and things of that nature.

7      Q.   Okay.  Do you do anything specific on Friday or

8  Saturday?

9      A.   I say hi to my kids, you know.  No, nothing

10  specific.  We just get ready for Sunday.

11     Q.   Okay.

12     A.   On Saturdays it's a -- You know, we may have a

13  membership class on a Saturday or something like that,

14  but that's once every three months.

15     Q.   Now, when you were on Culebra Road, do you have

16  a similar --

17     A.   Yeah.

18     Q.   -- pattern?

19     A.   Yeah.

20     Q.   Okay.  And when was the day care opened?

21     A.   What day care opened, the one on Culebra?

22     Q.   Yes.

23     A.   Oh, that was -- What did I say?  That was in

24  2006, I believe.  Is that what I said?

25     Q.   I don't recall right now.

239

1     *A.*    Something like that.

2     *Q.*    Well, what --

3           *MR. WHITWORTH:*  Are you talking about

4  daily?

5     *Q.*    *(BY MR. HENRY)* Yeah, daily.

6     *A.*    Everything I just said except I had to

7  oversee -- we did have a staff of about six or seven

8  people there, and I was involved in a lot more

9  counseling at the Culebra office.

10          A lot more of what we would call

11  one-to-one ministry, you know, because people were

12  coming in.  And towards the end of that, we began to

13  take in adults from Child Protective Services, you know,

14  so...

15     *Q.*    When was the day care's hours of operation?

16     *A.*    6:00 in the morn -- 6:30 in the morning until

17  six o'clock at night.

18     *Q.*    And do you intend to continue those hours of

19  operation with the children?

20     *A.*    We haven't decided yet.

21     *Q.*    Okay.  I want to talk to you a little bit about

22  your choice of location.  Okay.  You are in a B-2 zone.

23  I'll represent to you, you are in a B-2 zone.

24     *A.*    Okay.

25     *Q.*    Are you aware of any other churches that

240

1    currently exist in the same zone you are in?

2         A.    In Leon valley?

3         Q.    In Leon Valley.

4         A.    No, I'm not.

5         Q.    Okay.  Do you know of any other churches in

6    Leon Valley?

7         A.    Wait a minute.  Yes, there would be because

8    there are some -- This is an assumption on my part.

9    There are some churches in strip centers on Bandera

10   Road, and I'm assuming they would be in B-2.

11              And the reason that they would be able to

12   be there is because, like I explained prior, the owner

13   of the building is paying taxes.  So even though a

14   church may be in the strip center, they are not -- it's

15   not going to be a nonprofit, a tax exempt --

16        Q.    Which ones are you aware of?

17        A.    -- property.

18        Q.    What churches are you aware of right now?

19        A.    I wouldn't know the names.  I have just seen

20   the signs.

21        Q.    Where are they located?

22        A.    On Bandera Road.

23        Q.    Where on Bandera Road?

24        A.    One of them is down by, what is that, Huebner.

25   It seems like it was a Spanish church.  And then there's

241

1  a few that are kind of in the back where the 410/Jim's

2  kind of thing, back there.  But again, I'm -- I'm 99

3  percent sure those are rented spaces.

4      Q.   You don't know the names of them?

5      A.   No.

6      Q.   Okay.  How many of them are there?

7      A.   The ones I'm thinking of right now are three.

8      Q.   Okay.

9      A.   But that does not mean that there's -- they are

10 there for sure.  That means I have seen a sign on a --

11 on a strip center.

12     Q.   Okay.  And what signs have you seen?

13     A.   Church signs that I can't remember the names

14 of.

15     Q.   Okay.  You are making an assumption they are in

16 the same zone that you are?

17     A.   Yes, absolutely an assumption.  I do not know.

18     Q.   Okay.  When -- Did you ever look for a

19 location?  You gave me some parameters earlier --

20     A.   Right.

21     Q.   -- of an area you were constantly looking for a

22 new location.

23     A.   Uh-huh.

24     Q.   Do you still have that file?

25     A.   I have files with property in there,

242

1  absolutely.

2      Q.    Okay.  Would you be able to produce those?

3      A.    Sure, yeah.

4      Q.    Okay.  The ones you have been collecting for

5  eight years?

6      A.    Yes.

7      Q.    Would you be willing to produce those to us?

8      A.    Absolutely, yeah.

9      Q.    Okay.  I'll send your lawyer a request for

10  those.

11      A.    Okay.

12              *(Information to be supplied)*

13      Q.    *(BY MR. HENRY)* Did you look at any other

14  locations to relocate from Culebra?

15      A.    Like I said before, we were always looking,

16  but, you know, it's just -- There's so many different

17  variables.  Number one, building is incredibly

18  expensive.  Remodeling is incredibly expensive.  You

19  know, there's -- Location is incredibly important.  All

20  of those things factor in.

21              So, you know, we may see a piece of land

22  and say, that would be a great church and then it's just

23  out of our price range.  We may see a warehouse that we

24  say, that wouldn't be bad, but it's not where we want to

25  be.

243

1          So we were really looking.  And I have got

2  to tell you and without spiritualizing this in any way,

3  I was praying for a specific thing.  I wanted to buy a

4  church that was already built because the -- because of

5  the cost factor, plain and simple.  And, you know, I was

6  praying for something that that would happen.

7          I would never pray for a building, you

8  know, a church to go under or anything like that.  But

9  we looked at another facility.  It was just too far

10  away.  I mean, we didn't --

11      Q.   Which facility did you look at?

12      A.   It was on 1604 and Lockhill-Selma.  It's still

13  for sale today.

14      Q.   Is that inside San Antonio?

15      A.   Yes, it was.

16      Q.   Okay.  But you said it's too far away for you?

17      A.   And it would be one of those things.  It was

18  1.5 million and it needed at least a million dollars

19  worth of work.  You know, it was just a tragic story.

20  And, you know, it was one of those things where, well, I

21  guess, maybe, kind of...

22          But this brings us to another point.  We

23  have to have a specific deal, Ryan.  Because like I told

24  you before, we don't have 100,000.  We don't have

25  200,000.  We don't have 30,000.  So the financing of our

244

1  property has to fall into specific parameters.

2           The finance company that we have used --

3  or that we are using allows us to borrow up to

4  80 percent of appraised value, not 80 percent of asking

5  cost, asking price.

6           So we are looking for a building that's

7  appraised for a lot, selling for a little so we don't

8  have to put money down.  And that building on

9  Lockhill-Selma, even if we wanted to do it, it wouldn't

10  fit in those parameters because it's appraised just

11  about what they are asking for, maybe a little bit but

12  nowhere near 20 percent.

13           When this building came available, the

14  reason I did not want to go look at it is because it

15  absolutely is perfect for us.  I mean, it's absolutely

16  everything...except for the dome.  I wouldn't build a

17  dome.  But everything is just absolutely -- it's where

18  we want to be.  It's -- you know, it's just perfect for

19  us.

