1
2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

3   THE ELIJAH GROUP, INC.,          )        **Case No. SA-08-CV-907-OLG**
                                     )
4                   Plaintiff,       )
                                     )
5   VERSUS                           )        San Antonio, Texas
                                     )        December 5, 2008
6   **THE CITY OF LEON VALLEY,**     )
    **TEXAS,**                       )
7                                    )
                    Defendant.       )
8   _____ )

9               **TRO/Permanent Injunction Hearing**
    **BEFORE THE HONORABLE ORLANDO L. GARCIA**
10          **UNITED STATES DISTRICT JUDGE**

11

<u>TRANSCRIPT ORDERED BY</u>:  Honorable Ryan Henry
12

13  <u>APPEARANCES</u>:

14  For the Plaintiff            HONORABLE DANIEL P. WHITWORTH
                                 HONORABLE JOHN G. GEORGE
15                               112 E. Pecan
                                 San Antonio, Texas
16

17  For the Defendant           HONORABLE RYAN HENRY
                                HONORABLE MIGUELANGEL MATOS
18                              Denton, Navarro, Rocha & Bernal
                                2517 North Main Avenue
19                              San Antonio, Texas   78212
                                San Antonio, Texas   78206
20

21  Court Reporter              MAURICE D. WEST
                                Official Court Reporter
22                              655 E. Durango Blvd., Suite 316
                                San Antonio, Texas   78206
23
                                *  *  *  *  *
24                              -  -  -  -  -

25          **Captured and transcribed by computer - Xscribe**

1

1    THE COURT:  Good afternoon.  I'll call the Elijah
2  Group vs. City of Leon Valley, Texas, Cause No. 08-907.  Who's
3  here present for the city of Leon Valley?
4    MR. HENRY:  Ryan Henry and Miguel Matos for Leon
5  Valley, Your Honor.
6    THE COURT:  And what's your name, sir?
7    MR. MATOS:  Miguel Matos.
8    THE COURT:  All right.  And for Elijah Group?
9    MR. WHITWORTH:  Daniel Whitworth, Your Honor.
10    MR. GEORGE:  And John George.
11    THE COURT:  All right, thank you, Counselors.  Let me
12  have the City tell me -- you're seeking this injunction.  I've
13  read the pleading, the pleadings that I have thus far.  Tell
14  me what the status of your discussions are.  If you'll come
15  over here to the podium?
16    MR. HENRY:  Our primary concern, as the Court is
17  aware by reading the pleadings, we're not here on anything
18  regarding the zoning.  It's only regarding fire code
19  violations which have recently been discovered.
20    THE COURT:  Right.  Okay.
21    MR. HENRY:  The plaintiffs have informed me that they
22  are trying to correct several of the fire code violations.
23  They believe they can have them corrected in time.  We're not
24  certain if that's correct.  Our Fire Marshal hasn't been out
25  to reinspect yet.  He has actually received several calls from

2

1  contractors regarding some of the repairs that are going on at

2  the moment and some concerns as to whether or not they can

3  actually be up and operational by Sunday.

4          THE COURT:  Okay.  This building, has it been vacant

5  all this time?

6          MR. HENRY:  It's been vacant -- believe it was vacant

7  for eight or nine months before anyone moved in.

8          THE COURT:  Well, has the church conducted its church

9  services there?

10          MR. HENRY:  Our understanding is they have been

11  conducting church services there, yes, Your Honor.

12          THE COURT:  How many weeks have they been meeting

13  there?

14          MR. HENRY:  Confirmed, probably about a month and a

15  half.

16          THE COURT:  Okay.  Describe the nature of these

17  deficiencies or problems.

18          MR. HENRY:  There are larger deficiencies and minor

19  deficiencies, Your Honor.  Part of the deficiencies it's

20  difficult to kind of capture because we need to know the exact

21  use.  Different fire code restrictions apply depending on

22  whether or not it's being used as a church or as a school or a

23  daycare, as their application noted that they were using.

24  When our Fire Marshal went out to perform an inspection, he

25  noted that they told him it was to be used as both a church

1  and a school daycare.  Our understanding, we've only witnessed

2  church services, no school or daycare services occurring.

3        The school or daycare services are the more

4  restrictive because they require a sprinkler system.  That's

5  the primary difference between the church and the school

6  daycare.

7        For the church services, Your Honor, they need to

8  have an operating fire system inspected by a licensed

9  inspector that is being monitored.  They need to have their

10  exit lights properly marked.  There's actually some locking

11  issues, certain locks lock from the wrong side which don't

12  allow people to get out should there be a fire.

13        THE COURT:  All right, the last time this building

14  was inspected, am I correct, was November 17, 2008, or has

15  there been a subsequent inspection?

16        MR. HENRY:  There's been no other inspection other

17  than November 17th.

18        THE COURT:  Okay.  And when did the church, or

19  whoever -- have people been working on this facility to

20  correct the deficiencies?

21        MR. HENRY:  Our understanding, Your Honor, is -- if I

22  can give a little bit of expanse to the story?

23        THE COURT:  Yeah, go ahead.

24        MR. HENRY:  Because the building was vacant, it was

25  subject to vandalism and people came in and they stripped out

4

1  all the copper wiring.  They did a bunch of bad things to the
2  building.  The tenants went in and began making repairs.  Our
3  building inspector came in and said from a structural
4  standpoint they had fixed the building issues, but the Fire
5  Marshall still needed to come in and do an inspection for
6  final approval for use.

7          The church started holding church services.  Our Fire
8  Marshal's the one that discovered them.  As he was driving by
9  he noted it wasn't someplace he had inspected and came in and
10 talked to them and they said yes, they are holding church
11 services here.  And he advised them, "Well, you need to get it
12 corrected."

13         They began making corrections.  And our Fire Marshal,
14 Mr. Valdez, can testify, I'm uncertain of the exact date, it
15 was early November, if I am not mistaken, that he advised them
16 they needed to get it corrected and shouldn't be occupying the
17 building at that time.  They began making corrections at that
18 time but I believe it was on kind of a slow basis.

19         Last Sunday, Your Honor, the Fire Marshal drove by
20 again and noted a large congregation of cars outside the
21 building having services, and he had not been called back in
22 to do a re-inspection to see if everything had been fixed.

23         THE COURT:  How many people would you say or estimate
24 were present?

25         MR. HENRY:  He's estimated there were 30 to 40 cars

5

1  outside the building on Sunday.

2          THE COURT:  Okay.  All right, and when's the last

3  time the Fire Marshal was at the location?

4          MR. HENRY:  For an inspection, Your Honor, that would

5  have been November 17th.  Actually in the vicinity to witness

6  the exterior, that would have been last Sunday.

