IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

THE ELIJAH GROUP, INC., §
PLAINTIFF, §
 §
VS. §        CIVIL ACTION NO. SA08CA0907
 §
THE CITY OF LEON VALLEY, TEXAS, §
DEFENDANT. §

## PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56, Plaintiff, The Elijah Group, Inc.,

moves for final summary judgment on all of its claims and would further show:

> **"I think the staff changed that ("churches" to "assemblies") to protect us legally because we talked about churches.  Yeah, that's what drove the discussion.  Yeah, that's what prompted the whole thing because we had so many."[1]**

## I. Background Facts and History

In 2003, the City of Leon Valley Master Plan ("Master Plan") was amended to recommend

only "B-2 Retail District" uses for the 6400 block of Bandera Road.  *See generally* Leon Valley –

2003 Master Plan attached as **Exhibit "B."**  The Property at issue here is located at 6401 Bandera

Road and it consists of a large dome shaped church building and a separate administrative/office

building.  Before the current Master Plan was adopted, "churches" were allowed to locate and

worship in "B-2" districts.

On March 6, 2007, the City of Leon Valley approved a new Zoning Ordinance (the "Zoning

Ordinance") which moved churches out of "B-2 Retail Districts" and in to what the City calls "B-3

Commercial Districts."    *See* Leon Valley—2007 Zoning Ordinance, Chapter 30 attached as

---

[1] *See* Last Excerpt of Transcript of Leon Valley Zoning and Land Use Commission Meeting of Feb. 26, 2008 attached as **Exhibit "A."**

Exhibit "C." A review of the City Zoning Ordinance shows that while churches were moved to B-3 to exist alongside warehouses, storage units, flea markets, firing ranges, and other industrial uses, other similar *assembly* type uses were allowed to remain in B-2, whether "allowed by right" or by a "Specific Use Permit" application procedure. *See* Permitted Use Table at pp. 89-96 of the Zoning Ordinance at Exhibit "C." In addition to moving churches from B-2 to B-3, the Zoning Ordinance was written to ensure that churches have no possible means to locate in B-2. *See* Exhibit "C." The Zoning Ordinance contains no application process for churches to locate in B-2 areas or even to apply to locate in B-2 areas, whether by variance, specific use permit, or any other means, as admitted by Defendant. *See* Defendant's Responses to Admissions 14, 15, 46 attached as Exhibit "D." Other nonreligious assemblies are allowed by right or by specific use permit application procedure by the City Zoning Ordinance. *See* Defendant's Responses to Admissions 31, 32, 33 attached as Exhibit "D"; s*ee also* pp. 89-96 of Exhibit "C."

The Elijah Group, Inc. (the "Elijah Group") is a Christian church and ministry formed to spread the Gospel of Jesus Christ and to practice the Christian virtues contained in the Holy Scriptures. Service to others, for the good of others, or ministry, is a central tenet of the Christian faith and of the Elijah Group. *See* pp. 32-41 of the Deposition of Pastor Darryl Crain attached as Exhibit "E." The Elijah Group provides all traditional church services including Sunday worship, bible study, weddings, funerals, support for the poor and needy, and family violence and relationship counseling. *See* pp. 32-34 of Exhibit "E." It also operates a non-profit day care for children and runs a youth sports league. *See* pp. 37-41 of Exhibit "E."

The Elijah Group bid on and won the right to purchase the existing dome shaped church and administrative building located at 6401 Bandera Road, Leon Valley, Texas (the "Property").

*See* p. 18, line 11 to p. 19, line 20, and p. 76, line 2 to p. 96, line 6 of **Exhibit E**; *see also* Bid Package attached as **Exhibit "F."** The Elijah Group entered into a Purchase and Sales Agreement (the "Agreement") with the owner of the Property, Happy State Bank d/b/a GoldStar Trust Company ("GoldStar") on January 4, 2008 for the purchase price of $1,333,000.00. *See* Agreement attached as **Exhibit "G."** Because there was no procedure in the Zoning Ordinance allowing for a church to apply for a variance, or to locate in B-2, the Agreement requires GoldStar to have the Property rezoned for church use prior to the closing.   *See* p. 16, ¶ 59 of **Exhibit "G."** An Application for Zoning Change (the "Application") was filed with the City, asking that the Property be rezoned from "B-2 Retail District" to "B-3 Commercial District" as B-3 allows for the location of churches.   *See* Application attached as **Exhibit "H."**

A public hearing on the Application was held on February 26, 2008 before the City Zoning and Land Use Commission (the "Zoning Commission").   Pastor Crain attended and addressed the Zoning Commissioners during the public comment session during which he addressed his church's plans to beautify the Property and to contribute to the community of Leon Valley. *See* p. 17, line 21 to p. 20, line 14 of Portion of Leon Valley Zoning and Land Use Commission Meeting of Feb. 26, 2008 Transcript attached as **Exhibit "I."**

The Zoning Commission recommended denying the Application by a vote of six to one due to "economic" concerns and needed "sales taxes" as testified to by Commissioner Baird and Chairmen Guerra.   See p. 27, line 2 to p. 28, line 3, and p. 33, line 18 to p. 34, line 18 of **Exhibit "I."**   Second Vice Chari Phelps claimed that churches were not discriminated against because all uses with large gatherings of people were placed in the same district. *See* p. 34, line 19 to p. 35, line 19 of **Exhibit "I."**   However, the erroneous nature of this assertion is demonstrated by a

simple review of the zoning code. *See* pp. 89-96 of **Exhibit "C."**    In fact, a large number of

"assembly" uses are allowed in B-2 by right, while churches are not.[2] The City admits such unequal

treatment in its responses to Requests for Admissions. The City has simply decided that churches

are no longer welcome in B-2 and has even admitted this fact during public hearings discussing the

Plaintiff's attempts to rezone the Property for church use. *See generally* **Exhibit "I."**  Simply put,

churches were removed because they don't pay taxes as will be discussed herein.

The City Council acted upon the report and recommendation of the Zoning Commission on

March 4, 2008 and voted to deny the Application for the same economic reasons as the Zoning

Commission. *See* Transcript of Leon Valley City Council Meeting of March 4, 2008 attached as

**Exhibit "J"**; *see also* Official Minutes of Leon Valley City Council Meeting of March 4, 2008

attached as **Exhibit "J-1."**  Subsequently on August 26, 2008, GoldStar and Redemption Tabernacle

Ministries, Inc.[3] entered into a Second Amendment of Purchase Agreement ("Second Amendment")

due to the instant litigation filed by the Elijah Group to obtain a ruling that the City Zoning Code was

unconstitutional and in violation of RLUIPA. *See* Second Amendment attached as **Exhibit "K."**

Paragraph 59 was replaced in the Second Amendment to condition the closing of the sale on

