# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

THE ELIJAH GROUP, INC.   )
                      )
Plaintiff            )
                      )
vs.                 )   CIVIL ACTION NO. SA08CA0907
                      )
THE CITY OF LEON VALLEY,  )
TEXAS               )
                      )
Defendant            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL VIDEOTAPED DEPOSITION

DARRYL W. CRAIN

MAY 13, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL VIDEOTAPED DEPOSITION OF DARRYL W. CRAIN,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above-styled and

numbered cause on the 13th day of May, 2009, from

9:33 a.m. to 4:34 p.m., before ELENA MALONEY, Certified

Shorthand Reporter in and for the State of Texas,

reported by computerized stenotype machine at the

offices of DENTON, NAVARRO, ROCHA & BERNAL, P.C., 2517

N. Main Avenue, San Antonio, Bexar County, Texas 78212,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Page 2

```
 1        A P P E A R A N C E S
 2
 3
    FOR PLAINTIFF:
 4
       DANIEL P. WHITWORTH
 5     STUMPF & FARRIMOND
       Attorneys at Law
 6     112 East Pecan Street, Suite 700
       San Antonio, Texas 78205
 7     Telephone: (210)231-0919
       Fax: (210)231-0004
 8
    FOR DEFENDANT:
 9
       RYAN S. HENRY
10     MIGUELANGEL MATOS
       DENTON, NAVARRO, ROCHA & BERNAL, P.C.
11     2517 N. Main Avenue
       San Antonio, Texas 78212
12     Telephone: (210)227-3243
       Fax: (210)225-4481
13
    ALSO PRESENT:
14
       PATRICK KNAPICK, Videographer of
15     Federal Court Reporters;
16     DARRYL W. CRAIN,
          The Witness;
17
       ELENA MALONEY, CSR,
18        Certified Shorthand Reporter;
19
20
21
22
23
24
25
```

Page 3

```
 1
 2             INDEX
 3                          PAGE
 4  DARRYL W. CRAIN
 5  Examination by Mr. Henry ..........................6
    Further Examination by Mr. Whitworth .............300
 6  Signature Page ...............................302
    Court Reporter's Certificate .....................304
 7
 8      REQUESTED ON THE RECORD
 9                          PAGE
10  No. 1 Signed Copy of Purchase and Sale Agreement  100
11  No. 2 Signed Copy of Lease Agreement          139
12  No. 3 Second Electrician's Name       216
13  No. 4 File on Location of Locating New Church    242
14  No. 5 Written Agreement with GoldStar on      273
        Attorney's Fees
15
    No. 6 Lease Agreement for 8323 Culebra Road    276
16
17           EXHIBITS
18
19  EXHIBIT      DESCRIPTION         PAGE
20    1     Xerox Color Aerial Photograph     59
21    2     Xerox Color Aerial Photograph     60
22    3     Xerox Color Aerial Photograph     64
23    4     Xerox Color Aerial Photograph     64
24    5     Purchase and Sale Agreement       95
25
```

Page 4

```
 1           EXHIBITS (cont.)
 2  EXHIBIT      DESCRIPTION         PAGE
 3    6     Certification of Formation,    105
             Nonprofit Corporation
 4
      7     Application for Zoning Change,   113
 5           Case No. ZC
 6    8     Second Amendment of Purchase    132
             Agreement
 7
      9     Lease Agreement          136
 8
     10     Certificate of Occupancy     162
 9           Application
10   11     Inspection Report          163
11   12     Inspection Report          164
12   13     2/11/09 Letter           185
13   14     Certificate of Occupancy     192
14   15     Xerox Color Photograph      223
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        THE VIDEOGRAPHER: In the matter of The
 2  Elijah Group, Incorporated versus the City of Leon
 3  Valley, Texas, in the United States District Court for
 4  the Western District of Texas, San Antonio Division,
 5  Civil Action Number SA08CA0907, this is the deposition
 6  of Pastor Darryl Crain recorded on the 13th day of May
 7  2009.
 8        Present today, would counsel for the
 9  plaintiff please introduce themself.
10        MR. WHITWORTH: Dan Whitworth on behalf of
11  The Elijah Group, Inc.
12        THE VIDEOGRAPHER: Counsel for the
13  defense.
14        MR. HENRY: Ryan Henry on behalf of Leon
15  Valley and Miguel Matos is here as well.
16        THE VIDEOGRAPHER: Our court reporter
17  today is Ms. Elena Maloney with Federal Court Reporters
18  of San Antonio. I'm the videographer, Patrick Knapick,
19  also with Federal Court Reporters of San Antonio. The
20  time right now is 9:33 a.m. We are on the record.
21        Madam Court Reporter, please swear in our
22  witness.
23
24
25
```

Page 6

1              DARRYL W. CRAIN,
2    having been first duly sworn, testified as follows:
3              EXAMINATION
4    Q. (BY MR. HENRY) Good morning, Pastor Crain.
5    A. Good morning.
6    Q. Okay. Could you please state your full name
7    for the record.
8    A. Darryl Wayne Crain. Don't ask.
9    Q. Okay. Now, you're a -- you're a pastor,
10   correct?
11   A. Yes, sir.
12   Q. So it's appropriate for me to call you pastor,
13   correct?
14   A. Yes, sir.
15   Q. Is that fine?
16   A. Yes, sir.
17   Q. Okay. Pastor Crain, have you ever been deposed
18   before?
19   A. Yes.
20   Q. You have been deposed before?
21   A. Uh-huh.
22   Q. How many times?
23   A. Once.
24   Q. Once before. And what was the purpose of that
25   deposition?

Page 7

1    A. We were in a legal matter about some land a few
2    years back.
3    Q. Okay. And when you say we, you mean who?
4    A. The church.
5    Q. The church. And was that The Elijah Group?
6    A. No. That was when we were Redemption
7    Tabernacle Ministries.
8    Q. Okay. And you were the pastor of Redemption
9    Tabernacle --
10   A. Yes.
11   Q. -- Ministries? Okay. So you have been through
12   a deposition before?
13   A. Uh-huh.
14   Q. Okay. So I won't need to go through all of the
15   basics of it, but I'll just touch base with you and
16   maybe it's a refresher course for you.
17   A. Okay.
18   Q. You understand that The Elijah Group has
19   brought a lawsuit against the City of Leon Valley,
20   correct?
21   A. Yes, sir.
22   Q. Okay. And that's what this deposition is in
23   reference to. Do you understand that?
24   A. Uh-huh, yes, sir.
25   Q. Okay. You understand I represent the City of

Page 8

1    Leon Valley, correct?
2    A. Yes, sir.
3    Q. Okay. I'm not your lawyer, right?
4    A. Right.
5    Q. Okay. Your lawyer is sitting across from you?
6    A. The good looking one.
7    Q. The good looking one, that's right. During the
8    deposition you are under oath and you have promised to
9    come here and tell the truth while I ask you questions.
10   You understand that, right?
11   A. Yes, sir.
12   Q. All right. Now, the courter reporter is taking
13   everything you say down. And so even though it's being
14   recorded on video, I still need you to give me a verbal
15   answer because she can't take down head nods or head
16   shakes.
17   A. Yes, sir.
18   Q. Okay.
19   A. I understand.
20   Q. Now, if during anytime during this deposition
21   if I ask you a question that you don't understand, I
22   want you to stop me and -- because I don't want you to
23   answer a question that you don't understand. Okay?
24   A. Yes, sir.
25   Q. Okay. And so can I have your promise that you

Page 9

1    are going to do that?
2    A. Yes, sir.
3    Q. Okay.
4    A. If I don't understand something, you will be
5    the first to know.
6    Q. Okay. And can I assume that if you answer the
7    question, that you have understood it?
8    A. Yes, sir.
9    Q. Okay. Now, if at any time during the
10   deposition you need to take a break and go to the
11   bathroom or talk to your lawyer or whatever, just let me
12   know. Okay?
13   A. Yes, sir.
14   Q. Okay. You have given us your full name. What
15   is your address?
16   A. 10815 Hunters Way, Helotes, Texas 78023.
17   Q. Okay. Is that a residence?
18   A. Yes, sir.
19   Q. Okay. Now, I thought I remembered something in
20   your discovery responses that the church actually owns
21   that house; is that correct?
22   A. Yes, uh-huh.
23   Q. Okay. And that's The Elijah Group that owns
24   that house?
25   A. Yes, sir.

Page 10

1    Q.  Okay.  And how are you employed?
2    A.  By The Elijah Group.  I'm the pastor of the
3  church.  That's my full-time job.
4    Q.  Okay.  Now, The Elijah Group is a nonprofit
5  corporation, correct?
6    A.  Yes, sir.
7    Q.  Okay.  And it's a religious entity, correct?
8    A.  Yes, sir.
9    Q.  Okay.  Before we get into issues with The
10  Elijah Group, I want to ask a little bit more about
11  yourself.  Okay?
12    A.  Okay.
13    Q.  Okay.  How old are you?
14    A.  I'm under oath.  Forty.  I just turned 40 last
15  week or two weeks ago.
16    Q.  Okay.  Well, happy birthday.
17    A.  Thank you.
18    Q.  Are you married?
19    A.  Yes, sir.
20    Q.  And what's your wife's name?
21    A.  Christine.
22    Q.  Christine?
23    A.  Crain.
24    Q.  Crain.  Okay.  And how long have you been
25  married?

Page 11

1    A.  Fifteen years.
2    Q.  Fifteen years.  Okay.  Congratulations as well.
3    A.  Thank you.
4    Q.  Okay.  Have you ever been married before?
5    A.  No.
6    Q.  Okay.  So Christine has been your only wife?
7    A.  As far as I know.
8    Q.  Okay.
9    A.  Yes.  Yes, she has been my only wife.
10    Q.  Okay.  Do you have any kids?
11    A.  Oh, yes.
12    Q.  How many?
13    A.  We have six children.
14    Q.  Six children.  Okay.  Names and ages
15  respectively.
16    A.  Tristyn is 14.  Kailie is 12.  Davilyn is ten.
17  Zoe is eight.  Javen is three, going to be four in
18  two -- in three weeks.  And my sixth child, Savae, is
19  seven months.
20    Q.  Seven months.  Okay.  Congratulations again.
21  Not a lot of sleeping at night, are you?
22    A.  Yes.  We have -- My wife is a professional.
23  She is not -- We -- we sleep just fine.
24    Q.  Okay.  Now, what does your wife do?
25    A.  My wife is a homemaker for the most part, but

Page 12

1  she helps out in ministry stuff as well.
2    Q.  Okay.  And is she technically employed by The
3  Elijah Group at all?
4    A.  Not at the moment.  She -- she was while we had
5  had our school.  We are a day care, a child care
6  facility, and she was employed while we had that, but we
7  haven't reopened it yet, so she is not officially
8  employed.
9    Q.  Okay.  Who are the directors of The Elijah
10  Group?
11    A.  Myself, my wife, my mother, my father, Irma and
12  W.J. Crain respectively, and a woman named Julie Cortez.
13    Q.  Okay.  And who is Julie?
14    A.  Julie is a member of -- of our church.
15    Q.  Okay.  Now, who were the directors of
16  Redemption Tabernacle -- Tabernacle?
17    A.  I need to make a clarification just so -- so
18  you know --
19    Q.  Okay.
20    A.  -- what of kind the distinction is.  I think,
21  you know, it will help us.  Redemption Tabernacle was a
22  denominational church.  It was under the auspices of the
23  Nazarene denomination.  So because it was a part of that
24  denomination, the -- the directorship or the leadership
25  was structured very differently.

Page 13

1    What I mean by that is we -- we were
2  incorporated as a Church of the Nazarene.  It wasn't
3  just, you know, like -- what we would be considered now
4  is a nondenominational, you know, Christian church
5  but --
6    Q.  You mean The Elijah Group?
7    A.  The Elijah Group, yes.
8    Q.  Okay.
9    A.  Redemption Tabernacle was incorporated as a
10  Church of the Nazarene.  And the directors basically is
11  you have to go by their manual.  So it was myself as the
12  pastor of the church and then a church elected or a
13  church appointed board.
14    Q.  Uh-huh.
15    A.  So the directorship that we have now, I just
16  basically tell -- you know, it's my mom, my dad, my
17  wife, and a lady from our church.  Whereas prior to, it
18  was an elected board according to the denomination --
19  according to the rules of the denomination we were a
20  part of.
21    Q.  Okay.  And who were the directors of --
22    A.  If I'm not mistaken, the board is what it's
23  actually called.  It was myself, my dad, a man named
24  T.A. Littlefield, Fructuoso Delgado, Rey Trejo and Larry
25  Esquivel I think were the ones.  It's on the paperwork

Page 14

1   that -- that -- that we gave you guys back...I believe.
2   Q.  Okay.
3   A.  The actual names.
4   Q.  I just need to make sure I understand the
5   corporate distinctions.
6   A.  Okay.  Go ahead.
7   Q.  The Church of the Nazarene is a national or
8   international --
9   A.  Right.
10  Q.  -- religious organization?
11  A.  Yes.
12  Q.  Okay.  And actually let me -- let me back up
13  real quick.  When I was going through some of the basics
14  of the depo, I did skip one and I apologize.
15      During the deposition, I don't want to
16  sound rude or anything and I like having, you know, a
17  conversational tone with you, but I need to make sure
18  that the court reporter -- she can only take down one of
19  us talking at a time.
20  A.  Okay.
21  Q.  So I promise to let you finish answering a
22  question before I ask the next one if you promise to let
23  me finish asking my question before you start to answer.
24  A.  Don't interrupt is what you are saying.
25  Q.  That's exactly what I'm saying.

Page 15

1   A.  Okay.  I get it.  Yes, sir.
2   Q.  Okay.  All right.  So the Church of the
3   Nazarene is a -- is it national or international?
4   A.  International.
5   Q.  International religious organization.  And as a
6   denominational church of the Nazarene, you basically had
7   to abide by their tenets and --
8   A.  Right.
9   Q.  -- their directives?
10  A.  Uh-huh.
11  Q.  Is that correct?
12  A.  Yes.  Yes, sir.
13  Q.  Okay.  And Redemption Tabernacle -- is it
14  Tabernacle?
15  A.  Yes, sir.
16  Q.  Okay.  Was incorporated as part of that
17  denomination?
18  A.  Yes, sir.
19  Q.  Okay.  And then you formed The Elijah Group
20  later; is that correct?
21  A.  Yes, sir.
22  Q.  Okay.
23  A.  But there is some back story there, and I can
24  kind of give it to you.
25  Q.  Why don't you go ahead and expand.

Page 16

1   A.  All right.  Basically what happened was the --
2   the Nazarene church is where I started going as a child,
3   you know, years ago.
4       And long story short, they had asked me to
5   start a church for them in -- in the San Antonio area.
6   I agreed and, you know, we started the church.
7   Q.  About what time was that?
8   A.  That was around the year 2000.
9   Q.  Okay.
10  A.  In 2004, the man who had asked me to
11  start the church -- they have a hierarchy, and basically
12  they have a man who his position is called the district
13  superintendent.  He's in charge of all the churches of
14  south Texas -- he was retiring and a new guy was coming
15  in.  That coupled with -- I --
16      Our church for the Nazarene
17  denomination -- our church was not, you know, a mega
18  church or anything like that.  But for the Nazarene
19  denomination, it was one of the bigger ones in -- in
20  this area.
21      And I had brought in a gentleman, a guy,
22  to help me who was -- I'm not very -- I was not very
23  familiar with the tenets and all of the things that I
24  was supposed to be doing as a pastor of the Nazarene
25  denomination, so I brought in somebody who -- who was

Page 17

1   very familiar with that.
2       The thing was he and I just did not -- you
3   know, we just didn't -- didn't mesh.  So, you know, long
4   story short, the denomination basically decided to use
5   him to start another -- another church, and we felt best
6   that it would be good if I went my own way.
7       So we had -- for a period of about six or
8   seven months, we really didn't know -- I didn't know if
9   -- because our church went from 200 to about 100 and
10  then to about 50.  And, you know, we were very, very
11  small for -- and that was around 2005.  And we really
12  didn't know what was going to happen.
13      So we didn't do anything as far as the
14  incorporation or anything like that because we really
15  didn't know if the whole thing was going to dissolve or
16  if it was even going to be able to continue to go.
17      We met in the afternoons at another church
18  building and then we got a lease on Culebra Road.  And
19  even then while we were leasing on Culebra Road, the
20  church was not growing or anything like that.  I mean,
21  it was just really just barely making it.  Excuse me.
22  Q.  So at that point you weren't really an entity
23  yet?
24  A.  No.
25  Q.  Okay.

Page 18

1    A. And -- But as we -- we are about a year into
2    this, I start realizing, okay, you know, whether we are
3    good, bad, small or big, we need to organize ourselves a
4    little bit better than what we are.
5        So we had a board meeting with -- with
6    people that -- that we elected. We dissolved the
7    previous corporation. I don't even know if we needed to
8    do that because I think the Nazarene denomination
9    departed, but we had official minutes to do that because
10   we were going to incorporate.
11       We were going to incorporate as Redemption
12   Tabernacle Ministries. But when we checked into it, we
13   couldn't use that name because it was also incorporated
14   as Redemption Tabernacle Ministries, Church of the
15   Nazarene. You know, it was too close or whatever.
16       So we just kind of let it sit until we
17   were purchasing the house and until this -- You know,
18   I'm skipping about two years now. You know, the church
19   grew and we were purchasing this property. So we --
20   Q. Are you talking about the 6401 Bandera Road?
21   A. Right, the 6401 Bandera Road. We had -- we had
22   won that bid. And at that point, I knew, look, we need
23   to really get our ducks in a row here. And so we
24   incorporated, and I tried to incorporate as Redemption
25   Tabernacle Ministries first, but that name of course was

Page 19

1    taken, so we used that Elijah Group. That's how that
2    whole thing came -- came about.
3    Q. Okay. So let me -- let me back up just a
4    little bit.
5    A. Sure.
6    Q. When you were a denominational Church of the
7    Nazarene, basically it came to a point where you and the
8    Nazarene church decided it was probably best for
9    everybody if you split --
10   A. Right.
11   Q. -- and both went your separate ways? So when
12   you split, your -- your congregation shrunk?
13   A. Uh-huh.
14   Q. Is that correct?
15   A. Yes.
16   Q. Okay. Down to about 50?
17   A. Maybe even less.
18   Q. All right.
19   A. Because, you know, you figure, my family is --
20   you know, we are ten of us or eight of us.
21   Q. Okay.
22   A. So it was probably a little less than that.
23   Q. A little less than that. Okay. And you
24   weren't -- Were you still incorporated as the Nazarene
25   or you weren't sure if you were?

