EXHIBIT "F"

Sheldon Good & Company
333 West Wacker Drive
Chicago, Illinois 60606
(312) 346-1500
Fax (312) 453-7833

# SHELDON GOOD & COMPANY

November 12, 2007

*Re: 6401 Bandera Road, Leon Valley, TX*

Dear Prospective Purchaser:

Enclosed are the documents you will need in order to submit a bid on the above referenced property. Please find the following information:

1.  Updated ALTA Survey for the property
2.  Sealed Bid Instructions
3.  Purchase and Sale Agreement

Please follow the sealed bid instructions and make sure to have your bid to our office by November 20, 2007.

Please let us know if you have any questions.

Sincerely,

**SHELDON GOOD & COMPANY**
*Auctions, LLC*

## SEALED BID AUCTION INSTRUCTIONS

### 6401 BANDERA ROAD, LEON VALLEY, TX

**Deadline:**

Your written sealed bid must be received by 3:00 p.m. CT, Tuesday November 20, 2007. Any bid received after the deadline will be returned to the sender unopened. Please make sure there is a return address on the outside of your bid envelope.

**Delivery Instructions:**

Bids are to be delivered to the Seller's Broker, Sheldon Good & Company, at the address provided below:
GoldStar San Antonio Project Manager
Sheldon Good & Company Auctions, LLC
333 West Wacker Drive
Suite 400
Chicago, IL 60606

**Bid Documentation:**

Each bid must contain two original executed copies of the Purchase Agreement with all exhibits. Bids must be on the Seller's form which is contained in the Bidder's Information Packet. If the Purchaser wishes to modify the Agreement and present a non-conforming offer, it should be accomplished with a rider to the Agreement and with prior approval by the Seller. All proposed modifications shall be submitted through, and must be received by the Selling Broker at the bid delivery address on or before six business days prior to the Sealed Bid Deadline.

**Earnest Money:**

The submission of the bid must include $60,000 as the initial down payment. These funds are payable in the form of a cashier's or certified check made payable to **"Stewart Title Guaranty, as Escrow Agent"**. All checks submitted with offers shall be delivered by Sheldon Good & Company Auctions, LLC to the Escrow Agent who will, in turn, deposit them in a non-interest bearing account during the bid consideration period.

## INSTRUCTIONS ON HOW TO FILL OUT THE AGREEMENT

Pages 1&2

Paragraph 1: Please fill in your name, address, home and business phone numbers, fax number, email address and social security/FEIN number. Please be sure to use a street address that is deliverable, not a Post Office Box. Please fill in the name of your attorney and your attorney's address, email, and phone and fax numbers.

Page 2

Paragraph 3:

1.) Fill in your High Bid Price on Line A.

2.) Line B is the Purchaser's Premium; this is the amount equal to seven and one half percent (10%) of your High Bid Price (Line A * 10%).

3.) Line D is the Total Purchase Price; this number is the High Bid Price plus the Purchaser's Premium and Optional Extras, if any (Line A + Line B + Line C).

4.) Line E is the Initial Earnest Money; you must include initial earnest monies of $60,000 with your bid submission.

5.) Line F is the Additional Earnest Money; this is equal to ten percent (10%) of the Total Purchase Price minus the Initial Earnest Money (Line D X 10% - Line E).

Page 10

Paragraph 24: Initial the right column of this paragraph. If your broker is a "pre-qualified broker", fill in the name of the brokerage company in this paragraph. If you are not working with a broker, please fill in the words "no other".

A "pre-qualified broker" is defined as a licensed real estate associate who followed the procedures outlined in the terms of sale under "Realtor Participation Invited". All "pre-qualified brokers" will have an acknowledgment letter from Sheldon Good & Company Auctions, LLC and a copy of that letter must be attached to the Agreement

Page 16

Paragraph 59: Please indicate, by initialing the appropriate line whether or not you choose to have the zoning contingency in the contract.

Page 17

Signature Area: Fill in the name of the Purchaser in the signature area, and sign and date the Agreement.

Exhibit A:     Please initial on the bottom right corner
Exhibit B:     Please initial on the bottom right corner
Exhibit C:     Please initial on the bottom right corner

THIS AGREEMENT WAS PREPARED BY THE SELLER'S ATTORNEY.
THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT ONCE IT IS SIGNED BY BOTH PARTIES. PURCHASER MAY WANT TO HAVE THIS CONTRACT REVIEWED BY PURCHASER'S ATTORNEY BEFORE PURCHASER SIGNS IT. ONCE THIS CONTRACT IS FULLY SIGNED THERE SHALL BE NO FURTHER ATTORNEY REVIEW.

# 6401 Bandera Road

## Leon Valley, Texas
### Two Church Buildings on 3.8 +/- Acres
## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is entered into by and between the Seller and Purchaser, both hereinafter defined, whereby the Seller agrees to sell and Purchaser agrees to buy the Property, hereinafter defined, upon the terms, conditions and provisions set forth below.

1. **PARTIES:**

Happy State Bank d/b/a GoldStar Trust Company, solely in its capacity as Trustee for the Benefit of the Bondholders of Church on the Rock – San Antonio ("Seller")

Seller's Address:
5336 N. 19th Avenue
Phoenix, AZ 85015

Seller's Counsel:
Catherine Robinson, Esquire
Burdett, Morgan, Williamson and Boykin, LLP
3423 S. Soncy, Suite 300
Amarillo, Texas 79119
Phone (806) 358-8116 ext. 306
Facsimile (806) 358-1901
E-mail crobinson@bmwb-law.com

**PURCHASER:** *(Complete applicable Paragraph A. or B.)*

INDIVIDUAL: PURCHASER(S): Redemption Tabernacle Ministries, Inc
(Print Name) _____ (Print Name)

PURCHASER'S ADDRESS: 8323 Culebra Rd
San Antonio Tx. 78251

PURCHASER'S PHONE: Office: 210 522 1463   Fax: 210 647 1463
Home 210 887 2233   E-mail: pastorcraig@gmail.com

SOCIAL SECURITY OR FEIN NUMBER: 74.2951340

PURCHASER'S ATTORNEY: _____

ADDRESS: _____

PHONE: _____ Fax: _____

2.    **PROPERTY:** The real estate and improvements situated in the County of Bexar, State of Texas, commonly known as 6401 Bandera Road, together with all buildings, improvements, fixtures, and property attached hereto and made a part hereof owned by the Seller located in, on, attached to, or used in connection with the Property; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of Seller in and to adjacent streets, alleys, or rights-of-way, Seller's interest in and to all leases or rents and security deposits actually held by Seller, Seller's interest in and to any licenses and permits with respect to the Property, Seller's interest in any service, maintenance, management or other contracts relating to the ownership or operation of the Property, Seller's interest in any warranties or guaranties relating to the Property; all of the above hereinafter collectively called "Property", legally described in Exhibit A attached hereto and made a part hereof.

## 3.    CALCULATION & PAYMENT OF PURCHASE PRICE:

|  |  |  |
|---|---|---|
| A. | High Bid Price | $ _____ |
| B. | Purchaser's Premium (equal to 10% of the High Bid Price) | $ _____ |
| C. | Extras, if, any | $  NONE |
| D. | **Total Purchase Price** (equals A + B + C) | $  1,330,000 |
| E. | **Initial Earnest Money** | $ _____ |
| F. | **Additional Earnest Money**  (equals D x 10% - E) | $ _____ |

## 4.    PURCHASE PRICE :

A.    The **Total Purchase Price** for the Premises (exclusive of adjustments and costs referred to in Paragraphs captioned Closing Adjustments and Costs) is the amount set forth in the above Paragraph (the "Total Purchase Price") payable in U.S. dollars by Purchaser as follows:

(1)    **Initial Earnest Money** in the amount set forth in the above Paragraph is due when Purchaser signs and submits this Agreement, and is payable in the form of a certified or cashier's check made payable to the order of **Stewart Title Guaranty**, as Escrow Agent, and delivered at the time of signing this Agreement, receipt of which is hereby acknowledged.

(2)    **Additional Earnest Money:** If the Initial Earnest Money is less than 10% of the Purchase Price as stated in above Paragraph, the Purchaser shall be required to make an Additional Earnest Money, the amount of which, when taken together with the Initial Earnest Money, shall equal ten (10%) percent of the Total Purchase Price. The sum of the Initial Earnest Money and the Additional Earnest Money shall be referred to as the "Total Earnest Money." The Additional Earnest Money is payable a) by Purchaser's personal check if paid at the time of Purchaser's execution of this Agreement, subject to collection, or, b) by certified or cashier's check from a bank, made payable to the order of **"Stewart Title Guaranty, as Escrow Agent", and delivered to Sheldon Good & Company Auctions, LLC, 333 West Wacker Drive, Suite 400, Chicago, IL 60606 on or before 12:00 noon, five business days following Seller's acceptance of this Agreement.** The aggregate of the Initial Earnest Money and Additional Earnest Money shall constitute the total Earnest Money shall be held by the Escrow Agent in a non-interest bearing account unless requested otherwise in writing by Purchaser.

After the Earnest Money is paid to Escrow Agent, Purchaser may direct Escrow Agent to place the Earnest Money in an interest bearing account at a federally insured bank, the choice of which is the Escrowee's, within three (3) business days after receiving Purchaser's written direction to do so, which direction shall include Purchaser's income tax identification number. A service and administration charge not to exceed $100.00 will be charged by Escrow Agent to implement the opening, closing and Internal Revenue Service filing requirements with respect to such account. Interest on the Earnest Money shall be reported for income tax purposes in all events as being for the account of the Purchaser and shall be paid not withstanding the provisions of the foregoing Paragraph, the Escrow Agent shall not be obliged to deposit the Earnest Money in an interest-bearing account until receipt from the Purchaser of an IRS Form W-8 or W-9 setting forth the Purchaser's taxpayer identification number. Interest on the Earnest Money shall be reported for income tax purposes in all events as being for the account of the Purchaser, and shall be paid to Purchaser in all events, except in the event of Purchaser's default, in which case the interest shall follow the Earnest Money.

(3)    The **Balance of the Purchase Price ("Balance")** plus or minus prorations and closing adjustments as set forth in this Agreement, if any, is due at the closing of this transaction ("Closing") and must be paid by Purchaser's certified personal check or official cashier's check from a bank, made payable to the direct order of Seller or such other payee(s) as Seller may hereafter designate in writing. All checks must be made payable directly to the order of the payee as directed by the Seller; no checks may be endorsed. Third party checks are not acceptable. In lieu of accepting checks, Seller reserves the right to require Purchaser to pay the balance of the Purchase Price by wire transfer to a bank account designated by Seller.

B.    The acceptance by Purchaser of the delivery of the deed at the closing shall be and be deemed to be full performance and discharge of every agreement and obligation (either express or implied) on the part of Seller to be performed pursuant to this Agreement and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

5.    **CASH PURCHASE:** This is an all-cash sale and purchase; and is NOT contingent upon obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a loan. Purchaser understands and agrees that neither his receipt of a commitment from such a lending institution, his acceptance of such a commitment, nor his satisfaction of any condition set forth in such a commitment shall in any way be a condition of Purchaser's obligations under this Agreement. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

6.    **INTENTIONALLY DELETED**

7.    **CLOSING LOCATION:** Closing will take place a local office of Stewart Title Guaranty, or at another location designated by Seller in Bexar County.

8.    **CLOSING DATE:** Closing will take place at 10:00 a.m., **Forty-Five Days following Seller's Acceptance of this Agreement**. If Purchaser elects to have Seller deliver the property with zoning which allows for use as a church pursuant to Paragraph 59, below, Seller may, in Seller's sole discretion, extend Closing for an additional forty-five days, for a Closing ninety days following Seller's Acceptance of this Agreement. If Seller is unable to obtaining the changed zoning within ninety days following Seller's Acceptance of this Agreement, Purchase may, in Purchaser's sole discretion, (a) extend the Closing for an additional forty-five days, or (b) obtain a return of the Earnest Money and net accrued interest, if any, and this Agreement shall terminate and neither party shall have any further rights or obligations pursuant to this Agreement.

In the event that Closing shall be delayed due to the fault of Purchaser and Purchaser requests a delay in Closing, then Seller in its sole discretion may elect, upon written notice to Purchaser, to

extend the Closing, in which event Purchaser shall pay at Closing, in addition to all other sums then due hereunder, the sum of One Thousand Dollars ($1,000.00) per day for each day or part thereof that the Closing is delayed after the Standard Closing Date, representing an adjournment fee. Not withstanding the foregoing, **TIME IS OF THE ESSENCE WITH AN OUTSIDE CLOSING DATE OF December 31, 2007.**

9.    <u>**CLOSING DOCUMENTS:**</u>

A.    At the Closing, Seller shall deliver to Purchaser, at Seller's sole cost and expense, the following:

(1)    A duly executed and acknowledged Special Warranty Deed in recordable form conveying title in fee simple to all of the real estate, free and clear of any and all liens, encumbrances, and subject to the Permitted Title Exceptions attached hereto as <u>Exhibit B</u>;

(2)    A Preliminary Title Commitment at Closing and, subsequent to Closing, an Owner's Policy of Title Insurance (the "Title Policy") issued by Stewart Title Guaranty of North Carolina in the full amount of the Purchase Price, dated as of closing, insuring Purchaser's title to the real estate subject only to the Permitted Title Exceptions listed on Exhibit B, the standard printed exceptions and additional exceptions contained in the usual form of Owner's Title Policy;

(3)    Internal Revenue Code reporting requirements or disclosure including FIRPTA;

(4)    Seller shall by written assignment assign all Service Contracts, if any to Purchaser, (except any such contracts which by their terms are non-assignable) and Purchaser shall accept such assignment and agrees to discharge and assume all of the obligations and duties of landlord under the Service Contracts which accrue or arise for the period from and after the closing;

(5)    Customary transfer declarations;

(6)    Bill of Sale, without warranties, for any personal property being transferred free of liens or encumbrances;

(7)    All other documents that are reasonably customary to close this transaction; in accordance with the terms and conditions of this Agreement;

B.    At the Closing, Purchaser shall:

(1)    Pay the cash portion of the Purchase Price including prorations and adjustments, if any;

(2)    If Purchaser is a corporation or a limited liability company, deliver to Seller:

(a)    Certified resolutions of the board of directors of Purchaser (or managing member) authorizing all the transactions contemplated by this Agreement;

(b)    An incumbency certificate with respect to those officers (or managing member) of Purchaser executing any documents or instruments in connection with the transactions contemplated herein; and

(c)    Certificate of Good Standing for the entity acquiring title from the Secretary of State or other appropriate governmental office of the state in which the entity was formed.