20      Q.   Except it's in the wrong zone?

21      A.   That is a matter of opinion.

22      Q.   Is it your opinion that it's in the right zone?

23      A.   Yeah, absolutely.

24      Q.   Okay.

25      A.   And I mean, that I wouldn't -- I wouldn't do it

245

1    if I didn't think -- if I felt like I wasn't doing

2    something that didn't have integrity or if I felt like I

3    was having to bend the rules to get around, I don't

4    think we would have done it.  But I feel like I respect

5    you.  I respect the city's position.  I just feel like

6    it was -- it was -- once I learned what had been done...

7              If that was a property, say, down the road

8    a little bit right off of Bandera that there was never a

9    church there, and it was zoned the way that you are --

10   the B-2 or B-3, whatever the right one or wrong one is,

11   I don't think -- well, I don't -- I know 100 percent I

12   wouldn't have fought it because there has never been a

13   church there.  This is the way the city wants it.

14   That's it.

15             But this is something where there has been

16   an established church there for the last 12 to 15 years,

17   you know.  And that's the reason that we are in the

18   position that we are in.

19        Q.   Okay.  Do you feel you have a constitutional

20   right to have a church there?

21        A.   Absolutely.  Absolutely positively.

22        Q.   Okay.  What is your current financing for the

23   purchase of the Bandera property?

24        A.   We are just in a lease position right now.

25        Q.   Okay.

1     A.    When we -- The financing is based on an

2   executable bill of sale which we don't have now.  What

3   our financing is -- is -- right now is when we close, we

4   have everything set up.  It's just -- because we have an

5   appraisal that's here, and we have a bid that's here.

6   So that all matches up.

7     Q.    What's the appraised value?

8     A.    A little over $3 million.

9     Q.    Okay.  Do you know that GoldStar challenged the

10  appraisal?

11    A.    I'm sure they did for the tax purposes,

12  absolutely.

13    Q.    Yeah.  Do you know the result of that

14  challenge?

15    A.    No, I do not.

16    Q.    Okay.  Do you know if that challenge will have

17  any impact on your financing?

18    A.    No, it won't because it's not going -- they

19  are -- it will -- it will drop some, I'm sure, but it's

20  not going to drop to where it's going to affect us.

21    Q.    Okay.  Have you -- since the litigation has

22  occurred, have you looked at any other buildings in Leon

23  Valley that you can go to?

24    A.    There are no other buildings in Leon Valley we

25  could go to.

247

1    Q.   Okay.  Did you look?

2    A.   There is a Petco on 410 that was suggested to

3   us that was 11,000 or -- no, no -- 23,000 square feet.

4   I can't remember.  That would mean we would be paying

5   somewhere in the neighborhood of $18,000 per month to be

6   in that building.  We can't go there.

7           There is a warehouse off of Reindeer that

8   we looked at that we would be paying -- these are all

9   leased facilities, that we would be paying somewhere in

10  the neighborhood of five to $9,000 a month, but it would

11  take another 250,000 minimum to renovate it to fit our

12  needs.

13          There is land that would be where we are

14  at, but it's in the wrong zoning.  And I'm not going to

15  fight it.  I mean, to me, that's an unwinnable fight,

16  you know.  It's zoned -- It's never been a church.  Why

17  would they make a church now?

18          There are no other buildings, and -- you

19  know, none.  There are no other buildings that will fit

20  our needs because there are no other churches.

21          This is a church.  It has been a church.

22  It was built by a church for a church to be used by a

23  church.  There is no other building that fits that

24  description or comes close.  We are not interested in

25  leasing a facility.  We were leasing our other facility.

1          We want to get into a place where we can

2    expand and, you know, that's exactly where we were.

3    There is nothing -- I would venture to say, Ryan, there

4    is nothing like this facility, you know, not just in

5    Leon Valley.  There's nothing like it in Helotes.

6    There's nothing like it, you know, in the San Antonio,

7    you know, north -- northwest side.

8          Q.   Okay.  The two leased facilities you mentioned

9    that would basically be too expensive, you would have to

10   renovate, are they in the proper zones?

11         A.   I don't know.

12         Q.   Okay.

13         A.   But remember, when you are leasing, it doesn't

14   matter.  They would allow us to lease a building.  They

15   don't care if we are a church or not because a lease --

16   the property owner is paying the taxes.

17         Q.   That's your understanding?

18         A.   That's a fact.  I mean, if I'm in a lease -- I

19   have been in several before.  I pay a per square --

20   square footage charge plus what they call a triple net,

21   and part of that is your insurance, your taxes and

22   general upkeep to the building.

23              You know, if I'm in a leased facility the,

24   you know --

25         Q.   You don't think the city would have a problem

1  with you leasing a facility for a use that isn't zoned
2  to be used that way?
3            MR. WHITWORTH:  I think Ryan is talking
4  about the zoning designation, right?
5            MR. HENRY:  Zoning classifications.
6            THE WITNESS:  Okay.  I'm --
7            MR. WHITWORTH:  You are thinking of
8  something else.
9            THE WITNESS:  I'm sorry.  I get where you
10 are coming from.  And I think where you are coming from
11 is the right area and I'm in the wrong one.
12    Q.    (BY MR. HENRY)  Okay.  Do you know if those two
13 buildings are B-3 which permits churches?
14    A.    No idea.
15    Q.    Okay.  They could be.  They may not be.  You
16 don't know?
17    A.    Right.
18    Q.    Okay.  Are you familiar with any other what you
19 have classified in the lawsuit as assembly uses that are
20 nonsecular that are in the same zone you are in?
21    A.    Nonsecular or religious is what you are saying?
22    Q.    Nonreligious.
23    A.    Nonreligious.
24            MR. WHITWORTH:  Secular?
25    Q.    (BY MR. HENRY)  I'm sorry.  Secular.  My fault.

1    A.    Okay.   What you are looking at is I think the

2  bowling alley.

3    Q.    I'm asking you.   What are you looking at?

4    A.    I don't know specifically.   I'm just giving you

5  examples.   And none of these examples have any kind of

6  credibility behind me giving them other than me -- I'm

7  putting out a couple of examples for you.

8                 The bowling alley, when I was talking with

9  the mayor and Mr. Lambert and the city staff person who

10  I don't know her name, the city staff person told me

11  that there was someone interested in the property that

12  was going to make it into a theater type production,

13  that would be an assembly.   So I mean --

14    Q.    Okay.   Do you know of any other assemblies, as

15  we are talking about today, that are in the same zone as

16  you are?

17    A.    Currently?

18    Q.    Currently.

19    A.    I don't know the zoning.   You know, I don't

20  know -- I'm not familiar at all with the zoning.   Let me

21  just say that.   But I'm assuming the bowling alley right

22  down the street on Bandera is in the same zone.

23    Q.    Okay.

24    A.    And that's an assembly.

25    Q.    Okay.

1 A. I mean, it really --

2 Q. I'm saying you should treat it --

3 A. I mean, it really -- isn't it really determined

4 on what you define assembly as, I mean?

5 Q. Well, in your lawsuit --

6 A. Okay.

7 Q. -- you say that there are other assemblies that

8 are nonreligious assemblies that are allowed to exist in

9 a B-2 zone, the zone you are currently in.