7          THE COURT:  All right.  And I read the inspection

8  report filed on that date.  So if he hasn't been there since

9  November 17th, he doesn't know what, if any, of these

10  deficiencies have been corrected?  Which if any?

11          MR. HENRY:  He does not know if any of them have been

12  corrected, Your Honor.

13          THE COURT:  Well, is it possible that they've all

14  been corrected or they've not been corrected?

15          MR. HENRY:  It's possible that they -- most of them

16  may have been corrected.

17          THE COURT:  But you don't know?

18          MR. HENRY:  We don't know.  The Fire Marshal received

19  a phone call today from a fire alarm contractor that called

20  him because they were called in to look at the fire alarm

21  system.  One of the big issues is there's no working fire

22  alarm system in this building and there's no monitoring in

23  this building.  And they had concerns about the fact that they

24  didn't think it was fixed as of today.

25          THE COURT:  That's the alarm company saying that or

6

1  the Fire Marshal?

2        MR. HENRY:   That is the alarm company telling -- or

3  the -- yes, the alarm company telling the Fire Marshal that

4  it's not fixed.

5        THE COURT:   Okay, it's not fixed.   And are they

6  working on it?

7        MR. HENRY:   What they informed him at the time, Your

8  Honor, was that they were told by the church that the Fire

9  Marshal said certain things didn't need to be fixed.   He said

10  he never said that.   And the alarm company told him that they

11  were having a local individual within the congregation fixing

12  it who is not licensed by the State of Texas, so they wouldn't

13  be able to give a seal for it.   As far as we know it has not

14  been fixed and no monitoring has been set up.

15        THE COURT:   Okay.   And is that the major violation or

16  they're equally --

17        MR. HENRY:   That's the biggest one if all we're

18  talking about is a church use.   If we're talking about a

19  church and a daycare use, the sprinkler system's --

20        THE COURT:   Sprinkler system is needed.

21        MR. HENRY:   Yes, Your Honor.

22        THE COURT:   Okay, well, let me hear from the

23  counselors for the church then.

24        MR. HENRY:   Yes, Your Honor.

25        THE COURT:   Counselor, are there -- does your client

7

1  concede that there are some violations that have yet to be
2  resolved?
3          MR. WHITWORTH:  Judge, I hung up with my client as we
4  were walking in the building and --
5          THE COURT:  I'm sorry?
6          MR. WHITWORTH:  I'm sorry.  I hung with my client as
7  we were walking in the building, and I have been told that all
8  the things that were on this November 17th fire inspection
9  report had been dealt with.  We had originally --
10          THE COURT:  Well, where are you clients?
11          MR. WHITWORTH:  He's on the way here, Judge.
12          THE COURT:  Okay, good, we'll wait.  Well, can we
13  agree to this?  That if they're not fixed, obviously they
14  can't meet, right?
15          MR. WHITWORTH:  Judge, I would agree with that
16  completely.
17          THE COURT:  I'm sorry?
18          MR. WHITWORTH:  I would agree with that completely if
19  we're talking about the items on this November 17th report,
20  because the affidavit attached to their temporary restraining
21  order, the City's TRO, Fire Chief Luis Valdez said
22  specifically he was out there looking at it both as a church
23  and a school daycare.  What we're concerned about is the
24  parameters are going to change if we do agree to some kind of
25  a inspection to go out there.  Well, when he inspected it on

8

1    the 17th, this is the report he did.  It doesn't distinguish

2    between this is what's for church and this is what's for

3    daycare.

4            THE COURT:  Well, if there's not a workable fire

5    alarm system there right now, and if there's not a fire alarm

6    system there prior to the church service, I presume they meet

7    on Sunday, then obviously you can't be there, right?

8            MR. WHITWORTH:  Well, exactly.

9            THE COURT:  Okay.  So --

10           MR. WHITWORTH:  And, like I said, I've been told that

11   this has all been done but we're waiting for Pastor Crane to

12   get here.

13           THE COURT:  Well, let's hear from -- but what you're

14   telling me is that if these deficiencies are there and if

15   they have not been resolved to the satisfaction of the City of

16   Leon Valley, Texas, then, obviously, your church, or any other

17   group, can't be meeting there, right?

18           MR. WHITWORTH:  These specific deficiencies on the

19   report, yes, sir.

20           THE COURT:  But they still need to go out there.

21   When will they be here?

22           MR. GEORGE:  Your Honor, he indicated he could be

23   here in about 30 minutes and that was approximately 15 to 20

24   minutes ago.

25           THE COURT:  Okay, great.  We'll be in recess, then.

9

1    **(Recess; resuming.)**

2        THE COURT:  Okay, Counselor, go ahead.  I understand

3    your clients are not here yet or not able to be here yet?

4        MR. WHITWORTH:  We just got Pastor Crane on the

5    phone, Judge, and he said he was on Durango and would be here

6    momentarily.

7        THE COURT:  Okay.  Let me ask you something.  Have

8    you personally been out there to the facility, to the church?

9        MR. WHITWORTH:  I have several months ago, but not

10   recently.

11       THE COURT:  Okay, and it's your understanding from

12   your clients that you believe, or they believe that everything

13   has been now resolved?

14       MR. WHITWORTH:  Judge, I was told that not an hour

15   ago on the telephone that all those issues have been resolved.

16       THE COURT:  Okay.  But the inspector, Fire Marshal

17   has not been out there since the 17th -- is that right? -- of

18   November?

19       MR. HENRY:  That is correct, Your Honor.

20       THE COURT:  Okay.  Well, he would have to go out

21   there and inspect the premises to see that matters have been

22   resolved and resolved satisfactorily consistent with the

23   ordinance and however he deems they ought to be corrected.

24   And would you agree with me that if they're not, then you-all

25   can't have church there Sunday?

1        MR. WHITWORTH:  We would agree with that, Judge.

2        THE COURT:  Okay, so we'll just wait for your client.

3   Just let me know when they're here.

4        **(Recess; resuming.)**

5        THE COURT:  All right, let's do this.  Let me hear

6   from the City, from the Fire Marshal as to specific concerns

7   or violations, alleged violations of the ordinances, and

8   why don't you put him on the stand.

9        MR. HENRY:  Yes, Your Honor.

10       THE COURT:  Go ahead.

11       MR. HENRY:  I'd like to call Luis Valdez to the

12  stand.

13           **LUIS VALDEZ, LEON VALLEY'S WITNESS, SWORN**

14                     **DIRECT EXAMINATION**

15  **BY MR. HENRY:**

16  Q    Mr. Valdez, can you please state your full name?

17  A    Luis Valdez.

18  Q    And you're the Fire Marshal for the City of Leon Valley,

19  correct?