---

[2] Assembly uses remaining in B-2 Retail Districts *by right* include, but are not limited to, adult care facilities, art gallery/museums, child care facilities, gymnasiums/physical fitness facilities, libraries, inns, recreational facility, neighborhood restaurants and/or food establishments, cafeterias, cafés, delicatessens, frozen dessert shops, salons, schools, studios for fine art, and indoor theatres. *See* pp. 89 – 96 of **Exhibit "C."** In addition to the uses allowed *by right* in the Zoning Code, certain other assembly uses are allowed in B-2 Retail Districts through a Specific Use Permit (SUP) procedure. These include auditoriums, convention centers, and other similar meeting facilities, clubs or lodges (private), indoor billiard parlors, bowling alleys, playgrounds, skating centers, video game rooms, outdoor baseball/softball/volleyball parks, equestrian centers, fairgrounds, football fields, go kart tracks, miniature golf courses, and other sports complexes, convalescence centers, nursing homes, and unenclosed restaurants. *See id.* There is no similar procedure for churches to obtain a SUP or any other means to locate in a B-2 Retail District.  Again, the City admits this fact. *See* City's Responses to Requests for Admission 14, 15, and 46 attached as **Exhibit "D."**

[3] The Elijah Group, Inc. was operated as Redemption Tabernacle Ministries, Inc. by Pastor Darryl W. Crain at the time of the bid and during much of the factual history herein, but was changed by Pastor Crain to the present name, the Elijah Group, Inc. because Redemption Tabernacle Ministries was substantially similar to an existing entity per

–4–

evidence that the Elijah Group may use the Property for "church purpose," which is the very basis of this lawsuit to obtain such relief.

The Elijah Group, Inc. currently occupies the Property pursuant to a Lease Agreement which was executed after the City turned down the Application. *See* Lease Agreement attached as **Exhibit "L."** The Lease Agreement specifically provides for the filing of a lawsuit by the Parties to the Lease against the City of Leon Valley in order to rezone the Property. It also provides that if the lawsuit filed by the plaintiff is successful, the Lease terminates by merger of title on the closing of the Purchase and Sale Agreement between the Elijah Group and GoldStar. The Elijah Group has fully complied with all City occupancy codes as evidenced by two final Certificate of Occupancy's (the "C of O's") recently issued by the Defendant. The March 10, 2009 Final C of O and June 1, 2009 Final C of O issued by the City are attached as **Exhibit "M."**

Unfortunately, the case does not end with the issuance of the C of O's because they only allow the Elijah Group to occupy and use the Property as a *day care* and not as a *church*, despite the much more stringent fire and safety code requirements for approval as a day care. *See* p. 29, lines 4-18 and p. 30, lines 8-18 of the Transcript of Permanent Injunction Hearing before Judge Orlando Garcia on Dec. 5, 2008, attached as **Exhibit "N"**; *see also* p. 34, line 19 to p. 35, line 19 of **Exhibit "I."**

On October 31, 2008, the Elijah Group filed this lawsuit in District Court in Bexar County, Texas (the "State Court") asserting the City's zoning and land use regulations violate 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"), the Texas Religious Freedom Restoration Act, TEX. CIV. PRAC. & REM. CODE § 110.001, *et seq.*, and

the Texas Secretary of State Corporations offices. *See* p. 18, line 1 to p. 19, line 2 of **Exhibit "E"** (discussing the

the United States and Texas Constitutions. *See* Plaintiff's Original Petition and Request for Disclosure attached as **Exhibit "O."** Defendant removed this case to federal court and relies upon its state court answer.

Contrary to the City's assertions, the undisputed evidence shows that the City's land use policies and zoning ordinances are unconstitutional on their face and as they are applied to the Elijah Group and the Property made the basis of this lawsuit.

In particular, the City has violated:

a) Section (b)(1) of RLUIPA by imposing and implementing a land use regulation in a manner that treats a religious assembly on less than *equal terms* with a non-religious assembly or institution. 42 U.S.C. § 2000cc(b)(1);

b) Section (a) of RLUIPA which prohibits any government from imposing or implementing a land use regulation in a manner that imposes a *substantial burden* on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that the imposition of such burden is in furtherance of a compelling government interests and is also the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc(a)(1);

c) Section (b)(3) of RLUIPA which prohibits any government from *unreasonably limiting* religious assemblies, institutions, and structures within a jurisdiction, like the City of Leon Valley. 42 U.S.C. § 2000cc(b)(3);

d) The Fourteenth Amendment of the U.S. Constitution which prohibits any state or political subdivision from denying to any person the *equal protection* of the law;

e) The Texas Religious Freedom Restoration Act ("TRFRA") which provides that a "government agency may not substantially burden a person's free exercise of religion . . . [unless it] demonstrates that the application of the burden to the person: 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that interest." TEX CIV. PRAC. & REM. CODE § 110.003(a)-(b); and

f) The Free Exercise clause of the U.S. Constitution providing that Congress shall make no law respecting an establishment of religion, or prohibiting the *free exercise* thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

---

changed name of his congregation).

## II.  Summary Judgment and Injunctive Relief Are Proper

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 11147 (E.D. Cal. 2003); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  The movant must first show a lack of a genuine issue as to any material fact and then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The nonmoving party "must do more than to show that there is some metaphysical doubt as to the material facts"; the party must show "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

To be entitled to injunctive relief, the party seeking the injunction must show a likelihood of success on the merits.  *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).  The party must also show there is no adequate remedy at law.  *Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994).

**A.      The City has violated Section (b)(1) of the RLUIPA by imposing and implementing a land use regulation in a manner that treats a religious assembly on less than *equal terms* with a non-religious assembly or institution.**

–7–

The RLUIPA was enacted to prevent precisely the kind of burdensome and discriminatory restrictions imposed here by the City of Leon Valley on the Elijah Group.[4] The purpose of Section (b)(1) of the RLUIPA is to forbid government from prohibiting religious assembly, while allowing equivalent, and often more intensive, nonreligious assembly uses.[5] The *equal terms* provision provides:

> "no government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution **on less than equal terms** with a nonreligious assembly or institution."

42 U.S.C.A. § 2000cc(b)(1) (emphasis added).

The Elijah Group is entitled to summary judgment on its *equal terms* claims because there is no genuine issue as to any material fact with regard to whether the Zoning Ordinance, *on its face*, violates the RLUIPA by treating a religious assembly or institution on less than equal terms with a nonreligious assembly or institution. Defendant even admits in its Responses to Plaintiff's Request for Admissions that the Zoning Code, *on its face*, allows nonreligious assemblies to be located in the

---

[4] The distinct provisions of the RLUIPA's section 2 are universally referred to as the land use provisions of the Act, which were carefully crafted by Congress for the purpose of reinforcing the existing constitutional protections of religious speech, assembly and worship. Under Plaintiff's RLUIPA claims herein, all the Elijah Group is required to do, is make a *prima facie* case of substantial burden upon its free exercise of religion, and the law then shifts the burden of persuasion to Leon Valley to prove they are imposing the burden pursuant to a compelling governmental interest and have done so in the least restrictive means. 42 U.S.C. 2000cc(a)(1)(A) and (B). RLUIPA was passed after months of hearings that documented the prevalent discrimination against religious groups. The Bill was so well received that it passed the Senate by unanimous consent. Pub. L. No. 106-274, A Bill to Protect Religious Liberty, and For Other Purposes; Bill Summary and Status for the 106th Congress, S.2869 (Sep. 22, 2000).