Page 20

1    A. You know, I don't know if we were or not.
2    Q. Okay.
3    A. We signed paperwork with the denomination when,
4    you know, their -- They moved their headquarters. They
5    had a head -- The guy that I worked with had his
6    headquarters here in San Antonio. When he retired, they
7    merged.
8    Q. What was that guy's name?
9    A. His name was Dr. Jim Blankenship.
10   Q. Okay.
11   A. When he retired, another gentleman took over
12   and his headquarters were in Houston. So the
13   communication was a lot more difficult. But finally one
14   day, I went over to Houston. We, you know, had a very
15   long meeting.
16       And basically what the denomination said
17   is, you know, if you are thinking about like leasing
18   another property or anything like that, don't use our
19   name, you know. So you can't, you know, operate in a
20   denomination if -- if you can't use their name --
21   Q. Right.
22   A. -- because it just -- it just doesn't work that
23   way. So, Ryan, I think we probably operated in a very
24   gray area for about six months to a year.
25       But when I would talk to our accountant,

Page 21

1    because we have an accountant, she would -- she told me,
2    well, technically churches don't have to incorporate
3    anyway, but, you know, you want to do that.
4        But for those six months, a year maybe, we
5    really don't know from, you know, one month to another
6    if our church was even going to be viable. So it really
7    wasn't a priority.
8    Q. And what time -- time period was that?
9    A. 2005, 2006, early 2007, something like that.
10   Q. Okay. So in 2005-2006, you were in this --
11   this limbo --
12   A. Right.
13   Q. -- for lack of a better word?
14   A. Right. That would be a great word.
15   Q. Okay. And so once -- Did things start to
16   stabilize for you?
17   A. Yeah. And what we did was we opened a day care
18   facility which supplemented our income.
19   Q. Okay.
20   A. You know, and within a -- within, I would say,
21   six months -- well, about a year, it took about a year
22   to get to full capacity.
23       And once that was at full capacity, the
24   church was not growing exponentially by any stretch of
25   the imagination, but we had, you know, a real 50 people

Page 22

1    there, you know, and people were getting involved and,
2    you know, so it was -- We couldn't have sustained the
3    lease with just the church. So...
4        Q. Okay.
5        A. But because we had the day care now, we had at
6    least -- You know, we still didn't know if we were a
7    growing church, but at least we had a viable business to
8    operate and, you know, things of that nature.
9        Q. Okay. And this was the lease that you had on
10   Culebra Road?
11       A. Yes, sir.
12       Q. Okay. And how big was that facility?
13       A. Well, we started with -- when we got in there
14   when we signed the lease, we were the only tenants in
15   the building. There was a bar right next door to us.
16   And that could have explained a little bit of our church
17   growth or lack thereof.
18           But anyway, the bar was right next to us,
19   and we were the only tenants in the building. And the
20   owner was from California. And he basically -- he -- he
21   didn't have any problem with us using the whole facility
22   which was probably a little over 20,000 square feet. We
23   did not use the whole facility by any stretch of the
24   imagination. We just used probably about eight to
25   10,000 square feet.

Page 23

1        Q. Okay.
2        A. Within three months of us purchasing -- I mean,
3    signing this lease agreement with this guy, three to six
4    months, I don't remember, this was in 2005, he sold it
5    to somebody else, and that person moved in and moved
6    from California to San Antonio, and they, you know, were
7    on site, and they gave us parameters and everything like
8    that.
9        Q. Okay.
10       A. I think we had probably about 8,000 square feet
11   at that time and then we continued to shrink because we
12   would give them back different property -- I mean,
13   different parts of the -- of the building to -- to
14   lessen our lease.
15       Q. Okay. So you wouldn't be charged as much --
16       A. Right.
17       Q. -- if you weren't using as many square feet?
18       A. Right.
19       Q. Okay. So do you remember the address for
20   Culebra Road?
21       A. 8323 Culebra Road, Suite 102.
22       Q. Okay.
23       A. 78251.
24       Q. Okay. So --
25       A. 250. It was 250.

Page 24

1        Q. Okay. 250. And if anything during the
2    deposition, if you think you made an error and want to
3    correct your testimony, just let me know.
4        A. Okay.
5        Q. Okay. So you moved in in roughly '05. And
6    when you signed the lease, did you sign the lease with
7    them as Redemption Tabernacle?
8        A. Yes.
9        Q. Okay. You are not sure if that was right or
10   not, but that's what was signed?
11       A. It was okay for me to do that because I talked
12   to our accountant and, --
13       Q. Okay.
14       A. -- I mean, legally it was okay, but, you know,
15   we were not incorporated as that name or anything like
16   that.
17       Q. Okay. And you had already separated from the
18   Church of the Nazarene at that point?
19       A. Yes.
20       Q. Okay. And so you had -- You were using the
21   facility. When did you begin day care services?
22       A. Probably 2006, the end of 2006.
23       Q. Okay. Now, just for clarification, for church
24   use only, before you began using it for a day care
25   facility, the church is sustained financially how?

Page 25

1        A. Through the contributions of its members.
2        Q. Okay. So you are sustained through donations?
3        A. Yes, sir.
4        Q. Okay. And with a smaller congregation, you
5    don't get as many donations?
6        A. You are sharp, Ryan.
7        Q. That's the way it normally works?
8        A. Yeah, that's the name of -- yeah.
9        Q. Okay. And so the more members you have --
10       A. Right. Your contributions go up.
11       Q. -- your contributions go up?
12       A. Right.
13       Q. Okay. So the contributions really weren't what
14   they were when you were with Nazarene?
15       A. Right. Right.
16       Q. Okay. Now, did you -- When you were with
17   Nazarene, did you have to give a portion of those
18   contributions to the denomination?
19       A. You were required to.
20       Q. Okay.
21       A. But because we were a new church, a new church
22   is given a three to five-year window before they have to
23   start doing that. After that three to five years, you
24   are going to be giving about 20 percent of your total
25   contributions to the denomination, ten percent for local

Page 26

1   and then ten percent for international probably.
2       Q.   Okay.  So when -- time-wise when you -- You
3   started doing this in what, 2000?
4       A.   2000.  We never got to that point.
5       Q.   Okay.
6       A.   We never started -- you know, we were never
7   required to give -- You know, right when we were about
8   to do that is when our church -- we went a different
9   direction.
10      Q.   Okay.
11      A.   Not because of that, but just --
12      Q.   Just coincidence.  That's the way the time
13  went?
14      A.   Right.
15      Q.   Okay.  So you got -- You started a church doing
16  just church services --
17      A.   Uh-huh.
18      Q.   -- at the Culebra Road location?  And then
19  about in '06, you needed to supplement the income so you
20  started doing a day care facility; is that correct?
21      A.   Yes, sir.
22      Q.   Okay.  So what were the -- the parameters of
23  the day care facility, what were you doing?
24      A.   What?
25      Q.   Did you have any restrictions?

Page 27

1       A.   We -- I don't understand what you are saying.
2   As far as like who we could watch?
3       Q.   Yes.
4       A.   Okay.  The -- we had -- Our license comes from
5   San Antonio, and we were licensed to watch newborn
6   children to 12 years old.
7       Q.   Okay.
8       A.   But with the space that we had, we were
9   limited to -- limited to 44 children on premises at the
10  same time.
11      Q.   Okay.  So now you started this in '06.  Did you
12  get a license from the state to do day care facilities?
13      A.   Ryan, I don't know.  I don't know if the -- I
14  believe it comes through the state, but you go through
15  the city.
16      Q.   Okay.
17      A.   Whatever the proper licenses were, we -- we
18  went -- we did it all, I mean.
19      Q.   Okay.  Now, did you apply for it yourself?
20      A.   Yes.
21      Q.   You are the one that signed it?
22      A.   Yes.
23      Q.   All right.
24      A.   Because you have to -- you have to have a
25  designated director that has -- and it just so happened

Page 28

1   that, you know, some of my freshman college courses
2   allowed me to, you know, have enough child psychology or
3   whatever it was, enough hours there, plus, you know,
4   other work I did ministry-wise qualified me to get a
5   directorship.  So I was the actual director of the
6   facility.  And myself or what they call a designee which
7   would be my wife or another young lady in any our
8   church -- either all of us or one of the three of us
9   signed all the paperwork.
10      Q.   Okay.  So just to make sure I understand, you
11  actually had the qualifications to get a directorship
12  from the state?
13      A.   Yes, sir.
14      Q.   Okay.  And so you applied for a directorship?
15      A.   (Witness nodding).
16      Q.   And for a license to operate a day care
17  facility?
18      A.   Yes, sir.
19      Q.   All right.  And this was in '06?
20      A.   Yes, sir.
21      Q.   Okay.  And so if I remember correctly, in order
22  to get the license, you have to already have the
23  facility in place.  You already have to have a lease
24  somewhere?
25      A.   Right.

Page 29

1       Q.   Okay.  And so you told them, look, we are at
2   the Culebra Road location.  This is where the day care
3   facility is going to be.
4            And so did you section off a portion of
5   that or was technically the whole thing --
6       A.   No.  We sectioned off a portion of it.
7       Q.   Okay.  So how much -- What size portion was for
8   day care?
9       A.   I would say 3,300 -- well, 2,300 square feet
10  maybe.
11      Q.   2,300 square feet.
12      A.   I might -- That's a guesstimation.
13      Q.   That's fine.
14      A.   It's somewhere between --
15      Q.   I'm not going to hold you to a specific square
16  footage.
17      A.   -- 2,500 and 3,000 square feet, something like
18  that.
19      Q.   Okay.  All right.  And then the rest was used
20  for church services?
21      A.   Right.
22      Q.   Okay.  Now, what -- what city is that in?
23      A.   San Antonio.
24      Q.   It's in San Antonio.  Okay.  So you got the
25  proper licensing for day care?

Page 30

1    A.  Uh-huh.
2    Q.  Now, the day care services, is that part of
3  your religious mission?
4    A.  Yes.  Yes.
5    Q.  Okay.
6    A.  What we do specifically is we take care of --
7  Because -- because the church was on premises, we could
8  actually decrease the tuition rate from our competitors
9  in the immediate area.  And what we would do is we would
10  charge 20 to $30 less per week for -- you know, for our
11  services.
12        And that was based on a survey we did
13  several years ago about the greatest need in -- in the
14  demographic that we are there for.  The demographic that
15  we are trying to reach.  The greatest need in that
16  demographic was for affordable child care.
17        So we lowered our -- our rates to do that.
18  And through our day care center, we absolutely did get
19  people to start coming to our church.  And that's one of
20  the reasons our church began to grow.
21    Q.  Okay.
22    A.  And through our day care center, we would -- we
23  have a lot of single mothers and a lot of young families
24  and those are usually the targets that we are trying to
25  reach because those are the ones usually with, you know,

Page 31

1  marital problems and other issues that we believe that
2  God has called us specifically to address.
3        So, I mean, absolutely, it works hand in
4  hand with what we are doing.  We are trying to, you
5  know, reach the families, you know, in every capacity.
6  So it was a good in for us to get into the family, --
7    Q.  Okay.
8    A.  -- to serve in that capacity.
9    Q.  Okay.  Now, in order to provide day care
10  services to someone, they didn't have to be a member of
11  your church?
12    A.  No.
13    Q.  Okay.  But members of your church were using
14  the day care facility?
15    A.  A few of them, yes, sir.
16    Q.  Okay.  Now, let's talk a little bit about, you
17  know, the -- your church whether it was -- you know,
18  after you separated from the Church of the Nazarene,
19  whatever it was called until it was incorporated as The
20  Elijah Group.
21        What were some of the main, you know,
22  religious tenets that you followed?
23    A.  That is a question that can go in 150,000
24  different directions.
25    Q.  Okay.

Page 32

1    A.  I'll just give you the basic answer.
2    Q.  Okay.
3    A.  We are a basic vanilla Bible believing church.
4  We believe in all of the -- what we would call the
5  traditional or fundamental beliefs of scripture.  If you
6  want me to expand on those, I will have to take up an
7  offering after I that do.
8        No.  But, I mean, basically we teach the
9  basic tenets of Christianity with a -- I guess if we
10  have a specialty, we are trying to bring about what
11  we -- what we have defined as restoration to people
12  which means --
13        You know, a lot of the people that we --
14  that come into our church are usually what I would call
15  unchurched people or CEO, Christmas and Easter only,
16  kind of people.  And when they -- when they come into
17  our congregation, this is their first experience of a
18  Christian church.
19        So, you know, we're -- we're geared more
20  toward that demographic as opposed to, you know, people
21  that are used to, you know -- and that was one of the
22  reasons we didn't ultimately mesh with the Nazarene
23  denomination because the people that we attract are what
24  we would call unchurched individuals.
25        But what we teach is -- You know, we are

Page 33

1  not teaching anything differently than, you know, your
2  basic accepted traditional Christian values and biblical
3  principles.
4    Q.  Okay.  So let me see if I understand and you
5  tell me if my understanding is incorrect.  You are
6  spreading the Christian faith?
7    A.  Yes, sir, hopefully.
8    Q.  Okay.  And that's part of the purposes of your
9  religious organization?
10    A.  Right.
11    Q.  Okay.  And you have found that you're spreading
12  it and you attempt to spread it towards a particular
13  demographic or as you said unchurched people?
14    A.  Uh-huh.
15    Q.  And kind of bring them into the faith?
16    A.  Right.
17    Q.  Okay.  And other than spreading the Christian
18  belief through church services, okay, you found that
19  providing day care services is part of your religious
20  mission?
21    A.  Right.
22    Q.  Okay.  Are there any other activities?
23    A.  Avenues in which we are trained?
24    Q.  Right.
25    A.  Yes, there are.  We have a counseling service

Page 34

1   that's -- that we -- that we used that -- Actually, one
2   of the justices of the peace in Leon Valley came out to
3   our church a few years back, and we just asked her to
4   speak to us on Memorial Day, and she approached us after
5   seeing some of the things.
6          THE WITNESS: Thank you, sir, or is this
7   for you?
8          MR. WHITWORTH: No. I got one.
9          THE WITNESS: And she offered to make our
10  church -- We had to fill out some paperwork or whatever.
11  And again, I thought in college, I was just -- you know,
12  I played basketball in college, so I did not take any of
13  the courses with any kind of forethought in mind, but I
14  was able to be a counselor for the -- for the -- what we
15  would call at risk youth high school students that
16  are -- that are usually in nonviolent trouble.
17         You know, they are -- they have said a
18  curse word or they have consistent tardies or absences
19  and things of that nature and, you know, basic -- basic
20  issues that are not -- you know, don't have any kind of
21  criminal attachment to them usually.
22         And those people are referred to us. And
23  they have been being referred to us for about three or
24  four -- well, probably about four or five years now.
25  And it started off kind of slow.

Page 35

1          But, you know, now we are -- You know,
2   usually around this time of the year until July or
3   August until right about when school is starting, you
4   know, we have a pretty full docket of counseling that we
5   give to kids and also the justice of the peace, not only
6   Ms. Weiner, but her -- her colleagues. We will do, you
7   know, parental classes.
8          And then we have been -- from that, we are
9   able to give drug counseling to -- from the City of
10  San Antonio. We work with probation people, nonviolent
11  offenders.
12         I mean, you know, this -- that part of our
13  ministry although I never -- While the church was not
14  really growing, all these other avenues opened up for
15  us.
16         And, you know, we weren't -- you know, we
17  were not inundated with people by any means. But a real
18  ministry has developed there that we get phone calls on
19  a daily basis for, and it has evolved from just youth
20  counseling into now adult counseling, and now we are
21  about to offer parental classes to the North Side
22  Independent School District, you know. So it's a whole
23  gamut. That's one avenue.
24     Q.  (BY MR. HENRY) Okay.
25     A.  All right. Another avenue is --

Page 36

1      Q.  Let me interrupt --
2      A.  Yes, sir.
3      Q.  -- and then we will go to the other avenue.
4   This is also part of your religious mission?
5      A.  Yes, sir.
6      Q.  Okay. So you are providing day care services.
7   You are providing counseling service?
8      A.  We are not providing day care services at the
9   moment.
10     Q.  Okay. You were --
11     A.  We were.
12     Q.  -- providing day care services?
13     A.  Right.
14     Q.  That is still part of your --
15     A.  Right.
16     Q.  -- religious purpose?
17     A.  We -- we are in the process. We have been
18  licensed by the City of San Antonio to again, you know,
19  open up a day care facility.
20     Q.  At the --
21     A.  6401 --
22     Q.  -- Bandera --
23     A.  -- location, yes, sir.
24     Q.  Okay. And we will get to that in a minute.
25     A.  Okay.

Page 37

1      Q.  Okay. But that's part of your religious
2   purpose, and giving counseling is also part of your
3   religious purpose?
4      A.  Yes, sir.
5      Q.  Okay. Now, what was the other avenue?
6      A.  The other avenue is prior to me being -- going
7   into pastoring a church into the full-time ministry of
8   pastoring a church, I ran an organization for the
9   Christian schools of Texas called Texas Christian
10  Athletic League or TCAL.
11         And when I left, that was basically my
12  full-time job. It was the second largest organization
13  of its kind in the nation. It was a very -- it was a
14  very, very involved job. When I took -- when I became a
15  pastor however, I let that organization go. I resigned
16  it, and I gave it to a couple of other people.
17         Two years ago, I talked with the -- the
18  people that were operating it which my father-in-law was
19  one of the main ones. And I had lunch with him and I
20  just asked him about it. And he basically asked me, he
21  said, well, how would you like to take it over again
22  which told me it wasn't doing all that great.
23         When I left, there was 100 to 120 schools.
24  And I think there was like seven or eight left. And
25  so -- but I saw an opportunity. So we went ahead and

## Page 38

1  basically purchased that organization again and that
2  was --
3      Q.  And when you say we, was it The Elijah Group
4  that purchased it?
5      A.  You know, I don't know if we were -- No.  We
6  were not The Elijah Group at that time.
7      Q.  Okay.
8      A.  No, we weren't.  By purchasing it, I meant -- I
9  mean that he kept all the money that they had in
10  exchange for just letting me operate it.
11     Q.  Okay.
12     A.  That's all there is to it.  Now, since then, we
13  have kind of folded it and done d/b/a's or whatever we
14  are supposed to do.
15          But anyway, the point is, is that we took
16  that organization over.  And basically what we do with
17  that is, that is an organization of Christian schools of
18  Texas.  We will start the 2009-2010 school year with
19  around 50 schools, plus or minus a few, you know.
20          And we provide -- it's basically a mirror
21  of what UIL is here in Texas which is the
22  interscholastic league for the public schools.  We
23  provide districts, regions for athletic competition,
24  basketball, volleyball, you know, track, baseball,
25  softball, six-man football, cheerleading.  You know, the

## Page 39

1  whole gamut of extracurricular activities.  Organize
2  academic meets, that kind of thing.  We organize that
3  for the Christian schools so they can do extracurricular
4  activities as well.
5      Q.  All right.  Let me see if I get this straight.
6  There are Christian schools out there.  These are
7  private schools, correct?
8      A.  Yes, sir.
9      Q.  Okay.  And so you --
10     A.  Texas is the just --
11     Q.  Go ahead.
12     A.  I'm sorry.  Texas is the -- There's more
13  Christian schools in Texas than there is in any other
14  state in the union.
15     Q.  It wouldn't surprise me.
16     A.  Okay.  Go ahead.
17     Q.  Okay.  And it's not just the schools that have
18  signed up with you are not necessarily just in the
19  San Antonio area or are they all over Texas?
20     A.  All over.
21     Q.  All over Texas.  Okay.  So they sign up for
22  your organization.  And you kind of help divide them
23  into districts and --
24     A.  Right.
25     Q.  -- for extracurricular activities such as

## Page 40

1  football, basketball, other types of sports?
2      A.  Exactly.
3      Q.  You organize events, competitions, tournaments,
4  things like that?
5      A.  Yes, sir.
6      Q.  Okay.  Any other part of that that I'm missing?
7      A.  No.
8      Q.  Okay.  And do they -- When they sign up, do you
9  get money from the schools or is it the individual
10  participants that pay you or how does that work?
11     A.  Right now, it's the schools.  The schools pay a
12  $350 annual fee.
13     Q.  Okay.
14     A.  And from that, we -- Before we took the
15  organization, I talked with some of the people at the
16  church, and I said, you know, it's going to probably
17  take three years for this to be a profitable entity, but
18  we were willing to make a financial commitment to it,
19  and this will be the third year, and it will be
20  profitable this year.
21     Q.  Okay.
22     A.  Which by profitable, I mean, it can pay for
23  itself without the church, you know, helping -- helping
24  it.
25     Q.  Okay.  So now who are the employees of that?