(3)     If the entity acquiring title is a partnership, deliver to Seller a certified copy of the partnership agreement and all appropriate resolutions, partnership consents and evidence of authority of said entity;

(4)     Execute such other and further documents necessary to close this transaction; in accordance with the terms and conditions of this Agreement;

(5)     If Purchase Money Financing is applicable:

    (a)     Execute and deliver to Seller the Financing Documents;

    (b)     Deliver an ALTA Mortgage Title Insurance Policy insuring the Mortgage as a first lien on the Property subject only to the Permitted Title Exceptions; and

(6)     Execute an assignment and assumption agreement pursuant to which Purchaser assumes any obligations of Seller under the Leases and any other contracts relating to the Property.

10.     **SALES EXPENSES TO BE PAID IN CASH AT OR PRIOR TO CLOSING:**

    A.     **SELLER'S EXPENSES:**  All costs of releasing and recording any release of Mortgage required by the terms of this Agreement; All costs of the Owner's Title Policy; 1/2 of any escrow fee; state and county transfer taxes, real estate brokerage fees pursuant to the written agreement between Sheldon Good & Company Auctions and Seller and other expenses stipulated to be paid by Seller under provisions of this Agreement.

    B.     **PURCHASER'S EXPENSES:**  All recording costs of the Mortgage, the Deed, and the Collateral Documents, the full amount of any money lender's escrow, expense of ALTA Mortgage Title Policy, 1/2 of any escrow fee, City Transfer Taxes (if any); and expenses stipulated to be paid by Purchaser under other provisions of this Agreement.

11.     **PRORATIONS AND ADJUSTMENTS:**  The following shall be prorated and adjusted between Seller and Purchaser as of the time of closing, except as otherwise expressly provided herein:

    A.     Water, electricity, sewer, gas, telephone and other utility charges based, to extent practicable, on final meter readings and/or final invoices.

    B.     Amounts paid or payable under any assigned maintenance or other service contracts shall be prorated as of the time of closing.

    C.     Accrued general real estate taxes shall be prorated as of the time of closing. If such bills are not available, then such taxes shall be prorated on the basis of 100% of the most recent ascertainable tax bills.

    D.     Special Assessments - If at the time of Closing, the Premises are affected by an assessment which is or may become payable in installments, then only those installments due prior to the date of the Closing shall be paid by the Seller, and all installments due subsequent to Closing shall be paid by Purchaser.

    E.     Such other items that are customarily prorated in transactions of this nature shall be ratably prorated as of the Closing Date. Except as expressly provided herein, all prorations shall be final. The covenants and agreements set forth in this Paragraph shall survive the closing.

F.      As of Closing, Purchaser shall be responsible for the transfer of accounts and establishment of all utility services to the real estate to the name of Purchaser, including the making of any new utility deposits with the utility providers. Seller shall be entitled to receive a refund of utility service deposits, if any, covering the period prior to the Closing Date.

G.      Real estate tax assessment reductions, tax refunds, and credits received after the Closing Date after deducting the expenses of collection thereof including attorney's fees which obligation shall survive the Closing that are:

1.      attributable to the tax year during which the Closing Date occurs and thereafter shall be prorated between Seller and Purchaser;

2.      attributable to all tax years before the year in which the Closing occurs belong to the Seller.

**12.     POSSESSION:**      The possession of the Property and the keys shall be delivered to Purchaser at Closing.

**13.     ACCESS TO PROPERTY:** Seller shall allow Purchaser or Purchaser's representative access to the Property (subject to rights of tenants), on one occasion no more than three days prior to the scheduled Closing Date.

**14.     PLAT OF SURVEY:** Seller furnished to Purchaser a Plat of Survey dated September 9, 2007, prepared by South Texas Surveying Associates, Inc., Project Number 1838-07. Purchaser represents it has reviewed and accepts the contents and condition of the Plat of Survey as it depicts the Property and is purchasing the Property subject to the condition as depicted on of the Plat of Survey.

**15.     DEFAULT:**

A.      Unless otherwise provided for herein, if Purchaser fails to comply with the terms and conditions hereof, Seller may enforce specific performance, or terminate this Agreement, in which event the Earnest Money, plus net accrued interest, if any, shall be due and payable to Seller as its minimum liquidated damages. Purchaser shall be liable for payment of both the Initial Earnest Money and Additional Earnest Money if not previously paid. In the event the Purchaser defaults and the Earnest Money is forfeited, the Earnest Money plus accrued interest less reasonable costs of collection shall be paid as described in the Exclusive Real Estate Auction Agreement between Seller and Broker. The parties agree that actual damages in the event of default are difficult to ascertain and further agree that the amount set forth as liquidated damages is a reasonable estimate of the damages to Seller in the event of Purchaser's default. Such sum is intended to be liquidated damages, and not a penalty.

B.      If Seller defaults, Purchaser may elect to obtain a return of the Earnest Money and net accrued interest, if any, as liquidated damages and this Agreement shall terminate and neither party shall have any rights or obligations pursuant to this Agreement, or in the alternative, Purchaser shall have the right to an action for specific performance for Seller's breach of this Agreement, which shall be Purchaser's only other remedy. Purchaser acknowledges and agrees that under no circumstances shall Seller be liable for Purchaser's damages, consequential, actual, punitive, speculative, or otherwise.

**16.     ESCROW:** The Earnest Money is deposited with Escrow Agent with the understanding that the Escrow Agent (a) does not assume or have any liability for performance or non-performance of any party and (b) has the right to require in writing from all signatories (i) a written release of liability of the Escrow Agent, except for gross negligence or fraud and (ii) authorization to disburse the Earnest Money at Closing as such disbursement is provided for herein. At Closing, Earnest Money and accrued interest shall be applied to payment of the Purchase Price. Any refund or payment of the Earnest Money under this Agreement pursuant to a default shall be reduced by the amount of any

actual expenses incurred by Escrow Agent arising out of the acceptance and distribution of funds pursuant to a determination as to which party is entitled to such funds.

**19.    RIGHT TO NOTICE:**  Purchaser and Seller hereby agree that in the event Seller notifies Escrow Agent that Purchaser has breached this Agreement by reason of Purchaser's failure to timely deposit the Earnest Money or to timely close the transaction or for any other reason as set forth in this Agreement and that Seller has thereby elected to declare Purchaser's Earnest Money forfeited, the Escrow Agent shall notify the Purchaser as to the same.  Purchaser shall have five (5) business days from the date Escrow Agent notifies Purchaser of Seller's forfeiture notice to dispute Seller's notice.  In the event Purchaser fails to dispute such notice, within said five day period, then, Escrow Agent is hereby authorized by Purchaser and Seller to remit the Earnest Money and any accrued interest to Seller, reduced by the Escrow Agent's actual expenses described above.  Purchaser hereby agrees to indemnify, save harmless and agree to defend Escrow Agent from and against any claims, demand, costs or damages (including reasonable attorney's fees) incurred by Escrow Agent and arising from or out of or with respect to Escrow Agent's complying with such demand by Seller.

In the event that a dispute shall arise as to the disposition of all or any portion of the Total Earnest Money held by the Escrow Agent, Escrow Agent shall either (i) hold the Total Earnest Money subject to final determination of said dispute by a court of competent jurisdiction or receipt of joint instructions from Seller and Purchaser or (ii) deposit the same with a court of competent jurisdiction, pending the decision of such court, and shall be entitled to instructions, as the case may be, with respect to the disposition of the Total Earnest Money. Escrow Agent shall be entitled to consult with his counsel and be reimbursed for all reasonable expenses of such consultation with respect to his duties as Escrow Agent and shall be further entitled to all reasonable out-of-pocket expenses incurred in connection with the activities set forth in the preceding sentence. All such expenses shall be paid by the party whose position shall not be sustained.  Escrow Agent may act or refrain from acting in respect of any matter referred to herein, in full reliance upon and by and with the advice of counsel which may be selected by Escrow Agent (including any member of Escrow Agent's firm) and shall be fully protected in so acting or so refraining from acting upon the advice of such counsel. Seller and Purchaser promise and agree to indemnify and save Escrow Agent harmless from any claims, every kind and nature of which may be incurred by Escrow Agent by reason of his acceptance of, and his performance under this Purchase and Sale Agreement except claims involving gross negligence, bad faith or willful misconduct.

**18.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER:**

    A. Seller hereby represents and warrants to Purchaser which representations and warranties shall be deemed made by Seller to Purchaser also as of the Closing Date that:

        (1) Seller is duly authorized and empowered to sell the Property;

        (2) All obligations of Seller arising from the ownership and operation of the Property which accrue prior to the Closing Date, have been paid as they became due or will be paid at or prior to Closing.  Except for obligations for which provisions are herein made for proration or other adjustments at Closing, there will be no obligations of Seller with respect to the Property outstanding as of the Closing Date;

        (3) Seller is not aware of any unrecorded liens caused by Seller against the Property which will not be satisfied at Closing;

        (4) Seller has received no notice of the commencement of any legal action against Seller for the damaging, taking or acquiring of all or any part of the Property, either temporarily or permanently, by condemnation or by exercise of the right of eminent domain;

(5) Seller shall not withdraw, settle, or otherwise compromise any protest or reduction proceeding (if any) affecting real estate taxes assessed against the real estate for any tax year in which the Closing is to occur without the prior written consent of Purchaser, which consent shall not be unreasonably withheld; and

(6) Seller has no knowledge of receiving any written notice from any governmental department or agency having jurisdiction as to conditions affecting the Property that alleges a violation of law or governmental ordinances, orders or requirements relating to the Property.

B.   From the Effective Date of this Agreement until the Closing Date or earlier termination of this Agreement, Seller covenants to:

(1) without the prior consent of Purchaser, not enter into any new written or oral service agreement or other agreement with respect to the Property, that will not be fully performed by Seller on or before the Closing Date, or that may not be canceled by Purchaser without liability at the Closing;

(2) advise Purchaser promptly of any litigation, arbitration or administrative hearing before any governmental body or agency of which Seller is notified, concerning or affecting the Property which is instituted after the date hereof; and

(3) not take, or omit to take any action that would have the effect of violating any of the material representations, warranties, covenants, and agreements of Seller contained in this Agreement.

C.   If any representation or warranty in this Agreement is known by Purchaser, prior to Closing, to be untrue to a material extent or Purchaser knows that any covenant has not been performed or is not remedied by Seller prior to Closing except those liens, charges or unpaid bills or expenses that can be remedied by funds paid by Seller at Closing out of the Purchase Price, Purchaser may as its sole remedy (i) terminate this Agreement whereupon the Earnest Money and accrued interest shall be refunded to Purchaser, and neither party shall have any further rights or obligations pursuant to this Agreement, or (ii) waive its objections and close the transaction without reduction of the Purchase Price.

19.   <u>REPRESENTATION, WARRANTIES AND COVENANTS OF PURCHASER</u>      Purchaser represents, warrants and covenants to Seller as follows:

A.      Purchaser is a sophisticated purchaser and has reviewed all materials and/or had all materials reviewed by its own experts and consultants;

B.      Purchaser is purchasing the Property in its "AS IS, WHERE IS" condition with no warranties by Seller as to merchantability, suitability or fitness for any particular use, it being understood and agreed that Purchaser is relying solely on its own inspections, engineering studies and reports, economic and feasibility studies and examinations of the Property and Purchaser's own determination of the condition and value of the Property;

C.      Purchaser has all requisite power and authority to consummate the transaction contemplated by this Agreement and has by proper proceedings duly authorized the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby;

D.      This Agreement when executed and delivered by Purchaser and Seller, will constitute the valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms;

E.     To Purchaser's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transaction contemplated hereby will violate or be in conflict with (i) any applicable provisions of law, (ii) any order of any court or government agency having jurisdiction over the Purchaser, or (iii) any agreement or instrument to which Purchaser is a party or under which Purchaser is bound;

F.     There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser's ability to perform its obligations under this Agreement;

G.     Purchaser has sufficient funds available to consummate the Closing of the transaction described in this Agreement; and

H.     From the Effective Date of this Agreement, Purchaser covenants to Seller that, in addition to the acts and deeds recited herein and contemplated to be performed, executed, and delivered by Purchaser, the Purchaser shall perform, execute, and deliver or cause to be performed, executed, and delivered at, prior to, or after the Closing, any and all further reasonable acts, deeds, and assurances as Seller or the Title Company may reasonably require in order to consummate the transactions contemplated herein.

**20.     PERSONAL PROPERTY:**  Personal Property.  On the Closing Date the personal property shall be owned by Seller free of liens and encumbrances other than the liens of any Continuing Mortgages and title transferred by Bill of Sale without warranty of quality fitness and merchantability.

**21.     CONDITION OF AND DAMAGE TO PROPERTY:**  The Property shall be conveyed in its present condition, ordinary wear and tear and damage by casualty excepted.

**22.     CONDEMNATION:**  If, prior to the Closing Date, condemnation proceedings are commenced against any material portion of the Property (except for road widening), Purchaser may, at its option, terminate this Agreement by written notice to Seller within ten (10) days after Purchaser is advised of the commencement of such condemnation proceedings and the Earnest Money shall be refunded to Purchaser, or Purchaser shall have the right to proceed to consummate the purchase of the Property, in which event Purchaser may appear and defend any such condemnation proceedings, and any award in condemnation shall become the Property of Purchaser and the Purchase Price shall not be reduced.

**23.     RISK OF LOSS:**  Seller shall bear the risk of loss or damage to the Property from fire or other casualty until closing.