10 A. Okay.

11 Q. And if they can exist there, then your church

12 should be permitted to exist there.

13 A. Absolutely.

14 Q. Okay.  So I'm asking you, what do you mean by

15 assemblies in your lawsuit?

16 A. Okay.  What I mean by assemblies in my lawsuit

17 that my lawyer drafted on my behalf is the word assembly

18 there would mean -- I'm sure it has a broad definition,

19 but people gathering together for any kind of function.

20 If I'm going bowling, my family showing up is an

21 assembly.

22 Q. Okay.

23 A. We are assembling at the bowling alley.  I --

24 The bowling alley on this property -- well, it's not on

25 here -- is not one mile away from us right off of

252

1   Bandera Road.

2       Q.    Okay.

3       A.    That is a nonreligious assembly area.  There is

4   game shops like where you go play video games.  I mean,

5   for goodness sake, there's a Pizza Hut.  I mean, it

6   just -- You know, everything can be called an assembly

7   per se.

8       Q.    And is that your definition of assembly in your

9   lawsuit?

10      A.    Remember, I don't know what the legal

11  definition is.  You are asking me my opinion.

12      Q.    Yes.  I'm asking your opinion.

13      A.    That's why we pay the lawyers the big money.

14      Q.    Okay.  So you are aware --

15              MR. WHITWORTH:  Big money?

16              THE WITNESS:  Little money, any money.

17      Q.    (BY MR. HENRY) Are you aware of any assemblies

18  in the same zone that you are that you think are treated

19  better than you are being treated right now?

20      A.    Well, I think it kind of goes to the same thing

21  we have already said.  That's just --

22              MR. WHITWORTH:  Let me object as asked and

23  answered.  I think you have already said the theater, a

24  bowling alley and a restaurant.

25              MR. HENRY:  I'm asking any others.

253

1              MR. WHITWORTH:  Do you want other

2    examples?

3              MR. HENRY:  Other examples.

4              THE WITNESS:  Let me -- let me -- well, I

5    mean, the thing is --

6              MR. HENRY:  I want to exhaust his brain on

7    that question.

8              THE WITNESS:  Every time you say that

9    though, the court reporter wants to knock me.  If --

10   Let's just take this example.

11             If there was going to be a theater there

12   that the city themselves said we would welcome, there is

13   no way there is going to be a theater there.  No one is

14   going to pay that kind of money to make that thing a

15   theater.  It's not going to happen.

16             And by the way, if anyone would have came

17   in with a reasonable bid, GoldStar is not trying to

18   just, you know -- I mean, if they are going to accept --

19   they are going to accept --

20             If a theater came in with a higher bid

21   than us, they would have sold it to the theater.  I know

22   they would have.

23             But if you allow a theater in there,

24   that's an assembly.  That's not even wanting to have a

25   night to honor Leon Valley like we would.  That is a

254

1    difference.  That's an obvious difference.  That's not

2    just, you know, poor Pastor Crain who went to Podunk

3    university.  I mean, that's as clear as the nose on your

4    face different.

5              If are you saying we would allow a theater

6    to be in here, but we will not allow a church to be in

7    here and a theater is defined as an assembly of people

8    to watch a production, nothing wrong with that, but a

9    church group is an assembly to worship the Lord for an

10   hour and a half.  Same time frame.  You know, whatever.

11   That is absolutely a difference.  You know, there is no,

12   you know -- there's -- is it me?  And that's a

13   difference, isn't it?

14        Q.    (BY MR. HENRY)  I'm asking you.  Do you think

15   it's a difference?

16        A.    Yes, absolutely.  Absolutely unequivocably.

17        Q.    Okay.  Any other assemblies that you can think

18   of that would qualify for that?

19        A.    In the Bible the Lord says where two or three

20   people are gathered in my name, I'm there in the midst

21   which the inference is, if there's two or three people,

22   that's an assembly enough for me.

23              So if you start on Bandera Road at 410, if

24   you have two or three people at that gas station that's

25   in the zoning, they are assembled.  If you move up to

255

1   Henry's Puffy Taco, there's three or four people there,

2   they are eating, that's an assembly.

3          If you move up to Taco Cabana right next

4   to them, that could be an assembly.  Across the street

5   to the bank building, there's several businesses in

6   there.  If three or more people or more meet there for a

7   common thing, we are assembled in this building, they

8   are having a meeting, absolutely.

9          We could go down to the Zorro's Restaurant

10  that just was opened up, they have assemblies there.  If

11  a church group asked Zorro's we want to have an assembly

12  in your back room, they would say absolutely, come, you

13  know, eat your food, and have your little meeting.

14         If you went onto the car lot, if there's

15  three or four people assembling there, you know, to

16  discuss the price of a car, that could be an assembly.

17  Shipley Donuts has an assembly.  I have assembled at

18  Rita's Taco Place as much as I can.  We could go down to

19  the other restaurants.

20         All of those things, I believe, would fit

21  into the category of assembly.  I'm not a legal mind.

22  But in my opinion, absolutely, if I was a lawyer, I

23  would definitely feel like I would be on pretty solid

24  ground to state that.

25         If you go down to the soccer shop right

256

1   next to -- right by Huebner Road that I talked about,

2   you know, those washed up athlete guys like to assemble

3   at the soccer shop and watch sports and talk their

4   thing, that's an assembly.

5           The Firestone across the street is an

6   assembly of guys because there is always some old car

7   out there.  The skating rink is an assembly for

8   teenagers, you know.

9       Q.   Is a day care an assembly?

10      A.   Is a day an assembly, no, because you have a

11  primary purpose other than just meeting with people.

12  You have a primary purpose of watching children in my

13  estimation.

14      Q.   Okay.  Is counseling an assembly?

15      A.   Yes.

16      Q.   Okay.

17      A.   Because in my estimation, two people are

18  meeting on an extended basis for, you know,

19  conversation.

20      Q.   Okay.  So that's an assembly?

21      A.   No.  I want to recuse that.  I don't guess it

22  would be because you are coming for a specific reason.

23  Assembly to me has very few strings attached to it.  We

24  can stay ten minutes.  We can stay for two hours.

25      Q.   Okay.  Is church an assembly with a specific

1  purpose?

2      A.   Absolutely.  I would -- I would imagine so.

3      Q.   So what strings are not attached to that one?

4      A.   None.  If we go have a prayer meeting on a

5  Monday, but we are going to go down to Plan Parenthood

6  and hold hands in the parking lot and not be offensive,

7  not talk to anybody ugly, but just pray, Lord, we just

8  pray that you move in these women that are coming

9  here...  And I mean that.  We were not confronting

10  anybody.  No one would even know we were there.

11           If we were -- If a lawsuit was brought

12  against us, and they said you were assembling on a

13  parking lot, I think we would be found guilty.

14      Q.   Are there any -- You say, in your mind, you

15  qualify a church as an assembly?

16      A.   Right.

17      Q.   Church services as an assembly?

18      A.   Right.

19      Q.   Okay.  Are there any other assemblies based on

20  your definition that are similar to yours that currently

21  exist in the B-2 zone?