20  A    My title is Deputy Fire Marshal, actually.

21  Q    Okay.  You're the one that enforces the fire code?

22  A    Yes.

23  Q    And you do fire inspections?

24  A    Yes, sir.

25  Q    Okay.  When did you last inspect the property -- I want to

Valdez - Clarifying Exam by Court                    11

1  make sure I get the proper address.  It's 6401 Bandera Road?

2  A   I'm not sure.  It's the last inspection I gave you a

3  couple of weeks ago.

4  Q   Would that have been November 17th, 2008?

5  A   Yes, November 17th.

6  Q   Okay.  And you noted several fire code violations at that

7  time?

8  A   Yes.

9  Q   Okay.

10        MR. HENRY:  Your Honor, do you want exhibits?  Most

11  of them are the ones already attached to the motion.

12        THE COURT:  I have them.  Let me do this.  This is

13  Exhibit B?  No, I'm sorry, hold on.

14        MR. HENRY:  Exhibit C, Your Honor.

15        THE COURT:  Okay, I have before me Exhibit C, and

16  then along with the attachment which reads, "City of Leon

17  Valley Fire Prevention Division No. 2150," dated November

18  17th, 2008, "at the location of 6401 Bandera Road, Suite A."

19  Tell me do you have this copy here?  You want to give him

20  your copy?

21        MR. HENRY:  Yes, Your Honor.

22                    **CLARIFYING EXAMINATION**

23  **BY THE COURT:**

24  Q   Marshal, if you can just tell me the areas you've checked

25  and tell me each violation, the description and what the

1  potential consequences are if it is not corrected.

2  A    Yes, sir.  First, if I could just explain that I inspected

3  this building based on what was there, and because a use

4  hasn't been decided yet -- different uses would require

5  different things in the fire code.

6  Q    Right.

7  A    If there's an area where -- if it's the same building but

8  it's a book store versus a nightclub, different things would

9  apply.  So for what was there, this is all --

10  Q    Okay, that's a good point.  You inspected this building on

11  that day and what were you inspecting it for?

12  A    I just inspected what was there, what was existing and I

13  made some notations as to what was proposed and gave them an

14  additional attachment as to what was proposed by them.

15  Q    Okay.  So are you telling me that some requirements -- if

16  I understood you correctly, some requirements are imposed for

17  specific functions and not others?

18  A    Yes, sir.

19  Q    Okay.  Well, say, "Repair exit lights as needed, both

20  bulbs must be operative"?

21  A    Yes, sir, that part, when I went in there all the exit

22  lights were out.

23  Q    And that requirement would probably be a requirement

24  regardless of what the building's being used for, right?

25  A    Yes, sir, and the way the fire code reads is any occupancy

1  with an occupant load above 50 as determined by the fire code

2  official.  So, yes.

3  Q    All right.  Then Item No. 4:  "Replace missing/broken

4  electrical outlet covers/receptacles."  What are those?

5  A    Around the electrical outlet there's a plastic plate that

6  protects people from sticking their hands in there, especially

7  children.  Some of those were damaged or cracked and we wanted

8  those replaced.

9  Q    And how many of those do you recall having seen as either

10 missing or broken?

11 A    I remember seeing two.

12 Q    Okay, now how big is this building?  What's the square

13 footage?  Approximately?

14      MR. HENRY:  Off the top of my head, Your Honor, I

15 don't know.

16      THE COURT:  I'm sorry?

17      MR. CRANE:  Eight thousand square feet.

18 Q    All right.  That's a huge building.  All right, tell me

19 then No. 15.  No. 15, "Have the fire alarm system inspected

20 and re-tagged by a licensed service company." Tell me about

21 that.

22 A    Yes, sir.  The State of Texas requires that all life

23 safety devices, all fire alarm devices are installed by a

24 licensed contractor.  That's all regulated by the State, the

25 State Fire Marshal's Office.  What I do as the Fire Marshal is

1  basically say when the fire alarm system is required and how

2  it should be installed, and it should be installed according

3  to the national standard by a state-licensed individual.  The

4  fire alarm that was in there was last inspected, and it has a

5  certification tag on there by a licensed individual, and every

6  year they're supposed to come out and put an inspection tag

7  saying this is compliant for this use of this building.  And

8  that's a annual inspection that is required on every fire

9  alarm system in Texas.

10  Q    This is a fire alarm system?

11  A    Yes, sir.

12  Q    When was that system last inspected?

13  A    2004.

14  Q    Okay.  And it's supposed to be done annually?

15  A    Yes, sir.

16  Q    Okay.  And was that system a workable system?

17  A    The system was off line and --

18  Q    What do you mean by off line?

19  A    It was not connected, there was no power going to the

20  system at all.  The battery --

21  Q    Is that a question of turning on a switch?

22  A    I believe it wasn't wired up.  I don't know, I didn't

23  check that part of it so --

24  Q    Okay, in any event, it was not operable on the day you

25  inspected it?

1   A    Right.  And there were some other issues there, sir.
2   There was -- some devices were hanging down from the ceiling,
3   tiles.  Some devices were painted, had paint on it.
4   Q    Now when you say some devices, specifically what are you
5   talking about?
6   A    Horn strobes, smoke detectors; like a strobe, a
7   notification appliance circuit that flashes to let occupants
8   know that there's a fire.
9   Q    What do you call that?
10  A    That's a strobe.
11  Q    Strobe?
12  A    Yes, sir.
13  Q    Okay.
14  A    And there's a strobe and a horn strobe, which would be a
15  strobe and a speaker that sounds as well at the same time.
16  The devices that were in the building, some of the had paint
17  on them, which is a violation in the National Fire Protection
18  Association's standard.
19  Q    Why is that?
20  A    It can interfere with the operability [sic] of the device.
21  It's not tested like that, it's not -- it's just not --
22  Q    Say like one of these strobes that you're referring to, if
23  that was painted that could affect the operation of that
24  strobe?
25  A    Yes, sir.

1  Q   Okay.  And when you're talking about these components, the

2  strobe and the system itself, this is all one fire alarm

3  system?

4  A   Yes, sir.  Yes, sir.

5  Q   All right.  Then there's some writing here below that No.

6  15.  Can you tell me what each of those are?

7  A   Yes, sir.  The first item is repaint the fire lanes.  They

8  are --

9  Q   These are the fire lanes where, outside the building, in

10  the building?

11  A   I'm sorry, my writing.  They are faded and unidentifiable,

12  I believe I wrote.  "They are worn and unidentifiable."  Yes,

13  sir, those are the red striping on the outside of the

14  building.

15         What I do is I try to go -- when I do an inspection

16  is I'm looking to see, okay, what was required when you

17  initially built the building, and if that was a requirement

18  when you built the building to be there in the first place, I

19  look to make sure that those devices are maintained.  So this

20  fire lane was determined a long time ago when they first built

21  the building and it had been faded.