[5] The *equal terms* section is violated whenever religious land uses are treated worse than comparable nonreligious ones, *whether or not* the discrimination imposes a substantial burden on the religious uses. *See Vision Church v. Village of Long Grove,* 468 F.3d 975, 1002-03 (7th Cir. 2006); *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,* 450 F.3d 1295, 1308 (11th Cir. 2006); *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1228-31 (11th Cir. 2004); *Chabad of Nova, Inc. v. City of Cooper City,* 533 F. Supp. 2d 1220, 1222-23 (S.D. Fla. 2008).

–8–

City's B-2 Retail Zoning District by right while at the same time admitting that churches and religious assemblies are not allowed in B-2 Districts.[6]

Further, there is no dispute regarding the unequal treatment in light of the Permitted Use Table in the Zoning Ordinance which further establishes the unequal treatment between nonreligious assemblies and churches. *See* pp. 89–96 of **Exhibit "C."** Assemblies allowed "by Right" in B-2 include: "Art Gallery/Museum," "Bookstore," "Child Care Facility," "Gymnasium/Physical Fitness Facility," "Playroom/Birthday Party Room, Children," "Recreational Facility, Neighborhood," "Restaurant and/or Food Establishment, cafeteria, café, delicatessen, frozen dessert shop and other similar uses," "School," and "Theater, Indoor." *Id.* These very same uses permitted in B-2 Districts have been held by other courts, considering the RLUIPA equal term claims, to be assemblies. *See e.g.*, *Konokov v. Orange County, FL*, 410 F.3d 1317, 1325 (11th Cir.2005) (*"family day care"* qualifies as an assembly); *Misrash Sephardi*, 366 F.3d at 1230 ("private clubs" and "lodges" are assemblies); *Chabad of Nova*, 533 F. Supp. 2d at 1222-23 ("Cooper City has violated (b)(1) of the RLUIPA" because "Day care centers; indoor recreational facilities, including movie theaters; centers offering personal improvement services, such as aerobic studios, art, music, dance, and drama

---

[6] In particular, Defendant admits:

**REQUEST FOR ADMISSION NO 31**: Chapter 30 of the City of Leon Valley Zoning Code does not allow churches in B-2.
Objection: Defendant objects to this discovery request as it calls for legal conclusion. The City's zoning ordinance speaks for itself.
Response: Notwithstanding and subject to the above objection, Defendant answers as follows. **Admit.**
**REQUEST FOR ADMISSION NO. 32**: Restaurants, food establishments, cafeterias, cafes, delicatessens, and frozen dessert shops are allowed in B-2 by right.
Objection: Defendant objects to this discovery request as it calls for legal conclusion. The City's zoning ordinance speaks for itself. Defendant further objects to the term "by right" as it is vague and ambiguous.
Response: Notwithstanding and subject to the above objection, Defendant answers as follows. **Admit.**
**REQUEST FOR ADMISSION NO. 33**: Indoor theatres are allowed in B-2 by right.
Objection: Defendant objects to this discovery request as it calls for legal conclusion. The City's zoning ordinance speaks for itself.

schools; and places where people may gather for meetings and/or business . . . all undoubtedly meet the definition of assemblies).   Interestingly, the *Chabad of Nova* Court recently considered almost the exact issue before this court regarding a synagogues *equal terms* claim under RLUIPA and decided in the synagogues' favor.   *Chabad of Nova*, 533 F. Supp. 2d at 1222-23 (finding that a city ordinance excluding religious assemblies from a business district while allowing nonreligious "private clubs and other assemblies" to remain constituted differential treatment and was therefore a violation of RLUIPA's equal terms provision entitling synagogue to judgment on the pleadings).[7] The *Chabad of Nova* Court entered a very detailed order which is instructive.[8]   Additionally, "Clubs and Lodges (private)," which the *Midrash Sephardi* Court compared to churches, and found to be assemblies, are allowed in the City of Leon Valley's B-2 with a SUP issued by the City. *See* pp. 89-96 of **Exhibit "C."**   There is no SUP procedure for churches.[9]

---

Response:  Notwithstanding and subject to the above objection, Defendant answers as follows.  **Admit.**

[7] In short, RLUIPA was narrowly tailored to, and specifically enacted by Congress, to address the very same issue before this court because churches "were frequently discriminated against" by zoning codes that would exclude churches in areas where other secular (nonreligious) groups were allowed to meet. Congress specifically considered and found that businesses and local secular groups could bring theaters, health clubs, and community centers by right, but churches were simply excluded all together with no permit procedure or were required to apply for a special use permit. 146 CONG. REC. H7190-91 (daily ed. July 27, 2000) (statement of Congressman Canady).  The City of Leon Valley has no special use permit procedure for churches in B-2.

[8] The *Chabad of Nova* Court's detailed order is attached as **Exhibit "P."**

[9] In particular, Defendant admits:

> **REQUEST FOR ADMISSION NO. 30**:  Baseball parks, volleyball parks, equestrian centers, fairgrounds, football fields, go cart tracks, miniature golf parks, and sports complexes are allowed in B-2 with a Specific Use Permit.
> Objection:  Defendant objects to this discovery request as it calls for a legal conclusion. The City's zoning ordinance speaks for itself.
> Answer:  Notwithstanding and subject to the objection, Defendant answers as follows.  **Admit.**
> **REQUEST FOR ADMISSION NO. 46**:  The City Zoning Code has no application process for churches to locate in B-2 areas or even to apply to locate in B-2 areas, whether by variance, or specific use permit, or any other means.
> Objection:  Defendant objects to this discovery request as it calls for a legal conclusion. The City's zoning ordinance speaks for itself.
> Answer:  Notwithstanding and subject to the objection, Defendant answers as follows.  **Admit.**

The *Chabad of Nova* Court considered whether a city zoning code which permitted numerous nonreligious assembly uses within its business district but prohibited religious assemblies was a violation of the equal terms provision of RLUIPA. *See id.* at 1223. Defendant Cooper City admitted that each of the nonreligious uses being questioned were allowed in its business district, but refused to admit that any of the enumerated uses were an "assembly." [10] For example, Cooper City made the same assertion being made by Leon Valley in this case, and denied that an indoor theater was an assembly, instead arguing that an indoor movie theater is "a business which for a fee admits customers for the purpose of watching a movie." *Id.* at 1222. The court disagreed and held that the denial by Cooper City that certain listed uses were assemblies did not create a material fact in dispute and held:

> "Day care centers; indoor recreational facilities, including movie theaters; centers offering personal improvement services such as aerobic studios, art, music, dance, and drama schools; and places where people may gather for

---

REQUEST FOR ADMISSION NO. 14:  The City has no specific use procedure for churches to follow that wish to operate in B-2.
Answer: **Admit**
REQUEST FOR ADMISSION NO. 15: There is no variance procedure for churches that wish to apply for or locate in B-2.
Answer: **Admit.**

[10] Courts that have considered the definition of "assembly" within the context of a RLUIPA *equal terms* violation claim have defined the term according to its "ordinary or natural meaning" of the word. *See Midrash Sephardi*, 366 F.3d at 1230 (11th Cir. 2004) ("under RLUIPA, we must first evaluate whether an entity qualifies as an 'assembly or institution,' as that term is used in RLUIPA, before considering whether the governmental authority treats a religious assembly or institution differently than a nonreligious assembly or institution.")   Because RLUIPA does not define "assembly," the *Midrash Sephardi* Court defined "assembly" according to its "ordinary or natural meaning" and held an "assembly" is a:
> "company of persons collected together in place and usually for some common purpose (as deliberation and legislation, worship, or social entertainment). WEBSTERS 3D NEW INT'L UNABRIDGED DICTIONARY 131 (1993); or "[a] group of person organized and united for some common purpose."