## Page 41

1      A.  We -- myself is -- You know, I do a lot of that
2  work as well as a gentleman named Jason Balli,
3  B-a-l-l-i.  And I hired him for a whopping $500 a month.
4  I just happened to catch him at a good time in his life.
5  And he has been employed since the beginning of this
6  school year which would be -- we are at 2000 -- since
7  about August, July 2008, somewhere around there.
8      Q.  Okay.  Now, is he technically employed by The
9  Elijah Group?
10     A.  Yes, sir.
11     Q.  Okay.  So The Elijah Group is his employer?
12     A.  Yes, sir, I believe so.  Yeah, because if we
13  are a head of TCAL, yeah, it would be the same thing,
14  yes, sir.
15     Q.  Okay.  So The Elijah Group is the one that's a
16  head -- that owns and runs TCAL?
17     A.  Yes, sir.
18     Q.  Okay.  And so The Elijah Group is the one that
19  receives any funds from TCAL?
20     A.  No.
21     Q.  Okay.
22     A.  The -- We have a separate account set up for
23  Texas Christian Athletic League and the money goes
24  into -- into that account.
25     Q.  Okay.

12 (Pages 42 to 45)

Page 42

1    A.  And when we do accounting and things of that
2   nature, even if the church has to contribute,
3   there's a -- there's an accounting for that because we
4   are expecting that TCAL organization to pay the church
5   back. No interest, but just at least pay them back.
6    Q.  Okay.
7    A.  We will do that.
8    Q.  For the accounting purposes, you are keeping
9   the accounts separate?
10   A.  Right.
11   Q.  But The Elijah Group is the one that controls
12  the accounts?
13   A.  Yes, sir, that's correct.
14   Q.  Okay.  You decide where the money goes?
15   A.  Right.
16   Q.  Okay.
17   A.  Yes, sir.
18   Q.  But you are keeping them in separate accounts?
19   A.  Yes, sir.
20   Q.  Okay. It's probably advisable. All right. Do
21  you have -- Now, is TCAL, would you consider that part
22  of your religious purpose?
23   A.  Absolutely.
24   Q.  Okay.  How so?
25   A.  In that -- Again, don't let me get to wordy

Page 43

1   here, okay, but you are asking me things that, you know,
2   are very, very crucial to what -- what we feel like the
3   vision, for lack of a better word, that we are trying to
4   accomplish.
5        But Christian school students have -- we
6   have a low -- we have low recidivism.  That's the wrong
7   word.  We have a low -- We cannot seem to keep Christian
8   school students in church.
9        Less than 50 percent of Christian school
10  graduates end up serving the Lord, is what we would call
11  it, are in church five years after they have graduated
12  from high school.
13       What TCAL is, is trying to use Christian
14  schools and athletic competition to enhance the
15  Christian school's ability to keep these students
16  involved in -- in church.  And we will do that through,
17  you know, summer programs that we have.
18       We have worked -- we have worked with
19  cities in the past where cities will actually pay us to
20  have a tournament in their -- in their town.  Pay us.
21  What I mean is pay our expenses.
22   Q.  Uh-huh.
23   A.  Then we will -- in exchange for something like
24  that, we will bring back Christian school students to go
25  into the city and like provide basketball clinics free

Page 44

1   of charge for children 12 and younger, something like
2   that.
3        And it gives kids that are involved in,
4   you know, Christian schools an outlet to practice, you
5   know, some of the things that they have been -- that
6   they have been exposed to.  And that's kind of what I
7   was doing before.
8        Up until now, it's not been big enough to
9   even think about doing anything like that, but we are
10  getting that in place.  Beginning in July, we will have
11  a three-week program that we are going to use, just a
12  handful of students, to go and do things, you know, in
13  the neighborhoods, go to hospitals, things of that
14  nature, to just get them -- you know, get this program
15  going so that in the upcoming years, we can continue to
16  do that.
17   Q.  Okay.  So let me make sure -- I want to kind of
18  get a good understanding of the scope of The Elijah
19  Group as it exits today.
20   A.  Okay.
21   Q.  Okay.  So you -- The Elijah Group, as a
22  religious organization, you want to be able to provide
23  church services?
24   A.  Uh-huh.
25   Q.  Day care services, counseling services?

Page 45

1    A.  Right.
2    Q.  And TCAL services?
3    A.  TCAL services, that's right.
4    Q.  Okay.  Any other services?
5    A.  If anything comes up, man, we are ready.
6    Q.  Okay.  Any other services that you currently
7   are providing?
8    A.  Marriage counseling.  Would that be different
9   than just regular counseling?  We --
10   Q.  Okay.  I will -- I guess that counts.
11   A.  Yeah, that fits in.  We are not -- we are
12  not -- we don't advertise for that, but we get a lot of
13  people from our church come for marriage counseling
14  specifically.
15   Q.  Okay.  Well, as you said, your demographic,
16  that's --
17   A.  Right.
18   Q.  -- that's a high probability, isn't it?
19   A.  Yes.
20   Q.  Okay.  Now, The Elijah Group -- Where are your
21  central offices located?
22   A.  6401 Bandera Road.
23   Q.  Okay.  And are all of these activities run out
24  of that?
25   A.  Yes, sir.

Page 46

1    Q.  Okay.  Now, I'll get to a little bit more of
2  that address in -- in a minute, but just for preliminary
3  purposes, there are technically two buildings at that
4  address?
5    A.  Right.
6    Q.  There is what I'll call an admin building.
7    A.  Okay.
8    Q.  And a dome shaped building.
9    A.  Right.  Okay.
10   Q.  Okay.  What do you call the admin building?
11   A.  Children's.
12   Q.  Children's?
13   A.  Yeah.
14   Q.  Okay.
15   A.  Yeah.
16   Q.  Now, do you know how big that building is?
17   A.  That building is 8,500 square feet, give or
18  take.
19   Q.  Okay.  And then we will have what we call the
20  dome shaped building.
21   A.  Uh-huh.
22   Q.  Do you know which one I'm talking about?
23   A.  Yes, sir.  I do know which one you are talking
24  about.
25   Q.  It's pretty obvious, isn't it?

Page 47

1    A.  Yes, sir.
2    Q.  Okay.  How big is that one?
3    A.  15,500, give or take.
4    Q.  15,500 square feet.  Okay.
5    A.  Both of them total 23,000, give or take.
6    Q.  Okay.  And I'll have ask you more about the
7  specifics of that location and kind of how you got to it
8  in a minute, but I want to back up.
9          You had mentioned several things to me
10 about, you know, just the way fate turned out, you are
11 able to do a lot of these things because of your
12 education and training.  And it maybe not have been your
13 forethought, but you have been able to utilize it that
14 way, right?
15   A.  Right.
16   Q.  Well, talk to you a little bit about your
17 education and training.
18   A.  I wish I could -- there was a lot to talk
19 about, but there really isn't.  My education as far as
20 collegiately began right after high school.  I had
21 offers from very small colleges, you know, to play
22 basketball and I kind of just picked the one I thought
23 was going to allow me to play at the highest level, and
24 that was a small college in Louisiana.  I went there for
25 one semester.

Page 48

1          After the first semester, I realized that
2  the -- that college was Baptist Christian College and in
3  a sense turned into a very reputable Bible institute
4  that mostly services online postgraduate degrees.  But
5  when I went there, that was not their forte.
6    Q.  When did you go there?
7    A.  In 1987.
8    Q.  Okay.  When did you graduate high school?
9    A.  '87.
10   Q.  '87.  So then you went there?
11   A.  I went there.
12   Q.  For one semester?
13   A.  One semester.
14   Q.  Okay.  Then what happened?
15   A.  Then what happened is I knew I was going to be
16 in the ministry and somehow there was a Bible college in
17 Baton Rouge, Louisiana called Jimmy Swaggart Bible
18 College.  That same guy.  And we -- I had heard through
19 the grapevine that they were wanting to start an NCAA
20 program and that several guys were transferring over
21 there.
22          And I made a visit.  And they said that
23 that could be a reality for me.  I was coming during the
24 second season, but I would -- I would basically what's
25 called red shirt for the rest of that year, and I would

Page 49

1  start the next year without losing a year of
2  eligibility.
3          I went there in that semester.  Jimmy
4  Swaggart was caught in all kinds of scandalous things,
5  so that whole idea went south.
6          I don't even remember what classes I took.
7  I just took, you know, whatever -- In that situation,
8  you know, you take the basic stuff and you go around
9  your practices and everything else.
10         From there, I went to a college in
11 Missouri because of basketball.
12   Q.  What was it called?
13   A.  It was called Central -- Central Bible College.
14 And they didn't have any scholarships there that they
15 were going to offer me, but they said that we have one
16 available for a walk-on, you know, and if you feel like
17 you can do that...  And I felt like at a Bible College,
18 if I can't walk on, I'm pretty pathetic, and that's what
19 we did.  And I stayed there.
20         And then rightly or wrongly, my
21 father-in-law had these aspirations of starting a
22 university.  So I don't know how he did it, but he
23 convinced me to leave there and come to San Antonio and
24 help him start a school.
25         By helping him, I don't mean I was

Page 50

1  involved in any of the administrative things.  I meant
2  by getting him students through basketball.  He felt
3  like if he could get a bunch of guys to come play
4  basketball, you know, that would be a good nucleus to
5  start a university body.
6        Okay.  I -- I got a degree from that place
7  that I -- I don't tell anybody about.  I don't publicize
8  it.  I don't say anything because there's all kinds of
9  issues that ended up going on with that that, you
10 know --
11     Q.  And what was the degree in?
12     A.  Pastoral ministry probably.
13     Q.  Okay.
14     A.  And biblical philosophy, something like that.
15     Q.  Okay.
16     A.  But again, you know, I want for the record that
17 I do not at all espouse that or anything else.
18     Q.  Okay.  I won't hold it against you.
19     A.  And then when I got involved in the Nazarene
20 denomination years later, they require you to take -- to
21 be ordained, you have to have basically like an
22 associate's degree type of a thing.  So I had to take
23 classes for two years with them, but I crammed that into
24 about nine months until I was able to get ordained by
25 them as well.

Page 51

1     Q.  Okay.
2     A.  That -- that's not something that would be a
3  recognized degree.  But as I'm looking into getting a
4  master's or a Ph.D. later on, the colleges that I'm
5  looking at will take all of that stuff, you know.  But I
6  couldn't transfer that like to UTSA or UT or anything
7  like that.
8     Q.  Okay.  So you don't have a degree from a state
9  college?
10    A.  Absolutely not.
11    Q.  Okay.  Do you have any degree other than from
12 your father in-law's college from any other college?
13    A.  No.
14    Q.  Okay.  Now, you said that you --
15    A.  I might have an associate's degree from the
16 school in Missouri because I have seen my name on their
17 list, but I don't ever remember receiving something.
18    Q.  Okay.  Don't remember walking down the aisle?
19    A.  I don't remember walking down the aisle.  I
20 don't remember any of that.
21    Q.  Okay.  You had mentioned that because of
22 certain classes you took, counseling and things like
23 that, you were able to get the day care license?
24    A.  License.
25    Q.  Do you require any license to do the youth

Page 52

1  counseling or the marriage counseling or anything like
2  that?
3     A.  No, because we are not -- There's a lot of
4  leeway for counseling as long as you can show them a
5  program that you are having.  And as long as you make
6  sure -- you know, of course we can't prescribe any
7  medications or anything like that, but --
8        And, you know, we let the perspective
9  clients know exactly who we are, what we are doing.  We
10 require them to come to church during their counseling
11 time.
12    Q.  Uh-huh.
13    A.  I mean, you know, they know exactly what they
14 are getting into.  So we -- we meet the basic prescribed
15 tenets of a counseling service.
16       I am not, you know -- and I think I'm sure
17 we have disclaimers that say I'm not a psychiatrist.
18 I'm not, you know, a psychologist.  We don't, you know
19 --
20       If -- if children or parents have been
21 diagnosed with any type of malady or emotional things,
22 you know, one of the things that we do precursorly is we
23 say, you know, I can't talk to any of this.  You know,
24 I'm not qualified to speak to...  Because we have
25 disclaimers in place to make sure that they know what

Page 53

1  you are getting is counseling.
2     Q.  Okay.  Correct me if my understanding is wrong,
3  but my -- the general impression I'm getting is you give
4  counseling through just basically education in the
5  Christian faith.  You are using the Christian faith to
6  help them with their problems?
7     A.  Yes and no.
8     Q.  Okay.
9     A.  What we do is, is we do not -- we don't go that
10 route.
11    Q.  Okay.
12    A.  That would be -- that would be -- We go a more
13 subtle approach.
14    Q.  Okay.
15    A.  What we call it is a character packet.  And we
16 use character qualities.  There's nine -- seven to nine
17 character qualities depending on the individual as I
18 hear their story that we tell them to concentrate on.
19       You know, of course we -- we require them
20 to come to church.  But in the counseling services
21 themselves, very little proselytizing, if I can use that
22 word, is going on.
23       Basically I'm talking to them about these
24 character -- these character qualities.  How if they
25 change these behaviors, it helps them develop this type

Page 54

1   of a character quality, habits, thought processes,
2   things of that nature.
3           And we find that that's a lot more
4   successful than trying to, you know, talk to them about,
5   you know, biblical themes or something like that
6   because, you know, I have been absent from school. What
7   does Paul the Apostle have to do that?
8       Q.  Okay.
9       A.  You know, I need -- I need to know how to wake
10  my child up in the morning. How is that going to work?
11  So we -- That's how we do it. And because we do it that
12  way, we have just been -- there's a -- I'm not sure if
13  it's -- if it's in Leon Valley or not, but there is a
14  Adolescent Recovery Center which is like a Charter Real
15  or something like that's on Huebner Road, not too
16  far from us, and they've -- they've brought ten girls on
17  two different Sundays to our -- to your church service
18  and are talking about us bringing your character packet
19  to them and training them in -- in those kind of things
20  as well.
21      Q.  Okay. Now, these character qualities, are they
22  derived from some of the basic religious principles that
23  you are talking about?
24      A.  I mean, you can say yes.
25      Q.  Okay.

Page 55

1       A.  But, I mean, basically what they are is
2   honesty, integrity, initiative. I mean, you know, you
3   can say yes -- of course I'm going to have a scriptural
4   principle and a biblical precedent for it, but it's
5   something that's also you can look at and say, well, I
6   need -- yes, my kids needs the initiative. Yes, they
7   need to be more honest. You know, respect, loyalty, you
8   know, things of that nature. They can be, you know,
9   just as welcome in the secular community as well.
10          MR. HENRY: Okay. Let's take a real quick
11  break. Okay?
12          THE WITNESS: Go ahead.
13          THE VIDEOGRAPHER: We are off the record
14  at 10:22 a.m.
15          (Short break from 10:22 to 10:32)
16          THE VIDEOGRAPHER: We are on the record at
17  10:32 a.m.
18      Q.  (BY MR. HENRY) All right. Pastor Crain, I want
19  to back up one minute before I go onto the next area.
20  You had mentioned you had a deposition before?
21      A.  (Witness nodding).
22      Q.  And it was for a dispute over some property.
23      A.  (Witness nodding).
24      Q.  Okay. Why don't you tell me a little bit about
25  that dispute.

Page 56

1       A.  While we were with the Nazarene denomination,
2   we -- the gentleman that I had mentioned before,
3   Dr. Blankenship, had told me one of the last things that
4   he was going to do before he retired to assure that
5   our church had a -- had a place. So right off of Heath
6   Road, which we were renting a facility there --
7       Q.  Do you remember the address for Heath Road?
8       A.  No, I do not.
9       Q.  Okay.
10      A.  Heath Road is a small place. It's, you know --
11  it's off of Heath and Grissom.
12      Q.  In San Antonio?
13      A.  In San Antonio.
14      Q.  Okay.
15      A.  Anyway, right down the street, a large tract of
16  land, 20 to 30 acres, something like that, was going on
17  auction. And we went to the action and we won it at
18  $150,000 for 20 acres. The denomination approved us
19  because they have to approve everything. They approved
20  it.
21          At the auction, the owner was there, and
22  he approved it, and we signed documents. We put down
23  $15,000. You had to put down $15,000. A guy came up
24  and gave us a check for $5,000 to help us because we
25  were $5,000 short.

Page 57

1           Anyway, so we get to the place where we
2   are now going to close and the owner basically says, I
3   want more money. You know, I'm not going to do it for
4   this $150,000. I want more money. And he had private
5   meetings with me and said, look, I will finance you, but
6   you have got to give me at least $200,000.
7           The denomination decided we wanted to --
8   we wanted to pursue this legally. We got to the place
9   where we went to mediation. And before mediation, I was
10  deposed, I believe.
11      Q.  Okay.
12      A.  I don't remember if it was prior to or
13  whatever. But we got to the place of mediation. And in
14  mediation, we agreed on $190,000. But at closing, they
15  would give us $20,000 back. Okay.
16      Q.  Okay.
17      A.  But the caveat to that deal was we had to close
18  in 30 days, and that was, you know, their lawyer
19  outsmarting me because there was -- you know, once I got
20  into it, there was no way we were going to close in 30
21  days. You know, the bank -- You have to have appraisals
22  and soil samples and, you know, all kinds of things.
23          So it was right around that time also that
24  our church was beginning, you know, leadership
25  directions and things were going, you know, different.

Page 58

1  So we had it all worked out for the best, but that's
2  basically that whole story.
3      Q.  Okay.  So ultimately, you did not end up -- the
4  Church of the Nazarene didn't end up purchasing --
5      A.  Right.
6      Q.  -- that property?
7      A.  Right.  The 30 days -- As soon as I got back to
8  the office and we started investigating this, we knew
9  that there would be no way, even if everything went
10 right, we would be able to do it in 30 days.
11     Q.  Okay.
12     A.  Yeah.
13     Q.  But you had already signed the mediation?
14     A.  We already signed the mediation, and we
15 tried -- you know, we couldn't afford good lawyers like
16 you guys.  You know, we were just, you know, the guy.
17 He should -- he should have caught that, but we didn't.
18     Q.  Okay.
19     A.  But anyway...
20     Q.  Well -- So you had been through a property
21 auction purchase before?
22     A.  Yes.
23     Q.  Okay.  Let's talk about the property that's the
24 basis of this lawsuit today.  Okay.  And what is the
25 address that property?  And we have mentioned it a

Page 59

1  couple of times.
2      A.  6401 Bandera.
3      Q.  Okay.  And that is in Leon Valley, Texas?
4      A.  Yes, sir.
5      Q.  Okay.  Now, I'm going to show you just as kind
6  of a preliminary point.
7         MR. HENRY:  Can I get this marked as
8  Exhibit 1, please.  Dan, here's one for you.
9         (Exhibit 1 marked)
10     Q.  (BY MR. HENRY) Pastor Crain, you have been
11 handed Exhibit 1.  Can you tell me if you recognize
12 that?
13     A.  Hold on a second.  Oh, okay.  Yes, I do.
14        MR. WHITWORTH:  Ryan, is this going to be
15 my copy?
16        MR. HENRY:  Yeah.  That's your copy.
17        MR. WHITWORTH:  Okay.
18        THE WITNESS:  Yes, I do.
19     Q.  (BY MR. HENRY) Okay.  Can you tell me what that
20 is?
21     A.  This is an aerial photograph of the basic area
22 in which the property at 6401 is located?
23     Q.  Okay.  And I'll represent to you that this is
24 an aerial photograph taken off of Google.  Okay?
25     A.  Okay.

Page 60

1      Q.  And there is a little bubble with an "A" marked
2  on it.  Do you see that?
3      A.  Yes, sir.
4      Q.  And does that accurately identify where 6401
5  Bandera Road is located?
6      A.  Yes, sir.
7      Q.  Okay.  And it looks like it's right along
8  Bandera Road which is also marked as 16?
9      A.  Yes, sir.
10     Q.  And it actually notes not too far away is
11 Interstate 410, the Loop 410?
12     A.  Yes, sir.
13     Q.  Is that correct?
14     A.  Uh-huh.
15     Q.  And does that accurately represent where that
16 property is located?
17     A.  Yes, sir.
18     Q.  Okay.
19        MR. HENRY:  Can you mark this as Exhibit
20 2, please.
21        (Exhibit 2 marked)
22     Q.  (BY MR. HENRY) You have just been handed what
23 the court reporter has marked as Exhibit 2, Pastor
24 Crain.  Can you tell me if you can identify that?
25     A.  Yes, sir.