A.     If the cost of the damage to the Property due to fire or other casualty is equal to or less than 10% of the Purchase Price Purchaser shall proceed to consummate the transaction contemplated by this Agreement and Seller, shall proceed with the purchase of the Property, in which event Seller shall deliver possession of the Property to Purchaser at Closing together with

(i)     all insurance proceeds received by Seller pursuant to the Insurance Policy (and which have not been spent by Seller in the repair or preservation of the Property)

(ii)     an assignment of all rights and claims of Seller under the Insurance Policy

(iii)     give to Purchaser a credit equal to the deductible that Purchaser will incur – but there shall be no other reduction or abatement of the total Purchase Price.

B.     In the event of damage to or destruction of the Property by fire or other casualty, the aggregate cost of which exceeds 10% of the Purchaser Price, prior to closing, Purchaser may, at its

option, within fifteen (15) days after notice thereof from Seller to Purchaser but in to event later than the Closing Date, either

    (1)    terminate this Agreement and all rights and obligations hereunder, in which event

        (a)    the Earnest Money and all interest accrued thereon shall be returned immediately to Purchaser,

        (b)    all funds and documents deposited by or on behalf of Purchaser into the Escrow shall be returned promptly to Purchaser by the Escrowee and

        (c)    all documents and other items deposited by Seller into the Escrow shall be returned promptly to Seller by the Escrowee; OR

    (2)    elect to proceed with the purchase of the Property as provided in the foregoing subclause (A).

    C.    Seller agrees to fully cooperate with and assist Purchaser in adjusting any loss and perfecting and pursuing any claim under the Insurance Policy, but Seller shall not be obligated to incur any expense in connection therewith.

    D.    After Closing the risk of loss shall be and is assumed by the Purchaser. Seller shall retain Seller's insurance until Closing, and it shall be the obligation of Purchaser to procure Purchaser's own policies of insurance to be effective from and after the date of Closing.

**24.**    **BROKER'S COMMISSION**: Seller shall cause to be paid a broker's commission to **Sheldon Good & Company Auctions, LLC** (hereinafter referred to as "Seller's Broker") in accordance with its Exclusive Real Estate Auction Agreement dated September 5, 2007, and _____ (hereinafter referred to as "Buyer's Broker") an amount equal to 2.5% of the High Bid Price. Seller and Purchaser agree that all Broker's commissions shall be paid simultaneously with, and as a condition precedent to, any disbursements made at Closing. This Paragraph and disbursement instructions may not be amended or revoked without the prior written consent of Seller's Broker. Purchaser represents to the Seller that no Broker or Auctioneer other than Seller's Broker or Buyer's Broker as defined in this Paragraph was involved in submitting, showing or selling the Property to Purchaser and Seller and Purchaser hereto agree to indemnify the other party and all those parties claiming through them from and against any claims by any other broker other than Seller's Broker or Buyer's Broker, if any, with whom the indemnifying party may have dealt. The provisions of this Paragraph shall survive the closing.

**25.**    **AGENCY DISCLOSURE:** The listing broker, **Sheldon Good & Company Auctions, LLC** and its sales agents (Listing Company) represent Seller. The Listing Company owes duties of trust, loyalty and confidence to Seller only. While the Listing Company has a duty to treat Purchaser honestly, the Listing Company is Seller's agent and is acting on behalf of Seller and not Purchaser. Any Cooperating Broker will be recognized as a Buyer's agent (Buyer's Broker). BY SIGNING BELOW, PURCHASER ACKNOWLEDGES PRIOR TIMELY NOTICE BY LISTING OR SELLING COMPANY THAT LISTING COMPANY IS SELLER'S AGENT.

**26.**    **CONSULT YOUR ATTORNEY:** THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY. NO REPRESENTATION OR RECOMMENDATION IS MADE BY SELLER, BROKER OR THEIR AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS DOCUMENT OR THE TRANSACTION RELATING THERETO. THESE ARE QUESTIONS FOR YOUR ATTORNEY.

CONSULT YOUR ATTORNEY BEFORE SIGNING. NEITHER THE SELLER NOR THE BROKER CAN GIVE YOU ANY LEGAL ADVICE.

## 27.   DISCLAIMER:

PURCHASER HEREBY REPRESENTS, WARRANTS, ACKNOWLEDGES AND COVENANTS THAT:

A.      PURCHASER IS PURCHASING THE PROPERTY, AND THE PROPERTY SHALL BE CONVEYED AND TRANSFERRED TO PURCHASER, "AS IS, WHERE IS, AND WITH ALL FAULTS", WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESSED OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE SELLER. PURCHASER ACKNOWLEDGES THAT SELLER HAS ACQUIRED THE PROPERTY THROUGH FORECLOSURE AND, CONSEQUENTLY, HAS LITTLE OR NO DIRECT KNOWLEDGE CONCERNING THE PHYSICAL OR ECONOMIC CHARACTERISTICS OF THE PROPERTY. PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED, AND IS NOT RELYING, ON ANY INFORMATION, DOCUMENT, SALES BROCHURES, OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMS, STATEMENTS, REPRESENTATIONS, GUARANTEES, OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED, OR ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVE BY, OR MADE BY, OR ON BEHALF OF, SELLER;

B.      PURCHASER IS NOT ENTITLED TO, AND SHOULD NOT RELY ON, THE SELLER OR ITS AGENTS AS TO (A) THE QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE STRUCTURAL ELEMENTS, FOUNDATION, ROOF, APPURTENANCES, ACCESS, LANDSCAPING, PARKING FACILITIES, OR THE ELECTRICAL, MECHANICAL, HVAC, PLUMBING, SEWAGE OR UTILITY SYSTEMS, FACILITIES OR APPLIANCES AT THE PROPERTY, IF ANY; (B) THE QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF SOILS OR THE EXISTENCE OF GROUND WATER AT THE PROPERTY; (C) THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; (D) THE DEVELOPMENT POTENTIAL OF THE PROPERTY, ITS HABITABILITY, MERCHANTABILITY OR FITNESS, SUITABILITY, OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE; (E) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY; (F) THE PROPERTY'S OR ITS OPERATIONS COMPLIANCE WITH ANY APPLICABLE ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, CODES, LAWS, REGULATIONS, STATUTES, ORDINANCES, COVENANTS, CONDITIONS, OR RESTRICTIONS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY, OR OF ANY OTHER PERSON OR ENTITY, INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING , OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE; (G) THE QUALITY OF ANY LABOR OR MATERIALS RELATING IN ANY WAY TO THE PROPERTY; OR (H) THE CONDITION OF TITLE TO THE PROPERTY (EXCEPT FOR THE WARRANTY OF TITLE SET FORTH IN THE DEED), OR THE NATURE, STATUS AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, RIGHT OF REDEMPTION, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATIONS, COVENANT, CONDITION, RESTRICTION, OR ANY OTHER MATTER AFFECTING TITLE TO THE PROPERTY;

C.      PURCHASER HAS  HAD  AND  WILL HAVE, PURSUANT TO THIS CONTRACT, AN ADEQUATE OPPORTUNITY TO MAKE SUCH LEGAL, FACTUAL, AND OTHER INQUIRIES AND INVESTIGATIONS AS IT DEEMS NECESSARY, DESIRABLE, OR APPROPRIATE WITH RESPECT TO THE PROPERTY. THOSE INQUIRIES AND INVESTIGATIONS OF PURCHASER MAY INCLUDE, BUT ARE NOT LIMITED TO, ANY LEASES AND CONTRACTS PERTAINING TO THE PROPERTY, THE PHYSICAL COMPONENTS OF ALL PORTIONS OF THE PROPERTY, THE CONDITION OF THE PROPERTY, THE EXISTENCE OF ANY WOOD-DESTROYING ORGANISMS ON THE PROPERTY, THE STATE OF FACTS THAT AN ACCURATE SURVEY AND INSPECTION WOULD SHOW, THE PRESENT AND FUTURE ZONING ORDINANCES, RESOLUTIONS, AND REGULATIONS OF THE

CITY, COUNTY, AND STATE WHERE THE PROPERTY IS LOCATED, AND THE VALUE AND MARKETABILITY OF THE PROPERTY; AND

D.    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBPARAGRAPHS (I) THROUGH (V), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES, AND DISCHARGES ANY CLAIM THAT IT HAS, MIGHT HAVE HAD, OR MAY HAVE AGAINST THE SELLER WITH RESPECT TO THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, ITS ABILITY OR INABILITY TO OBTAIN OR MAINTAIN BUILDING PERMITS, EITHER TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, THE ACTUAL OR POTENTIAL INCOME OR PROFITS TO BE DERIVED FROM THE PROPERTY, THE REAL ESTATE TAXES OR ASSESSMENTS NOW OR HEREAFTER PAYABLE THEREON, THE COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, OR REQUIREMENTS, AND ANY OTHER STATE OF FACTS THAT EXIST WITH RESPECT TO THE PROPERTY.

E.    ALL PROVISIONS OF THIS REPRESENTATIONS AND ACKNOWLEDGMENTS OF PURCHASER SHALL SURVIVE THE CLOSING OF THIS TRANSACTION.

F.    THE REPRESENTATIONS, ACKNOWLEDGMENTS, WARRANTIES AND COVENANTS HEREIN SHALL BE CONTAINED IN THE SPECIAL WARRANTY DEED TO BE DELIVERED TO PURCHASER AS PART OF THE AGREEMENT AND SHALL SURVIVE CLOSING, OR IF APPLICABLE, THE EARLIER TERMINATION OF THE AGREEMENT.

G.    THE REAL ESTATE SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NO EXPERTISE WITH RESPECT TO ENVIRONMENTAL MATTERS.    PROPER INSPECTIONS OF THE PROPERTY BY QUALIFIED EXPERTS ARE AN ABSOLUTE NECESSITY TO DETERMINE WHETHER OR NOT THERE ARE ANY CURRENT OR POTENTIAL ENVIRONMENTAL CONCERNS RELATING TO THE PROPERTY.    THE REAL ESTATE SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NOT MADE, NOR WILL THEY MAKE, ANY REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, REGARDING THE EXISTENCE OR NON-EXISTENCE OF ANY SUCH ENVIRONMENTAL CONCERNS IN OR ON THE PROPERTY.    PROBLEMS INVOLVING ENVIRONMENTAL CONCERNS CAN BE EXTREMELY COSTLY TO CORRECT. IT IS THE RESPONSIBILITY OF PURCHASER TO RETAIN QUALIFIED EXPERTS TO DEAL WITH THE DETECTION AND CORRECTION OF SUCH MATTERS.

**28.**    **NOTICES:** All notices, elections, consents, demands and communications (collectively called "Notices" or individually called "Notice") shall be in writing and delivered personally or by registered or certified mail return receipt requested, postage prepaid, express mail or mailgram and, if sent to Purchaser, addressed to Purchaser at Purchaser's address and, if sent to the Seller, addressed to the Seller at Seller's address each stated in this Agreement with a copy to the Broker whose address is stated in this Agreement. Copies of Notices shall be sent to the Attorneys for the respective parties, if identified on the signature page. Either party may, by written notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service the express mail service or overnight courier within the United States of America, except that a Notice of a change of address shall be deemed given when actually received. Seller's affidavit of the date and time of deposit in a mailbox or with the express mail service or the postmark, whichever is earlier shall constitute evidence of the effective date when the notice has been given.

**29.**    **COOPERATION IN A TAX DEFERRED EXCHANGE:** Both Purchaser and Seller herein reserve the right to consummate this transaction as part of a deferred exchange of like kind property

as provided by Section 1031 of the Internal Revenue Code but in all events Seller would receive cash at closing. Both Purchaser and Seller agree to cooperate with each other in this regard at or prior to Closing and execute necessary documents as appropriate provided that the non exchanging party shall have no liability in connection with the execution of such exchange documents. Should there be any additional costs associated with this deferred exchange they will be borne solely by the party effectuating the exchange. Seller reserves the right to have all documents relative to the exchange reviewed and approved by its attorney at Purchaser's sole cost and expense which cost and expense shall be reasonable and customary. Purchaser hereby indemnifies and holds Seller harmless in connection with any matter concerning or arising out of such exchange or deferred exchange which indemnification shall survive the Closing.

**30.**    **NO RECORDING:**  Neither this Agreement nor any type of memorandum thereof shall be recorded with the office of the Recorder of Deeds or with any other governmental agency, and any purported recordation or filing hereof by Purchaser shall constitute a default on the part of Purchaser.

**31.**    **ENTIRE AGREEMENT:**  This Agreement constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements. There are no representations, agreements arrangements or understandings oral or written between the parties, including the Broker, relating to the subject matter contained in this Agreement which is not fully expressed or referred to herein.

**32.**    **SUCCESSORS AND ASSIGNS:**

A.    The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of the Seller and its successors and assigns. This Agreement may not be assigned by Purchaser without prior written consent of Seller.

B.    The Seller's refusal to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against Seller.

**33.**    **PURCHASER ASSIGNMENT TO TAKE TITLE:**  Purchaser may request the conveyance be made to another, persons or entity ("Nominee"), upon notification in writing delivered to Seller at least ten days prior to the date of Closing. Purchaser's designation of a Nominee to take title to the Property shall not relieve the Purchaser of any obligation hereunder or liability as stated in the Collateral Documents if Seller Financing is elected. Any additional transfer taxes due as a result of the designation of a Nominee shall be Purchaser's obligation to pay.

**34.**    **JOINT PURCHASERS:**  The term "Purchaser" shall be read as "Purchasers" if more than one person is the Purchaser of the Property, in which case their obligations shall be joint and several.

**35.**    **FURTHER ASSURANCES:**  Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein at any time and from time to time after execution of this Agreement whether before or after the Closing, as such other party may reasonably request in order to effectuate the provisions of this Agreement or the transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to this transaction, provided that neither party shall be required to incur any material expense in connection therewith.

**36.**    **SEVERABILITY:**  If any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other persons or circumstances shall not be affected thereby. All other clauses or provisions of this Agreement, not found invalid or unenforceable shall be and remain valid and enforceable.

37.    **TIME:** Time is of the essence of this Agreement.

38.    **STRICT COMPLIANCE:** Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

39.    **GOVERNING LAW:** The provisions of this Agreement shall be governed by, and construed and enforced in accordance with the laws of the state in which the Property is located.