22           MR. WHITWORTH:  You said in his opinion?

23           MR. HENRY:  In his opinion.

24           THE WITNESS:  I think -- I mean, the --

25  the list of names wasn't enough.  You want more?

1    Q.    (BY MR. HENRY) Do they all qualify?  You think

2    they are all similar?

3    A.    In my mind, if somebody calls me, Ryan, and

4    they say, hey, meet me up at Taco Cabana, and there's

5    three or four of us and we are sipping on coffee for two

6    hours, we are assembled.

7    Q.    Okay.  And do you think that allowing a Taco

8    Cabana restaurant to exist in a B-2 zone and allowing

9    assemblies to exist there is treating them better than

10   it's treating you because they won't allow a church to

11   exist?

12   A.    Maybe not in that specific instance.  But as a

13   general rule, absolutely.

14          MR. WHITWORTH:  Objection.  That calls for

15   a legal conclusion.

16   Q.    (BY MR. HENRY) In -- You say not in that

17   specific instance.  In your opinion, what specific

18   instances would qualify?

19          MR. WHITWORTH:  Objection.  Asked and

20   answered.

21          THE WITNESS:  This is what I feel like

22   with all of this.  The word assembly is -- can be taken

23   different ways.  If I have a purpose to go to Taco

24   Cabana and eat a taco and I'm gone in 15 minutes, I

25   didn't assemble.  If I have a business lunch, I really

259

1    didn't assemble.

2                But if I go with me and you and we all go

3    and we laugh this whole thing off and we invite you to a

4    night to honor Ryan, and we are there for more than 15,

5    20, 30 minutes, maybe it's just my background and we are

6    just sipping on coffee, and we are not really even

7    eating anymore, and we are doing what church people do,

8    just gab all night, we are assembled, man.  I mean, come

9    on.  What else do you call that?

10    Q.    (BY MR. HENRY) Are you aware of any other

11   assemblies in a B-2 zone --

12                MR. WHITWORTH:  Objection.  Asked and

13   answered.

14                MR. HENRY:  I haven't even finished yet.

15                MR. WHITWORTH:  It's the same question.

16                MR. HENRY:  No, it's not.

17                MR. WHITWORTH:  It's getting abusive.  You

18   have asked this question over five times now.

19    Q.    (BY MR. HENRY) -- where they have more than

20   100 -- or 150 or more people assembled?

21                MR. HENRY:  It's not the same question.

22                THE WITNESS:  I can answer this by just

23   saying at the bowling alley every night, you know, there

24   is going to be more than 150.  At the skating rink,

25   there's going to be more than 150.  At Henry's Puff --

260

1    Puffy Taco, there's going to be more than 150.  Maybe

2    not at the same time, but through the night, they will

3    probably triple that.  You know, my answer is going to

4    be yes, absolutely.  In my opinion, yes.

5        Q.    (BY MR. HENRY) Okay.  And those are the ones

6    you are giving me as examples?

7        A.    That and the slew of the other ones that I gave

8    you before.

9        Q.    Okay.

10           MR. WHITWORTH:  Good enough.  You have

11   answered the question.

12       Q.    (BY MR. HENRY) Are you aware of any museums in

13   a B-2 zone that currently exist?

14       A.    I don't believe there are any museums in Leon

15   Valley.

16       Q.    Okay.  Any libraries?

17       A.    I don't -- There is a library in Leon Valley.

18   I have no idea what it's zone as.

19       Q.    Any rec centers?

20       A.    I don't know of any rec centers in Leon Valley.

21       Q.    Liquor stores?

22       A.    There are liquor stores in Leon Valley.  I have

23   no clue what their zoning is.

24       Q.    Okay.  Auditoriums?

25       A.    Well, we are an auditorium, I would -- I would

261

1  imagine.

2      *Q.*   Any other auditoriums?

3      *A.*   Well, I mean, that's a general word because you

4  could say the bowling alley is an auditorium.   The

5  skating rink is an auditorium, you know.

6      *Q.*   In your lawsuit, I think you list auditoriums.

7  What do you mean by auditoriums?

8      *A.*   Anything like that.

9      *Q.*   Okay.  Are you aware of any that exist right

10 now?

11     *A.*   A bowling alley, a skating rink, you know,

12 things of that nature.

13     *Q.*   Any others?

14     *A.*   Not that I know of.

15     *Q.*   Okay.  Now, you say you don't know the zoning

16 in the city?

17     *A.*   No, I don't.

18     *Q.*   Do --

19     *A.*   Let me -- let me clarify that.  I know that

20 there is zoning disputes.  When you are asking me to

21 clarify these things, I really do mean that's why we

22 have attorneys because I'm not -- I'm just a pastor,

23 man.  I don't know -- hardly know what I'm talking about

24 when I do know what I'm talking about.

25     *Q.*   You may not know a particular zoning

262

1  classification that a particular property is located in;

2  is that right?

3      A.    Right.

4      Q.    Okay.  But you are aware that there are

5  different zoning classifications?

6      A.    Absolutely.

7      Q.    Okay.  And you know you are in one

8  classification and there are other classifications?

9      A.    Right.

10     Q.    Okay.  So you know that all of Leon Valley is

11 not a zone -- a B-2 zone?

12     A.    Right.

13     Q.    You know there are different zoning

14 classifications?

15     A.    Right.  I am aware of that, yes, sir.

16     Q.    Okay.  Are you aware that there is a zoning

17 classification that permits churches to -- to operate?

18     A.    Yes, sir.

19     Q.    Okay.  And you know you are currently not in

20 that zone?

21     A.    I also know that that church was built in that

22 zone, and that's to me the sticking point.

23     Q.    I understand that, but I'm -- I'm putting

24 together pieces.

25     A.    Okay.  You are saying do I know that it's not

1  zoned for a church now?  Absolutely, I do know that.

2  That's why we are here.

3      Q.    Okay.  Now, I want to talk to you a little bit

4  about a couple of vague points in your lawsuit.

5      A.    Okay.

6      Q.    Okay.  And it has to do with your alleged

7  injuries.

8      A.    My injuries?

9      Q.    Your injuries, or Elijah Group's injuries.

10     A.    Okay.  Okay.

11     Q.    So your lawsuit is pretty clear that you want

12  to have the right to use that property for church use;

13  is that correct?

14     A.    Yes, sir.

15     Q.    Okay.  Do you want the right to use that

16  property for any other use that you are not currently

17  permitted to do?

18            *MR. WHITWORTH:*  Other than church use?

19            *MR. HENRY:*  Other than church use.

20            *THE WITNESS:*  Like day care and -- not

21  other than -- well --

22     Q.    *(BY MR. HENRY)* Let me back up.

23     A.    Yeah.

24     Q.    Let me back up.

25     A.    I don't get that question very good.

264

1      Q.    Is it your understanding that you are permitted

2   to use that property for day care purposes that is

3   permitted in the zone that you are in?

4      A.    Yes.

5      Q.    Okay.  And is it your understanding that you

6   are permitted to use that property for counseling

7   services.  You are zoned for that?

8      A.    I believe so.

9      Q.    Okay.  Is it your understanding that under the

10  zoning code, the zoning code says you can't use it for

11  church use -- or church assembly use?