22         So I checked to make sure, okay, a fire alarm system

23  was required, it needs to be fixed.  Exit lights were

24  required, they need to be fixed.  Your fire lane striping is

25  faded, you need to repaint it.  And this is just about on any

1  business.

2  Q    Okay.  And what's the second one there?

3  A    "Cover and replace the cover for exterior electrical

4  panel; secure properly."  They had an exterior electrical

5  panel for their power and it was exposed and wires were easily

6  accessible to the public.

7  Q    Was the utilities working?

8  A    Yes, sir.

9  Q    There's light in the building?

10 A    Yes, sir.

11 Q    Okay.  All right, and the third item?

12 A    "Remove interior accessory lock in lady's bathroom."

13 Somebody added a lock to a door and they added it very high so

14 I guess children couldn't unlock it.  But we have lock

15 requirements on doors so that people that are in wheelchairs

16 or are short, they can reach the locks and not locked in.  So

17 I wanted that lock removed.

18 Q    All right, and then?

19 A    "Provide a blank dummy cover at breaker No. 35 at large

20 cover on Panel B."  And what is is there's breaker switches

21 and a couple of the breaker switches were missing and that

22 left a hole or a gap in there to where somebody, or one of our

23 firefighters or somebody could reach in trying to turn off

24 breakers and actually get electrocuted.  So I was concerned

25 about that.

1  Q    All right, and the next one?

2  A    "Provide fire extinguisher stickers indicating location of

3  fire extinguishers."  Those are red and white stickers that

4  are at eye level so that if you're in a standing room, the

5  level of fire extinguishers is generally blocked by the public

6  standing.  But the stickers are up high so that if you're

7  standing, you could see that sticker and know where it is.

8  Q    Right.  Well, first of all, were there any fire

9  extinguishers in the building anyway?

10  A    Yes, sir, they were there.

11  Q    And were they operable?

12  A    Yes, and they had a certification tag on them.  Yes, sir.

13  Q    And those were operable?

14  A    Yes, sir.

15  Q    But no stickers?

16  A    No identification stickers.

17  Q    Right, okay.  All right.

18  A    The next one?

19  Q    "Provide" -- what's the next one there?

20  A    "Provide address numbers to building, minimum of 6-inch

21  address numbers."  This is a requirement, it's a City code.

22  We want to know where we're going.  There was no address

23  numbers on the building.

24  Q    Sure.

25  A    The next one is "Provide installed carbon monoxide

1  detectors at all child-care rooms."  And that's proposed I put

2  in parenthesis.

3  Q    If it were a facility?

4  A    If it was that.  And one of the things I was concerned

5  about was that the fire alarm system, the requirements for a

6  fire alarm system are going to be different for a daycare

7  versus a church.  Rooms where children are sleeping and are

8  incapable of self-preservation, they're required to have smoke

9  detectors in those rooms and other devices.  This building

10  doesn't have that.  So if the fire alarm system is correct, if

11  it's fixed, it's fixed for what use?  That's why in their

12  initial request for certificate of occupancy, I looked to see

13  what they're going to use the building for so I can determine

14  what's needed to meet code.

15  Q    And what is their request for right now?

16  A    Their original certificate of occupancy was for use as a

17  daycare facility.  And so that's why I attached a report

18  saying that if you're going to use this for a daycare, well,

19  these are some of the requirements you're going to need to

20  meet that code.  If you're going to use it for a church, then

21  your certificate of occupancy was applied without the proper

22  use and you should reapply.

23  Q    Okay.  All right.

24          THE COURT:  Anything else, Counselor?

25          MR. HENRY:  I have two short lines of questioning,

1  Your Honor.

2            THE COURT:  No, go ahead.  Take as long as necessary.

3                    **DIRECT EXAMINATION RESUMED**

4  **BY MR. HENRY:**

5  Q    Okay.  In referencing the exhibit you have in front of

6  you, can you turn to the last page, Marshal Valdez?  Most of

7  your explanations there are pretty self-explanatory, but I

8  want you to explain -- you see the, I guess the  second to

9  last paragraph, it says, "In addition, it is necessary to

10 obtain a seating diagram"?

11 A    Uh-huh.

12 Q    Can you explain that to the Court why that was put in

13 there?

14 A    Yes.  Because I want to -- I needed to determine what

15 rooms are going to be used for infants, where they actually

16 have to be carried in and out of the building, what rooms are

17 identified for what purpose and including if there's a

18 sanctuary where people are gathered, then I need to figure out

19 a total occupant load so I can determine if and what type of

20 sprinkler system is required or any other systems, you know,

21 what other fire alarm system.  Is there a voice-activated

22 system required?  Again, I was -- I think I asked several

23 times for information and I was not given that information.

24 Q    Now if the area was to be used as a church, would this

25 request for a diagram still be --

1  A    Yes.

2  Q    Okay.  So what type of seating arrangements would you need

3  to know for a church?

4  A    Well, the reason I want to know the church seating

5  arrangements is because it helps me determine the occupant

6  load and also aisle widths, how many -- a door, or if -- I can

7  determine if they're going to use -- even if they're not fixed

8  seating I can base it on fixed seating and I can determine how

9  many exits that are needed for that building and how long they

10  should be apart or how much the travel distance is from where

11  they're sitting to where they need to go.  If the building

12  wasn't designed for that use, then there are some things that

13  need to be added, maybe another door or different hardware.

14  Panic hardware is required when you reach a certain occupant

15  load.

16        THE COURT:  What was this building used for

17  previously?

18        THE WITNESS:  It was used for a church, sir.

19        THE COURT:  And did that church meet its obligations?

20        THE WITNESS:  At the time.  Yes, sir.

21        THE COURT:  It was compliant?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Was there ever a time that that church

24  was permitted to go on for weeks or months not compliant with

25  the fire ordinances?

1      THE WITNESS:  No, sir.

2      THE COURT:  All right.  Anything else?

3      MR. HENRY:  Yes, Your Honor, one last set of topics.

4  Q   Marshal Valdez, I know you said you hadn't inspected the

5  interior of the building since November 17th?

6  A   Uh-huh.

7  Q   Is that correct?  I'm sorry, we need verbal answers.

8  A   Yes, sir.  I'm sorry.

9  Q   Okay.  But you did obtain information regarding the status

10 of the fire alarm system as of today, did you not?

11 A   Yes, I did.

12 Q   Okay.  So why don't you tell us what information you

13 obtained and how you obtained it?