*Id.* at *1231* (citing BLACKS LAW DICTIONARY 111 (7th ed. 1999)).
Assembly is not defined by the City Zoning Ordinance; however, Section 30.201(3) of the City Zoning Ordinance also requires that undefined terms are to be given their "usual and customary meaning." *See* p. 7 § 30.201 of **Exhibit "C."**

> meetings and/or business related to trade associations or unions, all
> undoubtedly meet the definition of assemblies."

*Id.* At 122-23. The *Chabad of Nova* Court specifically held that the Cooper City ordinance facially

discriminated against churches and found it had violated the *equal terms* provision of the RLUIPA

and that a showing of substantial burden was not required. *Id.*; *see also* the *Chabad of Nova* Court's

order, attached as **Exhibit "P,"** which states:

> **"In accordance with *Midrash Sephardi*, to the extent that other land uses
> that meet the definition of an "assembly" or "institution" are permitted in
> the business district, but religious assemblies or institutions are not,
> Cooper City has violated section (b)(1) of the RLUIPA"**

(emphasis added) (granting motion for judgment on the pleadings as to the Plaintiff's *equal terms*

claim).

In accordance with case law precedent, there are no fact issues regarding whether the Zoning

Ordinance, *on its face,* violates the RLUIPA by treating a religious assembly or institution on less

than equal terms with a nonreligious assembly or institution. Accordingly, the City of Leon Valley

has violated 42 U.S.C. § 2000cc(b)(1) of RLUIPA entitling the Elijah Group to summary judgment.

**B.     THE CITY OF LEON VALLEY'S DECISION TO DENY THE APPLICATION FOR
ZONING CHANGE AND ACTIONS AGAINST THE ELIJAH GROUP IMPOSE A
"SUBSTANTIAL BURDEN" ON RELIGIOUS EXERCISE, IN VIOLATION OF
SECTION (a) OF THE RLUIPA**

Section (a) of the RLUIPA provides:

(1) "General Rule- No government shall impose or implement a land use regulation
in a manner that imposes a **substantial burden** on the religious exercise of a person,
including a religious, assembly or institution, **unless the government demonstrates**
that imposition of the burden on that person, assembly or institution-

(A) is in furtherance of a **compelling governmental interest**; and

(B) is the **least restrictive means** of furthering that compelling governmental
interest."

42 U.S.C. § 2000cc(a)(1). (emphasis added)

Similar to the *equal terms* provision discussed above, the provisions of Section (a) are designed to reinforce the existing constitutional protection of religious speech, assembly, and worship. It also underscores that "any exercise of religion" is not to be burdened, including the "**use, building, or conversion of real property for the purpose of religious exercise**." 42 U.S.C. § 2000cc-5(7).

### 1.    *Section (a) of the RLUIPA applies to this case*

Section (a) applies if one of three jurisdictional requirements exists—the burden (a) was imposed on a program that receives federal funds; (b) affected interstate commerce; or (c) was imposed pursuant to a system of individualized assessments. 42 U.S.C. § 2000cc(a). First, Section (a)(2)(B) provides that the Section applies where "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several states, or with Indian tribes." *Id.* § 2000cc(a)(2)(B). Further, Congresses' interstate commerce power reaches activities that "arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect interstate commerce. *U.S. v. Lopez*, 514 U.S. 549, 558-59 (1995); *see also* 146 Cong. Rec. S7775; H.R. Rep. 106-219, at 28 (listing construction projects as an example of a specific economic transaction affecting commerce that land use laws might impermissibly burden). Courts considering the issue hold that construction and ongoing educational operations satisfy RLUIPA. *See, e.g.*, *Westchester Day Sch. v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 541 (S.D.N.Y. 2006).

In this case, the City's interference with the Elijah Group's operations as an employer and educator affects interstate commerce and the future growth plans and construction activities of the

–13–

Elijah Group would affect interstate commerce.[11] Pastor Crain testified at the public hearing on the Application to rezone that he planned on spending approximately $400,000.00 to beautify and remodel the buildings on the Property. *See* p. 19, lines 11-21 of **Exhibit "I."** Further, the bid process in which the Elijah Group was the winning bidders was conducted across state lines. The seller and owner of the Property is located at 5336 N. 19th Avenue, Phoenix AZ, 85015 and the Elijah Group is incorporated in Texas as a non-profit corporation. *See* Front Page of the Purchase and Sales Agreement attached as **Exhibit "G."**

Additionally, the RLUIPA's substantial burden provision applies where "the substantial burden is imposed in the implementation of a land use regulation . . . under which the government makes, *or has in place* formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. 2000cc(a)(2)(C) (emphasis added). Zoning permitting procedures are a system of individualized assessments. *See, e.g., Midrash Sephardi*, 366 F.3d at 1225. When land use regulations are "applied to grant or deny a certain use to a particular parcel of land, that application is an 'implementation'" under 42 U.S.C. 2000cc(a)(2)(C); *Guru Nanak Sikh Society*, 456 F.3d at 987.

In this case, the City has made, and also has in place, both formal and informal procedures permitting the City to make individualized assessments regarding the Elijah Group's plans and occupancy of the Property for church use, including 1) the City's Zoning Ordinance; 2) its assessment of the Zoning Application during public hearing ; 3) the numerous certificates of occupancy applied for by the Elijah Group and approved by the City; 4) the City's attempts to lock

---

[11] An intent to utilize and improve property for a church falls within the RLUIPA's definition of protected religious exercise. *Grace Church of North County v. City of San Diego*, 555 F. Supp. 2d 1126, 1135 (S.D. Cal. 2008).

out the Elijah Group and filing of an Application for Temporary Restraining Order; 5) the zoning

officer's numerous visits to the Property to perform fire code and safety inspections; and 6) the fire

marshal's threats to ticket the Elijah Group if it continued conducting church services. Accordingly,

because the City's burden on the Elijah Group's religious exercise affects interstate commerce and

was imposed pursuant to a system of individualized assessments, Section 2(a) of the RLUIPA

applies to this case.