Page 61

1      Q.  And what is it?
2      A.  The same photograph except this one is zoomed
3  in --
4      Q.  Okay.
5      A.  -- to highlight the property --
6      Q.  Okay.
7      A.  -- at 6401.
8      Q.  Okay.  And you can see the two buildings there?
9      A.  Uh-huh.
10     Q.  Which are marked next to the "A"?
11     A.  Uh-huh.
12     Q.  I think the "A" is right over the dome shaped
13 building?
14     A.  You are correct.
15     Q.  Okay.  And that's the dome shaped building we
16 mentioned before?
17     A.  That's the same.
18     Q.  All right.  And there's a -- it looks like a
19 little -- or a pretty good size building right next to
20 it that has kind of a bluish-purplish roof?
21     A.  Right.
22     Q.  Is that the one that you called the children's
23 building?
24     A.  Yes.
25     Q.  Okay.  And the parking lot surrounding that, is

Page 62

1  that all of your parking lot?
2      A.  Except on the lower right-hand corner, you will
3  see a convenience store.  But we -- we own all of that,
4  yes, we do.
5      Q.  Okay.  Now, you say you own all of that.  Have
6  you actually closed on that property yet?
7      A.  You are correct.  We have not closed on the
8  property.  We do not own it.
9      Q.  Okay.  You are currently leasing it?
10     A.  Yes, sir.
11     Q.  Okay.  And we will get into some specifics of
12  that in a minute, but this is the property --
13     A.  Property, yes, sir.
14     Q.  -- that we are talking about for this lawsuit?
15     A.  Yes, sir.
16     Q.  Okay.  Now, you mentioned the lower, I guess,
17  right-hand corner or left-hand corner?
18         MR. WHITWORTH:  Yeah.  The convenience
19  store.
20         THE WITNESS:  Right.
21     Q.  (BY MR. HENRY) That's just a much smaller
22  building with a bluish roof?
23     A.  Right.
24     Q.  Okay.  And that's on a separate -- is that on a
25  separate tract?

Page 63

1      A.  Yes, sir.
2      Q.  Okay.  What convenience store is that?
3      A.  Chevron.
4      Q.  Chevron.  Okay.  And it looks to me like you
5  have got residential housing behind you; --
6      A.  Yes, sir.
7      Q.  -- is that right?  It comes all the way around?
8      A.  Uh-huh.
9      Q.  And then you have got Bandera Road.  And what's
10  right across the street from you on Bandera Road?
11     A.  The water tower and a car lot.
12     Q.  A car lot.  Is that a Dodge dealership?
13     A.  I believe you are, right, yes, sir.
14     Q.  Okay.  And does that accurately represent
15  what --
16     A.  Yes, sir.
17     Q.  -- it looks like?
18     A.  Yes, sir.
19     Q.  Okay.
20     A.  It's several years old, but it does accurately
21  represent.
22     Q.  The photo is several years old?
23     A.  Yes.
24     Q.  Okay.  It hasn't changed much, has it, from the
25  outside?

Page 64

1      A.  No, but the property on the far left has been
2  developed.
3      Q.  Okay.  And what has that been developed into?
4      A.  A strip center --
5      Q.  A strip center?
6      A.  -- where various businesses are.
7      Q.  Okay.  And that would be, I guess, north of
8  your property?
9      A.  Yes, sir.
10     Q.  Okay.
11         MR. HENRY:  Can you mark these the next
12  two exhibits, please.
13         (Exhibits 3 and 4 marked)
14     Q.  (BY MR. HENRY) And I believe that's Exhibit 3
15  that she just handed you --
16     A.  Yes, it is.
17     Q.  -- and 4?  And I'll represent to you those were
18  also taken off of Google?
19     A.  Yes.
20     Q.  Okay.  And can you identify those?
21     A.  That is the -- looking -- that is the view from
22  Bandera Road going north looking in our parking lot.
23     Q.  Okay.  And both Exhibit 3 and Exhibit 4
24  represent --
25     A.  The same.

Page 65

1      Q.  -- the same thing?
2      A.  The same thing.
3      Q.  Okay.  And does that accurately represent
4  what --
5      A.  Yes, sir.
6      Q.  -- the property looks like today?
7      A.  No.
8      Q.  No?
9      A.  We have fixed it up a lot since -- since these
10  pictures were taken.
11     Q.  Okay.
12     A.  But other than that, yes, they do.
13     Q.  Okay.  And what have you done to fix up the
14  property?
15     A.  Well, landscape work, trimmed the trees, you
16  know.
17     Q.  Uh-huh.
18     A.  There was a lot -- that property -- These
19  pictures are old and it was dilapidated.
20     Q.  Okay.
21     A.  The property was dilapidated.
22     Q.  Now, let's talk a little bit about how you
23  acquired the property.  And you kind of acquired the
24  property in a little bit of a dilapidated state, did you
25  not?

Page 66

1    A.  Yes, sir.
2    Q.  Okay.  Now, before bidding on the property, you
3  were in the Culebra Road location?
4    A.  Yes, sir.
5    Q.  Okay.  And you hadn't incorporated as Elijah
6  Group yet?
7    A.  No, sir.
8    Q.  Okay.  You were still in that limbo period?
9    A.  Yes, sir.
10   Q.  Okay.  When did you decide you were going to
11 need a larger facility?
12   A.  I'm still thinking.  It wasn't -- It was
13 equal -- it was equal concerns.  It wasn't just the
14 largeness of the facility.  It was the amount of rent
15 that we were paying.
16   Q.  Okay.
17   A.  Our lease had expired in February of 2008.
18   Q.  Uh-huh.
19   A.  And because we were one of the larger square
20 footage facilities in our -- in our building, we -- we
21 continued to stay there.  But the rent was -- it was --
22 it was a lot of money.  It was --
23   Q.  How much was it?
24   A.  About $8,000 a month.
25   Q.  Okay.

Page 67

1    A.  That included electricity however, but it
2  still -- That was a big chunk of change.  So what we did
3  is around the time we started to -- like I told you
4  prior to, we started giving back little sections that we
5  could, but, I mean, we couldn't really do -- we
6  couldn't -- we would give back a section and maybe save
7  $500 a month.
8    Q.  Okay.
9    A.  So, you know, that was one of the things.  And
10 our day care facility was already at capacity.  We were
11 right at 40 kids.  And there was no way we could -- we
12 couldn't move anywhere in the building.  Because by this
13 time, other tenants had come to sign leases as well.
14        And although our landlord graciously -- in
15 the beginning of our lease, we fell behind several times
16 and graciously allowed us to stay there probably because
17 we were still one of the only ones there.  We were
18 paying something anyway.
19        But by this time, you know, he made no --
20 he made no secret that he wanted us to leave as soon as
21 possible because he could divide our space into several
22 smaller spaces and make more money.
23        And, you know, that relationship was
24 strained, you know, because just, you know, the
25 personality that he was, you know.  And he had -- he

Page 68

1  would come in -- And we -- we didn't have a signed
2  agreement.  We did not have a signed lease from two --
3  from February 2007 until when we moved out.  We did not
4  have a signed lease.  It was a month-to-month thing.
5        And he could come in, and he did several
6  times, and say, look, if you don't give me $4,000 by the
7  end of the day, you are out, you know.
8        And we would -- you know, we would look at
9  each other and look at the bank statement and just pray.
10 And, you know, a couple of times miraculously, you know,
11 $3,800 would come in from stuff we would have, but --
12        So we were -- we were -- The church was
13 not exponentially growing.  And it just wasn't that we
14 needed more space.  It was we were growing a little bit
15 and also we were looking at something that was going to
16 be a little bit financially, you know, more doable.
17   Q.  Okay.  So it wasn't so much your growth.  Just
18 financial considerations is why you needed to get out of
19 there?
20   A.  It was -- I mean, I don't -- I don't want to
21 give the impression that we were -- You know, by this
22 time, the church was just exploding.  That is not what
23 was going on.  But we were growing a little bit and we
24 were boxed in, you know.  There was nothing that we
25 could do.

Page 69

1        And we couldn't do anything with our day
2  care facility because there was no more classrooms to
3  open up.  We had our playground in a parking lot.
4    Q.  Uh-huh.
5    A.  That, you know -- so it was -- You know, we
6  were growing a little bit.  We could use more space, you
7  know.  That would have been nice.  But, you know,
8  several different things contributed to this.
9    Q.  Okay.  Let's talk about that just a little bit.
10 Now, you had said that when you moved into the Culebra
11 property, you had a round -- a little less than 50?
12   A.  Yes, sir.
13   Q.  Okay.
14   A.  Probably a lot less than 50.
15   Q.  A lot less than 50.  Definitely not over 50?
16   A.  No.
17   Q.  Okay.  And in February of 2008, how big was
18 your church congregation?
19   A.  The church congregation had probably gotten
20 close to like, say, 75, 80, 90 people.
21   Q.  Okay.
22   A.  You know, that fluctuation.
23   Q.  Okay.  So no more than 90?
24   A.  Well, sometimes there might be.
25   Q.  Okay.

Page 70

1    A.  But not on a regular basis, no.
2    Q.  Okay.  And you had maxed out on your capacity
3  for kids in the day care?
4    A.  Yes.
5    Q.  Which was 40 you said, correct?
6    A.  Forty-four.
7    Q.  Forty-four.  Okay.  And that -- Was that a
8  certificate of occupancy or a fire code restriction or
9  what was that?
10    A.  Well, not the certificate of occupancy.  The
11  fire code -- and it wasn't a fire code.  It was from
12  licensing themself.  The San Antonio --
13    Q.  Okay.
14    A.  -- licensing, they take the square footage in
15  your classrooms and then they give you, this is how many
16  kids you can have because of the square footage that you
17  have.
18    Q.  Okay.  It was tied to your license?
19    A.  Yes.
20    Q.  Okay.  And were you having people, you know,
21  families that wanted to come in and expand your day care
22  that still wanted you to have more room to have more
23  kids?
24    A.  Yes, absolutely.
25    Q.  Okay.  So you really could have used more

Page 71

1  space?
2    A.  Absolutely.
3    Q.  Okay.  But your licensing wasn't permitted
4  based on your square footage?
5    A.  Right.  And there is another thing I need to
6  address too.  We had a bar right next to us.  Okay.  We
7  opened up a child care facility.  And, I mean, they
8  weren't in operation at the same time.
9        But when parents would pick their kids up
10  at six o'clock, especially on Fridays, the bar was right
11  on the other side of the wall.  And every Monday morning
12  we would come in and it would be -- it would smell like
13  cigarette smoke.  Every Sunday morning we would come in
14  into the sanctuary and it would smell like cigarette
15  smoke.
16    Q.  Okay.
17    A.  I mean -- And during the time that we were
18  there, a tattoo parlor opened up, a pornography shop
19  opened up.  There was already a liquor store, but I
20  figured, man, you know, what does it matter, a liquor
21  store.  We are right next to a bar.  But, you know, it
22  just -- it became, you know, the environment.  So we
23  were definitely looking for something.
24    Q.  Okay.  So when did you decide you needed to
25  find something else?

Page 72

1    A.  There was not a time frame per se because --
2  that gets into a whole different thing.  We know we
3  wanted to find something.  It's just everything had to
4  work into can we afford it?  How are we going to get it?
5  You know, is building an option?  You know, is land --
6  You know, all these different variables.
7        So it wasn't more like, okay, we have
8  decided today we need a new place.  It was, man, we sure
9  could use a new place, you know.  But we, you know --
10    Q.  When was the first time you took steps to find
11  a new place?
12    A.  Ryan, as a pastor, you are also taking steps to
13  find a new place.  Okay.  There is not a one time.  You
14  are always.  You are consistently doing it.
15    Q.  Okay.
16    A.  It's not something -- I mean, I have a file
17  from I-10 to 151, 1604 to 410.  And maybe not in the
18  last 12 months, but prior to that, you could ask me
19  about every, almost every, vacant warehouse, tract of
20  land, you know, anything that I would have some basic
21  information about that.
22    Q.  Okay.  And how long had you been collecting
23  that information?
24    A.  Eight years.
25    Q.  Eight years.  Okay.  So you were always aware

Page 73

1  of different locations you may be able to move into?
2    A.  Right.  Our church is in our eighth building.
3  We started in a school -- well, started in a house.  We
4  moved to a school.  We moved to another leased facility.
5  We moved to the one on Heath Road which was a leased
6  facility.  Now, all of those things were in the Nazarene
7  denomination.
8        Then we -- when our church went through
9  that period I told you about in 2004-2005, we then moved
10  into another church building.  They let us have services
11  in the afternoon, and then we moved to Culebra and from
12  Culebra to Bandera.
13    Q.  Okay.  Just out of curiosity on a side
14  question, when did your home in Helotes, when was that
15  purchased?
16    A.  2007, I believe.
17    Q.  2007.  Okay.  And was that purchased -- that
18  was purchased by the church?
19    A.  Yes.
20    Q.  Okay.  But you weren't incorporated as The
21  Elijah Group yet?
22    A.  No.
23    Q.  Okay.  When did you decide to incorporate as
24  The Elijah Group?
25    A.  When -- We had been contacted by the auction

Page 74

1  company to purchase the 60 -- 6401 building. And when
2  those things looked like they were falling into place, I
3  told the people -- and by this time, the church was
4  solid, you know, very -- It wasn't as fluid as it was
5  before. And it was just time. It was time for to us do
6  it, you know, because we were growing. The day care was
7  growing, you know. We just wanted to have our -- Again,
8  churches don't have to incorporate, but it's a lot
9  better when you do.
10     Q.  Okay. So when did you find out about the
11  auction where the Bandera Road property was up for sale?
12     A.  Sometime in the summer of 2008, I believe.
13     Q.  Okay.
14     A.  I got a flier.
15     Q.  Okay. And what did the flier say?
16     A.  Church building for auction.
17     Q.  Okay. Now, is there a particular reason -- You
18  had given me some boundaries where you were constantly
19  looking for areas.
20         Was there a particular reason you were
21  restricted to those boundaries or you wanted to be
22  restricted to those boundaries?
23     A.  Well, no. Just, you know, a feel for where we
24  are comfortable ministry-wise. I grew up on the
25  northwest side of San Antonio. I'm comfortable with

Page 75

1  that. I have, not connections, but, you know, I have a
2  lot of people on that -- on that side. The majority of
3  our church come from the Leon Valley/San Antonio area.
4         So, you know, it would be -- it wouldn't
5  make sense for us to move, you know, to another part of
6  the city. We would -- we would be servicing the
7  community that we are in.
8         And also, a big part of that was the
9  connections we had in Leon Valley through the counseling
10  service. I didn't have, you know, if we were way on
11  the other side of town, we would lose those connections.
12     Q.  Now, when you were in the Culebra location,
13  were you doing counseling?
14     A.  Yes.
15     Q.  Okay. And when would you normally do
16  counseling?
17     A.  Tuesdays and Thursdays.
18     Q.  Tuesdays and Thursdays. Okay. Was this just
19  the youth counseling?
20     A.  It was at the beginning, but then it evolved
21  into parental counseling, adult drug counseling.
22     Q.  I'm talking about while you were still in
23  Culebra?
24     A.  Yes. Yes.
25     Q.  Okay.

Page 76

1     A.  It then evolved into where even Child
2  Protective Services would contact us for our day care
3  facilities. And they would place kids that are at
4  risk -- you know, their children, toddlers, infants,
5  whatever into our day care facility. And then their
6  parents would come to us for counseling.
7     Q.  Okay.
8     A.  So --
9     Q.  So you received a flier about the Bandera Road
10  property?
11     A.  Uh-huh.
12     Q.  And what did you do with it?
13     A.  I didn't do anything with it --
14     Q.  Okay.
15     A.  -- because it was an auction. And because of
16  our experience in the previous auction, I knew that we
17  were going to have to have ten percent of the money up
18  front.
19     Q.  Okay.
20     A.  That's a normal auction principle. Instead of
21  giving -- instead of giving a down payment, you have to
22  have -- in the other auction that we were involved in,
23  you had to have $5,000 to even bid. You had to show
24  them a cashier's check for $5,000.
25         So I didn't do anything with it because I

Page 77

1  knew we did not have -- the bid they said was going to
2  start about $1.3 million or something like that. So I
3  figured it would -- it would end up there. That's the
4  auction company wanting to start somewhere. But usually
5  where they want to start is where it's going to end.
6         So I just knew, you know, we don't have
7  $130,000. We don't have $100,000. We don't have
8  $50,000. We don't have $30,000. We are not going to do
9  this. I mean, there is no need --
10         You know, by this time, hopefully as I'm
11  getting a little older, there is no need to, you know,
12  waste everybody's time. It's not going to happen.
13     Q.  Okay. Well, let me ask you this. At the time
14  you received this flier, about how much was the church
15  bringing in?
16     A.  The church was probably bringing in close to
17  $100,000 a year. And the day care was probably bringing
18  in close to 300 -- 300 to $325,000 a year.
19     Q.  Okay. And what were your expenses running?
20     A.  I didn't make a lot of money, so I knew that --
21  I mean, we were probably -- the thing is, Ryan, that's
22  not the way ministries work. I mean, I can bring a
23  balance sheet and, you know, we have an accounting for
24  all that stuff.
25         But, you know, when -- when you have a

Page 78

1  business, you have -- you have a set of expenses. Okay.
2  And you have -- you know, you have to a ministry. But
3  whenever you have, you know, more money than you do in
4  another month, usually you are catching up with bills
5  that you were behind with something.
6          Because remember, no matter what, you are
7  depending on, you know, guys like Ryan to come every
8  week and give a contribution. And sometimes Ryan was
9  sick or sometimes I don't like you anymore, Pastor, or
10 we went to John Hagee's church. They have, you know,
11 whatever.
12         All those things are real. So, you know,
13 you have fluctuating things. So, you know, when you
14 make more in one month, you are usually catching up for
15 the month that you are there.
16   Q. Right.
17   A. But I would guess that we had, you know, after,
18 you know, our profits were -- Let me give you a number
19 instead of a percentage point. I would say somewhere
20 between ten and 25 percentage on a margin level speaking
21 in business terms.
22   Q. Okay.
23   A. Yeah.
24   Q. But you definitely didn't have $100,000 lying
25 around?

Page 79

1    A. Oh, no. No, no.
2    Q. Okay. And you are technically a nonprofit
3  organization, correct?
4    A. We are. Not just technically, we are a
5  nonprofit organization.
6    Q. Okay. Or a lack of -- or a negative profit
7  organization at times?
8    A. Sometimes, yes, sir.
9    Q. Okay. Okay. So you didn't do anything when
10 you first got the flier?
11   A. (Witness nodding).
12   Q. Okay. When did you decide you could do
13 something about it?
14   A. I got another one. Okay. And pastors and
15 Christian people, you know, we are a little mystic even
16 though we try not to -- try not to be. And I wanted to
17 know they knew I was -- where I was. Because having
18 leased a building and having leased prior to, I had made
19 a commitment. Unless the church is just blowing up, I'm
20 not going to spend a dime in this place, in a leased
21 facility.
22         Prior to, I had spent, you know, tens of
23 thousands of dollars when we were with the denomination
24 on leased space that we didn't end up, you know,
25 keeping. So we didn't even -- Ryan, we don't -- we

Page 80

1  didn't even have a sign up for our church at the Culebra
2  location.
3          Our thing was, if you want to come, you
4  are going to have to find us, you know and -- so we
5  didn't have a sign. I didn't -- We were -- we were not
6  at all, you know, what we would call evangelizing. You
7  know, we weren't telling people that we were here. We
8  were just kind of taking people as they -- as they come
9  through, whatever.
10         And many times, people would come and they
11 would knock on all the doors in our little center and
12 tell us they would come to our church. Oh, there's
13 where you guys are.
14         Well, we finally went there because I got
15 two or three of these fliers. And then I talked with my
16 wife about it. And I said, you know, maybe we will just
17 go look inside of it because she had always liked that
18 building for some unknown reason.
19   Q. Now, were you aware that that building was
20 previously a church?
21   A. Yes.
22   Q. Okay. Had you ever attended that church?
23   A. No. I hadn't, no.
24   Q. Okay. Had any members of your congregation?
25   A. Yes. Yes.