40.    **WAIVER OF JURY TRIAL:** EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

41.    **ATTORNEYS FEES:** A party to this Agreement who is the prevailing party in any legal proceeding against any other party brought under or with respect to this Agreement or the transaction contemplated hereby shall be additionally entitled to recover court costs and reasonable attorney's fees from the non-prevailing party.

42.    **GENDER:** A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

43.    **CERTAIN REFERENCES:** The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraph, subparagraphs or other provisions of this Agreement.

44.    **SINGULAR ALSO MEANS PLURAL:** Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

45.    **CAPTIONS:** The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

46.    **NO ORAL CHANGES:** This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

47.    **EXHIBITS:** All Exhibits described herein and attached hereto are incorporated herein by this reference for all purposes.

48.    **DATE OF PERFORMANCE:** If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state in which the Property is located, the date for such performance shall be the next succeeding business day.

**49.    NO PRESUMPTION REGARDING DRAFTING:** It is acknowledged and presumed that the substance and form of this Agreement have been fully reviewed by the parties hereto and approved as to form by their respective counsel. It is further acknowledged and agreed that no presumption shall exist against either party hereto by virtue of this Agreement being considered to have been drafted by counsel for either party thereto.

**50.    COUNTERPARTS:** This Agreement may be executed in multiple counterparts all of which when taken together shall constitute a Agreement for the sale of Real Estate under the laws of this state. It is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Purchaser.

**51.    COUNTERPART FACSIMILE EXECUTION:** For purposes of, executing this Agreement, a document signed and transmitted by facsimile machine shall be treated as an original document. The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document. At the request of either party, any facsimile document shall be re-executed by both parties in original form. No party hereto may raise the use of a facsimile machine or the fact that any signature was transmitted through the use of a facsimile machine as a defense to the enforcement of this Agreement or any amendment executed in compliance with this Paragraph. This Paragraph does not supersede the requirements of the "Notices" Paragraph.

**52.    FIRPTA:** Seller represents and warrants to Purchaser that Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA").

**53.    ENVIRONMENTAL MATTERS:** Seller represents and warrants to Purchaser that to Seller's knowledge there are no environmental conditions relating to the Property of which the Seller has knowledge of or have arisen out of activities of Seller or its agents or employees. Purchaser agrees to take the Property subject to all known or unknown environmental defects, conditions and liabilities, if any.

**54.    ENVIRONMENTAL REPORT:** Purchaser hereby acknowledges and agrees that it has been provided with a copy of the environmental report prepared by LandAmerica Assessment Corporation, dated September 17, 2007, (the "Report"), and is familiar with the contents of the Report. Seller does not warrant to Purchaser that the Report is accurate or complete. Purchaser agrees to purchase the Property subject to all known or unknown environmental defects, conditions and liabilities, if any and expressly waiver and releases Seller and Seller's Agreement from any claim or liabilities arising from any known or unknown environmental defect conditions or liability, having had sufficient time to review the Report and deciding to and (a) rely on their own expertise, (b) conduct their own investigation or not and (c) to bid or submit a price that reflects any uncertainty on their part.

**58.    IRREVOCABLE OFFER:** Purchaser further acknowledges that this Agreement is executed and delivered by Purchaser pursuant to an auction conducted on behalf of Seller. In consideration of the following: (a) preserving the integrity of the auction process and assuring that all offers are made in conformity therewith and in reliance thereon; (b) the monies spent by Seller to arrange for the auction; (c) the opportunity of the Purchaser to bid for the Property; (d) the promise by the Seller to sell the Property to Purchaser if this Agreement is accepted by Seller as hereinafter provided and (e) for other good and valuable consideration, the receipt and adequacy of which is expressly acknowledged by

Purchaser, including the mutual promises made by each party, this Agreement constitutes an irrevocable offer to purchase by Purchaser in accordance with this Agreement which cannot be revoked by Purchaser prior to 5:00 p.m. local time, (based on the location of the Property) on the fifth business day following Purchaser Execution of this Agreement ("Irrevocable Deadline").

Such offer to purchase shall not be deemed accepted by Seller until executed by Seller or Seller's duly authorized agent prior to revocation thereof. Notice from Seller or its duly authorized agent to accept or reject Purchaser's offer under this Paragraph may be given pursuant to the Notices Paragraph in this Agreement or by telephone and confirmed at a later date by notice given pursuant to Notices Paragraph in this Agreement. Failure of Seller or its duly authorized agent to notify Purchaser on or prior to the Irrevocable Deadline that Seller accepts or rejects Purchaser's offer shall not constitute acceptance or rejection by Seller of Purchaser's offer, but Purchaser's irrevocable offer shall thereafter become revocable.

In the event this Agreement is executed as a result of the Purchaser being the highest bidder at the Auction of this Property with the requisite Initial Earnest Money being tendered to the Escrow Agent and in the event Seller rejects this offer, the Initial Earnest Money shall be returned to Purchaser and Seller's Broker shall pay to Purchaser the sum of Five Thousand Dollars ($5,000.00) not as a penalty, but as liquidated damages for Purchaser having complied with the terms of the auction. The parties shall then have no further obligation or rights under this Agreement.

**59.    SPECIAL PROVISIONS:** Purchaser acknowledges that the current zoning on the Property does not allow for use of the Property as a church. Purchaser elects the following (*please initial one of the following options*):

\_\_x\_\_ Seller, at Seller's expense, will rezone the Property for use as a church prior to Closing. Closing may be extended in accordance with the provisions of Paragraph 8, above.

\_\_\_\_\_ The Property will be conveyed to Purchaser with its current zoning. Any changes in zoning will be Purchaser's sole responsibility.


60. THE PARTIES UNDERSTAND THAT SELLER'S PROPERTY SHALL REMAIN ON THE MARKET.

In the event Seller receives an acceptable bona fide offer to purchase the Property, Seller shall serve notice upon Purchaser that Seller has conditionally accepted the third party offer. Upon receipt of Seller's notice, Purchaser may increase its Total Earnest Money to $ 10,000 within 72 hours. In the event that Purchaser does increase its earnest money this Agreement shall remain in full force and effect. In the event that Purchaser does not increase its earnest money Seller shall have the right to cancel this Agreement and return to the Purchaser its earnest money with no further claims or actions from Purchaser.

IN WITNESS HEREOF, Purchaser and Seller agree that the Date of this Agreement shall be the date the Seller executes this Agreement.

**SELLER:**                                      **PURCHASER:**

<br>

(Signature)

DARRYL W CRAIN
(Print Name)

JANUARY 4, 2K8
_____                        _____
Authorized Signatory                             Date of Purchaser's Offer


_____                        _____
Date of Seller's Acceptance                      (Signature)


                                                 _____
                                                 (Print Name)


                                                 _____
                                                 Date of Purchaser's Offer


The attached Exhibits are hereby incorporated herein by reference:

Exhibit A - Legal Description
Exhibit B - Title Exceptions
Exhibit D - Plat of Survey

# EXHIBIT " A"

## Legal Description

Lot s 3 and 4, SENECA ESTATES SUBDIVISION UNIT 7, in the City of Leon Valley, situated in Bexar County, Texas, according to plat thereof recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas

# EXHIBIT " B"

## Permitted Title Exceptions

A.  **General Exceptions**

    (1)  Rights or claims of parties in possession not shown by the public records

    (2)  Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

    (3)  Easements or claims of easements not shown by the public records and existing water, mineral, oil and exploration rights.

    (4)  Any lien, or right to lien for services labor or material heretofore or hereafter furnished imposed by law and not shown by the public records.

    (5)  Taxes or special assessments which are not shown as existing liens by the public records.

    (6)  Restrictions upon the use of the premises not appearing in the record chain of title.

B.  **Specific Exceptions**

    (1)  Covenants, Conditions, Easements and Restrictions of record.

    (2)  General Real Estate Taxes not due and payable and subsequent years.

    (3)  Special Assessments and installments due after the date of Closing.

    (4)  Acts of Purchaser

    (5)  Drainage Ditches and Laterals

Exhibit B

Page 2

1.     The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

2.     Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements. Upon receipt of an approved survey, Schedule B, Item 2 may be modified to read in its entirety, "Shortages in area" (Mortgage Title Policy only or Owners Title Policy with prescribed premium)

3.     Homestead or community property or survivorship rights, if any, of any spouse of any insured   (Applies to the Owner Policy only.)

4.     Any titles or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

       a.   to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs, or oceans, or

       b.   to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

       c.   to filled-in lands, or artificial islands, or

       d.   to statutory water rights, including riparian rights, or

       e.   to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.
       (Applies to the Owner Policy only.)

5.     Standby fees, taxes and assessments by any taxing authority for the year 2007 and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to the Date of Policy" in lieu of "for the year 2007 and subsequent years.")  Schedule B, Item 5, may be amended to delete the words "and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership." AND to add "Company insures that standby fees, taxes and assessments by any taxing authority for the year 2007 are not yet due and payable." (Mortgage Policy only or Interim Construction Binder only, upon request and payment of premium)

6.     The terms and conditions of the documents creating your interest in the land.

7.     Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence to us before a binder is issued.)

Exhibit B

Page 3

8.   Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage. (Applies to Mortgagee (T-2) Policy only.)

9.   The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 6 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R)

10.  The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception.):

   a.   14' Electric, Gas, Telephone &          an easement as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas.

   b.   28' Overhead Electric easement,        locations as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas. (as to Lot 2)

   c.   Variable Width Drainage and Utility easement as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County Texas.

   d.   Electric Line Right-of-Way easement as set out in Volume 7382 Page 1718, Real Property Records of Bexar County, Texas.

   e.   Easement to Southwestern Bell Telephone Company, as set out in Volume 8647, Page 998 of the Real Property Records of Bexar County, Texas.

   f.   25' Building setback line as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas

   g.   Private Drainage and Utility Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 3)

   h.   10' Private Sanitary Sewer Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 3)

   i.   28' Electric Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 3)

   j.   Any visible and apparent roadway or easement over or across the subject property, the existence of which does not appear of record

   k.   Any and all leases, recorded and unrecorded and rights of parties therein.

©2007 Sheldon Good & Company, Auctions   Page 21
6401 Bandera Road, Leon Valley – 1/4/08

# EXHIBIT "C"

## Survey

## AS PROVIDED IN THE BIDDERS INFORMATION PACKET

# EXHIBIT "G"

THIS AGREEMENT WAS PREPARED BY THE SELLER'S ATTORNEY.
THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT ONCE IT IS SIGNED BY BOTH PARTIES.    PURCHASER MAY WANT TO HAVE THIS CONTRACT REVIEWED BY PURCHASER'S ATTORNEY BEFORE PURCHASER SIGNS IT.    ONCE THIS CONTRACT IS FULLY SIGNED THERE SHALL BE NO FURTHER ATTORNEY REVIEW.

# 6401 Bandera Road

## Leon Valley, Texas
## Two Church Buildings on 3.8 +/- Acres
## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is entered into by and between the Seller and Purchaser, both hereinafter defined, whereby the Seller agrees to sell and Purchaser agrees to buy the Property, hereinafter defined, upon the terms, conditions and provisions set forth below.

1.  **PARTIES:**

Happy State Bank d/b/a GoldStar Trust Company, solely in its capacity as Trustee for the Benefit of the Bondholders of Church on the Rock – San Antonio ("Seller")

Seller's Address:
5336 N. 19th Avenue
Phoenix, AZ 85015

Seller's Counsel:
Catherine Robinson, Esquire
Burdett, Morgan, Williamson and Boykin, LLP
3423 S. Soncy, Suite 300
Amarillo, Texas 79119
Phone (806) 358-8116 ext. 306
Facsimile (806) 358-1901
E-mail crobinson@bmwb-law.com

**PURCHASER:** *(Complete applicable Paragraph A. or B.)*

| | |
|---|---|
| INDIVIDUAL: PURCHASER(S): | Redemption Tabernacle Ministries, Inc |
| | *(Print Name)*                      *(Print Name)* |
| PURCHASER'S ADDRESS: | 6323 Cabbm Rd |
| | SAN Antonio TX, 78251 |
| PURCHASER'S PHONE: | Office: 210 522 1463   Fax: 210 647 1463 |
| | Home 210 887 2233   E-mail: pastorcrain@gmail.com |
| SOCIAL SECURITY OR FEIN NUMBER: | 74.2951340 |
| PURCHASER'S ATTORNEY: | |
| ADDRESS: | |

©2007 Sheldon Good & Company, Auctions     Page 1
6401 Bandera Road, Leon Valley – 1/4/08

PHONE: _____  Fax: _____

2.    **PROPERTY:** The real estate and improvements situated in the County of Bexar, State of Texas, commonly known as 6401 Bandera Road, together with all buildings, improvements, fixtures, and property attached hereto and made a part hereof owned by the Seller located in, on, attached to, or used in connection with the Property; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of Seller in and to adjacent streets, alleys, or rights-of-way, Seller's interest in and to all leases or rents and security deposits actually held by Seller, Seller's interest in and to any licenses and permits with respect to the Property, Seller's interest in any service, maintenance, management or other contracts relating to the ownership or operation of the Property, Seller's interest in any warranties or guaranties relating to the Property; all of the above hereinafter collectively called "Property", legally described in Exhibit A attached hereto and made a part hereof.

3.    **CALCULATION & PAYMENT OF PURCHASE PRICE:**

| | | |
|---|---|---|
| A. | High Bid Price | $ _____ |
| B. | Purchaser's Premium (equal to 10% of the High Bid Price) | $ _____ |
| C. | Extras, if, any | $ NONE |
| D. | Total Purchase Price (equals A + B + C) | $ 1,330,000 |
| E. | Initial Earnest Money | $ 2,000 |
| F. | Additional Earnest Money (equals D x 10% - E) | $ _____ |

4.    **PURCHASE PRICE :**

A.    The **Total Purchase Price** for the Premises (exclusive of adjustments and costs referred to in Paragraphs captioned Closing Adjustments and Costs) is the amount set forth in the above Paragraph (the "Total Purchase Price") payable in U.S. dollars by Purchaser as follows:

(1)    **Initial Earnest Money** in the amount set forth in the above Paragraph is due when Purchaser signs and submits this Agreement, and is payable in the form of a certified or cashier's check made payable to the order of **Stewart Title Guaranty,** as Escrow Agent, and delivered at the time of signing this Agreement, receipt of which is hereby acknowledged.