12     A.    Right.

13     Q.    Okay.  And you want to be able to use it for

14  church assembly use?

15     A.    Yes, sir.

16     Q.    Okay.  Are there any other uses that are

17  prohibited that you are aware of right now that are

18  prohibited that you want to be able to use that property

19  for?

20     A.    No.  Not that I'm aware of, no, sir.

21     Q.    Okay.  Now, are you claiming any form of

22  monetary damage other than paying your attorney?

23     A.    We are not attaching that to the lawsuit.  But

24  if I wanted to be ugly, I could absolutely claim

25  monetary damages from all this nonsense about opening up

265

1  our day care.

2            It's zone for a school and a day care, and

3  it took five or six months for us to get that.  And

4  that's five or six months of income we lost and -- I

5  mean, that's real money.  I mean, that's not just -- I

6  can show --

7            You know, we wouldn't have had 30 kids to

8  start off with.  I'm not saying that, but that's a real

9  issue.  We are behind, and we have gotten behind on our

10  bills on that.

11            I'm going to give -- And I really mean

12  this.  I don't think that Mr. Valdez or anyone in Leon

13  Valley was being malicious by telling us to change

14  things.  I -- you know, I don't believe that those

15  costs, we have a right to go -- I believe we did things

16  the right way because there was a genuine need for us to

17  change things.  So I wouldn't recant that.

18            But the extent that we can't open up a

19  school which it's zoned for and it's taking all this

20  time, I haven't -- we are not attaching that to this.

21  But, yes, I mean, I really do feel like that was

22  financial damages we have suffered because --

23     Q.   But you are not seeking those in this lawsuit?

24     A.   Not yet.

25     Q.   Okay.  And if you chose to seek them in the

266

1  lawsuit, do you have any estimates to what they would

2  be?

3              THE WITNESS:  I don't know if I'm

4  comfortable answering that question.

5              MR. WHITWORTH:  Just --

6              THE WITNESS:  Speculatively probably 50 or

7  $60,000.

8       Q.   (BY MR. HENRY) Okay.

9       A.   And that's speculative, I mean.

10      Q.   I understand.  But that would be based on lost

11 income for --

12      A.   Not having a school.

13      Q.   Okay.

14      A.   And that also affects us because -- because

15 that money is not on our balance sheet.  That affects us

16 when we are trying to purchase the facility.

17      Q.   Now, in your lawsuit, you claimed -- Well, have

18 you suffered any direct monetary damages because of the

19 delay in closing?

20      A.   Well, yes.  I mean, really we have because

21 we're -- we're -- If we were able to do church the way

22 we want to do church, we could, you know, do activities

23 on the grounds.  We would have a whole other freedom.

24              We don't do this to get money, to garner

25 wealth.  But the plain, simple fact is, you are asking a

267

1  business to operate in a percentage of where they could

2  operate to -- to capitalize on their facilities.  Do you

3  understand what I'm saying?

4      Q.    Uh-huh.

5      A.    We couldn't, you know, get into the dome or we

6  couldn't even -- I'm sorry.  We couldn't get into the

7  children's building until we had to literally go in

8  there and, you know, provoke a lawsuit to get in there.

9          I mean, those are real issues because

10 there is no like if this doesn't work out for us, I want

11 to -- you know, I don't know if this matters, but there

12 is no option B we have, you know.

13          Right or wrong, this is where we are

14 believing God is leading us.  I mean, I know that that's

15 not relevant to legal matters.  But there is no, okay,

16 if we go here, we can go back there if this doesn't work

17 out.

18          This facility is not just -- I mean, this

19 is a church.  It was built as a church.  We are moving

20 into a church.  That right there saves us hundreds of

21 thousands of dollars of repairs.  I mean, the building

22 is built.  Whether you like a dome or not, you know, the

23 building is already there.  That, you know -- that's a

24 big, big deal.

25          And there is no other, oh, look at this

268

1    one or look at that one.  There is no other comparable

2    property, you know.  There is no other comparable

3    property within five miles whether it's in Leon Valley

4    or San Antonio.

5         Q.    Comparable.  Why is -- why aren't the other

6    properties out there comparable to this one other than

7    the fact that this one was already built as a church?

8         A.    Ryan, what you just said is literally -- and

9    you know how much things cost.  That's $150,000.  For us

10   to try to renovate a warehouse -- I mean, you know, I

11   was uneducated in all these things, but I think I have a

12   very good education now on trying to renovation things.

13   You are talking about drop ceilings, air-conditioner

14   loads.  You are talking about plumbing issues.

15              We were going to renovate an Albertson's.

16   But we realized after spending $250,000, we wouldn't be

17   able to have a day care because they don't have enough

18   bathrooms.

19              You know, you are asking -- I don't know

20   how to compare it -- compare it because there's -- the

21   business model is so different for a church.  But if a

22   church is built and a church moves in, it's very

23   different than if we move into something that was built

24   as a whatever and we have to make it a church.

25        Q.    My -- Okay.  So what I'm getting from you, and

269

1  correct me if I'm wrong, is that one of the biggest

2  issues on this is it saves a lot on financing to go

3  ahead and move into a building already designed as a

4  church.  That way you don't have to do renovations.  You

5  don't have to purchase property?

6      A.   Right.

7      Q.   It saves you and your congregation a bunch of

8  time and money to have it already prebuilt for you?

9      A.   Absolutely.

10      Q.   Okay.  And that's one of the biggest issues?

11      A.   One of the issues.  One of the other big issues

12  is in the area of town that we want to be in, there is

13  nothing comparable.

14      Q.   Okay.

15      A.   Nothing even close.

16      Q.   Okay.  The area of town you want to be in.  And

17  were those the parameters you --

18      A.   Right.

19      Q.   -- gave me earlier?

20      A.   Uh-huh.

21      Q.   Okay.  Was the Culebra --

22      A.   Yes.  It's in there.

23      Q.   -- location in there as well?

24      A.   Uh-huh, yes.

25      Q.   Okay.  And you have been looking in that area

270

1  for other comparables?

2      A.    (Witness nodding).

3      Q.    And the particular reason you wanted in those

4  boundaries are because that's where your congregation

5  is?

6      A.    Basically.

7      Q.    Okay.  Now, are you aware -- In your lawsuit

8  you make an allegation that in addition to restrictions

9  on your freedom of religion, your ability to --

10     A.    Right.

11     Q.    -- operate a religious organization at that

12  location, there have been restrictions on your free

13  speech.  I'm not sure what that is supposed to mean.

14     A.    I think that that can mean maybe the way that

15  the sign permit was handled.  You know, we are putting

16  up a banner.  We are willing to pay for the banner

17  permit which was 25 dollars or something.  And for

18  someone to say no, we are not going to give you that

19  because you are a church...

20          If I was Taco Cabana or Henry's Puffy Taco

21  or enumerable things, you would do it.  Why won't you do

22  it now?