14 A   I received a phone call from a licensed contractor from

15 the ADT Company.  It's a fire alarm company.  And the

16 technician on the phone was very concerned about something

17 that had happened at this occupancy.  Under their state

18 license they're required to report any problems that they have

19 with local fire alarm systems, occupants, tenants, or anybody

20 to the local fire authority to let them know this is a problem

21 with the system, or with the agency and we need this fixed, or

22 we're letting you know.  And what they did was they -- she

23 said that they were called out to do a fire alarm evaluation,

24 to fix their fire alarm system.  And she said that they told

25 her that I did not require them to be a monitored fire alarm

1  system.  And she asked if that was --

2        THE COURT:  That they told her what?

3        THE WITNESS:  That I would not require them to be a

4  monitored fire alarm system.  That means that if there's a

5  fire that it's immediately dispatched to a monitoring center

6  and dispatch our fire trucks to that scene.  I asked her what

7  she thought about that statement and I told her that -- well,

8  I told her that that was not true, that I would never allow

9  any fire alarm system to not be monitored.  That's a standard

10 requirement that they're monitored, especially either a Group

11 A or an assembly, a church, or a daycare.  She said that --

12       THE COURT:  And this person told you what?

13       THE WITNESS:  She said that they told her that I did

14 not require monitoring.

15       THE COURT:  And this person was calling to say --

16       THE WITNESS:  She was calling to say that there's no

17 phone line there and that the system is not compliant and she

18 told them, "Well, I need to know what you're going to use the

19 building for so I can design and install and fix this system

20 according to what you're going to use the building for.  If

21 you're going to have kids here, we need to know."  And she

22 said that -- she didn't get the job but she was concerned

23 because she's aware that a member of their congregation was

24 working on the fire alarm system and that she thought it was

25 necessary to report that to me.  And I agreed.  If they're not

Valdez - Direct Resumed by Henry                    24

1   licensed, that's a life-safety device and it's not -- should

2   not be allowed.

3              THE COURT:  Right.  Okay.

4   Q    Did she have any other comments about the status of the

5   fire alarm system when she talked to you?

6   A    She said that the fire alarm system when she went there

7   that there was no phone line there, it was not monitored.  It

8   was in disrepair and needed some work to bring it up to code

9   but she didn't even know what to apply until --

10             THE COURT:  You mean you're talking about the fire

11  alarm system?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Okay.  When you say there's no phone

14  there, you mean with respect to a fire alarm system or there's

15  no phone in the building?

16             THE WITNESS:  No, sir.  The fire alarm panel needs a

17  phone line to send out a signal to the monitoring company.

18             THE COURT:  To the monitoring station?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  All right.  Let me ask you, Mr. Valdez,

21  of all the items that you've listed on the report, that is

22  those that you wrote on the 17th of November of this year, is

23  the most pressing concern is the fire alarm system as opposed

24  to the fire lanes and to the stickers?  I mean they're all

25  important, but in the scheme of things the most important one

Valdez - Cross by Whitworth                    25

1  here is which one?

2         THE WITNESS:  Yes, sir.  It would be the fire alarm

3  system.  As I said in my report on this day, that would be

4  needed in order to occupy the building.  I went the following

5  Sunday and they were still in the building.

6         THE COURT:  What was still in the building?

7         THE WITNESS:  There were still 40 vehicles in the

8  parking lot.

9         THE COURT:  Oh, I see.  Okay.  Anything else?

10        MR. HENRY:  I think you actually covered everything,

11 Judge.  Oh, one more question.

12 Q   Did she provide you any information with regard to any of

13 the devices attached to the fire alarm or anything else?

14 A   Well, she said the tag on the system had said 2004 and

15 she confirmed that, that's what I had said.

16 Q   Okay.

17        MR. HENRY:  No further questions, Your Honor.

18        THE COURT:  Thank you.  Do you have any other

19 witness?

20        MR. HENRY:  No, Your Honor.

21        THE COURT:  Okay.  All right.  Go ahead.

22        MR. WHITWORTH:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24 **BY MR. WHITWORTH:**

25 Q   Mr. Valdez, you're the Fire Marshal, is that correct?

1    A    Deputy Fire Marshal, sir.

2    Q    Who's the Fire Marshal?

3    A    The Fire Chief.

4    Q    All right.  And you've been talking about a lady from ADT.

5    Do you have a name for her?

6    A    Her name is Shelly.  I didn't get her last name, sir.

7    Q    And when did you talk to her?

8    A    About 2:30 today.

9    Q    Okay.  And do you have any idea when she was out there?

10   A    She said she was out there earlier today.

11   Q    You don't have any personal knowledge of that, whether she

12   was ever there?

13   A    No, sir, I don't.

14   Q    And as part of your job do you do the fire inspections for

15   the City?

16   A    Yes, sir.

17   Q    And you know that Pastor Crane's congregation has been out

18   there since October 17th, 2008?

19   A    I don't know the exact date.

20   Q    But they've been out there for quite some time?  You would

21   agree with that?

22   A    Yes, sir.  Since October I guess.

23   Q    Okay.  And you're employed by the City?

24   A    Yes, sir.

25   Q    And you understand we're here today on an emergency TRO?

Valdez - Cross by Whitworth                                    27

1  A    Yes, sir.

2  Q    And yet you've done nothing to go back there since they've

3  been in there since September of this year?

4  A    What do you mean?

5  Q    Well, you've done an inspection in November 17th, 2008.

6  You'd agree with that?

7  A    Yes, sir.

8  Q    And the certificate of occupancy was issued in September

9  of 2008?  You've seen that?

10  A    The certificate of occupancy was issued -- it was not a

11  certificate of occupancy, it was a temporary certificate of

12  occupancy, and it was issued in error because it was issued

13  under the wrong use.  The certificate of occupancy application

14  said daycare and it was RTM Enterprises, I believe.  Since

15  then they've changed their name to Resurrection Center, and

16  when I went over there the other day it said The Glory Barn

17  Christian Learning Center.  So I -- again, the certificate of

18  occupancy, I told him on several occasions that he needed to

19  apply properly with the City so we knew what the name of his

20  building was and what they were doing there, what the use of

21  the building is.

22  Q    Okay, and that's not my question.  Let me ask you again.

23  You knew that they had this certificate of occupancy, whether

24  you think it was incorrect or not, since September of 2008, is

25  that correct?

1  A    They had a temporary certificate of occupancy.

2  Q    But it says temporary certificate of occupancy on it?

3  A    UH-huh.

4  Q    And you went out there November 17th of 2008 to do your

5  inspection?

6  A    Uh-huh.

7  Q    That doesn't sound like an emergency, would you agree with

8  that?

9  A    Well, it depends on -- obviously we're involved in a court

10  case, so I don't know being my first.  I try to enforce the

11  codes as best I can.  Usually I get compliance when I say

12  don't occupy the building.  That's usually all it takes is I

13  say, "This is a problem, you need to fix it.  This is for the

14  welfare of the public, don't occupy the building."  But

15  they've continued to occupy the building and I probably should

16  have gone out there and done maybe something else to get them

17  to comply with the order to fix a life safety device.