**2.      *The City violated Section (a) of the RLUIPA***

     The undisputed facts in this case establish that the City violated Section 2(a) of the RLUIPA.

The City has substantially burdened the Elijah Group's religious exercise without a compelling

government interest.[12] Even if the City had a compelling interest, which is denied, they did not use

the least restrictive means of compelling such interest.

**a.      The Elijah Group's exercise of religion has been substantially burdened**

     The RLUIPA prohibits, *inter alia*, the government from placing substantial burdens on the

"use, building, or conversion, of real property for the purpose of religious exercise." *See* 42 U.S.C.

§ 2000cc-5(7). As recently stated by the Court of Appeals for the Fifth Circuit after surveying

decisions in other circuits:

> "[A] government action or regulation creates a 'substantial burden' on a religious
> exercise if it truly pressures the adherent to significantly modify his religious
> behavior and significantly violates his religious beliefs.
> . . . .
> And in line with the foregoing teachings of the Supreme Court, the effect of a
> government action or regulation is significant when either (1) it influences the

---

[12] "If you have a religious exercise being substantially burdened by a land use regulation, then the government can pretty much in my view forget about justifying it with a compelling interest. That's very, very, very difficult for the government to ever prove. James L. Dam, *Churches Use New Federal Statute to Win Zoning Cases*, LAWYERS WEEKLY USA, August 20, 2001 (quoting Prof. Jerold Kayden, Associate Professor Urban Planning, Harvard University).

adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non trivial benefit, and, on the other hand, following his religious belief."

*See Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). The substantial burden test requires a case-by-case, fact specific inquiry to determine whether a substantial burden has been imposed. *Id.* at 571. The Second Circuit has held that while mere inconvenience does not suffice, demonstrating the existence of a substantial burden is "not a particular onerous task." *McEachin v. McGuiness*, 357 F.3d 197, 202 (2d Cir. 2004). The Seventh Circuit held that "delay, uncertainty, and expense" resulting from the denial of a variance to permit a church relocating was a substantial burden. *See Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005). In *Constantine*, the application for rezoning had been wrongfully denied by the city, leaving the congregation with the prospect of either purchasing another parcel of land and attempting another navigation through the rezoning process, or filing more applications with the city using the already-owned land. *Id.* That level of delay, uncertainty and expense—given that the city's basis for denying the rezoning request was "utterly groundless"—rose to the level of substantial burden.

The Elijah Group's right to religious exercise has been substantially burdened by the City's actions. The Zoning Ordinance has denied the Elijah Group the right to finalize its purchase of the Property that was built as a church and has always been used as a church, and is the only property in the City that perfectly meets the spiritual and physical needs of the Elijah Group. *See* pp. 242-48, 268-69 of **Exhibit "E."** The Elijah Group has been forced to enter into a Lease Agreement that leaves the Elijah Group in a crippled state with no permanent home pending the outcome of this lawsuit. The Lease Agreement provides that if this lawsuit is successful, the lease will terminate by merger of title on the closing of the Purchase and Sale Agreement between The Elijah Group and

–16–

GoldStar. *See* Lease Agreement attached as **Exhibit "L."** These circumstances constitute a complete prohibition on the rights of the Elijah Group to worship in accord with its Christian Ministry and is precisely what Congress sought to address by enactment of the RLUIPA. Accordingly, the Elijah Group's right to build, buy, or rent an adequate space has been violated and substantially burdened.[13]

Further, as detailed above, the failure of the City to provide any SUP procedure for the Elijah Group to apply to locate in B-2 Districts constitutes a substantial burden. Courts routinely hold that the complete prohibition of a variance application to allow a religious institution to use or build its property for the purpose of its ministry is a substantial burden under RLUIPA. *See, e.g., Dilaura v. Ann Arbor Charter Tp.*, 30 Fed. Appx. 501, 509 (6th Cir. 2002) (zoning ordinance and denial of variance that prevented prayer gatherings was use of land constituting religious exercise that was substantially burdened under the RLUIPA). In this case, the Elijah Group was denied even the right to seek a variance, as there is no procedure allowing for a church seeking to locate to B-2 to ask for a variance. *See* **Exhibit "C"**; s*ee also Castle Hills First Baptist Church v. City of Castle Hills,*

---

[13] To make matters worse, since the Elijah Group moved on to the Property pursuant to the Lease Agreement, the City 1) has attempted to forcibly remove the congregation from the Property despite recognizing the valid temporary certificate of occupancy being issued by the City (*see* p. 27 line 22 to p. 28, line 3 of **Exhibit "N"**); 2) has contacted City Public Service attempting to have the utilities turned off (*see* internal City e-mails between Assistant Fire Marshall Valdez and City Staffers, including the City Manager, discussing attempts to "turn off electricity" and remove congregation attached as **Exhibit "Q"**); 3) has threatened punishment for worshiping in the form of civil and criminal citations (*see* p. 200, line 25 to p. 203, line 4 of **Exhibit "E"**); and 4) even had the Assistant City Fire Marshal Valdez pay an unannounced visit to the church on a Sunday morning wearing a sidearm while toting a video camera which he used to video tape individual congregants and their vehicles. A photograph of this incident taken by Pastor Crain's daughter is attached as **Exhibit "R."** Wearing a sidearm while videotaping the individual members of the church was clearly intended to have a chilling effect on religious worship of the congregation, which it did. *See* pp. 201-03 of **Exhibit "E."** The threats of punishment have placed the Pastor and the congregation in the position of having to choose between disobeying City officials and facing civil or criminal citations or in terminating their worship services altogether. *See Murphy v. Zoning Com'n of Town of New Milford*, 148 F. Supp. 2d 173 (D. Conn. 2001) ("Foregoing or modifying the practice of one's religion because of **governmental interference** or **fear of punishment** is precisely the type of substantial burden Congress intended to trigger the RLUIPA's protections, indeed, it is the concern which impelled adoption of the First Amendment.").

No. SA-01-CA-1149-RF, 2004 WL 546792 (W.D. Tex. Mar. 17, 2004) (finding a substantial burden existed where the City denied a special use permit for expansion of a fourth floor church building for religious education).

The court in *City of Castle Hills* held that the City had come too close to "requiring the Church to refrain from conduct required by religious beliefs." *Id.* at \*9. Specifically, it held "the denial of a fourth floor permit is a **substantial burden on religious exercise amidst a system of individualized assessments and is therefore subject to strict scrutiny**." *Id.* at \*20; *see also Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) (finding that a substantial burden existed even assuming that there was other land available on which church could locate due to the delay, uncertainty and expense incurred by church).

For the foregoing reasons and based on the undisputed facts, there are no fact issues with regard to the Elijah Group's right to religious exercise having been substantially burdened by the City's actions.