Page 81

1    Q. Okay. And did they tell you about it?
2    A. Yes -- Well, no, not that it was up for
3  auction, but they told me, you know, in speaking. That
4  church went through some issues as well and, you know,
5  people would say this happened and, you know, they would
6  tell me.
7    Q. Well, the church actually -- The property was
8  foreclosed on, correct?
9    A. Right.
10   Q. Because the church -- I believe it was the
11 Church on the Rock; is that correct?
12   A. Yes.
13   Q. Okay. They went through their own financial
14 problems?
15   A. They built that dome.
16   Q. But they weren't able to make their mortgage?
17   A. Right.
18   Q. Okay. And do you know when the bank
19 foreclosed?
20   A. No, I don't.
21   Q. Okay. But was it apparent from the flier you
22 received that it was a foreclosure --
23   A. Yes.
24   Q. -- sale?
25   A. Yes.

Page 82

1     Q.  I'm sorry.  Let me finish so she can -- and I
2  don't mean to be rude, but she --
3     A.  Are you right.
4     Q.  -- she has -- she has to type only one of us at
5  a time.  Okay.  The flier was obviously a foreclosure
6  sale?
7     A.  Yes.  Yes, sir.
8     Q.  Okay.  And who was conducting the auction?
9     A.  Sherwood -- I can't remember the name.
10  Anderson.  Some company from Chicago.
11     Q.  Okay.
12     A.  I forget what the name -- name was.  It's on
13  all of the paperwork though, I mean.  I forget what the
14  auction company's name was.
15     Q.  Okay.  So was it clear in your mind that the
16  bank had the building and they were trying to sell it
17  through an action?
18     A.  Absolutely.
19     Q.  Okay.  And so when was the auction?
20     A.  Sometime in December of 2007, I believe.
21     Q.  Okay.  I thought you said you got the flier in
22  the summer of 2008?
23     A.  Did I say that?  Then it was the summer of
24  2007.  I'm sorry.
25     Q.  Okay.  So you got the flier in the summer of

Page 83

1  2007?
2     A.  2007, yes, sir.
3     Q.  Okay.  Are you sure about that?
4     A.  Yes.
5     Q.  Okay.
6     A.  That's right.  Because if we got -- we got the
7  flier in 2007 and the auction was slated for the end --
8  that's -- that's right.  I made a mistake.  Because the
9  auction was set for, I believe, October of 2007 was the
10  first one.
11          The action company set up viewings in
12  which they invited the people that got the fliers.  And
13  we decided to go on the last day of -- of one of the
14  viewings.  And we looked at it.  And of course, you
15  know -- you know, it was perfect.
16     Q.  Okay.
17     A.  But, you know, we -- again, I had said, well,
18  we are not going to do anything with this because -- and
19  I didn't even tell anyone in the church about it because
20  it was being auctioned, and I knew the rules of the
21  auction.
22          And the guy at the auction company, he
23  walked me around and he was one of the vice-presidents
24  or something.  And he said, Pastor Crain, this is your
25  place.  I can tell, you know.  And of course I tell him,

Page 84

1  you tell that to everybody, you know.  So that was it.
2          We went to see it.  I believe we went to
3  see it one time.  And then I took my dad because they
4  didn't get that much interest in it, I guess.  I believe
5  they had three viewings.  And of those three viewings,
6  they were three or four days apiece where you could come
7  and look at it and whatever, and we went twice in that
8  period.
9     Q.  Okay.  Do you remember when that was, was that
10  in October, was that in November?
11     A.  No, it was prior to.  It was probably again
12  August, September of 2007.
13     Q.  Okay.  So in the summer of 2007, you got the
14  flier which noted that this was a foreclosure sale,
15  right?
16     A.  Right.
17     Q.  All right.  Now, had you already been aware
18  that the Church on the Rock had stopped conducting
19  services there?
20     A.  Yes, because a friend of mine was going to that
21  church.  A pastor -- a pastor friend of mine actually
22  was attending that church.
23     Q.  Okay.
24     A.  So he was --
25     Q.  Do you remember his name?

Page 85

1     A.  Jim Kingery.
2     Q.  Okay.  So he was going to that church and he
3  told you they were no longer conducting services?
4     A.  No.  It wasn't like that.  It was, I called him
5  one day, and he said, oh, yeah.  We are meeting over
6  here now.
7     Q.  Okay.
8     A.  And I said, meeting over where?  What are you
9  talking about?  And they were meeting at a location on
10  Fredericksburg.
11     Q.  Okay.
12     A.  And I didn't really go into any -- what
13  happened or anything like that.
14     Q.  Okay.
15     A.  He didn't tell me anything about the
16  foreclosure or anything like that.  He wasn't that
17  involved where he may or may not know that information.
18     Q.  Okay.  So he told you, look, we have moved.  We
19  are over here --
20     A.  Yeah.
21     Q.  -- on Fredericksburg?  And when you received
22  the flier, were you able to put two and two together?
23     A.  Well, yeah.
24     Q.  Okay.
25     A.  I mean, I knew -- you know, I knew that they

Page 86

1  where struggling because, you know, just like you guys
2  talk among your profession, pastors -- pastors talk
3  among their profession as well. And we knew that that
4  was a huge payment, you know, and, you know, they were
5  struggling to make it. And, you know, to have a payment
6  that big, you have to have a very, very large church,
7  you know. Anyway...
8      Q. Okay.
9      A. But I was absolutely certain that that --
10  somewhere the bank had foreclosed and that this was an
11  auction sale, absolutely.
12     Q. So you went to a couple of viewings, but really
13  didn't tell anybody about it, right?
14     A. Family.
15     Q. Okay. So when did you decide to bid on it?
16     A. I didn't --
17     Q. Okay.
18     A. -- decide to bid on it for the reasons I have
19  talked to you about. The auction company contacted me
20  through the vice-president. And I thought -- I honestly
21  thought he was just being a salesman, you know, as he
22  would be.
23         And he said, you know, Pastor Crain, I can
24  just see you doing so well here, a young guy, blah,
25  blah, blah. And I said, whatever. I said -- You know,

Page 87

1  we looked at it. And I looked around at it.
2         And I talked with my friend. And I said,
3  what do you know about the building? And he told me,
4  you know, the positives and the negatives. And the date
5  was moved from October, the original auction date, to
6  November and then to December.
7      Q. Okay.
8      A. It was moved three times. And I believe it had
9  to do with the interest in the building and then the
10  legal issues as well.
11     Q. Okay.
12     A. And I'm telling you all I know about that. I
13  don't know exactly why it was moved because we didn't
14  bid on any of the dates.
15     Q. Okay.
16     A. The final date came and the -- you know, the
17  date came, and I didn't bid because we don't have the
18  ten percent to put down.
19         Somewhere they called us and they said,
20  look, forget the ten percent. Can you come up with
21  $60,000? And I said, well, no, but I have a pastor
22  friend of mine who -- who is -- is wealthy. And I ran
23  it by him. And he said, I don't think you should put
24  any money down. You don't know what's going to happen.
25         So I called him back and said, I don't

Page 88

1  have $60,000. This was on the day of the auction. And
2  they said, Pastor Crain, please just send in a bid.
3  Would you please just send in a bid. A guy called me
4  and told me that.
5         And so I called my wife. I said, look,
6  these guys are calling me. They want me to send in a
7  bid. And so now I'm thinking maybe this is something we
8  need to pursue.
9         So I called my dad and I called my wife
10  back, and we put in a bid, and we faxed it. And I think
11  ten minutes later they called us back. Congratulations,
12  Pastor Crain. You won.
13     Q. Well, how much did you bid?
14     A. $1.33 million.
15     Q. Okay. Anything down?
16     A. They wanted something down, but I told them at
17  the beginning, you know, we are not going to put
18  anything... He coached me how to fill out the bid on
19  the paperwork.
20     Q. The gentleman from the auction?
21     A. From the auction company. I told him, well, we
22  can't put any money down. And I think -- I don't
23  remember what I did. You will have the paperwork, but I
24  don't remember if I put zero down or $60,000 down. It
25  was depending upon what he said.

Page 89

1         And he said -- if you did tell me that --
2  I think I remember him telling me, but I'm not for sure.
3  He said, Pastor Crain, just put $60,000 down on paper,
4  and we will worry about it later. And I don't remember
5  if I put 60 or zero. But anyway, we faxed it to him.
6  And they called us back and said, congratulations,
7  Pastor Crain. You won.
8      Q. Okay.
9      A. Get ready for the ride of your life.
10     Q. All right. Do you remember -- And this was in
11  December of '07?
12     A. Yes, sir.
13     Q. Okay. So you were encouraged, almost sought
14  after, in order to bid on the property?
15     A. Yes.
16     Q. Okay. Now, at the time of the bid in December,
17  were you aware of the -- the dispute regarding the
18  zoning?
19     A. Yes, absolutely.
20     Q. Okay. When did you become aware of that?
21     A. As soon as we went to look at it. They -- as
22  soon as the first viewing was there, they had other
23  entities, nonchurch entities, looking at it.
24     Q. Okay.
25     A. I felt like the gentleman -- I don't remember

24 (Pages 90 to 93)

Page 90

1  what his name was, but I felt like he was being pretty
2  straightforward with me, saying, you know, we have this
3  company is looking for it, this company. And what he
4  basically was saying is they are not going to get it
5  because it's going to cost too much money to renovate it
6  to what they -- they want to do.
7          And there was some larger churches that
8  were looking to purchase this facility to make them
9  second campuses. But because of the legal issues, they
10 didn't want to get involved.
11     Q.  Okay. Now, during the viewings -- You said you
12 went to two viewings?
13     A.  I believe so.
14     Q.  Okay. Did you become aware at that time that
15 the property had been vandalized?
16     A.  Yes.
17     Q.  Okay. Or that the property was dilapidated?
18     A.  I want to back up.
19     Q.  Okay.
20     A.  I was not aware that it had been vandalized. I
21 was aware that it had been dilapidated.
22     Q.  Okay.
23     A.  The church prior to, probably for the last 18
24 months that they had it, was just paying the interest on
25 the note, and they weren't able to -- you know, a

Page 91

1  property like that, you -- it costs several thousand
2  dollars every couple of months to, you know, just keep
3  it up like anything else. And they hadn't kept it up.
4  You know, they were having all kinds of problems.
5      Q.  Okay. So because of the prior tenants, they
6  weren't keeping it up. So it was kind of in --
7      A.  Disrepair.
8      Q.  Disrepair. Okay. Good word. When you viewed
9  it, you noted it was in disrepair?
10     A.  Yes.
11     Q.  Okay. At that time, did they tell you it had
12 been vandalized?
13     A.  I don't believe so.
14     Q.  Okay. When did you discover it had been
15 vandalized?
16     A.  Ryan, I don't exactly remember, but it was
17 somewhere around the time prior -- we went to turn on a
18 light switch and nothing happened which was not unusual
19 because the electricity might be off.
20          Okay. But then upon further
21 investigation -- and I don't remember if the auction
22 company told us this or not or we may have learned about
23 this after we bought it. I don't remember the time.
24 But we found out that all of the electrical wiring for
25 both buildings had been taken out.

Page 92

1      Q.  Okay. All the copper wiring?
2      A.  All the copper wiring, yeah.
3      Q.  Okay. It had been stripped?
4      A.  (Witness nodding).
5      Q.  Verbal answer. Sorry.
6      A.  Yes, sir. It had been stripped.
7      Q.  Okay. And did you -- They didn't want to give
8  an explanation to you about what happened or why there
9  was no cooper wiring in there?
10     A.  No, sir.
11     Q.  Okay. So you never found out when that
12 happened or how it happened?
13     A.  Well, we found out once we began to -- once we
14 won the auction and began to go in there and look at it,
15 we -- you know, we have tradesmen in the congregation,
16 electricians, plumbers that, you know, go through things
17 and look at it. We realized that there was no copper
18 wiring.
19          The air conditioners were nonfunctional
20 because of that, you know, and we thought originally
21 that it was just the wiring to the -- to the -- what
22 they call the panel box on the outside. But we later
23 found out that they had actually got in the building
24 and -- from the roofs and, you know, it was very, very
25 extensive.

Page 93

1      Q.  Okay. So basically -- And forgive me if my
2  paraphrasing is inaccurate, and you can clarify it,
3  please. All the copper wiring had been removed from the
4  buildings or most of it had?
5      A.  Yes, sir.
6      Q.  Okay. So you had no electricity for either the
7  children's building or the dome building?
8      A.  Yes, sir, that's correct.
9      Q.  Okay. And you weren't aware of this prior to
10 your purchase?
11     A.  I -- I may have been, but I don't think so
12 because I don't think it had happened yet because I
13 remember going into the dome building and the lights
14 being on.
15     Q.  During one of the viewings?
16     A.  During one of the viewings.
17     Q.  Okay.
18     A.  I thought, you know, the lights were on
19 because, you know, the dome building is very dark
20 without any kind of -- because there's no windows.
21     Q.  Okay.
22     A.  And the lights were on there. So it must have
23 happened after that.
24     Q.  Okay. Now, let's clarify some things, the
25 timing and the legal issues.

Page 94

1    A.  Okay.
2    Q.  You bid on the property in December of '07,
3  correct?
4    A.  Yes, sir.
5    Q.  And did you negotiate a contract for the
6  purchase of the property?
7    A.  Wouldn't that be the same thing as me bidding
8  on it because the auction company -- you're -- they are
9  the real estate agent per se, and we had a real estate
10  agent ourselves.  And I think that the actual contract
11  that we were filling out with the auction company, isn't
12  that the negotiated --
13    Q.  Well, you tell me what your understanding is.
14    A.  That's what my understanding was.
15    Q.  Okay.
16        MR. WHITWORTH:  Yeah.  And let me object
17  to the question also.  Just objection, form, that it
18  calls for a legal -- legal response which he is not
19  qualified as -- as an attorney to give.  Go ahead.
20        MR. HENRY:  That's why I clarified as his
21  understanding afterwards.
22        THE WITNESS:  Yeah.  And -- Right.
23    Q.  (BY MR. HENRY) Okay.  So your understanding was
24  you would enter into a contract to buy it when you
25  placed your bid?

Page 95

1    A.  Yes.
2    Q.  Okay.  All right.
3        MR. HENRY:  Can I have this marked as the
4  next exhibit, please.
5        (Exhibit 5 marked)
6    Q.  (BY MR. WHITWORTH) Can you tell me which
7  exhibit -- I think that's five.  Is that the one that
8  she gave you?
9        MR. WHITWORTH:  Yeah.
10        THE WITNESS:  Yes.  My -- I want to just
11  say something.  I said $60,000, but I wrote on the thing
12  $2,000.
13    Q.  (BY MR. HENRY) $2,000.  Okay.
14    A.  It's right here.
15    Q.  When you were handed Exhibit 5, that refreshed
16  your memory?
17    A.  Yes.
18    Q.  Okay.  Can you tell me what Exhibit 5 is?
19    A.  This is the -- I don't know if it's a contract.
20  It's a purchase and sale agreement it says right here
21  that the auction company gave us.
22    Q.  Okay.
23    A.  We -- we looked through it and basically we had
24  our real estate agent look through it, and we knew that
25  there were going to be legal issues as -- as part of,

Page 96

1  you know, the deal.  We knew that there were zoning
2  grievances and so forth and so on.  But this is that
3  agreement that we signed with the auction company.
4    Q.  Okay.  Now, does this fairly and accurately
5  represent what you remember signing, the exhibit in
6  front of you?
7    A.  Yes.  I believe this is a copy that.
8    Q.  Okay.  Now, is this what you faxed in as your
9  bid?
10    A.  This page only.
11    Q.  Okay.  And what page is that?
12    A.  This would be Page 2.
13    Q.  At the very bottom --
14    A.  Sheldon Good & Company.
15    Q.  Okay.  That was the auction company?
16    A.  (Witness nodding).
17    Q.  Okay.  And you looked at the bottom of that
18  page and noted the footnote or the footer; is that
19  correct?
20    A.  Yes, sir.
21    Q.  Okay.  At the bottom of that page, it says
22  P-00011.  Do you see that?
23    A.  Yes, sir.
24    Q.  Okay.  That is the page that you are
25  referencing?

Page 97

1    A.  Yes, sir.
2    Q.  Just for your edification, when your counsel
3  produced these to us, that's called a Bates stamp.
4    A.  Okay.
5    Q.  And they stamp all the numbers -- all the pages
6  of all the documents they gave us.  So this was the 11th
7  page that he gave us.
8    A.  Okay.
9    Q.  And you faxed in just this page?
10    A.  To the auction company.
11    Q.  To the auction company?
12    A.  Yes.
13    Q.  Okay.  Did you fill out anything else at that
14  time?
15    A.  I may have filled this out but --
16    Q.  Page P-000 --
17    A.  10.
18    Q.  10?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  But I know that I did not fax this whole
22  packet.
23    Q.  Okay.
24    A.  Because the guy called me specifically, and he
25  said, don't fax me the whole thing.  Just pick this page

Page 98

1    out.  Write your bid.
2        Q.  Okay.
3        A.  We talked about earnest money, and -- and he
4    was wanting $60,000.  He said, just put something or
5    whatever.  And I thought I put either zero or 60, but I
6    guess I put two.
7        Q.  Okay.
8        A.  And I faxed that page to him only.
9        Q.  Okay.  And then about ten minutes later he
10   called and said, congratulations.  You won?
11       A.  You won.
12       Q.  Okay.  So at what time did you actually sign
13   this entire agreement, do you remember?
14       A.  I think we signed it prior to the auction being
15   done because my real estate agent -- This is my
16   understanding.  I'm not sure if this is right or not.
17       Q.  That's all I want is your understanding.
18       A.  This is my understanding.  This from our real
19   estate agent is the purchase agreement.  This is the
20   stuff you sign.  This is what it was.  It had a couple
21   of more -- There was a book that went along with this
22   that described...  I mean, it was a novel that described
23   the different things of the building.  But it was my
24   understanding this was the purchase agreement.
25           MR. HENRY:  Okay.  Let's change tapes real

Page 99

1    quick.
2        Q.  (BY MR. HENRY) On the exhibit, if you will go
3    to P-00028.
4        A.  (Witness complies).
5        Q.  That actually says seller and purchaser.  Do
6    you see that on top?
7        A.  Yes, sir.
8        Q.  Is that your signature under purchaser?
9        A.  Yes, it is.
10       Q.  Okay.  And do you see the date there?
11       A.  Yes.
12       Q.  What does it say?
13       A.  January 4th, 2008.
14       Q.  Okay.  Would that have been the date you signed
15   this?
16       A.  Yes.
17       Q.  Okay.  So if you bid in December, you came back
18   and signed the whole thing on January 4th?
19       A.  Yes, sir.
20       Q.  Okay.  Did you ever get a signature from the
21   seller?
22       A.  Yes, sir, we did.
23       Q.  Okay.
24       A.  I don't see it on this one because this is the
25   one that we sent to the auction company.  And somewhere

Page 100

1    down the line, the auction company dropped out and we
2    were just dealing with the bank.
3        Q.  Okay.  But do you have a signed copy from the
4    seller?
5        A.  Ryan, I don't know now that I think about it --
6        Q.  Okay.
7        A.  -- because -- I don't know if we do or not.  It
8    seems like we would.  But I was doing this on the behest
9    of our real estate agent working with the auction
10   company.
11           And when we -- when we did this in
12   January, we -- we -- the bid was made in middle to late
13   December.  Okay.  And the reason this wasn't signed is
14   because they wanted some money down.  And we wouldn't
15   have any money down.  I told him we are not going to put
16   any money down.  I don't even think that I can come up
17   with 2,000 that I wrote down.
18           If I'm not mistaken -- And again, I think
19   what they said, look, you just sign it and send it back
20   to us.  We will get them to sign it and whatever.  After
21   that, I don't remember what happened.
22       Q.  Okay.  Will you do me a favor and look to see
23   if you have a copy?
24       A.  Yes, I will.
25           (Information to be supplied)

Page 101

1        Q.  (BY MR. HENRY) Okay.  And if you have a copy,
2    you can give it to your lawyer and he can give it to us.
3        A.  Yes, sir.  Yes, sir.
4        Q.  Okay.  But as far as your understanding goes,
5    you have a valid contract with the bank?
6        A.  Yes.
7        Q.  Okay.
8        A.  Absolutely.
9        Q.  And when you said the seller, you are talking
10   about the bank, right?
11       A.  Yes.
12       Q.  The bank that foreclosed on the property?
13       A.  Yes.
14       Q.  Is that GoldStar Trust?
15       A.  Yes.
16       Q.  Okay.  Now, on this exhibit, I want you to turn
17   to, let me find it myself, the page right before the
18   signature page, P-00027.
19       A.  Okay.
20       Q.  Okay.  Do you see Section 59?
21       A.  Uh-huh.
22       Q.  Okay.  Special provisions?
23       A.  Uh-huh.
24       Q.  It has two spaces there, and one of them has an
25   X next to it.  Do you see that?