(2)    **Additional Earnest Money:** If the Initial Earnest Money is less than 10% of the Purchase Price as stated in above Paragraph, the Purchaser shall be required to make an Additional Earnest Money, the amount of which, when taken together with the Initial Earnest Money, shall equal ten (10%) percent of the Total Purchase Price. The sum of the Initial Earnest Money and the Additional Earnest Money shall be referred to as the "Total Earnest Money." The Additional Earnest Money is payable a) by Purchaser's personal check if paid at the time of Purchaser's execution of this Agreement, subject to collection, or, b) by certified or cashier's check from a bank, made payable to the order of **"Stewart Title Guaranty, as Escrow Agent",** and delivered to Sheldon Good & Company Auctions, LLC, 333 West Wacker Drive, Suite 400, Chicago, IL 60606 on or before 12:00 noon, five business days following Seller's acceptance of this Agreement. The aggregate of the Initial Earnest Money and Additional Earnest Money shall constitute the total Earnest Money shall be held by the Escrow Agent in a non-interest bearing account unless requested otherwise in writing by Purchaser.

After the Earnest Money is paid to Escrow Agent, Purchaser may direct Escrow Agent to place the Earnest Money in an interest bearing account at a federally insured bank, the choice of which is the Escrowee's, within three (3) business days after receiving Purchaser's written direction to do so, which direction shall include Purchaser's income tax identification number. A service and administration charge not to exceed $100.00 will be charged by Escrow Agent to implement the opening, closing and Internal Revenue Service filing requirements with respect to such account. Interest on the Earnest Money shall be reported for income tax purpose in all events as being for the account of the Purchaser and shall be paid not withstanding the provisions of the foregoing Paragraph, the Escrow Agent shall not be obliged to deposit the Earnest Money in an interest-bearing account until receipt from the Purchaser of an IRS Form W-8 or W-9 setting forth the Purchaser's taxpayer identification number. Interest on the Earnest Money shall be reported for income tax purposes in all events as being for the account of the Purchaser, and shall be paid to Purchaser in all events, except in the event of Purchaser's default, in which case the interest shall follow the Earnest Money.

(3)     The **Balance of the Purchase Price ("Balance")** plus or minus prorations and closing adjustments as set forth in this Agreement, if any, is due at the closing of this transaction ("Closing") and must be paid by Purchaser's certified personal check or official cashier's check from a bank, made payable to the direct order of Seller or such other payee(s) as Seller may hereafter designate in writing. All checks must be made payable directly to the order of the payee as directed by the Seller; no checks may be endorsed. Third party checks are not acceptable. In lieu of accepting checks, Seller reserves the right to require Purchaser to pay the balance of the Purchase Price by wire transfer to a bank account designated by Seller.

B.     The acceptance by Purchaser of the delivery of the deed at the closing shall be and be deemed to be full performance and discharge of every agreement and obligation (either express or implied) on the part of Seller to be performed pursuant to this Agreement and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

5.     **CASH PURCHASE:** This is an all-cash sale and purchase; and is NOT contingent upon obtaining financing even though Purchaser may apply to a lending institution of Purchaser's choice for a loan. Purchaser understands and agrees that neither his receipt of a commitment from such a lending institution, his acceptance of such a commitment, nor his satisfaction of any condition set forth in such a commitment shall in any way be a condition of Purchaser's obligations under this Agreement. Seller makes no representation or warranty as to Purchaser's ability to obtain financing.

6.     **INTENTIONALLY DELETED**

7.     **CLOSING LOCATION:** Closing will take place a local office of Stewart Title Guaranty, or at another location designated by Seller in Bexar County.

8.     **CLOSING DATE:** Closing will take place at 10:00 a.m., **Forty-Five Days following Seller's Acceptance of this Agreement.** If Purchaser elects to have Seller deliver the property with zoning which allows for use as a church pursuant to Paragraph 59, below, Seller may, in Seller's sole discretion, extend Closing for an additional forty-five days, for a Closing ninety days following Seller's Acceptance of this Agreement. If Seller is unable to obtaining the changed zoning within ninety days following Seller's Acceptance of this Agreement, Purchase may, in Purchaser's sole discretion, (a) extend the Closing for an additional forty-five days, or (b) obtain a return of the Earnest Money and net accrued interest, if any, and this Agreement shall terminate and neither party shall have any further rights or obligations pursuant to this Agreement.

In the event that Closing shall be delayed due to the fault of Purchaser and Purchaser requests a delay in Closing, then Seller in its sole discretion may elect, upon written notice to Purchaser, to

extend the Closing, in which event Purchaser shall pay at Closing, in addition to all other sums then due hereunder, the sum of One Thousand Dollars ($1,000.00) per day for each day or part thereof that the Closing is delayed after the Standard Closing Date, representing an adjournment fee. Not withstanding the foregoing, **TIME IS OF THE ESSENCE WITH AN OUTSIDE CLOSING DATE OF December 31, 2007.**

9.    **CLOSING DOCUMENTS**:

A.    At the Closing, Seller shall deliver to Purchaser, at Seller's sole cost and expense, the following:

(1)    A duly executed and acknowledged Special Warranty Deed in recordable form conveying title in fee simple to all of the real estate, free and clear of any and all liens, encumbrances, and subject to the Permitted Title Exceptions attached hereto as Exhibit B;

(2)    A Preliminary Title Commitment at Closing and, subsequent to Closing, an Owner's Policy of Title Insurance (the "Title Policy") issued by Stewart Title Guaranty of North Carolina in the full amount of the Purchase Price, dated as of closing, insuring Purchaser's title to the real estate subject only to the Permitted Title Exceptions listed on Exhibit B, the standard printed exceptions and additional exceptions contained in the usual form of Owner's Title Policy;

(3)    Internal Revenue Code reporting requirements or disclosure including FIRPTA;

(4)    Seller shall by written assignment assign all Service Contracts, if any to Purchaser, (except any such contracts which by their terms are non-assignable) and Purchaser shall accept such assignment and agrees to discharge and assume all of the obligations and duties of landlord under the Service Contracts which accrue or arise for the period from and after the closing;

(5)    Customary transfer declarations;

(6)    Bill of Sale, without warranties, for any personal property being transferred free of liens or encumbrances;

(7)    All other documents that are reasonably customary to close this transaction; in accordance with the terms and conditions of this Agreement;

B.    At the Closing, Purchaser shall:

(1)    Pay the cash portion of the Purchase Price including prorations and adjustments, if any;

(2)    If Purchaser is a corporation or a limited liability company, deliver to Seller:

(a)    Certified resolutions of the board of directors of Purchaser (or managing member) authorizing all the transactions contemplated by this Agreement;

(b)    An incumbency certificate with respect to those officers (or managing member) of Purchaser executing any documents or instruments in connection with the transactions contemplated herein; and

(c)    Certificate of Good Standing for the entity acquiring title from the Secretary of State or other appropriate governmental office of the state in which the entity was formed.

(3)    If the entity acquiring title is a partnership, deliver to Seller a certified copy of the partnership agreement and all appropriate resolutions, partnership consents and evidence of authority of said entity;

(4)    Execute such other and further documents necessary to close this transaction; in accordance with the terms and conditions of this Agreement;

(5)    If Purchase Money Financing is applicable:

(a)    Execute and deliver to Seller the Financing Documents;

(b)    Deliver an ALTA Mortgage Title Insurance Policy insuring the Mortgage as a first lien on the Property subject only to the Permitted Title Exceptions; and

(6)    Execute an assignment and assumption agreement pursuant to which Purchaser assumes any obligations of Seller under the Leases and any other contracts relating to the Property.

10.    **SALES EXPENSES TO BE PAID IN CASH AT OR PRIOR TO CLOSING:**

A.    **SELLER'S EXPENSES:** All costs of releasing and recording any release of Mortgage required by the terms of this Agreement; All costs of the Owner's Title Policy; 1/2 of any escrow fee; state and county transfer taxes, real estate brokerage fees pursuant to the written agreement between Sheldon Good & Company Auctions and Seller and other expenses stipulated to be paid by Seller under provisions of this Agreement.

B.    **PURCHASER'S EXPENSES:** All recording costs of the Mortgage, the Deed, and the Collateral Documents, the full amount of any money lender's escrow, expense of ALTA Mortgage Title Policy, 1/2 of any escrow fee, City Transfer Taxes (if any); and expenses stipulated to be paid by Purchaser under other provisions of this Agreement.

11.    **PRORATIONS AND ADJUSTMENTS:**    The following shall be prorated and adjusted between Seller and Purchaser as of the time of closing, except as otherwise expressly provided herein:

A.    Water, electricity, sewer, gas, telephone and other utility charges based, to extent practicable, on final meter readings and / or final invoices.

B.    Amounts paid or payable under any assigned maintenance or other service contracts shall be prorated as of the time of closing.

C.    Accrued general real estate taxes shall be prorated as of the time of closing. If such bills are not available, then such taxes shall be prorated on the basis of 100% of the most recent ascertainable tax bills.

D.    Special Assessments - If at the time of Closing, the Premises are affected by an assessment which is or may become payable in installments, then only those installments due prior to the date of the Closing shall be paid by the Seller, and all installments due subsequent to Closing shall be paid by Purchaser.

E.    Such other items that are customarily prorated in transactions of this nature shall be ratably prorated as of the Closing Date. Except as expressly provided herein, all prorations shall be final. The covenants and agreements set forth in this Paragraph shall survive the closing.

F.    As of Closing, Purchaser shall be responsible for the transfer of accounts and establishment of all utility services to the real estate to the name of Purchaser, including the making of any new utility deposits with the utility providers. Seller shall be entitled to receive a refund of utility service deposits, if any, covering the period prior to the Closing Date.

G.    Real estate tax assessment reductions, tax refunds, and credits received after the Closing Date after deducting the expenses of collection thereof including attorney's fees which obligation shall survive the Closing that are:

1.    attributable to the tax year during which the Closing Date occurs and thereafter shall be prorated between Seller and Purchaser;

2.    attributable to all tax years before the year in which the Closing occurs belong to the Seller.

**12.    POSSESSION:**    The possession of the Property and the keys shall be delivered to Purchaser at Closing.

**13.    ACCESS TO PROPERTY:** Seller shall allow Purchaser or Purchaser's representative access to the Property (subject to rights of tenants), on one occasion no more than three days prior to the scheduled Closing Date.

**14.    PLAT OF SURVEY:** Seller furnished to Purchaser a Plat of Survey dated September 9, 2007, prepared by South Texas Surveying Associates, Inc., Project Number 1838-07. Purchaser represents it has reviewed and accepts the contents and condition of the Plat of Survey as it depicts the Property and is purchasing the Property subject to the condition as depicted on of the Plat of Survey.

**15.    DEFAULT:**

A.    Unless otherwise provided for herein, if Purchaser fails to comply with the terms and conditions hereof, Seller may enforce specific performance, or terminate this Agreement, in which event the Earnest Money, plus net accrued interest, if any, shall be due and payable to Seller as its minimum liquidated damages. Purchaser shall be liable for payment of both the Initial Earnest Money and Additional Earnest Money if not previously paid. In the event the Purchaser defaults and the Earnest Money is forfeited, the Earnest Money plus accrued interest less reasonable costs of collection shall be paid as described in the Exclusive Real Estate Auction Agreement between Seller and Broker. The parties agree that actual damages in the event of default are difficult to ascertain and further agree that the amount set forth as liquidated damages is a reasonable estimate of the damages to Seller in the event of Purchaser's default. Such sum is intended to be liquidated damages, and not a penalty.

B.    If Seller defaults, Purchaser may elect to obtain a return of the Earnest Money and net accrued interest, if any, as liquidated damages and this Agreement shall terminate and neither party shall have any rights or obligations pursuant to this Agreement, or in the alternative, Purchaser shall have the right to an action for specific performance for Seller's breach of this Agreement, which shall be Purchaser's only other remedy. Purchaser acknowledges and agrees that under no circumstances shall Seller be liable for Purchaser's damages, consequential, actual, punitive, speculative, or otherwise.

**16.    ESCROW:** The Earnest Money is deposited with Escrow Agent with the understanding that the Escrow Agent (a) does not assume or have any liability for performance or non-performance of any party and (b) has the right to require in writing from all signatories (i) a written release of liability of the Escrow Agent, except for gross negligence or fraud and (ii) authorization to disburse the Earnest Money at Closing as such disbursement is provided for herein. At Closing, Earnest Money and accrued interest shall be applied to payment of the Purchase Price. Any refund or payment of the Earnest Money under this Agreement pursuant to a default shall be reduced by the amount of any

actual expenses incurred by Escrow Agent arising out of the acceptance and distribution of funds pursuant to a determination as to which party is entitled to such funds.

19.    **RIGHT TO NOTICE:** Purchaser and Seller hereby agree that in the event Seller notifies Escrow Agent that Purchaser has breached this Agreement by reason of Purchaser's failure to timely deposit the Earnest Money or to timely close the transaction or for any other reason as set forth in this Agreement and that Seller has thereby elected to declare Purchaser's Earnest Money forfeited, the Escrow Agent shall notify the Purchaser as to the same. Purchaser shall have five (5) business days from the date Escrow Agent notifies Purchaser of Seller's forfeiture notice to dispute Seller's notice. In the event Purchaser fails to dispute such notice, within said five day period, then, Escrow Agent is hereby authorized by Purchaser and Seller to remit the Earnest Money and any accrued interest to Seller, reduced by the Escrow Agent's actual expenses described above. Purchaser hereby agrees to indemnify, save harmless and agree to defend Escrow Agent from and against any claims, demand, costs or damages (including reasonable attorney's fees) incurred by Escrow Agent and arising from or out of or with respect to Escrow Agent's complying with such demand by Seller.