23          And although the banner was -- I mean, I

24  don't want to underestimate how unimportant this thing

25  was.  I mean, it was maybe three by five.  You know, you

271

1  could barely see it.  But, you know, on the overall

2  scheme of things, if you will let the bike shop put up a

3  banner that says 20 percent off, and they pay for it, we

4  were willing to pay for it, why wouldn't they let us?

5      Q.   Okay.  Any other free speech issue that you can

6  think of?

7      A.   Ryan, I have got to tell you that when you have

8  a man with a weapon in the middle of an assembly, that's

9  a free speech issue -- free speech issue to me.  And Dan

10 knows that --

11     Q.   Are you talking about Marshal Valdez?

12     A.   Absolutely.  That to me is a major free speech

13 issue.

14     Q.   How so?

15     A.   If we were assembling at Raymond Rimkus Park,

16 and we asked for security to be there, I would expect to

17 see security people there that would not be intimidating

18 whatsoever.  We have done things like that.

19          But for all practical purposes, our leased

20 facility, that's our property.  We are having a church

21 service and there's an armed marshal walking around, you

22 are intimidating.  And that's exactly what he was doing.

23 I felt intimidated. I'm a nonconfrontational guy, man.

24 And that was intimidating, absolutely.

25     Q.   And would you have felt intimidated if a police

272

1  officer was there doing the same thing?

2      *A.*    Invited.  If he was invited, I would not have.

3  If he was not invited and he's just patrolling and you

4  are, you know, giving a message...  I mean, I used to be

5  a history teacher, man.  That is -- that's --

6      *Q.*    Okay.  Any other free speech issues?

7      *A.*    No.  I don't think so.

8      *Q.*    Okay.  Now, you have made a claim for

9  attorney's fees.  Okay.  Now, my understanding is that

10 Mr. Whitworth's attorney's fees are paid for by GoldStar

11 at the moment?

12     *A.*    Right.

13     *Q.*    So you actually haven't paid him anything?

14     *A.*    No, sir.

15     *Q.*    Okay.  Do you have any written agreement with

16 GoldStar if you are awarded attorney's fees to

17 reimburse?

18     *A.*    Yes.  Yes, we do.

19     *Q.*    Okay.  And that's a written agreement with you

20 and GoldStar?

21     *A.*    Yes.

22     *Q.*    Okay.  And have you produced that agreement?

23     *A.*    I don't think so.

24             *THE WITNESS:*  Have we?

25             *MR. WHITWORTH:*  I'm not sure it was asked

273

1  for, but we will get it to you.

2                    MR. HENRY:  Okay.

3                    MR. WHITWORTH:  That's not a problem.

4                    (Information to be supplied)

5      Q.   (BY MR. HENRY) All right.

6      A.   I see the bottom.

7      Q.   Yeah.  We are not that far away.

8      A.   I have got to charge double time.

9                    MR. WHITWORTH:  Ryan, I think you are

10  trying to sweat us out of here.

11                   MR. HENRY:  Yeah.  I think the air

12  conditioning went out a little bit for some reason.

13                   MR. WHITWORTH:  For some reason, all of a

14  sudden it's hot again.

15                   THE WITNESS:  Okay.  Good.

16                   MR. WHITWORTH:  It's really going out

17  there.

18                   THE WITNESS:  I thought that was just me.

19     Q.   (BY MR. HENRY) Okay.  What I want to do next

20  and hopefully next to the last, --

21     A.   Okay.

22     Q.   -- okay, is we sent you some discovery

23  questions.

24     A.   Okay.

25     Q.   Do you remember those?

1        A.    Yes.

2        Q.    Okay.  And you signed a verification answering

3    the discovery questions?

4        A.    Yes.

5        Q.    Okay.  I want to go through just a couple of

6    them that I had some questions about.

7        A.    Okay.

8        Q.    Okay.

9              MR. WHITWORTH:  Do you have a copy he can

10    look at?  I have one if you need it.

11              MR. HENRY:  Let's see.  Yeah, I do have a

12    couple of copies.

13              THE WITNESS:  I think I brought mine.

14              MR. WHITWORTH:  You have one and I have

15    one.  Okay.

16              MR. HENRY:  There you go, Dan.

17              MR. WHITWORTH:  Thanks.

18        Q.    (BY MR. HENRY) All right.  That's just a

19    stapled copy of the various different production and

20    interrogatory and admission requests.

21        A.    Uh-huh.

22        Q.    Turn to Page 7 -- I'm sorry.  Well, on the top

23    is a fax page, and it says Page 7 on the bottom.

24    Actually, it says Page 5.  And it starts off with

25    Interrogatory Number 3 and Interrogatory Number 4.  Do

275

1    you see that?

2        A.    Yes.

3        Q.    Okay.   Looking at Interrogatory Number 4, lease

4    agreement, you have a lease agreement for the 6401

5    Bandera Road property.

6        A.    Uh-huh.

7        Q.    You had a lease agreement for the 8323 Culebra

8    Road property.   Expired in February of '07.

9        A.    Right.

10       Q.    And that you will supplement with any -- with

11   the lease if you can find it.   Have you been unable to

12   find it?

13       A.    Yes.   That's --

14              MR. WHITWORTH:   I think he said -- Did he

15   say today he didn't have one that's the --

16              THE WITNESS:   No.   I think I have a

17   lease -- I think I do have a lease, but we -- we messed

18   up here.   That should say February of 2008.

19       Q.    (BY MR. HENRY) February of 2008?

20       A.    Yes.

21       Q.    Okay.   So you want to correct that today?

22       A.    Yes, I do.

23       Q.    Okay.

24       A.    Because the lease was from February 2005 to

25   February 2008.   It was a three-year lease.

276

```
 1      Q.    Okay.  And you think you do have a copy?

 2      A.    I believe I do, yes.

 3      Q.    Okay.

 4      A.    Give me a day or two to search for it, but I

 5  believe I can produce that.

 6      Q.    And you agree you can produce it if you can

 7  find it, right?

 8      A.    Yes.  If I can find it, I can produce it.

 9      Q.    Interrogatory Number 5 says that the --

10            MR. WHITWORTH:  I'm writing all this down.

11  So I'm going to -- I'll shoot you an e-mail later.

12            THE WITNESS:  Okay.

13            (Information to be supplied)

14      Q.    (BY MR. HENRY) Now, the plaintiff, meaning The

15  Elijah Group, also owns the house occupied by Pastor

16  Crain as a --

17      A.    Parsonage.

18      Q.    -- parsonage at 10815 Hunters Way?

19      A.    Yes.

20      Q.    When was that house purchased?

21      A.    I believe that house was purchased in 2007.

22      Q.    2007.  Okay.  Had The Elijah Group been

23  incorporated at that time?

24      A.    No.

25      Q.    Okay.
```

277

1      A.   It was bought under Redemption Tabernacle

2   Ministries.

3      Q.   Okay.   Does Redemption Tabernacle Ministries

4   still have the title or the deed to that property?