18  Q    Okay, but September to November is two months, correct?

19  A    Uh-huh.

20  Q    September to December is three months.

21  A    I don't know exactly when they were out there, sir.  I was

22  told that -- generally what happens is they apply for a

23  certificate of occupancy and it gets sent to my office so I

24  can schedule for an inspection.  When I got this certificate

25  of occupancy I was told to not go out there to do a final

1  C of O because the City needed to know exactly what they're

2  going to use the building for because that was already in

3  question.

4          So I get a phone call from a representative of the

5  church, Ms. Christine Crane, I believe, and she asked me if I

6  could come out to inspect her building for a daycare center.

7  The State requires that in order for you to use the building

8  as a daycare, you have to get a fire inspection.  I told her,

9  "Ma'am, I can't come out and do your inspection yet because

10  you have to go back and get your certificate of occupancy

11  applied for properly and get the proper name and use put down

12  on your building.  Once you get that addressed and approved,

13  send it to my office, I'll be more than happy to come out.

14  What are you going to use the building for?"

15          And she says, "Daycare."

16          And I said, "Are you going to use it for anything

17  else?"

18          And she said, "No."

19  Q   When was the last date you were out there?  Was that the

20  date of your report?

21  A   Yes.  Well, actually it was last Sunday I was out there at

22  11:15.  I didn't go in the building.

23  Q   But when you did this inspection report, was that the last

24  time you've been in the building?

25  A   Yes, sir.

Valdez - Cross by Whitworth                                    30

1  Q    Okay.  And then you also signed an affidavit.  Do you have
2  Exhibit D in front of you from the --
3  A    No, sir, I don't.
4  Q    But you're familiar with your affidavit?
5  A    Yes.
6          MR. WHITWORTH:  May I approach, Your Honor?
7          THE COURT:  Yes, you may.
8  Q    Let me hand you a copy of what was attached as Exhibit D
9  to the application for TRO, and I'm going to point right
10 there.  Do you see where it says, "Both a church and a school,
11 daycare"?
12 A    Yes, sir.  That statement is what they told me when I was
13 on site.  That was not on the application for --
14 Q    This is in your sworn affidavit, though?
15 A    Yes, sir, and if you read that statement, sir, it says
16 that I -- when I went there that's -- this is -- when I went
17 there then they told me they were going to use it for a church
18 and a daycare.
19          What happened was I was driving by -- I live a mile
20 from the fire station, I live in the city of Leon Valley --
21 driving by knowing that nobody's supposed to be in that
22 building and I pull in.  And the day -- I think it was on a
23 Thursday, I asked the person on the telephone, "What are you
24 going to use this building for?"
25          She says, "Daycare."

1    I said, "Are you going to use it for anything else?"

2    She says, "No."

3    I said, "Are you going to use it for a church?"

4    And she says, "No."

5    And I said, "Okay.  Then you should be fine.  Make

6  sure your paperwork's taken care of with the City.  They'll

7  send it to me.  I can then get free to go and reinspect your

8  building."

9    I'm driving around, I pull into the church.  I'm off

10  duty so I'm not in uniform.  And when I walk into the door, I

11  say, "What time is service?"

12    And they say, "11 o'clock, sir, come in and have a

13  seat."

14  Q    Is any of that in your sworn affidavit supporting this

15  application for TRO?

16  A    Well, I -- no.

17  Q    It either is or it isn't.

18  A    It isn't.

19  Q    Thank you.

20        MR. WHITWORTH:  That's all I have, Your Honor.

21        THE COURT:  All right.  Anything else?

22        MR. HENRY:  Very brief redirect, Your Honor.

23        THE COURT:  Sure.

24                    **REDIRECT EXAMINATION**

25  **BY MR. HENRY:**

1  Q    Marshal Valdez, is a temporary certificate of occupancy

2  meant to allow people to actually occupy it and use?

3  A    No.

4  Q    What's it meant for?

5           THE COURT:  Actually for what?

6           MR. HENRY:  To use.  To occupy and use, Your Honor.

7  A    No.

8  Q    Okay.  When a temporary certificate of occupancy is

9  issued, like the one issued in September of this year, what is

10 its intended purpose?

11 A    It's intended purpose is to allow the tenant to turn on

12 the power and set up the displays, set up the aisles, chairs,

13 rows, furnishings, to see how they're going to use the

14 building.  The building inspector generally says the building

15 is safe to occupy.  The fire inspector says it's safe to use.

16 So I need to see how they're going to use the building.  You

17 know, I can't say, "You can use this empty shell of a

18 building."  I need to see where you're furnishings are, are

19 you hanging things from the sprinkler heads.  Are you doing

20 things that you shouldn't be doing.  So set up everything.

21 Are you blocking exits with your chairs and your tables?  So

22 that's why we say a temporary C of O, okay building, now set

23 it up.  Does that make sense?

24                    **CLARIFYING EXAMINATION**

25 **BY THE COURT:**

1  Q    Now when you have a temporary CO, is the occupant using

2  the building in the manner he wants to use it, or is this just

3  like the preliminary stages?

4  A    They're not supposed to.  I mean, you know, it's not

5  saying that they have -- but, no, they're not supposed to be

6  open to the public until they pass their fire inspection.

7  Q    Okay.

8  A    And that's when they get their final certificate.

9  Q    And is that the stage you're in?  There's a temporary CO

10  in existence right now?

11       MR. HENRY:  Correct, Your Honor.

12  Q    How long does a temporary CO last?

13  A    I don't issue the temporary C of O's, but generally it's

14  been 45 days I think is the --

15  Q    And the one here was issued in September?

16  A    Yes, sir, I think.

17  Q    So has it expired?

18       MR. HENRY:  It has expired, Your Honor.  It is also

19  contingent upon Fire Marshal approval and when he went out on

20  November 17th, our contention is that pretty much eliminates

21  it because he failed them for the fire inspections.

22       THE COURT:  All right.  Okay, anything else?

23       MR. HENRY:  No, Your Honor, that's it.

24       THE COURT:  Okay.  Counselor?

25       MR. WHITWORTH:  Judge, I don't have any further

Valdez - Clarifying Exam by Court                                    34

1    questions but I do have a clarification.  It's six months for

2    the temporary certificate of occupancy.

3                THE COURT:  Okay.  All right, that's fine.

4    Q    But, as far as you know, Mr. Valdez, from your own

5    inspection, this facility is not compliant with the fire code

6    regulations for the City, right?