**b.    The City does not have a compelling government interest which justifies the substantial burden on the Elijah Group's religious exercise**

The City has shown no compelling interest which would justify the substantial burden it has placed on the Elijah Group's exercise of religion. "The interests advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). As the Supreme Court recently affirmed, "the burden [of satisfying strict scrutiny] is placed squarely on the government." *Gonzales v. O Centro Espirita Beneficente Uniato do Vegetal,* 546 U.S. 418, 429 (2006). To meet this burden, a "government's mere invocation" of broadly defined interests "cannot carry the day." *Id.* at 420. The government must demonstrate that the particular burden as applied to the particular plaintiff's religious exercise

–18–

represents the "least restrictive" means of religious exercise to serve a compelling governmental interest. *Id.* at 429-32. The City has asserted no facts, nor any defenses which could be construed as legitimate interests of the City, much less a compelling interest, other than the need for additional tax revenues.

The Official Minutes of the February 26, 2008 Meeting of the Leon Valley Zoning Commission establish the real reason that the City moved churches from B-2 to B-3 and denied the Application to Rezone for purely improper economic reasons. *See* Official Minutes of the Feb. 26, 2008 Leon Valley Zoning Commission Meeting attached as **Exhibit "S."** The Official Minutes state:

> "Commissioner Baird noted that the Commission had looked at all of the non-tax paying entities and felt that there was an economic crisis. She further noted that it was the reason churches were placed in the B-3 (Commercial) zoning district."

> "Chairmen Guerra III noted that much discussion and consideration was given to the economic viability of the city and the placement of churches into the B-3 zoning district."

*Id.* Interestingly, what is not noted in the Official Minutes of the February 26, 2008 public meeting, are quotes from the Commissioners during the actual public hearing. These are highlighted in the attached transcripts of the meeting. However, as just a few examples of the depth of the deceit by the Commission in denying the Application to Rezone and the real reason churches were discriminated against, Commissioner Baird testified:

> "It has only been recently that we ourselves talked about the fact that we, ourselves, talked about the fact that we have churches, all this non taxpaying and that we are reaching any kind of an economic crisis here and for that reason we – for that reason for that reason we disallowed the – churches anywhere except B-3. So, because, every little strip center everywhere was having a church . . . I feel very strongly that if we change this to commercial, this little strip, we are just, you know, opening up the flood gates."

> "Every church that's going to want to come in anywhere is going to come before us and say change this; and, again, most of these uses we – we don't want there…I think

that this is not in the best interest of the whole city.  Certainly <u>not in the best interest of the business community."</u>

*See* p. 27, line 2 to p. 2, line 3 of **Exhibit "I."**  Commissioner Baird went on to state:

> "[W]e did hold a lot of discussion about—about—the issue concerning the economic viability of the community and the impact on property that was not taxable and churches being one of those categories . . . and we felt that in certain instances such as right there on Bandera Road.  I mean, to me, that is where you put your business. That is where you put your business.  That's where you begin to concentrate your economic development resources and the use of property . . . .   That's why the recommendation to locate churches in B-3 was made."

*Id.* at p. 34, line 5 through p. 18.

Again, discussing the reasoning behind the zoning change, Zoning Chairman Guerra addressed the City Council and explained the rationale behind the decision to move churches from B-2 to B-3:

> "<u>A large amount of sales tax has been lost</u> over the last several years and we felt that it was important to try to maintain the integrity of certain land within the City for economic development purposes . . . we felt that it was important to maintain the integrity of B-2 zoning and to locate churches, if they desire to locate . . . in a B-3 classification."

*See* p. 12, line 20 to p. 13, line 6 of **Exhibit "J."**

The only interest repeatedly identified to date by the City leaders is economic.  It is clear that economic reasons do not satisfy strict scrutiny.   The Supreme Court has defined the compelling interests that may justify burdens on religious exercise as "only the gravest abuses, endangering paramount interests."  *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (quoting *Thomas v. Collins*, 232 U.S. 516 (1945)).  Compelling interests in the land use context that would allow infringement of religious beliefs has been held to be those that "present a clear, grave, and immediate danger to public health."  *Elsinore Christian Ctr. v. City of Lake Elsinore*, 291 F. Supp. 2d 1083 (C.D. Cal. 2003).  Further, it has long been held that a permit for religious use may not be denied on grounds

–20–

that revenues will be lost due to the tax exempt status of religious institutions. *Diocese of Rochester v. Planning Bd. Of Town of Brighton*, 136 N.E.2d 827, 836 (N.Y. 1956) ("It cannot seriously be argued that the decision of respondents denying this permit because of a loss of tax revenue is in furtherance of the general welfare."); *Jacobi v. Zoning Board of Adjustments of the Lower Moreland Township*, 196 A.2d 742, 745 (Pa. 1964). Economic interests and revenue generation are not compelling interests as stated by the court in *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002). "If revenue generation were a compelling state interest, municipalities could exclude all religious institutions from their cities." *Id.* at 1228. Likewise, if the City asserts in its Motion for Summary Judgment that churches were moved for health, safety, or welfare concerns, the **City of Leon Valley Zoning Commission has already admitted that there are no health, safety, or welfare concerns** regarding church occupancy of the very same Property at issue here. *See* Official Minutes of the July 25, 2006 Leon Valley Zoning Commission meeting attached as **Exhibit "T."**[14]

### c.    The City Failed to use the Least Restrictive Means

The RLUIPA requires that even if a government entity acts in furtherance of a compelling interest—which the City has not proven that it did in this case—it still must prove it used the *least restrictive* means to further such interest. A city showing its actions are the least restrictive means is

---

[14] Before the Commission on that date was a public hearing on the prior church occupant's application to operate a child care facility on the very same Property. The Official Minutes conclusively prove that safety concerns are not at issue as Commissioner Baird admits that retail traffic would "easily" cause even greater safety problems to local residents than a church:

> "**[T]here were no grounds to deny the request based on health, safety, or welfare**. She further noted that residents in the area should be aware that if the Church were not occupying the location, the zoning of the property was B-2 (Retail) and **could easily have a number of more heavily trafficked uses at that location.**"

*See* p. 12, line 20 to p. 13, line 6 of **Exhibit "J."** Moreover, as discussed above, the Elijah group is currently operating a day care facility on the Property pursuant to two valid C of O's issued by the City which require that much more stringent fire and safety code requirements be met.  See C of O's attached as **Exhibit "M"**.

a difficult task. *See, e.g., Murphy v. Zoning Comm'n. of the Town of New Milford*, 148 F. Supp. 2d 173 190 (D. Conn. 2001). Whatever interest the City may claim to be compelling, the facts show that the City failed to use the "least restrictive means" available to further such interest. The City chose to move churches into B-3 zoning districts next to, among other things, storage units, flea markets, or animal shelters. *See* pp. 89-96 of **Exhibit "C."** The City also completely denied churches the right to seek a SUP to operate in B-2 Districts while allowing other non-religious commercial and noncommercial uses to remain. How worshiping next to a storage unit, flea market, or animal shelter, is a more appropriate location for a church and house of God, or the least restrictive means of furthering a compelling interest, remains unexplained by the City and is not in evidence. "If a state has open to it a less drastic way of satisfying its legitimate interest, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Elrod*, 427 U.S. at 363.