Page 102

1    A.  Yes, sir.
2    Q.  Can you read that X for me?
3    A.  It says purchaser acknowledges that the current
4  zoning on the property does not allow for use of the
5  property as a church.  Purchaser elects the following.
6          Seller, at seller's expense, will rezone
7  the property for use as a church prior to closing.
8  Closing may be extended in accordance with the provision
9  of Paragraph 8.
10    Q.  Okay.  And did you negotiate that with the
11  bank?
12    A.  Yes.
13    Q.  Okay.  Prior to you signing it?
14    A.  I don't know if I directly negotiated with the
15  bank.  All I know is the real estate agent was saying
16  this is an issue, you know, and they are going to -- you
17  are going to enter in with them or they are going to or
18  you are going to.  There is going to be a legal issue.
19  And we were fully aware of that prior to, you know, us
20  coming in there.
21    Q.  Okay.  Who was your real estate agent?
22    A.  J.J. Arrida, A-r-r-i-d-a.
23    Q.  And is J.J. still your real estate agent?
24    A.  For whatever practical purposes there -- you
25  know, when we need him.

Page 103

1    Q.  Okay.  Did you have a particular agent helping
2  you?
3    A.  Him.
4    Q.  Him.  Okay.  I'm going to -- in that exhibit,
5  I'm going to refer you to Page 12, P-00012.
6    A.  Okay.
7    Q.  Okay.  Do you see down at the bottom Section 8?
8    A.  I'm on the wrong page.  Tell me one more time.
9    Q.  P-00012.
10    A.  12.  Okay.  Yes.
11    Q.  Okay.  That's the closing date?
12    A.  Yes.
13    Q.  Okay.  And it says closing will be -- what does
14  it say the closing date will be?
15    A.  Forty-five days following seller's acceptance
16  of this agreement.
17    Q.  Okay.  Do you remember when the seller accepted
18  this agreement?
19    A.  No, I don't.
20    Q.  Okay.
21    A.  I remember this being pointed out to me though
22  in accordance with what you just read.
23    Q.  Okay.
24    A.  My real estate agent was saying that these two
25  things can be pushed back depending upon the -- the

Page 104

1  legal issues.
2    Q.  Okay.
3    A.  And basically he wanted us to know that this
4  may not happen in 45 days.  And quite frankly, we didn't
5  expect it to.
6    Q.  Okay.
7    A.  We were -- we were okay with that.
8    Q.  Okay.  So you entered into this agreement
9  knowing that you couldn't -- the property wasn't zoned
10  to use as a church anymore?
11    A.  Yes.
12    Q.  Okay.  And that's why you asked them to have it
13  rezoned?
14    A.  Right.
15    Q.  So you could use it as a church?
16    A.  Right.
17    Q.  Okay.  And you wanted to use it for Elijah
18  Group purposes, correct?
19    A.  We weren't Elijah Group at that point.
20    Q.  Okay.
21    A.  But yes.
22    Q.  Okay.  So when did you actually become The
23  Elijah Group?
24    A.  Probably September, October 2008, something
25  like that.

Page 105

1          MR. HENRY:  Okay.  Let's mark this as the
2  next exhibit, please.
3          (Exhibit 6 marked)
4    Q.  (BY MR. HENRY)  You have just been handed what's
5  been marked as Exhibit 8 -- 6, I'm sorry.  Can you tell
6  me if you recognize that?
7    A.  These are the incorporate -- incorporation
8  papers from the State of Texas.
9    Q.  For?
10    A.  The Elijah Group.
11    Q.  For The Elijah Group.  Okay.  And the first
12  page notes it's for The Elijah Group.  It notes on the
13  top, you know, filed in the office of the secretary of
14  the State of Texas.  Do you see that?
15    A.  Yes, sir.
16    Q.  And what's the date on there?
17    A.  October 22, 2008.
18    Q.  Okay.  Is that an accurate date --
19    A.  Yes, uh-huh.
20    Q.  -- now that you have seen this document?
21    A.  (Witness nodding).
22    Q.  I'm sorry.  I need a verbal answer.
23    A.  Yes, sir.  I'm sorry.
24    Q.  Okay.  So you became incorporated in October of
25  '08?

Page 106

1    A.  Yes, sir.
2    Q.  Okay.  Now, you entered into the contract to
3  purchase the property.  From your understanding, that's
4  what it is, right?
5    A.  Yes.
6    Q.  In January of '08?
7    A.  Yes.
8    Q.  Okay.  And then the bank, GoldStar, did they
9  take steps to do what they said they were going to do
10 and try and rezone the property?
11   A.  Somewhere around that time frame, the document,
12 Exhibit 5, is a document that was generated by the
13 auction company.
14   Q.  Okay.
15   A.  Okay.  Somewhere around that time frame, I
16 stopped dealing with the auction company.  I don't know
17 exactly what happened there, and I was dealing with
18 GoldStar and their representative, and then I began to
19 deal with the lawyer, Patrick Christensen.
20        And Patrick and I met.  And basically he
21 said he was doing the zoning things.  He needed my
22 input.  We began to talk.  And he said the first step to
23 this before we file legal action is to go to the zoning
24 commission which we did.
25        And we had one public hearing which went

Page 107

1  pretty good, I thought.  They couldn't do anything right
2  there, the zoning commission.  But Patrick and my
3  realtor was there as well.  They said, the best thing we
4  can hope for is we are not going to do anything.  We are
5  going to go back and talk to people and next month we
6  will revisit it, and that's what we got.
7        The next month they came back and they,
8  you know, denied it and said -- you know, talked about
9  that.  And basically everyone was of the same opinion at
10 that meeting.
11        The zoning concerns were we are losing,
12 you know, a massive tax revenue, a tax generating
13 property.  And the citizens that spoke, none of them --
14 well, one lady was, but the citizens that spoke by and
15 large said, we don't have an issue with a church being
16 there, but we need to be conscious of the fact that we
17 are losing a tax revenue base, and they were -- they
18 didn't want us to go under again.
19        You know, the church, you know, built this
20 thing and there was some bitterness because of the
21 building of the dome, you know.  The people that live
22 right behind the dome had a very nice view of the city
23 and then they built this dome there.
24        Anyway, so we were there and then
25 basically, you know, everyone's concerns were the same.

Page 108

1  We are going to be losing, you know, a large tax
2  generating facility.
3        One person, I don't remember if it was a
4  zoning commissioner or one of the -- or one of the
5  citizens, said this is right now the most valuable piece
6  of property we have in Leon Valley, you know.  And with
7  the highway going in, they made reference to that, we
8  just do not want to lose it.
9        And, you know, at that point, one of the
10 ladies that was -- that's a staffer there for Leon
11 Valley recommended that, you know, they deny that zoning
12 based on -- based on that.  And everybody -- I think one
13 person voted not to do it, but pretty much everybody
14 voted to do it.
15   Q.  Was that at the zoning commission or the
16 council?
17   A.  Zoning commission.
18   Q.  Okay.  So let me see if I -- I understand this
19 correctly.  You entered into the contract to purchase
20 the property?
21   A.  Right.
22   Q.  Contingent upon GoldStar getting the property
23 rezoned?
24   A.  Yes, sir.
25   Q.  Okay.  And was it your understanding that if

Page 109

1  they could not get the property rezoned, you were
2  relieved of any obligations?
3    A.  Yes.
4    Q.  Okay.  Under the contract?
5    A.  Right.
6    Q.  Okay.  So GoldStar moved forward, and GoldStar
7  paid for Patrick Christensen, correct?
8    A.  Yes.
9    Q.  You didn't pay for him, correct?
10   A.  No.
11   Q.  Okay.  Did you have a lawyer on your end
12 helping you at all?
13   A.  No.
14   Q.  Okay.  So you were dealing with Patrick
15 Christensen.  Now, he's with Brown, P.C.?
16   A.  Hold on a second.
17   Q.  Yeah.
18   A.  I want to clarify something.  I believe that
19 Patrick Christensen was my lawyer per se.  Although I
20 didn't hire him, I believed he was, you know -- that he
21 was our lawyer, I believed.
22   Q.  Okay.  Your understanding was he was your
23 lawyer, but he was being paid --
24   A.  Right.
25   Q.  -- by GoldStar?

Page 110

1    A.  Yes.
2    Q.  And he was being paid to take care of the
3  zoning issue?
4    A.  Yes.
5    Q.  Okay.  That both you and the bank wanted
6  accomplished?
7    A.  Yes, sir.
8    Q.  Okay.  Because if the rezoning didn't occur,
9  then the contract could technically go away.  Your
10 understanding?
11   A.  Yes.  Yes, sir.
12   Q.  Okay.  So you met with -- with Patrick.  Now,
13 like I said, I don't think I got an answer from you,
14 he's with Brown, P.C., correct, that's the name of the
15 firm he works for?
16   A.  I have no idea, sir.
17   Q.  Okay.  But you know he's a lawyer?
18   A.  Yeah.  And it seems like I saw that somewhere.
19   Q.  Okay.  But you are not certain?
20   A.  No, I'm not.
21   Q.  Okay.  And how many times did you meet with
22 him?
23   A.  Three or four.
24   Q.  Three our four.
25   A.  Three or four different times.

Page 111

1    Q.  Okay.  And what was the -- I guess the scope of
2  his representation for you?
3    A.  Basically, Pastor Crain, I'm Pastor Chris --
4  I'm Patrick Christensen.  I'm with -- he, if I'm not
5  mistaken, represented -- when he was introduced, I
6  represent GoldStar.  You know, tell me what you know.
7  Show me what you have done.  Show me your paperwork,
8  that kind of thing.
9         This is what we are going to try before we
10 do litigation.  Before we do anything, we are going to
11 try to do it through the zoning commission.
12        And the first time he said a victory for
13 us will be that they will want to hear the case.  That
14 they will have 30 days or whatever it was until their
15 next meeting and that's what we got the first time.
16        And then I met with him -- I talked with
17 him on the phone a few times, you know, met with him
18 briefly, and then we went to the zoning commission the
19 next time, and they went the other direction.
20   Q.  Okay.  Now, when -- You said you met at the --
21 did you meet at the zoning commission twice --
22   A.  Yeah, we met at the zoning --
23   Q.  -- or just once?
24   A.  No.  We met at the zoning commission twice.
25   Q.  Okay.  And how many times did you go before

Page 112

1  city council?
2    A.  None.
3    Q.  None?
4    A.  No.  We ever went before city council.
5    Q.  Okay.  Do you know if your application to
6  rezone went before city council?
7    A.  No, I don't because that would speak to the
8  process of the City of Leon Valley which I'm not aware
9  of.  But this is -- I can tell you what my understanding
10 of it was.
11   Q.  Okay.
12   A.  Based on what Christensen Patrick told me --
13 Patrick Christensen told me, he said basically that the
14 city council was going to take its cue from the zoning
15 commission.  If the zoning commission recommended that
16 they rezone it, then we still were not guaranteed, but
17 we had a good chance that they would rezone it.
18        But he said if the zoning commission
19 recommends that we do not rezone it, he said, you are
20 virtually, you know -- then it's virtually impossible
21 unless the city council just decides to do something
22 completely different.  So there was no need for us to go
23 to the city council from what -- what he advised me.
24   Q.  Okay.  So that was your understanding?
25   A.  Yes.

Page 113

1    Q.  Okay.  Are you aware of a three-quarter
2  majority override vote?
3    A.  No, I am not.
4    Q.  Okay.  Then I won't ask you about it.
5    A.  I know we got the names of the city council
6  people and prayed for them by name.  But, you know,
7  again, somewhere during that time, I don't remember the
8  exact dates, but I met with the mayor a couple of times.
9  And, you know, they were very cordial, professional,
10 non-vindictive or any -- anything like that.  They were
11 just very matter of fact, you know.
12        There's a financial issue we have to look
13 at here, I mean, and it's real.  You know, I understand
14 it.  We live in a little town, Helotes, and everyone is
15 always fighting against do we raise property taxes or do
16 we raise, you know, the taxes on our businesses?  And,
17 you know, they explained those things.
18        And they reiterated numerous times that we
19 are not doing this per se against churches.  We just --
20 you know, we just have a financial concern here.
21   Q.  Okay.
22        MR. HENRY:  Can you mark this as next
23 exhibit, please.
24        (Exhibit 7 marked)
25   Q.  (BY MR. HENRY)  You have been handed what's been

Page 114

1   marked as Exhibit 7. Can you tell me if you recognize
2   that at all?
3       MR. WHITWORTH: Take your time if you want
4   to.
5       THE WITNESS: I want just to -- I don't
6   think my signature is on here anywhere, is it?
7       Q. (BY MR. HENRY) Well, I'm asking you. That's
8   actually going to be my next question.
9       A. I don't recognize this --
10      Q. Okay.
11      A. -- per se, no.
12      Q. So you don't remember ever seeing this
13  document?
14      A. That doesn't mean I didn't see it. I just
15  don't remember seeing it.
16      Q. Okay.
17      A. I want to make sure I didn't sign it before I'm
18  adamant.
19      Q. I want you to take a look at it and tell me if
20  you see your signature anywhere on it?
21      A. No, I don't.
22      MR. WHITWORTH: Can I go to the bathroom
23  and take a short break?
24      MR. HENRY: Yeah. Let's go ahead and take
25  a short break so he can look at it.

Page 115

1       THE VIDEOGRAPHER: We are off the record
2   at 11:33 a.m.
3       (Short break from 11:33 to 11:43)
4       THE VIDEOGRAPHER: This is Tape 2 of
5   Pastor Darryl Crain. We are on the record at 11:43 a.m.
6       Q. (BY MR. HENRY) Pastor Crain, before the break,
7   I had handed you Exhibit 7, and you said you didn't
8   remember seeing that document; is that correct?
9       A. Yes, sir, that is correct.
10      Q. And I asked you to look at the document and
11  tell me if you -- if your signature is on it anywhere?
12      A. No, it is not. I looked at it and I do not see
13  it anywhere.
14      Q. Okay. You did not actually fill out that
15  document at all, did you?
16      A. Not that I know of, no, sir.
17      Q. Okay. Now, what does that document say on the
18  top of it?
19      A. Application for zoning change.
20      Q. Okay.
21      A. Case whatever.
22      Q. And I'm going to represent to you that that's
23  the application that GoldStar filed to rezone the
24  property on Bandera Road. Okay?
25      A. Yes, sir.

Page 116

1       Q. Okay. Now, did you ever fill out any
2   application to rezone?
3       A. I don't believe I did. I believe that it was
4   my understanding that our attorney, at that time who was
5   Patrick Christensen, he was doing all of that for us.
6       Q. Okay. Now, GoldStar at that time still owned
7   the property?
8       A. Yes, sir.
9       Q. They just had a contract to sell it to you
10  under certain conditions?
11      A. Right.
12      Q. Okay. And so they were trying to fulfill their
13  obligation by getting it rezoned?
14      A. Yes, sir.
15      Q. Okay. And wanting the property with the
16  rezone, you helped and cooperated with that process,
17  correct?
18      A. I understood it more as we were involved in
19  that process as -- as opposed to just kind of helping
20  cooperate whether it was right or wrong. I don't know
21  exactly where you are going, so let me just tell you
22  what I assumed.
23      I used that word one time in basketball
24  practice and -- But anyway... The point is, is what my
25  assumption was, is that Patrick Christensen was

Page 117

1   representing us, and he was doing this work for us. And
2   I -- and I believe I talked with our realtor about that,
3   about him filing paperwork like this for us and things
4   of that nature. And maybe that our real estate agent
5   suggested that that's the route we go as opposed to us
6   filling out things. Letting them do it on our behalf.
7       Q. Okay.
8       A. That's what my assumption was, right or wrong.
9       Q. Okay. But you weren't paying Mr. Christensen?
10      A. No, I was not.
11      Q. Okay. And do you know how he was getting paid?
12      A. I do not know how he was getting paid.
13      Q. Okay. Assume Gold --
14      A. Yeah. I assumed GoldStar was, but I don't know
15  how he was --
16      Q. All right. Did you ever enter into a -- ever
17  get a letter of representation or a retainage agreement
18  with him?
19      A. I don't remember.
20      Q. Okay.
21      A. I'm thinking I signed something, but that may
22  have been for the realtor, not him.
23      Q. Okay. Now, did you pay your realtor?
24      A. No.
25      Q. How was your realtor paid?

Page 118

1    A.  When we closed.
2    Q.  Okay.  Now, technically you haven't closed yet;
3  is that correct?
4    A.  That's correct.
5    Q.  Okay.  But the contract -- the contract has
6  actually been extended; is that correct?
7    A.  Yes, sir.
8    Q.  Okay.  Exhibit 6, I believe?
9    A.  Right.
10   Q.  No.  Exhibit 5.
11   A.  Yes, sir.
12   Q.  Okay.  Now, when did you extend the contract?
13   A.  I would -- I have already messed up so many
14  dates as it is, I would -- my knowledge, I would belie
15  myself to remember, but I don't know if we signed a
16  paper -- paperwork for that or just in communication
17  with Patrick and, you know, our real estate agent, and
18  the people from GoldStar, you know.  And by this time,
19  by the way, we had contacted financing companies.
20   Q.  Uh-huh.
21   A.  And the guy that we contacted, our financing
22  company, knew of Wanda, the representative from
23  GoldStar.  And so I was just kind of going along with
24  what everyone was saying.  You know, this was going to
25  be extended.  We went through the zoning process.  We

Page 119

1  were denied.  Now we were going to whatever the next
2  phrase of this was.
3       We were -- I don't know if we ever signed
4  something of complicity, but we were fully aware that
5  this was -- you know, this -- we expected something like
6  this to happen.
7    Q.  Okay.
8    A.  I guess I'll put it that way.
9    Q.  So let's back up a minute.
10   A.  Okay.
11   Q.  I need to make sure I have got the chronology
12  down in my head.
13   A.  Okay.
14   Q.  In January of '08, you entered into the
15  agreement with GoldStar?
16   A.  Yes, sir.
17   Q.  Okay.  An application to rezone was filed?
18   A.  (Witness nodding).
19   Q.  You appeared before the zoning commission?
20   A.  Zoning commission, yes, sir.
21   Q.  Okay.  And you think you appeared before them
22  twice; is that right?
23   A.  I know I did.
24   Q.  You know you did.  Okay.  Do you remember the
25  dates?