In the event that a dispute shall arise as to the disposition of all or any portion of the Total Earnest Money held by the Escrow Agent, Escrow Agent shall either (i) hold the Total Earnest Money subject to final determination of said dispute by a court of competent jurisdiction or receipt of joint instructions from Seller and Purchaser or (ii) deposit the same with a court of competent jurisdiction, pending the decision of such court, and shall be entitled to instructions, as the case may be, with respect to the disposition of the Total Earnest Money. Escrow Agent shall be entitled to consult with his counsel and be reimbursed for all reasonable expenses of such consultation with respect to his duties as Escrow Agent and shall be further entitled to all reasonable out-of-pocket expenses incurred in connection with the activities set forth in the preceding sentence. All such expenses shall be paid by the party whose position shall not be sustained. Escrow Agent may act or refrain from acting in respect of any matter referred to herein, in full reliance upon and by and with the advice of counsel which may be selected by Escrow Agent (including any member of Escrow Agent's firm) and shall be fully protected in so acting or so refraining from acting upon the advice of such counsel. Seller and Purchaser promise and agree to indemnify and save Escrow Agent harmless from any claims, every kind and nature of which may be incurred by Escrow Agent by reason of his acceptance of, and his performance under this Purchase and Sale Agreement except claims involving gross negligence, bad faith or willful misconduct.

18.    **REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER:**

A. Seller hereby represents and warrants to Purchaser which representations and warranties shall be deemed made by Seller to Purchaser also as of the Closing Date that:

(1) Seller is duly authorized and empowered to sell the Property;

(2) All obligations of Seller arising from the ownership and operation of the Property which accrue prior to the Closing Date, have been paid as they became due or will be paid at or prior to Closing. Except for obligations for which provisions are herein made for proration or other adjustments at Closing, there will be no obligations of Seller with respect to the Property outstanding as of the Closing Date;

(3) Seller is not aware of any unrecorded liens caused by Seller against the Property which will not be satisfied at Closing;

(4) Seller has received no notice of the commencement of any legal action against Seller for the damaging, taking or acquiring of all or any part of the Property, either temporarily or permanently, by condemnation or by exercise of the right of eminent domain;

(5) Seller shall not withdraw, settle, or otherwise compromise any protest or reduction proceeding (if any) affecting real estate taxes assessed against the real estate for any tax year in which the Closing is to occur without the prior written consent of Purchaser, which consent shall not be unreasonably withheld; and

(6) Seller has no knowledge of receiving any written notice from any governmental department or agency having jurisdiction as to conditions affecting the Property that alleges a violation of law or governmental ordinances, orders or requirements relating to the Property.

B. From the Effective Date of this Agreement until the Closing Date or earlier termination of this Agreement, Seller covenants to:

(1) without the prior consent of Purchaser, not enter into any new written or oral service agreement or other agreement with respect to the Property, that will not be fully performed by Seller on or before the Closing Date, or that may not be canceled by Purchaser without liability at the Closing;

(2) advise Purchaser promptly of any litigation, arbitration or administrative hearing before any governmental body or agency of which Seller is notified, concerning or affecting the Property which is instituted after the date hereof; and

(3) not take, or omit to take any action that would have the effect of violating any of the material representations, warranties, covenants, and agreements of Seller contained in this Agreement.

C. If any representation or warranty in this Agreement is known by Purchaser, prior to Closing, to be untrue to a material extent or Purchaser knows that any covenant has not been performed or is not remedied by Seller prior to Closing except those liens, charges or unpaid bills or expenses that can be remedied by funds paid by Seller at Closing out of the Purchase Price, Purchaser may as its sole remedy (i) terminate this Agreement whereupon the Earnest Money and accrued interest shall be refunded to Purchaser, and neither party shall have any further rights or obligations pursuant to this Agreement, or (ii) waive its objections and close the transaction without reduction of the Purchase Price.

19. <u>REPRESENTATION, WARRANTIES AND COVENANTS OF PURCHASER</u>    Purchaser represents, warrants and covenants to Seller as follows:

A.    Purchaser is a sophisticated purchaser and has reviewed all materials and/or had all materials reviewed by its own experts and consultants;

B.    Purchaser is purchasing the Property in its "AS IS, WHERE IS" condition with no warranties by Seller as to merchantability, suitability or fitness for any particular use, it being understood and agreed that Purchaser is relying solely on its own inspections, engineering studies and reports, economic and feasibility studies and examinations of the Property and Purchaser's own determination of the condition and value of the Property;

C.    Purchaser has all requisite power and authority to consummate the transaction contemplated by this Agreement and has by proper proceedings duly authorized the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby;

D.    This Agreement when executed and delivered by Purchaser and Seller, will constitute the valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms;

E.    To Purchaser's knowledge, neither the execution and delivery of this Agreement nor the consummation of the transaction contemplated hereby will violate or be in conflict with (i) any applicable provisions of law, (ii) any order of any court or government agency having jurisdiction over the Purchaser, or (iii) any agreement or instrument to which Purchaser is a party or under which Purchaser is bound;

F.    There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser's ability to perform its obligations under this Agreement;

G.    Purchaser has sufficient funds available to consummate the Closing of the transaction described in this Agreement; and

H.    From the Effective Date of this Agreement, Purchaser covenants to Seller that, in addition to the acts and deeds recited herein and contemplated to be performed, executed, and delivered by Purchaser, the Purchaser shall perform, execute, and deliver or cause to be performed, executed, and delivered at, prior to, or after the Closing, any and all further reasonable acts, deeds, and assurances as Seller or the Title Company may reasonably require in order to consummate the transactions contemplated herein.

**20.    PERSONAL PROPERTY:** Personal Property. On the Closing Date the personal property shall be owned by Seller free of liens and encumbrances other than the liens of any Continuing Mortgages and title transferred by Bill of Sale without warranty of quality fitness and merchantability.

**21.    CONDITION OF AND DAMAGE TO PROPERTY:** The Property shall be conveyed in its present condition, ordinary wear and tear and damage by casualty excepted.

**22.    CONDEMNATION:** If, prior to the Closing Date, condemnation proceedings are commenced against any material portion of the Property (except for road widening), Purchaser may, at its option, terminate this Agreement by written notice to Seller within ten (10) days after Purchaser is advised of the commencement of such condemnation proceedings and the Earnest Money shall be refunded to Purchaser, or Purchaser shall have the right to proceed to consummate the purchase of the Property, in which event Purchaser may appear and defend any such condemnation proceedings, and any award in condemnation shall become the Property of Purchaser and the Purchase Price shall not be reduced.

**23.    RISK OF LOSS:** Seller shall bear the risk of loss or damage to the Property from fire or other casualty until closing.

A.    If the cost of the damage to the Property due to fire or other casualty is equal to or less than 10% of the Purchase Price Purchaser shall proceed to consummate the transaction contemplated by this Agreement and Seller, shall proceed with the purchase of the Property, in which event Seller shall deliver possession of the Property to Purchaser at Closing together with

(i)    all insurance proceeds received by Seller pursuant to the Insurance Policy (and which have not been spent by Seller in the repair or preservation of the Property)

(ii)    an assignment of all rights and claims of Seller under the Insurance Policy

(iii)    give to Purchaser a credit equal to the deductible that Purchaser will incur – but there shall be no other reduction or abatement of the total Purchase Price.

B.    In the event of damage to or destruction of the Property by fire or other casualty, the aggregate cost of which exceeds 10% of the Purchaser Price, prior to closing, Purchaser may, at its

option, within fifteen (15) days after notice thereof from Seller to Purchaser but in to event later than the Closing Date, either

> (1)    terminate this Agreement and all rights and obligations hereunder, in which event

>> (a)    the Earnest Money and all interest accrued thereon shall be returned immediately to Purchaser,

>> (b)    all funds and documents deposited by or on behalf of Purchaser into the Escrow shall be returned promptly to Purchaser by the Escrowee and

>> (c)    all documents and other items deposited by Seller into the Escrow shall be returned promptly to Seller by the Escrowee; OR

> (2)    elect to proceed with the purchase of the Property as provided in the foregoing subclause (A).

C.    Seller agrees to fully cooperate with and assist Purchaser in adjusting any loss and perfecting and pursuing any claim under the Insurance Policy, but Seller shall not be obligated to incur any expense in connection therewith.

D.    After Closing the risk of loss shall be and is assumed by the Purchaser. Seller shall retain Seller's insurance until Closing, and it shall be the obligation of Purchaser to procure Purchaser's own policies of insurance to be effective from and after the date of Closing.

24.    **BROKER'S COMMISSION**: Seller shall cause to be paid a broker's commission to **Sheldon Good & Company Auctions, LLC** (hereinafter referred to as "Seller's Broker") in accordance with its Exclusive Real Estate Auction Agreement dated September 5, 2007, and *J.J. ARIDA - KELLER WILLIAMS LEGACY GROUP* (hereinafter referred to as "Buyer's Broker") an amount equal to 2.5% of the High Bid Price. Seller and Purchaser agree that all Broker's commissions shall be paid simultaneously with, and as a condition precedent to, any disbursements made at Closing. This Paragraph and disbursement instructions may not be amended or revoked without the prior written consent of Seller's Broker. Purchaser represents to the Seller that no Broker or Auctioneer other than Seller's Broker or Buyer's Broker as defined in this Paragraph was involved in submitting, showing or selling the Property to Purchaser and Seller and Purchaser hereto agree to indemnify the other party and all those parties claiming through them from and against any claims by any other broker other than Seller's Broker or Buyer's Broker, if any, with whom the indemnifying party may have dealt. The provisions of this Paragraph shall survive the closing.

25.    **AGENCY DISCLOSURE**: The listing broker, **Sheldon Good & Company Auctions, LLC** and its sales agents (Listing Company) represent Seller. The Listing Company owes duties of trust, loyalty and confidence to Seller only. While the Listing Company has a duty to treat Purchaser honestly, the Listing Company is Seller's agent and is acting on behalf of Seller and not Purchaser. Any Cooperating Broker will be recognized as a Buyer's agent (Buyer's Broker). BY SIGNING BELOW, PURCHASER ACKNOWLEDGES PRIOR TIMELY NOTICE BY LISTING OR SELLING COMPANY THAT LISTING COMPANY IS SELLER'S AGENT.

26.    **CONSULT YOUR ATTORNEY**:    THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY. NO REPRESENTATION OR RECOMMENDATION IS MADE BY SELLER, BROKER OR THEIR AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS DOCUMENT OR THE TRANSACTION RELATING THERETO. THESE ARE QUESTIONS FOR YOUR ATTORNEY.

CONSULT YOUR ATTORNEY BEFORE SIGNING. NEITHER THE SELLER NOR THE BROKER CAN GIVE YOU ANY LEGAL ADVICE.

## 27.    DISCLAIMER:

PURCHASER HEREBY REPRESENTS, WARRANTS, ACKNOWLEDGES AND COVENANTS THAT:

A.    PURCHASER IS PURCHASING THE PROPERTY, AND THE PROPERTY SHALL BE CONVEYED AND TRANSFERRED TO PURCHASER, "AS IS, WHERE IS, AND WITH ALL FAULTS", WITHOUT ANY WARRANTIES, REPRESENTATIONS, OR GUARANTEES, EITHER EXPRESSED OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE SELLER. PURCHASER ACKNOWLEDGES THAT SELLER HAS ACQUIRED THE PROPERTY THROUGH FORECLOSURE AND, CONSEQUENTLY, HAS LITTLE OR NO DIRECT KNOWLEDGE CONCERNING THE PHYSICAL OR ECONOMIC CHARACTERISTICS OF THE PROPERTY. PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED, AND IS NOT RELYING, ON ANY INFORMATION, DOCUMENT, SALES BROCHURES, OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMS, STATEMENTS, REPRESENTATIONS, GUARANTEES, OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED, OR ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVE BY, OR MADE BY, OR ON BEHALF OF, SELLER;

B.    PURCHASER IS NOT ENTITLED TO, AND SHOULD NOT RELY ON, THE SELLER OR ITS AGENTS AS TO (A) THE QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE STRUCTURAL ELEMENTS, FOUNDATION, ROOF, APPURTENANCES, ACCESS, LANDSCAPING, PARKING FACILITIES, OR THE ELECTRICAL, MECHANICAL, HVAC, PLUMBING, SEWAGE OR UTILITY SYSTEMS, FACILITIES OR APPLIANCES AT THE PROPERTY, IF ANY; (B) THE QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF SOILS OR THE EXISTENCE OF GROUND WATER AT THE PROPERTY; (C) THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR PHYSICAL CONDITION OF ANY UTILITIES SERVING THE PROPERTY; (D) THE DEVELOPMENT POTENTIAL OF THE PROPERTY, ITS HABITABILITY, MERCHANTABILITY OR FITNESS, SUITABILITY, OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE; (E) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY; (F) THE PROPERTY'S OR ITS OPERATIONS COMPLIANCE WITH ANY APPLICABLE ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, CODES, LAWS, REGULATIONS, STATUTES, ORDINANCES, COVENANTS, CONDITIONS, OR RESTRICTIONS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY, OR OF ANY OTHER PERSON OR ENTITY, INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING , OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE; (G) THE QUALITY OF ANY LABOR OR MATERIALS RELATING IN ANY WAY TO THE PROPERTY; OR (H) THE CONDITION OF TITLE TO THE PROPERTY (EXCEPT FOR THE WARRANTY OF TITLE SET FORTH IN THE DEED), OR THE NATURE, STATUS AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, RIGHT OF REDEMPTION, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATIONS, COVENANT, CONDITION, RESTRICTION, OR ANY OTHER MATTER AFFECTING TITLE TO THE PROPERTY;

C.    PURCHASER HAS HAD AND WILL HAVE, PURSUANT TO THIS CONTRACT, AN ADEQUATE OPPORTUNITY TO MAKE SUCH LEGAL, FACTUAL, AND OTHER INQUIRIES AND INVESTIGATIONS AS IT DEEMS NECESSARY, DESIRABLE, OR APPROPRIATE WITH RESPECT TO THE PROPERTY. THOSE INQUIRIES AND INVESTIGATIONS OF PURCHASER MAY INCLUDE, BUT ARE NOT LIMITED TO, ANY LEASES AND CONTRACTS PERTAINING TO THE PROPERTY, THE PHYSICAL COMPONENTS OF ALL PORTIONS OF THE PROPERTY, THE CONDITION OF THE PROPERTY, THE EXISTENCE OF ANY WOOD-DESTROYING ORGANISMS ON THE PROPERTY, THE STATE OF FACTS THAT AN ACCURATE SURVEY AND INSPECTION WOULD SHOW, THE PRESENT AND FUTURE ZONING ORDINANCES, RESOLUTIONS, AND REGULATIONS OF THE

CITY, COUNTY, AND STATE WHERE THE PROPERTY IS LOCATED, AND THE VALUE AND MARKETABILITY OF THE PROPERTY; AND

D.    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBPARAGRAPHS (I) THROUGH (V), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES, AND DISCHARGES ANY CLAIM THAT IT HAS, MIGHT HAVE HAD, OR MAY HAVE AGAINST THE SELLER WITH RESPECT TO THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, ITS ABILITY OR INABILITY TO OBTAIN OR MAINTAIN BUILDING PERMITS, EITHER TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, THE ACTUAL OR POTENTIAL INCOME OR PROFITS TO BE DERIVED FROM THE PROPERTY, THE REAL ESTATE TAXES OR ASSESSMENTS NOW OR HEREAFTER PAYABLE THEREON, THE COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, OR REQUIREMENTS, AND ANY OTHER STATE OF FACTS THAT EXIST WITH RESPECT TO THE PROPERTY.