5      A.   No.   You have to transfer it.

6      Q.   Okay.  /And did you transfer it to The Elijah

7   Group?

8      A.   Yes, I believe we did.

9      Q.   Okay.   And do you utilize your home for any

10  gatherings or --

11     A.   Assemblies?

12     Q.   Yeah.

13     A.   Every time we show up at the house, brother.

14  No.   We -- we have people over all the time.

15     Q.   Okay.   Production Number 4 is just asking for

16  the Culebra lease.   And you have already promised to

17  give that to us.   Have you been in contact with anyone

18  from Church on the Rock?

19     A.   I have had contact with them, but not

20  purposefully.

21     Q.   Okay.

22     A.   I took a counseling class or a continued

23  education class that Church on the Rock happened to be

24  giving in their new facility.

25              We have had people that have come back to

278

1    our church that used to attend that church because it's

2    in the area.   And they don't mind me that much.

3                 The friend that I talked about, Pastor Jim

4    Kingery, he doesn't go to that church anymore, but I'm

5    in regular contact with him.

6        Q.    Have you ever talked to anyone in the

7    management or the administration division of Church on

8    the Rock regarding the Bandera property?

9        A.    Yes, I have.

10       Q.    Okay.   And when have you talked to them?

11       A.    I don't know exact dates, but pastoral staff,

12   and they didn't have good things to say about Leon

13   Valley.   They said that they made it very difficult for

14   them even when they were there.

15       Q.    Was that before you bid on the property?

16       A.    Yes.

17       Q.    Okay.   Have you talked to them after?

18       A.    Uh-huh.

19       Q.    And what were the subjects of those

20   conversations?

21       A.    The same thing, you know.   ·

22       Q.    Okay.

23       A.    Not anything deep.   Because as a general rule,

24   I don't like to bad mouth X in front of Y or whatever.

25   Just, you know, how's it going?   If you remember the --

279

1   the issue came out in the Express-News a few months

2   back.   They had an article about this.   And a couple

3   of -- in Express, and I think it came out in one smaller

4   northwest distributed...

5              And I thought it was buried in a back

6   page, but a lot of people asked me about it.   And one

7   pastor over there in particular asked me about it.   He

8   was the teacher of my continuing counseling class, and

9   he was also in the administration, whatever.

10       Q.   What was the subject of that article?

11       A.   Just what's going on, nothing --

12       Q.   This particular lawsuit?

13       A.   Yes.

14       Q.   Okay.   Have you talked to them about any

15   equipment or anything they have left in the buildings?

16       A.   Absolutely not.

17       Q.   Okay.

18       A.   I want to keep all that stuff.

19       Q.   Okay.   So you have --

20       A.   If people come -- if people come to pick up

21   their stuff, have at it.   But if not, it's ours.

22       Q.   Has anyone that's identified themselves as

23   being from Church on the Rock come to you and said, we

24   still have stuff in your building, --

25       A.   No.

280

1    Q.    -- give it back to us?

2    A.    No.  Not other than what I said before, that I

3 assumed that that's what was going on.

4    Q.    Okay.

5    A.    But I don't have any, you know --

6    Q.    When was the last time that happened?

7    A.    Before we moved in.

8    Q.    Before you moved in?

9    A.    Yes.

10    Q.    Okay.  Luckily, you have answered most of my

11 questions for these, and I can speed through them a lot

12 faster now.

13    A.    (Witness nodding).

14            THE WITNESS:  Who likes the Tasmanian

15 Devil?

16            MR. HENRY:  That would be Lowell Denton.

17            THE WITNESS:  I have noticed --

18            MR. HENRY:  He's one of our mascots.

19            THE WITNESS:  I have noticed him.

20    Q.    (BY MR. HENRY) Are you aware of any

21 neighborhood recreational facilities that are in a B-2

22 zone in Leon Valley?

23    A.    It's like déjà vu.  Recreational facilities in

24 a B-2 zone.  The skating rink could be a neighborhood

25 recreational facility.  The bowling alley could be

1    deemed as a neighborhood recreational facility.

2                    There used to be a play area next to the

3    bowling alley that could be deemed as a recreational

4    area.  Peter Piper's Pizza is definitely a recreational

5    area that's there right there on Bandera Road.  You will

6    appreciate this, Ryan, but there is one of those dungeon

7    and dragons, Star Wars --

8        Q.    Novelty shops?

9        A.    -- novelty shops where guys can go and you

10   dress like Chewbacca or something like that.  That would

11   be assemblies of some sort.

12       Q.    Okay.  Have you ever been given a criminal

13   citation for any activities that you have done or failed

14   to do while out at the Bandera location?

15       A.    A criminal citation, I don't think so.

16       Q.    Have you ever been given a ticket?

17       A.    From Leon Valley?

18                    MR. WHITWORTH:  Personally or on behalf of

19   the church?

20                    MR. HENRY:  On behalf of the church.

21                    THE WITNESS:  Not that I know of.

22       Q.    (BY MR. HENRY) No one has come to you and says

23   you are having a church service here.  You are not zoned

24   for it.  That's a violation.  Here's a ticket?

25       A.    No, not to me anyway.  If they did to somebody

282

1   else, they didn't tell me about it.

2       Q.   Well, if they did it to somebody else, wouldn't

3   that somebody else have to tell you if it's against The

4   Elijah Group?

5       A.   Not necessarily.  You know, Christian people

6   are different, you know.  And depending on the guy they

7   gave it to...  I mean, this -- I'm 90 percent sure this

8   did not occur, but what if they gave it to a visitor?

9   And the guy says, well, for sure, I'm never coming back

10  to this church.  They are handing out tickets to

11  everybody.

12              MR. WHITWORTH:  Ryan, and not to interject

13  too much, but I think what you are referring to is

14  somebody threatened to give him a criminal citation.

15              THE WITNESS:  Oh, okay.  Yeah.  That was

16  when we -- the first or second Sunday we were in there.

17  Is that what you are referring to?

18      Q.   (BY MR. HENRY) Well, I'm asking first if you

19  ever got one?

20      A.   No, we did not.  But what happened was I think

21  it was actually officer -- I mean, Fire Marshal Valdez

22  came prior to a service beginning on a Sunday morning.

23  And he walked in and kind of pretended he was, you know,

24  like, what's going on here.  Are you guys having church

25  here?  And everyone all of a sudden got nervous and

283

1    didn't know what to say and was stumbling over their

2    words and everything.

3                   And then I think, you know, this is a

4    church.  And, you know, he said, you guys can't be here.

5    And that's when the whole thing -- I'm not sure if he

6    used those exact words, but I think something like that

7    was threatened.

8         Q.    Okay.  Saying this -- this could be a potential

9    criminal violation?

10        A.    Right, but nothing was ever --

11        Q.    Okay.

12        A.    That I know of, nothing was ever done.

13        Q.    And he never wrote anyone in your church a

14   ticket?

15        A.    Not that I know of.

16        Q.    Okay.  Now, you have since obtained a

17   certificate of occupancy for the children's building?

18        A.    Yes, sir.

19        Q.    For day care use?

20        A.    Yes, sir.

21        Q.    Now, before you obtained that in March or

22   April of '09 which I think is --

23        A.    Yes.

24        Q.    -- what you testified earlier to?

25        A.    Right.

284

1    Q.    We had an injunction hearing --

2    A.    Right.

3    Q.    -- in December of '08?

4    A.    Okay.

5    Q.    And in one of your answers, you say the

6    location was inspected and approved for church use by

7    Assistant Fire Marshal Valdez as he testified at the

8    hearing at the city's temporary restraining order and it

9    was later noted in his said inspection report.