7    A    No, sir.

8    Q    And you visited or you saw the building last Sunday?

9    A    Yes, sir.

10   Q    You went into the building?

11   A    I did not go in the building, sir.

12   Q    Okay.

13   A    Generally what happens is they'll call me to say, "Come

14   and reinspect, we're to reinspect because we want to open.  We

15   want people to come into our business."

16   Q    Okay, and no one called you after November 17th?

17   A    No, sir.

18   Q    And who did you, this November 17th document, or document

19   dated November 17th, who did you give that to?

20   A    Mr. Crane.

21   Q    Mister who?

22   A    Mr. Daryl Crane.

23   Q    Okay.  All right.  And so you've not received a call from

24   anyone about the document you gave them?

25   A    No, sir.

Valdez - Clarifying Exam by Court                               35

1   Q   No one's called you and said, "Okay, fine, come and check
2   us out"?
3   A   No, sir.
4   Q   No one's called you and said, "We're ready to do business,
5   you need to come here because we want to have Sunday
6   services"?
7   A   No, sir, nobody called, I've not received a phone call
8   from anybody.
9   Q   Is the usual course that a person would call you?
10  A   Yes, sir.  I had an incident yesterday where an individual
11  called me saying, "Can you come and reinspect me so I can
12  open."  And it's pretty standard that all local people that
13  work in the city, either they're licensed or business owners,
14  it's their responsibility to know the local codes and to check
15  with the local officials to find out before they open to the
16  public that they're compliant.
17  Q   Right.  Okay, thank you, sir.
18          THE COURT:  You may step down.  And you have no
19  further witnesses, right?
20          MR. HENRY:  We have no further witnesses, Your Honor.
21          THE COURT:  All right.  Do you have any witnesses?
22          MR. WHITWORTH:  Yes, Pastor Daryl Crane is here, Your
23  Honor, we'd call him to the stand.
24          THE COURT:  Okay.
25          **DARYL CRANE, ELIJAH GROUP'S WITNESS, SWORN**

1    **DIRECT EXAMINATION**

2  BY MR. WHITWORTH:

3  Q    Good afternoon, Pastor Crane.

4  A    Good afternoon.

5  Q    Would you state your name for the record?

6  A    Daryl Crane.

7  Q    And what is it you do for a living?

8  A    I'm a minister.

9  Q    And do you operate a church as a minister?

10 A    Yes, I do.

11 Q    And where do you operate?

12 A    At 6401 Bandera Road.

13 Q    And that is the property -- is that the property that's

14 known as The Church on the Rock in Bandera?

15 A    Yes, it is.

16 Q    And how long have you been in that property?

17 A    We received our temporary certificate of occupancy in

18 early September and I believe we have actually been in there

19 since October 17th, the second Sunday of October I believe.

20 Q    Okay, and do you have a lease agreement stating that

21 you're allowed to be in there?

22 A    Yes, sir.

23 Q    And did you also attempt to purchase the property?

24 A    Yes, sir.

25 Q    And what is the status of that?

1  A    It's dependent upon a court case.

2  Q    I'm sorry, dependent upon?

3  A    It's dependent upon a legal issue that the City is trying

4  to change the zoning.

5  Q    Okay.  Were you at the church on November 17th when --

6  A    Yes, I was.

7  Q    -- the Fire Marshal came by?

8  A    Yes, I was.

9  Q    Okay, and did you have a chance to visit with him?

10  A    Yes, I did.

11  Q    And what was the basis of the visit?

12  A    Well, it was somewhat ambiguous I must say because he came

13  and he told us -- normally when we received our temporary

14  certificate of occupancy, the lady who issued it said that the

15  Fire Marshal would be calling you and setting up a time for us

16  to come and check us out, which we were, you know, waiting

17  for.  And I had actually contacted him on another occasion

18  about, you know, questions that I had because I knew that we

19  were going to -- well, I knew the building was in violation,

20  there was no question about that.  It was just different areas

21  that we had.

22       So we were in the process of fixing of things and he

23  came in and he told me very specifically, he said, "This is

24  not a certificate of occupancy inspection."  He even wrote it

25  on his inspection.

1        And I said, "Well, what is it?"

2        And he says, "This is just a general fire

3   inspection."

4        And I said, "Well, okay."  You know, and he led me

5   around and the list that he went over, he had that and he

6   said, "You're going to do this and this."  And this is not our

7   first building.  It's very typical, just like he said, for

8   them to go and do things of that nature.  And then at the end

9   he visited with us about, you know, how we can do the things

10  that we need to do to get us up to code.

11  Q   Okay.  Did you fill out an application for a certificate

12  of occupancy?

13  A   I didn't personally but one was done.

14        THE COURT:  Well, let's get to the chase here.

15  Whether you have a certificate or not, or whatever, is

16  irrelevant.  The issue here, the bottom-line issue, are there

17  any fire code violations?  Are there any in existence at this

18  moment?

19        MR. WHITWORTH:  Okay, I'll move on.

20        THE COURT:  The City of Leon Valley could give you a

21  permit to be there for the next 100 years, that's irrelevant.

22  What's relevant is are you -- is the church, this building

23  compliant with the fire code regulations.  If it's not, then

24  you-all have a problem with or without a permit, with or

25  without a certificate of occupancy.

1         MR. WHITWORTH:  Thank you, Your Honor, I'll move.

2         THE COURT:  Let's get to the point here.

3    Q   Okay, Pastor Crane, you were there on November 17th?

4    A   Uh-huh.

5    Q   Did the Fire Marshal give you a report that he said was a

6    fire inspection report?

7    A   Yes, sir.

8    Q   When were you provided a copy of that?

9    A   The same day.

10   Q   The same day?  Before he left?

11   A   Uh-huh.

12   Q   Do you have a copy of it with you?

13   A   Yes, I do, right in front of me, the copy he gave me.

14   Q   Would you pull that out?

15   A   Yes, I do.

16   Q   And have you had an opportunity to look at that, the items

17   on there and do anything about them?

18   A   Yes.  And he told me that we had a couple of weeks, you

19   know, to do this.  He told me, you know, as soon as possible

20   get this --

21        THE COURT:  Okay, have they been fixed?

22        THE WITNESS:  Yes, they have.

23        THE COURT:  You're telling me that you have corrected

24   the fire alarm system?

25        THE WITNESS:  I have not.  A licensed person did it.

1    THE COURT:  Listen to my question.

2    THE WITNESS:  Okay.

3    THE COURT:  You're telling me that the fire alarm

4  system -- you've just said that someone told you and all that

5  is fine.  I want to know, you're telling me that this fire

6  alarm system is now operable?