**C.    The City has Violated Section (b)(3) of RLUIPA which prohibits any government from unreasonably limiting religious assemblies, institutions, and structures within a jurisdiction**

Section (b)(3) states that "no government shall impose or implement a land use regulation that – (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." As discussed above, the Zoning Ordinance was purposefully designed to impose an unreasonable limit on the ability of religious assembly to locate in the City. The arbitrary restrictions constitute a discriminatory violation of Section (b)(3) of RLUIPA. One particular commissioner went so far as asking the collective group if their actions were discriminating against churches. *See* p. 2, line 1 to p. 4, line 7

of **Exhibit "A."** City staffers even acknowledged that only churches were discussed during the move but city staffers changed the final wording of the ordinance to say all assemblies were moved in order to avoid the appearance of discriminating against churches. *See supra, footnote* 1.

For the foregoing reasons, the Plaintiff seeks summary judgment on its claims under Section (b)(3) of RLUIPA due to the City's arbitrary and intentional discrimination preventing religious organizations from locating in B-2 zoned areas.

**D.    The City's Zoning Code prohibiting religious assembly in the City's B-2 Retail District violates plaintiff's equal protection rights under the 14th Amendment**

The Fourteenth Amendment to the United States Constitution provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., AMEND. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). Unequal treatment, among similarly situated persons, "no matter how subtle, is anathema under the Equal Protection Clause." *Id.* The only difference between the analysis under the Elijah Group's claim under the RLUIPA's *equal terms* analysis and under this Equal Protection claim is that the non-religious assembly uses allowed in B-2 Districts—such as restaurants with banquet areas, gymnasiums with aerobic dance classes, yoga studios, and fitness classes, day care centers, funeral homes with visitation chapels, bowling alleys, hotels, and theaters—should now be construed as uses which are "similarly situated" to the Elijah Group. If a legislative classification disadvantages a suspect class, such as race, religion, or alienage, then courts may uphold the classification only if it is "precisely tailored to serve a compelling governmental interest." *Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984) (quoting *Plyler v. Doe*, 457 U.S. 216-17 & n. 14 (1982)).

The only issue the court should look at under its analysis is whether the Elijah Group's use of the Property is an assembly use, and whether all assembly uses (religious and nonreligious) are treated alike. *City of Cleburne,* 473 U.S. at 439. The nonreligious uses allowed in B-2 by the City and the Church are similarly situated because they are all uses where people gather to meet for a common purpose, converse, study, dance, and develop their skills. *See* the attached pictures of nonreligious assembly uses and flyers from various business located in B-2, including dance and aerobic classes and studios, gyms, restaurants with banquet facilities for rent, child cares, and bowling alleys attached as **Exhibit "U."** One business even has a banner on it advertising its banquet facilities. *See* **Exhibit "U."** The only real difference, if any, is the content of the message between some of the uses. However, nonreligious banquet halls likely have the exact same content as church assemblies, depending on what organization is using the banquet hall. It is not hard to foresee a religious organization renting the banquet hall at Texian's Cocina, which is located at 6430 Bandera in B-2 across the street from the Church or occupying a substantial portion of the meeting area of any restaurant in B-2. *See* **Exhibit "U."**

The Court should consider whether the City violated the Elijah Group's rights on an "as applied" basis, i.e., whether the City's denial of the Application violates the equal protection clause. *City of Cleburne* at 447. If an "as applied" violation exists, the court need not assess whether the zoning code is facially invalid. *Id.* As discussed above in detail and as established by the documentary evidence, an applied violation against the Elijah Group has occurred.

The *Love Church* Court, in determining that the ordinance in question was not narrowly tailored to traffic and pedestrian safety issues as argued by the City, held:

> "All business, commercial, and residential uses attract pedestrians. Many people walk to a theatre or meeting hall. If pedestrians do not threaten the city's interest

–24–

> while walking to attend a show or a meeting, why should it be different when they are
> walking to attend a religious service? The answer is it should not."

*Love Church v. City of Evanston¸* 671 F. Supp. 508, 519 (N.D. Ill. 1987).  The court not only

determined that the City of Evanston's justifications for its zoning ordinance did not pass strict

scrutiny, it would not even pass the lesser rational basis test if that were applied.  *Id.* at 520.

The court also gave a pertinent hypothetical discussing a group of people who could rent a building

in "any business or commercial zone" and assemble to discuss "great books" and instruct their

children on such literature, but if they wished to do the same and instruct their children about their

religion, they would have to get "special permission" from the City.  The court noted the "only

distinguishable feature of the groups in our hypothetical is the purpose and content of the assembly.

Because Evanston's ordinance distinguishes between religious assembly uses and non-religious uses,

it classifies on the basis of religion."  *Id.* at 518-19.  The present situation before the court is even

more discriminatory and therefore much worse than that addressed in the *City of Evanston* because

churches, including the Elijah Group, cannot even apply for a special use permit to locate in B-2

Districts because no such procedure exists.[15]

---

[15] In *Vineyard Christian Fellowship*, the court considered the constitutionality of requiring a religious institution to obtain a special permit in a particular zoning district when nonreligious assemblies were permitted by right. *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 961, 976 (N.D. Ill. 2003).  The court considered whether the ordinance, as applied, was "precisely tailored to serve a compelling governmental interest" because the legislative classification at issue negatively affected a suspect class, i.e., religious institutions were being treated differently from their similarly situated counterparts. *Id.* at 975 (citations omitted).  The court then evaluated whether the specific zoning ordinance furthered any compelling interest and, if so, whether it was narrowly tailored to meet those interests. The court in finding for the church, relied upon another persuasive hypothetical:

> "Vineyard's congregants may permissibly stage (at the subject property) a production of the musical play 'Fiddler on the Roof,' which includes a scene depicting a traditional Jewish wedding.  Vineyard may not, however, host an actual religious wedding at [the address] under the zoning ordinance.  These simple examples (relying on the *Love Church* example above) satisfy the court that the City's ordinance, although it does not single out a particular religious group, nevertheless classifies on the basis of religion."

*Id.* at 976. Similarly, while the Elijah Group does not assert that the City of Leon Valley has singled out a particular religion to discriminate against, the City "classifies on the basis of religion." *Id.* The Vineyard court ruled in favor of the church on its equal protection claim even though the City alleged as interests "traffic and

By prohibiting religious assembly from B-2 while allowing numerous other similarly situated non-religious assembly uses, whether "by right" or by SUP, the City treated the Elijah Group on less than equal terms than similarly situated uses. The City has failed to assert any justification for such unequal treatment, has failed to provide specific admissions and denials by relying on its state court general denial, and has admitted repeatedly stated during public hearing on the Application to Rezone that it discriminated against churches. Therefore, the City's rationale, if any, for such unequal treatment cannot pass strict scrutiny, or even a lesser rational basis analysis, if that were the standard, which it is not.