Page 120

1    A.  No.
2    Q.  If I tell you they were in February of '08,
3  would that sound about right?
4    A.  I was thinking March.
5    Q.  Okay.
6    A.  So maybe.
7    Q.  Okay.  February, March, around that time
8  period?
9    A.  Yes.
10   Q.  Okay.  Maybe one in February, one in March?
11   A.  Maybe.
12   Q.  You don't remember?
13   A.  Well, the thing is I'm really self-conscious
14  now about dates because I messed up on that first one.
15  That was kind of a big one.  So I don't want to be under
16  oath and, you know -- It was right around that time.
17  I'm comfortable with saying that.
18   Q.  Okay.
19   A.  Somewhere right around there.  It was a month
20  or two, plus or minus.
21   Q.  Okay.  So you appeared before the zoning
22  commission?
23   A.  (Witness nodding).
24   Q.  And there were other property owners there?
25   A.  Yes.

Page 121

1    Q.  At both meetings?
2    A.  Yes.
3    Q.  Okay.
4    A.  Excuse me.  They were there for -- there was
5  three or four, excuse me, residents there specifically
6  to give their opinion on our case.  And then there
7  were -- if I'm not mistaken in both meetings, there were
8  people there prior to our hearing to talk about
9  completely different things.
10   Q.  So when the zoning commission met, they weren't
11  just hearing your case?
12   A.  Right.
13   Q.  Okay.  They -- they had other zoning issues
14  coming up?
15   A.  Right.
16   Q.  Okay.  So the citizens that commented on your
17  case, you said that they had -- they had talked about
18  being disgruntled because of the dome; is that right?
19   A.  No.  They didn't talk about it at that meeting.
20   Q.  Okay.
21   A.  I just knew that because of, you know, talking
22  with some of the people in that neighborhood.  That
23  neighborhood is a little older demographic.
24       And like I suggested, where our church is,
25  it's a gorgeous view of the -- you know, of a whole

Page 122

1 little valley there. And the people that were right
2 behind us, no doubt, had a gorgeous view, and then they,
3 you know, built that dome, whenever they did it. So I
4 have talked to them, but not at that meeting about that.
5    Q. Okay. Now, at this time period, you hadn't
6 moved into the Bandera building yet?
7    A. Right.
8    Q. Okay. Could you have moved into it or was it
9 still dilapidated or not habitable?
10    A. I don't know.
11    Q. Okay.
12    A. I don't know if -- when exactly the vandalism
13 happened.
14    Q. Okay. But you didn't have any electricity at
15 that time?
16    A. I don't know. I mean, that would probably be a
17 safe assumption though.
18    Q. Okay. So you are going through the -- the
19 zoning meetings. And people had commented that they
20 have got -- there's a lot of work going on on Bandera
21 Road; is that correct?
22    A. Right.
23    Q. There's a lot of construction work going on on
24 Bandera Road?
25    A. Yes.

Page 123

1    Q. Okay. What are they doing to Bandera Road?
2    A. They are expanding the north and south lanes,
3 and they are building a highway like we were talking at
4 the break that they are trying to do on 281. They are
5 doing that at the Bandera/410 interchange.
6    Q. And that's a -- that's a large
7 interchange, is it not?
8    A. Yes.
9    Q. Okay. And do you know who's financing that
10 corridor?
11    A. No idea.
12    Q. You don't know if it's the City of Leon Valley
13 or the State of Texas?
14    A. No.
15    Q. Okay. You have got no clue one way or the
16 other?
17    A. To be honest, that's the only thing I can for
18 sure say absolutely I have no idea about that.
19    Q. Okay. But it's obvious that's happening right
20 now?
21    A. Yes.
22    Q. Okay. Now, you had mentioned earlier that the
23 property that's just north of you on Bandera --
24    A. Yes.
25    Q. -- has developed into a strip center?

Page 124

1    A. Yes, sir.
2    Q. Has there been any other development around you
3 in that area along Bandera Road?
4    A. I wouldn't call it new. But because exactly
5 like they talked about in the zoning meeting, Leon
6 Valley is -- you know, the buildings that are there are
7 there and have been there, and there's not a lot of land
8 in Leon Valley for new businesses to move in. That's
9 exactly one of their points of -- of caution were, is
10 that we don't have land on the Bandera -- I believe they
11 referred to it as the Bandera corridor to put new
12 businesses.
13       And the business that they got that's
14 right north of our facility is because the church prior
15 to us moving in there, trying to raise finances, sold a
16 little bit of their land.
17    Q. Okay.
18    A. But other than that, there is not like, you
19 know, open businesses and open things that people can
20 move into anyway on Leon Valley or Bandera Road. It
21 pretty much and has been pretty much set for several
22 years, I would imagine.
23    Q. Okay. And when you say the church sold a
24 little bit of the property, you are talking about the
25 Church on the Rock?

Page 125

1    A. Yes, sir, the Church on the Rock.
2    Q. The prior owners sold that property to help
3 raise funds?
4    A. Yes, sir.
5    Q. Okay.
6    A. I assume that's what happened because I -- I
7 assumed that they owned that land from looking at the
8 original, you know, things.
9    Q. Okay.
10       THE VIDEOGRAPHER: Could you move your
11 mike to your jacket.
12       THE WITNESS: (Witness complies).
13       THE VIDEOGRAPHER: Thank you.
14       MR. HENRY: Okay.
15       MR. WHITWORTH: Do you need it a little
16 lower? Is it too loud?
17       THE VIDEOGRAPHER: No.
18    Q. (BY MR. HENRY) Okay. All right. So you went
19 through the zoning process and you had opposition from
20 surrounding neighbors; is that correct? Did the zoning
21 change?
22    A. I wouldn't say opposition. It's just caution.
23 But you know what, yes, there was a few ladies that were
24 absolutely opposed to it.
25    Q. Okay. And what was the basis of their

Page 126

1 opposition?
2    A.  The tax generated revenue --
3    Q.  Okay.
4    A.  -- from what I understand.  And again, I didn't
5 know any of this prior to the zoning, but the ladies
6 that have been in there, all prefaced their comments by
7 saying, I'm so-and-so.  I have been here 25 years.  I
8 have been here X amount of years.  And all of them
9 were -- were very long time residents.
10       And they made reference to a school that
11 had just been built on Grissom Road that I learned that
12 day was -- was on -- in Leon Valley.  North side has two
13 large facilities there in Leon Valley.  One I believe on
14 the Wurzbach/Evers interchange and one on the
15 Grissom/Bandera interchange, you know.  And they just
16 made references to that.
17       And one of the ladies was, if I remember
18 right, a graduate from St. Mary's.  She said she had a
19 degree in economics.  And from what the zoning
20 commission and how they were responding, I assumed that
21 they were familiar with her.
22       And she said, you know, we are just -- we
23 are landlocked.  You know, we are letting in all these
24 churches which is what she said.  I think she said
25 there's like 40 churches in Leon Valley, and I think

Page 127

1 there's 13 or 14, but still, you know...
2       And she says, where are we going to get
3 our tax revenue?  And her concern was you miss this and
4 then you are going to raise taxes on me.  You know, and
5 that's kind of -- everyone was at one point or
6 another -- at one level of contention or another, that
7 was their basic premise, give or take.
8    Q.  And when you say everyone, does that include
9 citizens and zoning commission members?
10    A.  I didn't hear from every zoning commission
11 member, but the zoning commission -- excuse me -- the
12 zoning commission was -- was hearing their -- their
13 constituents, for lack of a better word, and were
14 agreeable, you know, with that.
15       And to be honest, I can absolutely
16 understand.  I didn't realize you were talking about,
17 you know, I'm just a dumb, hick pastor.  What do I know
18 about anything?
19       But, you know, they started throwing out
20 real numbers.  You know, 75 or $80,000 a year and, you
21 know, something around there.
22       And then some of the concerns with the
23 residents were, okay, well, if we are not going to have
24 a church, I don't want, you know -- because they showed
25 some of the other things there could be.  And I don't

Page 128

1 know which zoning, a B-3 or a B-2, whatever the one is
2 that it was rezoned.  Well, we don't want an oil change
3 place there or we don't want a strip place -- a strip as
4 in an adult --
5    Q.  A gentlemen's club?
6    A.  I won't call it that, but an adult sin factory
7 or whatever.  You know, they were saying that.  And the
8 zoning commission was saying, well, of course, we
9 wouldn't let anything like that in, you know.  And then
10 that's when the comments were made.  Well, the dome is
11 already there.  We don't want a bunch of other things.
12 And so that's kind of where all that went, but everybody
13 was kind of on the same page.
14    Q.  That was your understanding?
15    A.  That was my understanding of it, yes, sir.
16    Q.  Okay.  So the zoning commission recommended
17 that the request to rezone that property be denied?
18    A.  Yes, sir.
19    Q.  Okay.  Now -- And you said you didn't quite
20 remember which zone was which.  Do you remember B-2 or
21 B-3, which zone applied?
22    A.  No, I don't.
23    Q.  Okay.  If I were to tell you that the B-2
24 zone is what you are currently in, would that sound
25 correct, that does not allow church use?

Page 129

1    A.  If you told me the B-3 zone was what I was in,
2 that would sound correct too.
3    Q.  Okay.
4    A.  So what I'm getting at, I don't know the
5 distinction.
6    Q.  Okay.  But the application to rezone asked that
7 the property at 6401 Bandera Road be rezoned to the zone
8 that allowed churches; is that right?
9    A.  Yes.  I believe what we were asking them to do
10 is keep it the zone that it had always been.  We didn't
11 want it to be changed to the new thing.  We wanted to
12 keep it, you know, the zone that allowed churches since
13 the church had been built.
14    Q.  Okay.  Is that what --
15    A.  That's my understanding.
16    Q.  -- Mr. Christensen explained to you?
17    A.  That, and I think my national Christian
18 university education allowed me to assume because
19 they -- it's been a church since its inception.  So
20 obviously something had changed, and we obviously were
21 finding the change.
22    Q.  Okay.
23    A.  We weren't trying to -- For instance, in the
24 property that we spoke about, in the -- in the zoning
25 for the land that we had bid on for auction, there was

Page 130

1  going to have to be a change of zoning there.
2          It was my understanding -- and right or
3  wrong, I don't know, but it was my understanding is we
4  were trying to get them to keep the zoning the way it
5  has always been.
6          So I guess I'm coming from a viewpoint of
7  not changing it as opposed to changing it. Do you
8  understand what I'm saying?
9      Q. Yeah. And so what --
10     A. Whether that's right or wrong, I might be
11 completely wrong on how I'm looking at it, but in my
12 estimation, it's been a church since I think 1995, '96,
13 something like that, whenever they bought it. And I
14 don't know when it changed, but just keep it the way
15 it's been.
16     Q. Okay. So your understanding was that at the
17 zoning commission meetings, you were trying to prevent
18 them from changing the law to prevent it from being a
19 church?
20     A. No. I knew that it had already been -- been
21 changed.
22     Q. Okay.
23     A. I'm just saying, I'm thinking more in terms of
24 changing it back as opposed to changing it into
25 something new. That's the distinction -- distinction --

Page 131

1      Q. So were you aware that the law changed?
2      A. Yes.
3      Q. Okay. And you understand that a zoning law is
4  a law, right?
5      A. Yes, sir.
6      Q. Okay. And so the law changed and said churches
7  can't be in this zone, whatever zone it is?
8      A. Yes, sir.
9      Q. Okay. And so your understanding was you wanted
10 them to change it back to say churches can be in that
11 zone?
12     A. Yes, sir.
13     Q. Okay.
14     A. I would agree with that.
15     Q. So that's your understanding of what
16 that process was?
17     A. Yes, sir.
18     Q. Okay. Do you -- and you going to make
19 allowances for the fact -- Legally your lawyers may not
20 say, no, that's not exactly what we did, but that's
21 ultimately the requested result?
22     A. Yes, sir.
23     Q. Okay.
24     A. I think so.
25     Q. Okay. Now, as of today, GoldStar still owns

Page 132

1  the property; is that correct?
2      A. Yes, sir.
3      Q. Okay. And you haven't closed on the property?
4      A. That's right.
5      Q. Has the closing date been moved?
6      A. I think when we were speaking to our attorney,
7  Patrick Christensen, it was kind of an understood thing
8  that we are not going to put a closing date right now,
9  and we were -- Because of our prior experience, I wasn't
10 real excited about the process.
11     Q. Okay.
12     A. So we weren't looking -- you know, we -- In
13 conversation, we understood that, you know, there is not
14 a hard, fast closing date here. This is going to take a
15 while to go through.
16         MR. HENRY: Okay. Would you mark this as
17 the next exhibit, please.
18         MR. WHITWORTH: Thank you.
19         (Exhibit 8 marked)
20     Q. (BY MR. HENRY) Pastor Crain, you have been
21 handed what's been marked as Exhibit 8. Can you tell me
22 if you recognize that document?
23     A. Yes. I have seen this before.
24     Q. You have seen it before. Okay.
25     A. If I'm not mistaken, it was -- these two things

Page 133

1  were attached. They were one thing. I could be
2  mistaken though, but I have seen --
3      Q. When you say these two things, you are talking
4  about Exhibit 8 and Exhibit 5?
5      A. Five. I thought they were -- Like we got this
6  one to replace this one, if I'm not mistaken.
7      Q. Okay.
8      A. We got Exhibit 8 and we were told Exhibit 8
9  replaces Exhibit 5.
10     Q. Okay. Well, on top of Exhibit 8, what does
11 that say?
12     A. The second amendment of the purchase and sale
13 agreement is entered into blank date of August 2008 by
14 Happy State Bank, a Texas banking association, d/b/a
15 GoldStar, successor to Colonial Trust, acting solely in
16 its capacity as trustee for the benefit and the
17 bondholders of Church on the Rock (seller) and
18 Redemption Tabernacle Ministries, a Texas nonprofit
19 organization (purchaser).
20     Q. Okay.
21         MR. WHITWORTH: Real quick, do you wear
22 reading glasses?
23         THE WITNESS: Yes.
24         MR. WHITWORTH: Do you have those?
25         THE WITNESS: No, I didn't -- I didn't

Page 134

1  bring them.
2      Q.  (BY MR. HENRY) That's okay.
3      A.  I'm okay so far.  If it goes too far in the
4  afternoon --
5      Q.  And I apologize for my question.  Actually,
6  what I was looking for was just the heading on top, the
7  first paragraph.
8      A.  That's all right.  That's okay.  I'm going to
9  get a headache, but don't worry about it.
10     Q.  What does the heading on top say?
11     A.  Second amendment of purchase agreement.
12     Q.  Okay.  So this is an amendment to Exhibit 5?
13     A.  That's my understanding of it.
14     Q.  Okay.  Now, this was -- I'll represent to you
15  that this was produced to us by your attorneys --
16     A.  Okay.
17     Q.  -- in discovery?  I want you to turn to the
18  last page.  I guess it's second to the last page.
19     A.  Title exceptions.
20     Q.  Hold on.  On the bottom it says P-00054.
21     A.  Okay.
22     Q.  So I guess it's the third to the last page.
23     A.  Okay.
24     Q.  Okay.  It has signature lines there.
25     A.  Uh-huh.

Page 135

1      Q.  But there's no signatures.
2      A.  Right.
3      Q.  Okay.  Did you ever sign this agreement?
4      A.  I do not -- I don't think so.
5      Q.  Okay.
6      A.  I think at this stage around August of 2008 is
7  when we were talking about the lease agreement.
8      Q.  Okay.
9      A.  Sometime around there.  Because basically what
10  we are saying is if this is -- if this stretches into this
11  time period, would you guys be willing to lease it to us
12  for the duration of the -- of the litigation?
13     Q.  Okay.  And when you say you guys, you are
14  talking about GoldStar?
15     A.  Yes.  Yes, sir.
16     Q.  Okay.  Have you signed any document that
17  extends your closing date?
18     A.  Ryan, I don't remember.
19     Q.  Okay.
20     A.  If you told me I did, then I would agree with
21  you.  And if you told my I haven't, then --
22     Q.  Well, I'll represent to you when we asked your
23  lawyers for any document along that lines, they have not
24  produced any.
25     A.  Okay.  That's --

Page 136

1      Q.  The only document produced is Exhibit 8 --
2      A.  Okay.
3      Q.  -- which you said you didn't sign.
4      A.  I would agree with that.
5      Q.  Okay.  Now, have you entered into a lease for
6  the property?
7      A.  Yes.
8      Q.  Okay.  And is it a signed written lease?
9      A.  Yes, it is.
10         MR. WHITWORTH:  Sorry.
11         THE WITNESS:  Are you starting that
12  fasting already?
13         MR. WHITWORTH:  No, not yet.  That happens
14  to me when I have a banana for breakfast.
15         MR. HENRY:  Mark that as the next exhibit,
16  please.
17     (Exhibit 9 marked)
18         MR. HENRY:  Here, Dan.
19         MR. WHITWORTH:  Thank you.
20     Q.  (BY MR. HENRY) Pastor Crain, can you tell me if
21  you recognize Exhibit 9?
22     A.  Yes, I do.
23     Q.  Tell me what that is.
24     A.  This is the lease agreement.  And I would like
25  to officially pat myself on the back for having the date

Page 137

1  somewhat correct.
2      Q.  Okay.  This is the lease agreement that you say
3  that you entered into with GoldStar?
4      A.  Yes, sir.
5      Q.  In order to lease the property pending this
6  litigation?
7      A.  Yes.
8      Q.  Okay.
9      A.  And they put, if I'm not mistaken, a two-year
10  lease agreement basically giving it a 24-month period
11  for the litigation to play out.
12     Q.  Okay.  And is it your understanding that if the
13  litigation is decided in your favor, then you will close
14  and purchase the property?
15     A.  Yes, sir.
16     Q.  Okay.  But do you have any written document
17  that says that?
18     A.  I don't know if we do or not if it says it
19  exactly that way.  But, you know, I have no reason to
20  believe that the people I have talked to at GoldStar,
21  you know, would misrepresent anything like that.  That's
22  the general idea.
23     Q.  Okay.  That's your understanding --
24     A.  Yes.
25     Q.  -- of what your agreement is?