E.    ALL PROVISIONS OF THIS REPRESENTATIONS AND ACKNOWLEDGMENTS OF PURCHASER SHALL SURVIVE THE CLOSING OF THIS TRANSACTION.

F.    THE REPRESENTATIONS, ACKNOWLEDGMENTS, WARRANTIES AND COVENANTS HEREIN SHALL BE CONTAINED IN THE SPECIAL WARRANTY DEED TO BE DELIVERED TO PURCHASER AS PART OF THE AGREEMENT AND SHALL SURVIVE CLOSING, OR IF APPLICABLE, THE EARLIER TERMINATION OF THE AGREEMENT.

G.    THE REAL ESTATE SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NO EXPERTISE WITH RESPECT TO ENVIRONMENTAL MATTERS.    PROPER INSPECTIONS OF THE PROPERTY BY QUALIFIED EXPERTS ARE AN ABSOLUTE NECESSITY TO DETERMINE WHETHER OR NOT THERE ARE ANY CURRENT OR POTENTIAL ENVIRONMENTAL CONCERNS RELATING TO THE PROPERTY.    THE REAL ESTATE SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NOT MADE, NOR WILL THEY MAKE, ANY REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, REGARDING THE EXISTENCE OR NON-EXISTENCE OF ANY SUCH ENVIRONMENTAL CONCERNS IN OR ON THE PROPERTY.    PROBLEMS INVOLVING ENVIRONMENTAL CONCERNS CAN BE EXTREMELY COSTLY TO CORRECT. IT IS THE RESPONSIBILITY OF PURCHASER TO RETAIN QUALIFIED EXPERTS TO DEAL WITH THE DETECTION AND CORRECTION OF SUCH MATTERS.

**28.    NOTICES:** All notices, elections, consents, demands and communications (collectively called "Notices" or individually called "Notice") shall be in writing and delivered personally or by registered or certified mail return receipt requested, postage prepaid, express mail or mailgram and, if sent to Purchaser, addressed to Purchaser at Purchaser's address and, if sent to the Seller, addressed to the Seller at Seller's address each stated in this Agreement with a copy to the Broker whose address is stated in this Agreement. Copies of Notices shall be sent to the Attorneys for the respective parties, if identified on the signature page. Either party may, by written notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service the express mail service or overnight courier within the United States of America, except that a Notice of a change of address shall be deemed given when actually received. Seller's affidavit of the date and time of deposit in a mailbox or with the express mail service or the postmark, whichever is earlier shall constitute evidence of the effective date when the notice has been given.

**29.    COOPERATION IN A TAX DEFERRED EXCHANGE:** Both Purchaser and Seller herein reserve the right to consummate this transaction as part of a deferred exchange of like kind property

as provided by Section 1031 of the Internal Revenue Code but in all events Seller would receive cash at closing. Both Purchaser and Seller agree to cooperate with each other in this regard at or prior to Closing and execute necessary documents as appropriate provided that the non exchanging party shall have no liability in connection with the execution of such exchange documents. Should there be any additional costs associated with this deferred exchange they will be borne solely by the party effectuating the exchange. Seller reserves the right to have all documents relative to the exchange reviewed and approved by its attorney at Purchaser's sole cost and expense which cost and expense shall be reasonable and customary. Purchaser hereby indemnifies and holds Seller harmless in connection with any matter concerning or arising out of such exchange or deferred exchange which indemnification shall survive the Closing.

30.    **NO RECORDING:** Neither this Agreement nor any type of memorandum thereof shall be recorded with the office of the Recorder of Deeds or with any other governmental agency, and any purported recordation or filing hereof by Purchaser shall constitute a default on the part of Purchaser.

31.    **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements. There are no representations, agreements arrangements or understandings oral or written between the parties, including the Broker, relating to the subject matter contained in this Agreement which is not fully expressed or referred to herein.

32.    **SUCCESSORS AND ASSIGNS:**

A.    The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of the Seller and its successors and assigns. This Agreement may not be assigned by Purchaser without prior written consent of Seller.

B.    The Seller's refusal to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against Seller.

33.    **PURCHASER ASSIGNMENT TO TAKE TITLE:** Purchaser may request the conveyance be made to another, persons or entity ("Nominee"), upon notification in writing delivered to Seller at least ten days prior to the date of Closing. Purchaser's designation of a Nominee to take title to the Property shall not relieve the Purchaser of any obligation hereunder or liability as stated in the Collateral Documents if Seller Financing is elected. Any additional transfer taxes due as a result of the designation of a Nominee shall be Purchaser's obligation to pay.

34.    **JOINT PURCHASERS:** The term "Purchaser" shall be read as "Purchasers" if more than one person is the Purchaser of the Property, in which case their obligations shall be joint and several.

35.    **FURTHER ASSURANCES:** Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein at any time and from time to time after execution of this Agreement whether before or after the Closing, as such other party may reasonably request in order to effectuate the provisions of this Agreement or the transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to this transaction, provided that neither party shall be required to incur any material expense in connection therewith.

36.    **SEVERABILITY:** If any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other persons or circumstances shall not be affected thereby. All other clauses or provisions of this Agreement, not found invalid or unenforceable shall be and remain valid and enforceable.

**37.**   **TIME:** Time is of the essence of this Agreement.

**38.**   **STRICT COMPLIANCE:** Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

**39.**   **GOVERNING LAW:** The provisions of this Agreement shall be governed by, and construed and enforced in accordance with the laws of the state in which the Property is located.

**40.**   **WAIVER OF JURY TRIAL:** EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

**41.**   **ATTORNEYS FEES:** A party to this Agreement who is the prevailing party in any legal proceeding against any other party brought under or with respect to this Agreement or the transaction contemplated hereby shall be additionally entitled to recover court costs and reasonable attorney's fees from the non-prevailing party.

**42.**   **GENDER:** A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

**43.**   **CERTAIN REFERENCES:** The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraph, subparagraphs or other provisions of this Agreement.

**44.**   **SINGULAR ALSO MEANS PLURAL:** Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

**45.**   **CAPTIONS:** The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**46.**   **NO ORAL CHANGES:** This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

**47.**   **EXHIBITS:** All Exhibits described herein and attached hereto are incorporated herein by this reference for all purposes.

**48.**   **DATE OF PERFORMANCE:** If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state in which the Property is located, the date for such performance shall be the next succeeding business day.

**49.    NO PRESUMPTION REGARDING DRAFTING:** It is acknowledged and presumed that the substance and form of this Agreement have been fully reviewed by the parties hereto and approved as to form by their respective counsel. It is further acknowledged and agreed that no presumption shall exist against either party hereto by virtue of this Agreement being considered to have been drafted by counsel for either party thereto.

**50.    COUNTERPARTS:** This Agreement may be executed in multiple counterparts all of which when taken together shall constitute a Agreement for the sale of Real Estate under the laws of this state. It is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled. modified or amended only by a written instrument executed by both the Seller and the Purchaser.

**51.    COUNTERPART FACSIMILE EXECUTION:** For purposes of, executing this Agreement, a document signed and transmitted by facsimile machine shall be treated as an original document. The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document. At the request of either party, any facsimile document shall be re-executed by both parties in original form. No party hereto may raise the use of a facsimile machine or the fact that any signature was transmitted through the use of a facsimile machine as a defense to the enforcement of this Agreement or any amendment executed in compliance with this Paragraph. This Paragraph does not supersede the requirements of the "Notices" Paragraph.

**52.    FIRPTA:** Seller represents and warrants to Purchaser that Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA").

**53.    ENVIRONMENTAL MATTERS:** Seller represents and warrants to Purchaser that to Seller's knowledge there are no environmental conditions relating to the Property of which the Seller has knowledge of or have arisen out of activities of Seller or its agents or employees. Purchaser agrees to take the Property subject to all known or unknown environmental defects, conditions and liabilities, if any.

**54.    ENVIRONMENTAL REPORT:** Purchaser hereby acknowledges and agrees that it has been provided with a copy of the environmental report prepared by LandAmerica Assessment Corporation, dated September 17, 2007, (the "Report"), and is familiar with the contents of the Report. Seller does not warrant to Purchaser that the Report is accurate or complete. Purchaser agrees to purchase the Property subject to all known or unknown environmental defects, conditions and liabilities, if any and expressly waiver and releases Seller and Seller's Agreement from any claim or liabilities arising from any known or unknown environmental defect conditions or liability, having had sufficient time to review the Report and deciding to and (a) rely on their own expertise, (b) conduct their own investigation or not and (c) to bid or submit a price that reflects any uncertainty on their part.

**58.    IRREVOCABLE OFFER:** Purchaser further acknowledges that this Agreement is executed and delivered by Purchaser pursuant to an auction conducted on behalf of Seller. In consideration of the following: (a) preserving the integrity of the auction process and assuring that all offers are made in conformity therewith and in reliance thereon; (b) the monies spent by Seller to arrange for the auction; (c) the opportunity of the Purchaser to bid for the Property; (d) the promise by the Seller to sell the Property to Purchaser if this Agreement is accepted by Seller as hereinafter provided and (e) for other good and valuable consideration, the receipt and adequacy of which is expressly acknowledged by

Purchaser, including the mutual promises made by each party, this Agreement constitutes an irrevocable offer to purchase by Purchaser in accordance with this Agreement which cannot be revoked by Purchaser prior to 5:00 p.m. local time, (based on the location of the Property) on the fifth business day following Purchaser Execution of this Agreement ("Irrevocable Deadline").

Such offer to purchase shall not be deemed accepted by Seller until executed by Seller or Seller's duly authorized agent prior to revocation thereof. Notice from Seller or its duly authorized agent to accept or reject Purchaser's offer under this Paragraph may be given pursuant to the Notices Paragraph in this Agreement or by telephone and confirmed at a later date by notice given pursuant to Notices Paragraph in this Agreement. Failure of Seller or its duly authorized agent to notify Purchaser on or prior to the Irrevocable Deadline that Seller accepts or rejects Purchaser's offer shall not constitute acceptance or rejection by Seller of Purchaser's offer, but Purchaser's irrevocable offer shall thereafter become revocable.

In the event this Agreement is executed as a result of the Purchaser being the highest bidder at the Auction of this Property with the requisite Initial Earnest Money being tendered to the Escrow Agent and in the event Seller rejects this offer, the Initial Earnest Money shall be returned to Purchaser and Seller's Broker shall pay to Purchaser the sum of Five Thousand Dollars ($5,000.00) not as a penalty, but as liquidated damages for Purchaser having complied with the terms of the auction. The parties shall then have no further obligation or rights under this Agreement.

59.    **SPECIAL PROVISIONS:** Purchaser acknowledges that the current zoning on the Property does not allow for use of the Property as a church. Purchaser elects the following (*please initial one of the following options*):

___x__ Seller, at Seller's expense, will rezone the Property for use as a church prior to Closing. Closing may be extended in accordance with the provisions of Paragraph 8, above.

_____ The Property will be conveyed to Purchaser with its current zoning. Any changes in zoning will be Purchaser's sole responsibility.

60. THE PARTIES UNDERSTAND THAT SELLER'S PROPERTY SHALL REMAIN ON THE MARKET.
In the event Seller receives an acceptable bona fide offer to purchase the Property, Seller shall serve notice upon Purchaser that Seller has conditionally accepted the third party offer. Upon receipt of Seller's notice, Purchaser may increase its Total Earnest Money to $__10,000___ within 72 hours. In the event that Purchaser does increase its earnest money this Agreement shall remain in full force and effect. In the event that Purchaser does not increase its earnest money Seller shall have the right to cancel this Agreement and return to the Purchaser its earnest money with no further claims or actions from Purchaser.

IN WITNESS HEREOF, Purchaser and Seller agree that the Date of this Agreement shall be the date the Seller executes this Agreement.

SELLER:                                          PURCHASER:

Goldstar Trust Co as Trustee
FBO Bondholders of Church on the Rock

                                                 _____
                                                 (Signature)

_____                         DARRYL W CRAIN
Authorized Signatory                             _____
                                                 (Print Name)

                                                 JANUARY 4, 2k8
                                                 _____
                                                 Date of Purchaser's Offer

   1-4-08
_____                         _____
Date of Seller's Acceptance                      (Signature)

                                                 _____
                                                 (Print Name)

                                                 _____
                                                 Date of Purchaser's Offer

The attached Exhibits are hereby incorporated herein by reference:

Exhibit A - Legal Description
Exhibit B - Title Exceptions
Exhibit D - Plat of Survey

## EXHIBIT " A"

## Legal Description

Lots 3 and 4, SENECA ESTATES SUBDIVISION UNIT 7, in the City of Leon Valley situated in Bexar County, Texas, according to plat thereof recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas

## EXHIBIT " B"

## Permitted Title Exceptions

A.   General Exceptions

    (1)   Rights or claims of parties in possession not shown by the public records

    (2)   Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

    (3)   Easements or claims of easements not shown by the public records and existing water, mineral, oil and exploration rights.