10   A.    If I said inspection report, then that we

11   speaking too much.  I don't know if he -- if he did that

12   in the inspection report.

13   Q.    Okay.

14   A.    All I was referring to was his testimony.

15   Q.    Okay.

16   A.    I don't know if he ever -- if he, you know,

17   wrote that down.

18   Q.    Okay.

19             MR. WHITWORTH:  Which number is that?

20             MR. HENRY:  That is Request for Admission

21   Number 10 on Page 13.

22             THE WITNESS:  Okay.

23   Q.    (BY MR. HENRY) I want to make sure I understand

24   your answer to this question.  The question itself asked

25   you -- which you admitted and said you had not applied

285

1    for a certificate of occupancy for a church use for that

2    location.

3         A.    Right.

4         Q.    And that's consistent with your testimony

5    today, if I'm not mistaken, correct?

6         A.    Right, yes, sir.

7         Q.    And you admit, yes, you hadn't applied for one.

8    Are you taking the position that he somehow approved you

9    a certificate of occupancy for a church use at all?

10        A.    No, I am not.

11        Q.    Okay.

12        A.    I'm saying what his testimony was, was that if

13   there was no zoning issue, we would be fine there.

14        Q.    For a church use?

15        A.    For a church use.

16        Q.    Okay.  And that's what you mean by this answer,

17   for number ten, Request for Admission Number 10?

18        A.    Yes.

19        Q.    Okay.

20        A.    Right.

21        Q.    If you can turn the page to Page 14.

22        A.    (Witness complies).

23        Q.    Okay.  Look at Interrogatory Number 16.  It

24   says please an itemized list of all damages, monetary

25   and nonmonetary, that the plaintiff intends to seek in a

1    lawsuit.

2            And you told me you are not seeking a lot

3    of damages at least, quote, not yet.  You are going to

4    supplement.  What other damages are you -- what damages

5    are you seeking in this lawsuit right now?

6        A.    The damages I believe that we are seeking is

7    attorney's fees and a written apology on a Hallmark

8    card.  Is that in there anywhere?  No.  I think that's

9    it.  Just attorney's fees I think is what we are doing

10   right now.

11       Q.    Attorney's fees.  And I'll make an injection

12   here.  I think what you are really looking for is you

13   want a declaration that you can use the property for

14   church use; is that right?

15       A.    Good idea.

16       Q.    Is that correct?

17       A.    Yes, sir, that's exactly correct.

18       Q.    Okay.  And that's really what you guys are

19   seeking right now?

20       A.    Yes, sir.

21       Q.    Okay.

22       A.    Good job, Ryan.

23       Q.    I want to make sure we are all on the same

24   page.

25       A.    There are so many pages.  I don't know what

287

1  page I'm on anymore.

2      Q.   If you could turn to Page 15, Interrogatory

3  Number 18.

4      A.   Yes, sir.

5      Q.   Gloria Barn Christian Learning Center is a day

6  care and Christian school operated by the plaintiff.

7  Was that the one on Culebra Road?

8      A.   Yes, it was.

9      Q.   Okay.  And it has since been sold?

10     A.   Yes, sir.

11     Q.   And is no longer under that name?

12     A.   Until the license changes with the city, it is

13  under that name.

14     Q.   Okay.

15     A.   But it could be, you know, kind of a d/b/a,

16  whatever the new business is.

17     Q.   Okay.

18     A.   But that will be done probably in the next week

19  to ten days because last week I was given all the final

20  paperwork and everything.

21     Q.   Request for Admission Number 14, at the bottom

22  of Page 15.  Based on your testimony today, I want to

23  make sure I understand, it sounds like that admission

24  has changed?

25     A.   Yes.

288

1    Q.   Okay.  So do you have electricity to the dome
2  building right now?
3    A.   Yes.
4    Q.   Okay.  And are all utilities connected to the
5  dome building right now?
6    A.   Yes.
7    Q.   Okay.  But are you still working on a couple of
8  minor little things before your certificate of
9  occupancy --
10    A.   Right.
11    Q.   -- is finalized?
12    A.   Yes, sir.
13    Q.   Okay.  Go to Page 16.  Interrogatory Number 20,
14  this is basically asking for your hours of operation.
15  You listed them there.  I think that's pretty
16  consistent, but is that how -- Are those your current
17  hours of operation of what happens right now?
18    A.   We are open from about 8:30 to 5:00 every
19  Monday through Friday.
20    Q.   Okay.
21    A.   And that can go a little bit later depending on
22  counseling.  And Wednesday until about nine o'clock, we
23  are there.  On Sundays, we are there from about 9:00
24  a.m. to about 1:00 p.m.  That's not the service times,
25  you know, the first people in and the last people out.

289

1  That's about how that goes.

2      Q.    Okay.  So the answer to this interrogatory

3  should probably be changed.  Is that what you are

4  telling me?

5      A.    Yeah.  Let me look.  Yes.  And the reason -- I

6  want -- I want to say the reason that it was answered

7  like this is probably before the phones were put in.

8  Because the phones were put in, we weren't even officing

9  there.  But as soon as the phones were put in, we all

10  kind of congregated there.

11      Q.    Okay.  And I believe these were answered on

12  February 4th of 2009.  If you look at Page 2.

13      A.    Okay.

14      Q.    That's when your lawyer signed the certificate

15  of service.

16      A.    Okay.

17      Q.    And on Page 3 is your verification.  I'll let

18  you know it says February 4th of 2009.

19      A.    Okay.

20      Q.    Am I correct based on your testimony -- and I

21  understand some of these answers are probably stale.

22  They are old right now?

23      A.    Yes, sir.

24      Q.    Okay.  Because some things have changed since

25  then?

290

1       A.    Yes, sir.

2       Q.    Okay.  Would you be willing to go through and

3  update them?

4       A.    Absolutely.

5               MR. WHITWORTH:  Absolutely.

6               MR. HENRY:  Okay.

7               MR. WHITWORTH:  I think I just did it.

8               THE REPORTER:  What?

9               MR. WHITWORTH:  I said I think I just did

10  it.

11               MR. HENRY:  Let's take a quick five minute

12  break and let me go through my notes and make sure I

13  don't have anything else to ask you before I let you go.

14               MR. WHITWORTH:  Let's take a quick five

15  minute break and go turn on the air conditioning.

16               MR. HENRY:  Yeah.

17               THE VIDEOGRAPHER:  We are off the record

18  at 4:12 p.m.

19               (Off record from 4:12 to 4:22)

20               THE VIDEOGRAPHER:  We are back on the

21  record at 4:22 p.m.

22       Q.    (BY MR. HENRY) Pastor Crain, have you -- other

23  than the lawsuit that you mentioned to us before with

24  regard to the purchase of the property when you were

25  with Nazarene in this lawsuit, have you ever been