7    THE WITNESS:  Yes, sir.

8    THE COURT:  It's monitored?

9    THE WITNESS:  Yes, sir, as far as I know.  Now, I'm

10  going by -- I don't know anything about fire --

11    THE COURT:  And who fixed it?

12    THE WITNESS:  No, no -- who fixed it?

13    THE COURT:  Yes.

14    THE WITNESS:  We got the sticker that Mr. Valdez

15  referred to remains on the alarm system.  The lady that

16  called Mr. Valdez was an ADT representative, that was just the

17  first person I --

18    THE COURT:  I understand, but the bottom line is

19  you're telling me that the fire alarm system then, now at this

20  address 6401 Bandera, is operable?

21    THE WITNESS:  Yes, sir.  We called the tag of the

22  original installer and I told 'em the issue that we were

23  facing.  We thought we had, you know, some more time.  He came

24  out this afternoon --

25    THE COURT:  And what is his name?

1          THE WITNESS:  I got his card before I left.

2          THE COURT:  Okay.  Well, I think this matter can be

3     easily resolved.  If the fire inspector is permitted to go

4     this afternoon or evening or in the morning, the sooner the

5     better, and if he inspects it and he says it's fully compliant

6     with the code then doesn't that resolve the issue?  And now,

7     on the other hand, if he says it isn't then doesn't that

8     resolve the issue against you also?

9          MR. WHITWORTH:  I would agree with that, Your Honor.

10          THE COURT:  I mean it's either fixed or not.

11          MR. WHITWORTH:  Absolutely, and Counsel and I have

12     discussed that.  It's either --

13          THE COURT:  It's either operable or not.

14          MR. WHITWORTH:  Correct.

15          THE COURT:  And certainly the church does not want --

16     I know the church, nor the City, want to place any number of

17     people in any danger.

18          THE WITNESS:  Right.

19          THE COURT:  Right?

20          MR. WHITWORTH:  Absolutely.

21          THE COURT:  So why don't we do this?  I'm going to

22     enter an order in favor of the City and basically it will

23     expire -- if the City Marshal goes out there and says

24     everything's fine, then this order will be of no consequence.

25     If he says, "No, it's not okay," then this order will last for

Crane - Direct by Whitworth                    42

1  ten days.  Is that agreeable with everybody?

2          THE WITNESS:  Can I say something?

3          THE COURT:  Sure.

4          THE WITNESS:  Could it be for maybe two days because

5  then we would -- the only thing that I know that would be an

6  issue could be resolved.

7          THE COURT:  Let me ask you this, Pastor.  Do you have

8  one church service on Sunday?

9          THE WITNESS:  Yes.

10         THE COURT:  At what time?

11         THE WITNESS:  11 o'clock.

12         THE COURT:  Well, I would imagine that if -- I think

13 I know what you're getting up to.  If the City tells you today

14 there's a problem and if you can get it fixed by -- I

15 guess what you're saying, "Can you give me till Sunday at 11

16 o'clock?"  Let's do it this way.  If he says you have a

17 problem, you got till 6 o'clock Saturday evening to fix it.

18         THE WITNESS:  That'd be perfect.

19         THE COURT:  Okay.  I don't want him waiting there

20 minute by minute by minute.

21         THE WITNESS:  Right.

22         THE COURT:  He has his own church to go to, I'm sure.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  So he'll go out there.  If he says

25 everything's fine, you proceed.  If he says, "You still have

1  this problem," if you get it resolved by Saturday 6 o'clock in

2  the evening, then -- and he says it's resolved then you can

3  proceed.  If not, the order will remain in effect for ten

4  days.

5          THE WITNESS:  Yes, sir.

6          MR. WHITWORTH:  I only ask for one brief

7  clarification, Your Honor?  That the use we're talking about

8  is a church use and not a daycare/school use.

9          THE COURT:  Is that right?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Church.  Good.

12          MR. WHITWORTH:  Okay, so he doesn't have to inspect

13  it for daycare, he's just focused on church.

14          THE COURT:  Right, just for church.  Okay, do we all

15  understand each other?

16          MR. WHITWORTH:  Judge, I had just one thing.  Could

17  we use the same forum where he would go through the same

18  report?  That way we can look at it and say, "Here the

19  problems are"?

20          THE COURT:  Whatever is acceptable to --

21          MR. HENRY:  It's a standard form, Your Honor.

22          THE COURT:  Okay, use the same form.  And if you

23  could -- when do you think you might be able to get out there,

24  Officer?

25          MR. VALDEZ:  I can go straight there, sir.

1          THE COURT:  Okay.  And I appreciate you -- you're

2    probably already working overtime and everything, and I

3    appreciate the City's willingness to even work through the

4    weekend to try to resolve this issue.  And, Pastor, I

5    appreciate your willingness to accept the proposition that the

6    thing needs to be fixed.

7          THE WITNESS:  Absolutely.

8          THE COURT:  Your congregation would not be happy --

9          THE WITNESS:  You're right.

10          THE COURT:  Right?

11          THE WITNESS:  You're right.

12          THE COURT:  Okay.  So let's get it all fixed.

13          THE WITNESS:  Thank you, sir.

14          THE COURT:  And if it's not fixed this weekend, I'm

15    sure it'll be fixed --

16          THE WITNESS:  Yes, it will.

17          THE COURT:  -- soon.

18          THE WITNESS:  It'll be fixed.

19          THE COURT:  Do you take special prayer requests?

20          THE WITNESS:  Yes, we do.

21          THE COURT:  Well, the DCS poll already came out.

22          THE WITNESS:  We've been all praying for that for a

23    long time.

24          THE COURT:  Thank you.

25      **(Proceedings concluded.)**

45

1   UNITED STATES DISTRICT COURT     )

2   WESTERN    DISTRICT OF  TEXAS    )

3

4        I, MAURICE D. WEST, Official Court Reporter, United

5   States District Court, Western District of Texas, do certify

6   that the foregoing is a correct transcript from the record of

7   proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply

9   with those prescribed by the Court and Judicial Conference of

10  the United States.

11

12

13

14  21 June 2009                    /s/Maurice D. West
                                    MAURICE D. WEST
15                                  Official Court Reporter
                                    United States District Court
16                                  Western District of Texas

17

18

19

20

21

22

23

24

25

i

1                                    **INDEX**

2                                                                      **Paid**

3    Discussion of Status
     By Mr. Henry ------------------------------------------      1
4    By Mr. Whitworth --------------------------------------      7

5    **WITNESS FOR**
     **LEON VALLEY:**              <u>Direct</u> <u>Cross</u> <u>Redirect</u>
6    Luis Valdez                      10
     Clarifying By Court -----------------------------------     11
7                                     20    25    32
     Clarifying By Court -----------------------------------     33

8

9    **WITNESS FOR**
     **ELIJA GROUP:**              <u>Direct</u>
10   Daryl Crane                      36

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25