## E.    Texas Religious Freedom Restoration Act

For the very same reasons as noted above, the City's actions have violated the Elijah Group's rights under the Texas Religious Freedom Restoration Act ("TRFRA") which provides that "a government agency may not substantially burden a person's free exercise of religion [unless it] demonstrates that the application of the burden to the person . . . is in furtherance of a compelling governmental interest [and] is the least restrictive means of furthering that interest." TEX. CIV. PRAC. & REM. CODE § 110.003(a)-(b).

The Texas Act is modeled after RLUIPA. It states that "[t]he protection of religious freedom afforded by this chapter is in addition to the protections provided under federal law and the constitutions of this state and the United States." In *Barr v. City of Sinton*, the Texas Supreme Court held that a zoning ordinance, which effectively precluded a religious half way house from operating in the City of Sinton, violated the TRFRA. *Barr v. City of Sinton*, No. 06-0074, 2009 WL 1712798

---

parking problems" and the **need to encourage business in the area to increase tax revenue.** *Id.* at 977. The court held that the alleged city "interests" of traffic and the need to increase tax revenues were "important," "understandable" and "acceptable," but as applied, the ordinance did not advance those goals. *Id.* at 977-78.

(Tex. June 19, 2009). This recent ruling is instructive in that it marks the very first time the Texas Supreme Court has interpreted the TRFRA. The Court held that the City lacked a "compelling interest" under the TRFRA to substantially burden, through a restrictive zoning ordinance, a pastor's free exercise of religion in operating a  halfway house ministry for newly released convicts, and therefore, the ordinance violated the TRFRA, despite recitation in the ordinance that it was enacted to preserve the public safety, morals, and general welfare of the city, and despite city's contention that it sought to advance safety, prevent nuisance, and protect children. The Court found that the safety recitations by the City were the kind of "broadly formulated interest[]" that does not satisfy the scrutiny mandated by TRFRA. *Id.* at *13. Because there are no fact issues concerning the fact that the City placed a substantial burden on the Elijah Group's free exercise of religion, that there is no compelling governmental interest for such burden, and that the City did not use the least restrictive means of furthering any claimed interest, the Elijah Group is entitled to summary judgment under the TRFRA.

**F.    The Free Exercise Clause of the United States Constitution**

The First Amendment to the U.S Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the *free exercise* thereof; or abridging the *freedom of speech*, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The Free Exercise Clause is applied to the states and local government through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

The Free Exercise Clause guarantees every individual the right to freely exercise his or her religious beliefs and requires "government respect for, and noninterference with the religious beliefs

–27–

and practices of our nation's people." *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). If the object of a law is "to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling governmental interest and is narrowly tailored to advanced that interests." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (citations omitted). To determine the object of the law, courts must first look at the text of the law. *Id.*

The text of the Leon Valley Zoning Ordinance is not facially neutral as it specifically moves churches from B-2 to B-3 Districts and leaves other assembly uses in B-2. *See generally* **Exhibit "C."** Therefore, the inquiry should end here. However, the court may also look beyond the facial discrimination of the Zoning Ordinance as the Free Exercise Clause extends beyond facial discrimination and "protects against governmental hostility which is masked, as well as overt." *Id. at* 534. A court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696 (U.S. 1970) (Harlan, J., concurring)). In determining whether a law is neutral under the Free Exercise Clause, the Court should also seek guidance in the equal protection analysis above. *Walz*, 397 U.S. at 696. The Court may determine the discriminatory object of the law from direct and circumstantial evidence. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1977). Relevant evidence includes the historical background and "contemporaneous statements made by members of the decision making body." *City of Hialeah*, 508 U.S. at 540 [emphasis added] (citing *Arlington Heights*, 429 U.S. at 267-68). The court in *City of Hialeah*, relied heavily upon the minutes and taped excerpts of city council public meetings, as well as discriminatory statements

–28–

made by residents and city council members in ruling that the ordinance at question had as its object the "suppression of religion." *Id.* at 541-42.

The facts in this case leave no dispute that suppression of religious activity in B-2 was the object of the Zoning Ordinance and the Court should grant summary judgment the Elijah Groups claims under the Free Exercise Clause.

## ATTORNEY FEES

Plaintiff has pled for and is entitled to its reasonable and necessary attorney fees pursuant to the Religious Land Use and Institutionalized Person Act and the Texas Religious Freedom Reformation Act. Further, under 42 U.S.C. § 1988, a prevailing plaintiff in an action under 42 U.S.C. § 1983 or under the RLUIPA is entitled to judgment against the Defendant for the amount of attorney fees incurred in pursuing the action.

## CONCLUSION

For the foregoing reasons, Plaintiff, the Elijah Group, Inc., respectfully asks that the court (1) enter judgment in Plaintiff's favor on all Counts of the Plaintiff's First Amended Complaint; (2) declare the zoning ordinance unconstitutional; (3) permanently enjoin Defendant from depriving the Elijah Group of any zoning application procedure for applying for and receiving a final Certificate of Occupancy to use the Property for church and religious uses as other non-religious assembly uses are allowed by the City; (4) issue an Order setting an evidentiary hearing at some time in the near future to hear proof of Plaintiff's damages and reasonable and necessary attorney fees; and (5) issue an order at that time awarding Plaintiff's costs and reasonable and necessary attorney fees.

Respectfully submitted on this the 8th day of July, 2009.

> **STUMPF FARRIMOND, P.C.**
> 112 E. Pecan Street, Suite 700
> San Antonio, Texas 78205
> Telephone 210.231-0919
> Facsimile 210.231-0004
>
> By _____
>     Daniel P. Whitworth, State Bar No. 24008275
>     Roger G. Bresnahan, State Bar No.02959460
>     John G. George, State Bar No. 24051944
>
> **ATTORNEYS FOR PLAINTIFF AND PETITIONER,
> THE ELIJAH GROUP, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of July, 2009 a true and correct copy of the above and foregoing was served upon the following parties using the CM/ECF system:

Mr. Ryan S. Henry
Mr. Lowell F. Denton
**DENTON, NAVARRO, ROCHA & BERNAL**
A Professional Corporation
2517 North Main Avenue
San Antonio, Texas 78212
210.227.3243 Telephone
210.225.4481 Facsimile

_____
Daniel Whitworth

## **VERIFICATION**

| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, on this day personally appeared DANIEL P. WHITWORTH, the Affiant, a person whose identify is known to me. After I administered an oath to Affiant, the Affiant testified:

1.    My name is Daniel P. Whitworth. I am over 18 years of age, of sound mind, and capable of making this Affidavit. The facts in this Affidavit are within my personal knowledge and are true and correct.

2.    I am one of the attorneys of record for the Plaintiff. All of the documents included with the Plaintiff's Motion for Summary Judgment are true copies.

Daniel P. Whitworth

SUBSCRIBED AND SWORN TO BEFORE ME on this the 8th day of July, 2009, to certify which witness my hand and seal of office.

HERMINIA PUENTE
Notary Public
State of Texas
Commission Expires
August 20, 2011

Notary Public in and for
The State of Texas