Page 138

1  A.  Yes.
2  Q.  Okay.  Whether it's in writing or not?
3  A.  Right.
4  Q.  Okay.  Now, if you look at that exhibit that I
5  just handed you, the lease agreement, turn to P-00049,
6  the lease agreement, Page 13.
7  A.  Okay.
8  Q.  Again, there are lines for signatures but no
9  signatures.  Okay.  Did you, in fact, sign this lease
10 agreement?
11 A.  Yes, I did.
12 Q.  Okay.
13 A.  We -- Go ahead.
14 Q.  And did Wanda Perdue sign this lease agreement?
15 A.  I'm assuming she did as well.  I don't remember
16 if we have a copy of the -- of the signed one.  I'm sure
17 we do somewhere.
18 Q.  Okay.  Can you look for it for me?
19 A.  Yes.
20 Q.  Because I need to know if it's signed or not.
21 A.  The reason I'm saying yes is because when we
22 agreed to this, they FedEx'ed this to us in certified
23 mail, and we had to have it notarized and sent back to
24 them.
25      So, you know, there would be no -- no

Page 139

1  reason why she wouldn't have signed it when they are
2  initiating, you know, this process.  I will look for it.
3  You know, I assume she signed it.
4  Q.  Okay.  Do you remember ever seeing a signature?
5  A.  No, I don't.
6  Q.  Okay.  Do you remember signing it yourself?
7  A.  Yes, I do.
8  Q.  Okay.  And did you keep a copy of it?
9  A.  Yes.  We have that somewhere.
10 Q.  Okay.  Can you produce that to me?
11 A.  Yes.  I will look for it.  The thing is we have
12 moved offices and things are a little discombobulated
13 still because of, you know, paperwork being there, but
14 we will look for that.
15      (Information to be supplied)
16 Q.  (BY MR. HENRY) Okay.  And I'll be very honest
17 with you, Pastor Crain.  I'm a little concerned about
18 the execution of this agreement because I have also sent
19 discovery requests through a subpoena to GoldStar, and
20 they produced all the documents they say they have.  And
21 they don't have a signed executed one in there.  I'll
22 represent that to you right now.
23 A.  Okay.
24 Q.  Okay.  So I want you to look to see if you have
25 a signed, executed agreement.

Page 140

1  A.  If they wouldn't have one, I'm not going to
2  have one probably either --
3  Q.  Okay.
4  A.  -- because I'm getting my stuff from them.
5  Q.  Okay.  Would this have been the only written
6  lease agreement that you have?
7  A.  Possibly not.
8  Q.  Okay.
9  A.  And the reason is, is because during this time,
10 you know, right or wrong, we were getting so much stuff
11 from, you know, the realtor, these guys.  Every once in
12 awhile the auction company would be calling us.  So --
13 and -- and I would show this to our realtor and, you
14 know, we would X things out and whatever.
15 Q.  Okay.
16 A.  So I don't know if there is another one or not.
17 If you are telling me however they are saying that
18 I'm -- you know, I'm not here disputing anything.  I'm
19 just saying I don't remember.
20 Q.  Okay.
21      MR. WHITWORTH:  We'll -- we'll go back and
22 look for it.
23 Q.  (BY MR. HENRY) Okay.  Is it your understanding
24 you have a signed written lease agreement with GoldStar
25 for that property?

Page 141

1  A.  Yes, sir.
2  Q.  Okay.  How much do you pay in rent per month?
3  A.  Well, they -- the agreement was -- and I'm not
4  sure if it's written.
5      THE WITNESS:  I'll give you a little
6  break.  It's Article VI on P-0039 (sic), maintenance and
7  repair of the premises.  Basically you will see on
8  P-0037 (sic) that they are saying -- they are charging
9  us a thousand dollars a month to be there.  That is dirt
10 cheap.  But we haven't paid them many times.
11      I should say this.  We have not paid the
12 rent that it deserves because we agreed to fix up the
13 building.  And we are taking that as a risk.  Because if
14 this doesn't turn out our way, then we have lost all
15 that money.  And there has been -- We have spent getting
16 close to $100,000 on this building, you know, already.
17 Q.  (BY MR. HENRY) Okay.  So your agreement with
18 GoldStar is you will pay them a thousand bucks a month,
19 but right know you are going to use that money to help
20 fix up the property?
21 A.  Right.
22 Q.  Okay.  And GoldStar has accepted that?
23 A.  Yes.
24 Q.  Okay.
25 A.  Absolutely.

Page 142

1    Q.  They haven't tried to evict you at all?
2    A.  No.  They're -- and, you know, they -- Once
3  we -- once we got in there and realized our first --
4  just as an example, our first thought was that they --
5  that vandals had got in there and taken out the
6  connecting wires from the air conditioner, the
7  connecting copper to the panel boxes.
8         And in the smaller building, that was the
9  case.  But in the domed building, they had actually gone
10  to where the pole is, 30 feet high, cut that, taken out
11  every wire, and then they actually broke into the
12  building.
13         And for some period of time, people were
14  working to take these things out.  And it ended up an
15  estimate -- You know, our first estimate was like
16  $65,000 to replace the electrical wiring and, you know,
17  we were able to -- to bring that down, but I mean, it's
18  been a bear.
19         And then, you know, flood damages and --
20  because the building underneath the prior tenants,
21  Church on the Rock, you know, I -- keeping up with the
22  leased facility is one thing, but keeping up with the
23  building is -- you know, you have to put up -- so
24  they -- they weren't able to -- to keep it up to par, I
25  guess.

Page 143

1    Q.  Okay.  Did it have flood damage?
2    A.  Yes.
3    Q.  Okay.  As a result of the prior tenant not
4  maintaining it?
5    A.  I shouldn't say flood damage.  Water damage.
6    Q.  Water damage.
7    A.  Yes.
8    Q.  Okay.  What -- what was damaged?
9    A.  Where my office is right now, obviously there
10  has been water damage because we are going to have to
11  replace -- all of the sheetrock is all molded, you know,
12  and that's obviously not from the little bit of rain we
13  have had now.  That's from years ago.
14         There is a connecting porte-cochere on the
15  dome that wasn't sealed right, and there is water that
16  leaks into the bathrooms and has gotten on some of the
17  paneling that we have had to replace.
18         So the electrical wiring in there was
19  damaged that we have to replace.  I mean, there's --
20  there's all kinds of stuff.
21    Q.  Okay.  And you say where your office is
22  located.  Is that in the children's building?
23    A.  No.  We are not actually in these offices, but
24  when we get into the dome building, we have everything
25  there, and there is only a few more things we have to do

Page 144

1  to have that.  It should be done this week to come up to
2  code, you know, different little things.
3         We have everyone's stuff there.  We have a
4  temporary certificate of occupancy to have our stuff in
5  there, but not --
6    Q.  This is the dome building?
7    A.  This is the dome building.
8    Q.  Okay.  Now, you actually have a permanent
9  certificate of occupancy right now for the children's
10  building?
11    A.  The other building, right.  And we are
12  anticipating this week to get our permanent certificate
13  of occupancy for the dome building.
14    Q.  Okay.  Let's back up just a minute --
15    A.  Okay.
16    Q.  -- because I don't want to get into those
17  issues just yet.  The bank still owns the building.
18  Under your original purchase agreement, the bank is the
19  one that pays the taxes on the building; is that
20  correct?
21    A.  If that's what you are telling me.  I mean,
22  someone is paying the taxes on it, and I know it's not
23  us.
24    Q.  Okay.
25    A.  Or they are taking it out of the money that we

Page 145

1  give them.  I don't know.
2    Q.  Okay.  Have you actually paid the bank
3  anything?
4    A.  Yes.
5    Q.  Okay.  And how much have you paid them?
6    A.  I don't know exact numbers right now, but, you
7  know, we paid them for I think two or three months.  And
8  then again, you know, we told them, look, this is going
9  to be a lot more money than we thought, and, you know,
10  they're -- they understand that.
11    Q.  Okay.  Now, just for clarification, as a
12  religious organization, The Elijah Group is tax exempt;
13  is that correct?
14    A.  We are tax exempt from property tax and things
15  of that nature, yes, sir.
16    Q.  Okay.  What do you get taxed on?
17    A.  We have to pay Social Security to full-time
18  employees.  We are taxed on contents.  Sometimes if we
19  don't file right -- For instance, like you guys would be
20  taxed on your leased copy machines and things of that
21  nature.  If we do that, we can be taxed on that as well,
22  you know.  But for the most part, property -- well,
23  property tax and things of that nature, we are exempt
24  from.
25    Q.  Okay.  And as the -- When you were in the

Page 146

1  Culebra location and you had the day care facility, were
2  you paying any taxes for that service?
3      A.  No.
4      Q.  Okay.  And so that service is not taxed?
5      A.  Well, the thing is, is that we don't pay -- If
6  you are leasing a facility, part of your lease payment
7  per month is to pay the taxes on that property.  Okay.
8  We are not exempt from paying those taxes because we are
9  a church because we are leasing.  The other guy still
10  has to pay the taxes.
11      Q.  The owner still has to pay the taxes?
12      A.  The owner still has to pay the taxes.  And just
13  because we are a religious organization, that does not
14  exclude him.
15      Q.  Right.
16      A.  So we pay the taxes third party that way.  But
17  once we are, you know, in a facility, you know, that's
18  in our name, we don't have to.  We are not --
19      Q.  I understand that.
20      A.  Okay.
21      Q.  And one of the things that I'm pointing at
22  right now, the bank owns the facility --
23      A.  Yes.
24      Q.  -- so they have to pay taxes?
25      A.  Right.  I would assume that they are doing

Page 147

1  that.
2      Q.  Okay.  But when you were in Culebra, when --
3  did you have to pay any sort of retail or sales tax or
4  anything like that for the services?
5      A.  No.
6      Q.  Okay.  And is that because you are a religious
7  organization?
8      A.  Right.
9      Q.  Okay.
10      A.  Yes, sir.
11      Q.  Okay.  And I'm talking about for the day care
12  services?
13      A.  Right.  It still falls under the auspices of
14  the church.
15      Q.  Okay.  It's part of your religious mission,
16  right?
17          MR. HENRY:  Okay.  Why don't we go ahead
18  and break for lunch.  I think this is a good stopping
19  point.
20          THE WITNESS:  Okay.
21          MR. HENRY:  And we can pick up afterwards.
22  Is that okay with you, Dan?
23          MR. WHITWORTH:  Yeah.  You want to meet
24  back here at 1:00?
25          MR. HENRY:  Yeah.

Page 148

1          MR. WHITWORTH:  Or do you want to take a
2  little longer?
3          MR. HENRY:  1:00 is fine with me.
4          THE VIDEOGRAPHER:  We are off the record
5  at 12:17 p.m.
6          (Short break from 12:17 to 1:33)
7          THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 1:33 p.m.
9      Q.  (BY MR. HENRY)  Pastor Crain, before our break,
10  we were talking about your purchase or your attempted
11  purchase and then your lease of the Bandera Road
12  property.
13      A.  (Witness nodding).
14      Q.  Okay?
15      A.  Yes, sir.
16      Q.  I want to kind of pick back up along those
17  lines.  You testified earlier that you appeared before
18  the zoning commission --
19      A.  Yes, sir.
20      Q.  -- on two separate occasions?
21      A.  Yes, sir.
22      Q.  And requested that the property at Bandera
23  County (sic) be rezoned?
24      A.  Yes, sir.
25      Q.  Okay.  Now, at both commission hearings, did

Page 149

1  the council recommend denial?
2      A.  No, sir.
3      Q.  Okay.
4      A.  At the first -- not the council.  The
5  commission.  The city council is different.  The zoning
6  commission heard from the citizenry, heard from our
7  attorney, Patrick Christensen.  I was able to speak.
8          And at that meeting, our attorney,
9  Mr. Christensen, told us we are not going to win
10  anything at this meeting.  What we are wanting them to
11  do is either -- we are wanting them to take time to
12  think about it or to reconsider or something like that.
13          The -- There was a staffer, I don't
14  remember what her name was, from Leon Valley, and she
15  basically said that we are -- are -- going back to --
16  The original zoning does not fit with the current master
17  plan.  And she let them know about that, and they --
18  they heard, you know us.  They heard from the citizenry
19  and they heard her.
20          And they said, you know what, we will
21  think about it.  And basically I think they wanted to
22  talk to the attorneys is what they said, and, you know,
23  whatever.  So that's what we did.
24          Then we came the back the following month,
25  and we talked with them again and that's when they

Page 150

1  denied it. Well, they didn't say they would deny it.
2  They were going to recommend denial to the city council.
3      Q.   Okay.  So the first zoning commission hearing
4  was really -- that was the first public hearing that
5  they held, right?
6      A.   That was the first public hearing we attended.
7      Q.   Okay.
8      A.   I'm not sure if there was any prior to, but
9  that was the first one we attended.
10     Q.   Okay.  And then at the second zoning commission
11 hearing, they had a vote, correct?
12     A.   Yes, sir, I believe so.
13     Q.   And they voted to recommend to the city council
14 that the application to rezone that property be denied?
15     A.   Yes, sir.
16     Q.   Okay.  Now, did you attend any city council
17 meeting?
18     A.   No, sir, we did not.
19     Q.   Okay.  Not with regard to the application to
20 rezone?
21     A.   Not any -- not any of them.
22     Q.   Have you ever attended a Leon Valley City
23 Council meeting?
24     A.   I have gotten enough tickets there, but I don't
25 think I actually attended a city council meeting.

Page 151

1      Q.   Okay.  So is your -- Go ahead.
2      A.   I'm sorry.  Earlier I talked about speaking
3  with the mayor and I spoke with the city manager, Lanny
4  Lambert, on two separate occasions.  It was not at the
5  city council meeting.
6      Q.   Okay.
7      A.   It was just meetings we had before.
8      Q.   You went into their office?
9      A.   Right.
10     Q.   Okay.  And so that wasn't a public meeting?
11     A.   No.
12     Q.   Okay.  Now, was that before or after the zoning
13 commission meetings or in between?
14     A.   In between, after.  It was right around that
15 same time -- that same time period.  One of them I
16 initiated and then one of them they initiated.
17     Q.   Okay.  And you weren't able to come to any sort
18 of --
19     A.   No.  It was -- Again, like I stated before,
20 they were very cordial.  They were not, you know -- they
21 are very, very nice people.  You know, we talked for a
22 while.  It's just -- we just couldn't see, you know, eye
23 to eye.  They were just very --
24          You know, they had taken the
25 recommendation of the -- the city staffer.  I can't

Page 152

1  remember what her name is.  But in one of the meetings,
2  she was in there with us.  And basically they pulled out
3  the master plan, and they said, you know, this does not
4  fit in with having our retail on the Bandera corridor,
5  you know, by allowing a church to be there.
6          And I think we may have talked about a
7  variance to the -- to the zoning code like keeping it
8  the same code, but giving it a variance.  I think that
9  might have been kind of what I was there for, to see if
10 they would do that, but, you know, they just -- No one
11 was recommending to the mayor that that's what would be
12 done except me, you know, so...
13     Q.   Okay.  So what happened after the zoning
14 commission denied the application to rezone?
15     A.   As far as?
16     Q.   Well, what was the next thing you did with
17 regard to the building.
18     A.   Okay.  Well, let's see.  Around that time, when
19 they denied that, it was going to be another month I
20 think or another few weeks before -- When the zoning
21 commission denied it, it was going to be some time
22 before it went to city council.  There was -- there was
23 some time period in there.
24          So we were thinking.  But in your minds,
25 you know, this was just another part of the process.

Page 153

1  And we figured that it was not going to be approved at
2  the city council meeting when it was disapproved in the
3  zoning meeting.
4          So we waited.  And, we -- you know, it
5  wasn't -- they -- The zoning commission recommended that
6  they not approve it, and they didn't.  And then when
7  they told us again, that's when I think we started
8  thinking in terms of leasing during this time.  It
9  wasn't immediately afterwards, but we started talking
10 about that.
11     Q.   Okay.  Now, do you know if Patrick Christensen
12 attended the city council meeting?
13     A.   No, I don't know that.
14     Q.   Okay.  He may have and you just don't know?
15     A.   Yes, sir, that's correct.  I don't know.
16     Q.   Okay.  So who told you that the city council
17 denied the request?
18     A.   I don't remember.
19     Q.   Okay.  But you were told at some point that the
20 city council had denied the request?
21     A.   Yes, sir, or -- yes, sir.  Some -- We found
22 that out somehow.
23     Q.   Okay.
24     A.   The reason I'm saying it like this, Ryan, is
25 because I remember thinking when we lost the zoning

Page 154

1  commission, it was like, well, that's -- you know, if we
2  didn't win this, we are not going to win the other one.
3  So I think in my mind, if I just -- You know, that was
4  the final one for me, not the city council one.
5  Q.  Okay.  So you kind of already wrote it off?
6  A.  Right.  Exactly.
7  Q.  Okay.  At the end of the zoning commission
8  meeting?
9  A.  Right, yes, sir.
10  Q.  Okay.  So at that point, you actually had the
11  option to completely cancel the contract, correct?
12  A.  Well, I mean, technically, yes.  But now by
13  this point, we are being stressed at our current
14  location.
15  Q.  The Culebra Road?
16  A.  The current, the Culebra Road.  Right or wrong,
17  I'm now emotionally involved.  The building -- if I was
18  going to build a church, I'm not sure I would build a
19  dome, but everything else is just -- I mean, it's
20  like -- you know, it's made for exactly what we want to
21  do in the exact place we are doing it.
22       The majority of our kids come from the
23  Marshall High School, Warren High School, you know.  So
24  I think at that point, we were pretty much committed
25  that we are going to follow the process through.

Page 155

1       But, you know what, your question was,
2  technically could we have gotten out of it, I think we
3  probably could have.
4  Q.  Okay.  But you choosed (sic) to continue
5  forward?
6  A.  We did choose to do that.
7  Q.  Okay.  And you discussed with GoldStar a
8  leasing option?
9  A.  Yes, sir.
10  Q.  Okay.  Did you come to an agreement with regard
11  to leasing before you moved in?
12  A.  Yes, sir.
13  Q.  Okay.  Do you remember having a signed lease
14  before you moved in?
15  A.  Again, when we were talking about that before,
16  I know they faxed us something, and we signed it.
17  Q.  Okay.
18  A.  And we sent them money, I mean.
19  Q.  Okay.
20  A.  But I think in speaking with Wanda, the thing
21  was, is when we started looking at it because we got --
22  the realtor had a key.  And by this point, one of the
23  doors had been vandalized, and you could go with a
24  combination and open it or whatever.  And we were
25  realizing --

Page 156

1       And one of the other things I haven't
2  mentioned is I'm -- I'm -- this is -- I don't know of
3  this factually.  Okay.  But somebody -- because none of
4  the locks had changed, and there was stuff in the
5  buildings from the other church.  Okay.  And it was
6  evident as we would go look at stuff -- I mean, there
7  was still equipment in there.  There was still stuff in
8  there.  And sometimes we would go in there and it would
9  be gone, you know.  So someone was --
10  Q.  What stuff was it?
11  A.  Just church equipment, you know, like sound
12  stuff and -- just stuff.  I mean, I'm not real --
13  Q.  Like chairs?
14  A.  No, no, not chairs.  Like electronic equipment.
15  You know, churches have to have a fairly extensive
16  audio/visual kind of setup.  And there would be
17  equipment that we would notice because we would get
18  excited.  Wow!  We can use this when we get going.  And
19  then we would go back and it would be gone.
20       And there was no sign of break-in at that
21  point.  It was -- to me, it was obviously somebody, you
22  know, that didn't go to church anymore, I want to get my
23  stuff back and that kind of thing, but --
24  Q.  Did you ever find out who was taking it?
25  A.  No.  No.  And it wasn't -- I don't want to make

Page 157

1  it seem like it was a repetitive thing.  It only
2  happened once or twice.  And once I kind of -- I went
3  back over there -- and I was telling Dan this.
4       I went over there one time just kind of
5  thinking -- I was in the area.  And I said, well, let me
6  go check on the building and make sure everything is
7  okay.  And one of the windows was out and the door to
8  the dome was open.
9       And I went into one of the buildings, and
10  I looked around and there was some equipment there.  And
11  I said, you know what, I need to get this equipment out
12  and put it in my car.  Somebody is going to come in here
13  and steal it.
14       And I said, no, because with my luck, I'm
15  going to be walking out of a window (sic) or something
16  with this equipment, and they are going to think I'm
17  stealing it.  And sure enough, there was a police
18  officer that was -- So I told him what was going on.
19  And after that, the building was -- was secured.
20       But during that time, like I think
21  vagrants were living in there for a short period because
22  there was no -- they didn't break in.  There was a door
23  that was ajar, but we went into one of the rooms and
24  there was, you know, vagrants in there so...  There was
25  just, you know --