    (4)   Any lien, or right to lien for services labor or material heretofore or hereafter furnished imposed by law and not shown by the public records.

    (5)   Taxes or special assessments which are not shown as existing liens by the public records.

    (6)   Restrictions upon the use of the premises not appearing in the record chain of title.

B.   Specific Exceptions

    (1)   Covenants, Conditions, Easements and Restrictions of record.

    (2)   General Real Estate Taxes not due and payable and subsequent years.

    (3)   Special Assessments and installments due after the date of Closing.

    (4)   Acts of Purchaser

    (5)   Drainage Ditches and Laterals

Exhibit B

Page 2

1.  The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception)

2.  Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements. Upon receipt of an approved survey. Schedule B, Item 2 may be modified to read in its entirety, "Shortages in area" (Mortgage Title Policy only or Owner's Title Policy with prescribed premium)

3.  Homestead or community property or survivorship rights, if any, of any spouse of any insured. (Applies to the Owner Policy only.)

4.  Any titles or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,
    a.  to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs, or oceans, or
    b.  to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
    c.  to filled-in lands, or artificial islands, or
    d.  to statutory water rights, including riparian rights, or
    e.  to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area
    (Applies to the Owner Policy only.)

5.  Standby fees, taxes and assessments by any taxing authority for the year 2007 and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to the Date of Policy" in lieu of "for the year 2007 and subsequent years.") Schedule B, Item 5, may be amended to delete the words "and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership." AND to add "Company insures that standby fees, taxes and assessments by any taxing authority for the year 2007 are not yet due and payable." (Mortgage Policy only or Interim Construction Binder only, upon request and payment of premium)

6.  The terms and conditions of the documents creating your interest in the land.

7.  Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished before a binder is issued.)

Exhibit B

Page 3

8    Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage (Applies to Mortgagee (T-2) Policy only.)

9.    The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R)

10    The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception.)

   a    14' Electric, Gas, Telephone and cable Television easement as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas.

   b    28' Overhead Electric easement in new locations as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas. (as to Lot 2)

   c    Variable Width Drainage and Utility easement as set out in Volume 9571, Page 85, Deed and Plat Records of Bexar County Texas.

   d    Electric Line Right-of-Way easement as set out in Volume 1382 Page 1718, Real Property Records of Bexar County, Texas.

   e    Easement to Southwestern Bell Telephone Company, as set out in Volume 6547, Page 998 of the Real Property Records of Bexar County, Texas.

   f    25' Building setback line as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas.

   g    Private Drainage and Utility Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 1)

   h    10' Private Sanitary Sewer Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 1)

        28' Electric Easement as shown on plat recorded in Volume 9571, Page 85, Deed and Plat Records of Bexar County, Texas (as to Lot 1)

   j    Any visible and apparent roadway or easement over or across the subject property, the existence of which does not appear of record.

   k    Any and all leases, recorded and unrecorded and rights of parties thereto.

©2007 Sheldon Good & Company, Auctions   Page 21
6401 Bandera Road, Leon Valley – 1/4/08

# EXHIBIT "C"

## Survey

# AS PROVIDED IN THE BIDDERS INFORMATION PACKET

# EXHIBIT "H"

## APPLICATION FOR ZONING CHANGE, CASE NO. ZC

PRINT (IN BLACK) OR TYPE

| |
|---|
| NAME OF APPLICANT:  Patrick Christensen, Brown, P.C., Attorneys at Law |
| ADDRESS:  112 East Pecan Street, Suite 1490; San Antonio, Texas 78205 |
| PHONE NO:  HOME (   )        WORK (210) 299-3704        FAX (210) 299-4731 |
| STATUS: OWNER ( ) AGENT (X) - If agent, attach notarized Letter of Authorization. |

### PROPERTY DESCRIPTION

| |
|---|
| ADDRESS:  6401 Bandera Road |
| LEGAL DESCRIPTION: Lot 4, CB 4429 J |
| CURRENT ZONING: "B-2" Retail District    REQUESTED ZONING: "B-3" Commercial District |
| EXISTING PROPERTY USE or STATE NONE:    Church |
| ACREAGE AND/OR SQUARE FOOTAGE:    3.803 acres |
| DOES OWNER OWN ADJACENT PROPERTY:    YES ( )    NO ( X ) |
| LIST EXISTING STRUCTURES: AND/OR EXISTING USES:    Church |

I HEREBY CERTIFY THAT I HAVE READ AND EXAMINED THIS APPLICATION AND THE ATTACHED INSTRUCTION SHEET AND KNOW THE INFORMATION I HAVE PROVIDED TO BE TRUE AND CORRECT. ALL PROVISIONS OF LAWS AND ORDINANCES GOVERNING THIS APPLICATION WILL BE COMPLIED WITH WHETHER SPECIFIED HEREIN OR NOT. THE GRANTING OF A ZONING CHANGE DOES NOT PRESUME TO GIVE AUTHORITY TO VIOLATE OR CANCEL THE PROVISIONS OF ANY OTHER STATE OR LOCAL LAW REGULATING THE USE OF THE PROPERTY.

SIGNATURE OF APPLICANT and DATE
(Owner or Authorized Agent)

STATE OF Texas
COUNTY OF Bexar

BEFORE ME, A Notary Public in and for State of Texas, on this date personally appeared Patrick Christensen (Applicant) who duly states that all facts in this application are true to the best of his knowledge

SWORN TO and SUBSCRIBED before me this 29 day of March, 2007.

SEAL

NOTARY PUBLIC
My Commission expires: 4-11-05

LORI J BETUS
NOTARY PUBLIC
State of Texas
Comm. Exp. 04-11-2009

RECEIVED
JAN 4 2007
COMMUNITY DEVELOPMENT

3

ZONING APP
Rev. 1/95

DEF LEON VALLEY 00347

**MAILING LIST OF PROPERTY OWNERS TO BE NOTIFIED**

1. Please print/type names and addresses of the applicant, representative, property owners, and all owners of all property within 200 feet of the subject site listed with Bexar County Appraisal Rolls (as indicated on the map you are providing).

2. The names listed below should be keyed to the map, indicating the specific property owned.

3. Provide the City with corresponding **pre-addressed labels of property owners** listed below.

**NOTE:** If a property owner holds more than one lot (same mailing address for different lots), make only one mailing label for that property owner and write "Same Owner as #___" on the attached mailing list.

I certify that the names, addresses and zip codes listed below are those listed on the current Bexar County Tax Roll.

Signed: _____
                    Owner/Agent

Sworn to and subscribed before me this the 29th day of November of 2007.

LORI J BETUS
NOTARY PUBLIC
State of Texas
Comm. Exp. 04-11-2009

Notary Public and for the State of Texas _____

Appointment Expires: 4-11-09

---

APPLICANT: Patrick Christensen, Brown, P.C., Attorneys at Law _____

ADDRESS: 112 East Pecan Street, Suite 1490; San Antonio, Texas 78205 _____

REPRESENTATIVE: Patrick Christensen, Brown, P.C., Attorneys at Law _____

ADDRESS: 112 East Pecan Street, Suite 1490; San Antonio, Texas 78205 _____

PROPERTY OWNER: Goldstar Trust Company _____

ADDRESS: 5336 N. 19th Avenue; Phoenix, Arizona 85015 _____

4

ZONING APP
Rev. 1/95

DEF LEON VALLEY 00348

Case #
Date:

| # | PROPERTY OWNERS' NAMES & ADDRESSES | LOT | BLK | CB (NCB) | ACREAGE & PROPERTY DESCRIPTION & TAX ID NUMBER |
|---|---|---|---|---|---|
| 1 | Hetherington LOIS E FMLY TR | | | | 0.2143 Acres |
| | % Mary Carolyn Lee, Trustee<br>255 Doral Way | P-20 B | | CB 4429 | |
| | Colorado Springs, CO 80921-3205 | | | | 04429-000-0203 |
| 2 | Robert T. Lee | NW IRR<br>104.49 FT<br>of 1 | 1 | CB 4429 H | 0.4590 Acres |
| | 6336 Bandera Road | | | | |
| | San Antonio, TX 78238-1604 | | | | 04429-801-0010 |
| 3 | Church on the Rock – SA | | | | 3.803 Acres |
| | 6401 Bandera Road | 4 | | CB 4429 | |
| | San Antonio, TX 78238-1512 | | | | 04429-100-0040 |
| 4 | Cadena, Richard & Carla | | | | 0.2149 Acres |
| | 6105 Rue Francois St | 10 | 3 | CB 4432 D | |
| | San Antonio, TX 78238-1637 | | | | 04432-403-0100 |
| 5 | Najera, Ramon Jr & Janie G. | | | | 0.2261 Acres |
| | 6101 Rue Francois | 11 | 3 | CB 4432 D | |
| | Leon Valley, TX 78238 | | | | 04432-403-0110 |
| 6 | Gomez, Carlos Jr & Yolanda | | | | 0.3053 Acres |
| | 2182 Cardinal Dr | 1 | 4 | CB 4432 D | |
| | San Diego, CA 92123-3746 | | | | 04432-404-0010 |
| 7 | Lowry, Thomas S. & Heidi R. | | | | 0.2985 Acres |
| | 6104 Rue Francois St | 2 | 4 | CB 4432 D | |
| | San Antonio, TX 78238-1636 | | | | 04432-404-0020 |
| 8 | Sok, Chheng & Vanna | | | | 0.380 Acres |
| | 6346 Bandera Rd | 2 | 7 | CB 4429 A | |
| | San Antonio, TX 78238-1632 | | | | 04429-107-0020 |
| 9 | Tran, Kim Dong & Doan Nham Duc | | | | 0.3271 Acres |
| | 14922 Rio Rancho Way | 1 | 1 | CB 4429 C | |
| | Helotes, TX 78023 | | | | 04429-301-0010 |
| 10 | Richardson Family LTD PTSHP | | | | 4.63 Acres |
| | % Fiesta Auto<br>6320 Bandera Road | 5 | 1 | CB 4429 H | |
| | San Antonio, TX 78238-1632 | | | | 04429-801-0050 |
| 11 | Prattes, William Theodore & Oralia Rios | | | | 0.2259 Acres |
| | 6202 Echo Hill Dr | 2 | 8 | NCB 9925 A | |
| | San Antonio, TX 78238-1516 | | | | 09925-108-0020 |
| 12 | Vasquez Gilberto N. & Marielena | | | | 0.2478 Acres |
| | 6206 Echo HI | 3 | 8 | NCB 9925 A | |
| | San Antonio, TX 78238 | | | | 09925-108-0030 |

5

ZONING APP
Rev. 1/95

Date:

| # | PROPERTY OWNERS' NAMES & ADDRESSES | LOT | BLK | CB (NCB) | ACREAGE & PROPERTY DESCRIPTION & TAX ID NUMBER |
|---|---|---|---|---|---|
| 13 | Olivares, Nora M & Horacio L | 26 | 4 | CB 4432 D | 0.2639 Acres |
| | 6103 Rue Des Amis | | | | |
| | San Antonio, TX 78238-1616 | | | | 04432-404-0260 |
| 14 | Buchanan, Elsie G. | 24 | 5 | CB 4432 D | 0.2975 Acres |
| | 6232 Rue Marielyne St | | | | |
| | San Antonio, TX 78238-1625 | | | | 04432-405-0240 |
| 15 | Flores, Tomas & Sheila Marie | 25 | 5 | CB 4432 D | 0.0953 Acres |
| | 6230 Rue Marielyne | | | | |
| | San Antonio, TX 78238-1625 | | | | 04432-405-0250 |
| 16 | Parker, Martha C. | 26 | 5 | CB 4432 D | 0.0976 Acres |
| | 6228 Rue Marielyne St | | | | |
| | San Antonio, TX 78238-1625 | | | | 04432-405-0260 |
| 17 | Ballantyne, Martha R. | 27 | 5 | CB 4432 D | 0.0919 Acres |
| | 6226 Rue Marielyne St | | | | |
| | San Antonio, TX 78238-1625 | | | | 04432-405-0270 |
| 18 | Lozano, Ruth | 28 | 5 | CB 4432 D | 0.1185 Acres |
| | 6224 Rue Marielyne St | | | | |
| | San Antonio, TX 78238-1625 | | | | 04432-405-0280 |
| 19 | Garcia, Estela G. | 29 | 5 | CB 4432 D | 0.1281 Acres |
| | 14002 Gingerwood | | | | |
| | San Antonio, TX 78231 | | | | 04432-405-0290 |
| 20 | Sierra Residential Partners, LTD | 2 & all Units of Sierra Royal Condos | | CB 4429 J | 5.713 Acres |
| | 7887 San Felipe, STE 237 | | | | |
| | Houston, TX | | | | 04429-000-0000 |
| 21 | SCI Cemeteries, Inc of Illino | 3 | 6 | CB 4429 L | 2.034 Acres |
| | Prop Tax Dept 8th Floor #2920 1929 Allen Parkway | | | | |
| | Houston, TX 77019-2506 | | | | 04429-060-0030 |
| 22 | M C Stores, Inc | 3 | | CB 4429 J | 1.095 Acres |
| | 313 St Cloud | | | | |
| | San Antonio, TX 78228-5011 | | | | 04429-100-0030 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

6

ZONING APP
Rev. 1/95

DEF LEON VALLEY 00350

FILE COPY

**Land Use Statement**

The purpose of the requested "B-3" Commercial District is to allow for the continued use of the subject property as a church. The Church on the Rock utilized this property as a church until the fall of 2007. The church ceased operation and the time limit to register for non-conforming use rights lapsed. Therefore, a zoning change request will be submitted in an attempt to continue to operate a church at this location. As a pre-existing use, this zoning change will not substantially nor permanently injure the property rights of the owner(s) of all real property affected by the proposed change in zoning. This request does not adversely affect the health, safety, and welfare of the general public.

DEF LEON VALLEY 00351



Copyright COSA GIS 2002 -2007

FILE COPY



DEF LEON VALLEY 00353

11/8/2007