·Mr. HATCH. Mr. President, I ask unanimous consent that the resolution be agreed to and the motion to reconsider be laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Con. Res. 132) was agreed to, as follows:

S. CON. RES. 132

*Resolved by the Senate (the House of Representatives concurring),* That, in consonance with section 132(a) of the Legislative Reorganization Act of 1946, when the Senate recesses or adjourns at the close of business on Thursday, July 27, 2000, Friday, July 28, 2000, or on Saturday, July 29, 2000, on a motion offered pursuant to this concurrent resolution by its Majority Leader or his designee, it stand recessed or adjourned until noon on Tuesday, September 5, 2000, or until noon on Wednesday, September 6, 2000, or until such time on either day as may be specified by its Majority Leader or his designee in the motion to recess or adjourn, or until noon on the second day after Members are notified to reassemble pursuant to section 2 of this concurrent resolution, whichever occurs first; and that when the House adjourns on the legislative day of Thursday, July 27, 2000, or Friday, July 28, 2000, on a motion offered pursuant to this concurrent resolution by its Majority Leader or his designee, it stand adjourned until 2:00 p.m. on Wednesday, September 6, 2000, or until noon on the second day after Members are notified to reassemble pursuant to section 2 of this concurrent resolution, whichever occurs first.

SEC. 2. The Majority Leader of the Senate and the Speaker of the House, acting jointly after consultation with the Minority Leader of the Senate and the Minority Leader of the House, shall notify the Members of the Senate and House, respectively, to reassemble whenever, in their opinion, the public interest shall warrant it.

## RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT OF 2000

Mr. HATCH. Mr. President, I ask unanimous consent that the Senate now proceed to the consideration of Calendar No. 684, S. 2869.

The PRESIDING OFFICER. The clerk will report the bill by title.

The assistant legislative clerk read as follows:

A bill (S. 2869) to protect religious liberty, and for other purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. HATCH. Mr. President, I rise today to thank the Senate in anticipation of its action in passing the Religious Land Use and Institutionalized Persons Act of 2000. I want to express my appreciation specifically to the lead cosponsor of this bill, Senator KENNEDY. He and I worked together almost 10 years ago in enacting the Religious Freedom Restoration Act. He has once again demonstrated his commitment to religious liberty by his leadership and effort on this measure.

I also express my appreciation to Senators THURMOND and REID. Both of these Senators had strong and serious concerns about portions of this bill but were willing to work with us to secure passage of this legislation because of

their overriding commitment to religious freedom.

Our bill deals with just two areas where religious freedom has been threatened—land use regulation and persons in prisons, mental hospitals, nursing homes and similar institutions. Our bill will ensure that if a government action substantially burdens the exercise of religion in these two areas, the government must demonstrate that imposing the burden serves a compelling public interest and does so by the least restrictive means. In addition, with respect to land use regulation, the bill specifically prohibits various forms of religious discrimination and exclusion.

It is no secret that I would have preferred a broader bill than the one before us today. Recognizing, however, the hurdles facing passage of such a bill, supporters have correctly, in my view, agreed to move forward on this more limited, albeit critical, effort. The willingness of many serious and well-intentioned persons has brought us to this successful conclusion in the Senate today and likely swift action in the House of Representatives this fall.

I thank all persons involved in this effort. Numerous religious denominations have come together with other groups in the spirit of cooperation to form the Coalition for the Free Exercise of Religion. They have joined forces and concentrated their energy on this vital issue—I am grateful to all of them.

In conclusion, I thank the staff members who devoted so much of their time and who worked so hard to ensure the success of this bill. In particular, I would like to thank Eric George, my former counsel, Manus Cooney, my Chief Counsel, Sharon Prost, my Deputy Chief Counsel, and Sam Harkness, a law clerk for the Judiciary Committee. Their collective work has brought us to where we are today. Furthermore, I would like to express my gratitude to the staff of Senator KENNEDY; specifically, Melanie Barnes and David Sutphen, who were a pleasure to work with. Eddie Ayoob, from the office of Senator REID, also provided valuable assistance. Finally, I would like to thank the dedicated professionals at the Department of Justice who helped in the effort.

I ask unanimous consent that following my statement and that of Senator KENNEDY the following items be printed in the RECORD: A manager's statement consisting of a joint statement by myself and Senator KENNEDY; a letter received today from the administration in support of the bill; and several other letters of support.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit I.)

Mr. President, I commend Chairman CANADY of the House Judiciary Committee. I am hopeful that the other body can promptly—even this evening is a possibility—pass this bill. I know Congressman CANADY has and will con-

tinue to do everything he can do to enact this important legislation.

Cathy Cleaver of Chairman CANADY's staff has also been indispensable. I acknowledge her for her efforts.

I also thank Senators KENNEDY, REID, and THURMOND for their yeoman work on this bill. This is one of the most important bills of this new century, and it is one I am so pleased to be a part of in passing.

EXHIBIT I

JOINT STATEMENT OF SENATOR HATCH AND SENATOR KENNEDY ON THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT OF 2000

SUMMARY AND PURPOSE

The Religious Land Use and Institutionalized Persons Act of 2000 ("This Act") is a targeted bill that addresses the two frequently occurring burdens on religious liberty. The bill is based on three years of hearings—three hearings before the Senate Committee on the Judiciary and six before the House Subcommittee on the Constitution—that addressed in great detail both the need for legislation and the scope of Congressional power to enact such legislation.

The bill targets two areas: land use regulation, and persons in prisons, mental hospitals, and similar state institutions. Within those two target areas, the bill applies only to the extent that Congress has power to regulate under the Commerce Clause, the Spending Clause, or Section 5 of the Fourteenth Amendment. Within this scope of application, the bill applies the standard of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb–1 (1994): if government substantially burdens the exercise of religion, it must demonstrate that imposing that burden on the claimant serves a compelling interest by the least restrictive means. In addition, with respect to land use regulation, the bill specifically prohibits various forms of religious discrimination and exclusion. Finally, the bill provides generally that when a claimant offers prima facie proof of a violation of the Free Exercise Clause, the burden of persuasion on most issues shifts to the government.

NEED FOR LEGISLATION

Land Use. The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.

The hearing record compiled massive evidence that this right is frequently violated. Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.

Sometimes, zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church, especially in cases of black churches and Jewish shuls and synagogues. More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or "not consistent with the city's land use plan." Churches have



EXHIBIT

A

been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic. Churches have been denied the right to meet in rented storefronts, in abandoned schools, in converted funeral homes, theaters, and skating rinks—in all sorts of buildings that were permitted when they generated traffic for secular purposes.

The hearing record contains much evidence that these forms of discrimination are very widespread. Some of this evidence is statistical—from national surveys of cases, churches, zoning codes, and public attitudes. Some of it is anecdotal, with examples from all over the country. Some of it is testimony by witnesses with wide experience who say that the anecdotes are representative. This cumulative and mutually reinforcing evidence is summarized in the report of the House Committee on the Judiciary (House Rep. 106–219) at 18–24, in the testimony of Prof. Douglas Laycock to the Committee on the Judiciary 23–45 (Sept. 9, 1999), and in Douglas Laycock, State RFRAs and Land Use Regulation, 32 U.C. Davis L. Rev. 755, 769–83 (1999).

This discrimination against religious uses is a nationwide problem. It does not occur in every jurisdiction with land use authority, but it occurs in many such jurisdictions throughout the nation. Where it occurs, it is often covert. It is impossible to make separate findings about every jurisdiction, or to legislate in a way that reaches only those jurisdictions that are guilty.

Institutionalized Persons. Congress has long acted to protect the civil rights of institutionalized persons. Far more than any other Americans, persons residing in institutions are subject to the authority of one or a few local officials. Institutional residents' right to practice their faith is at the mercy of those running the institution, and their experience is very mixed. It is well known that prisoners often file frivolous claims; it is less well known that prison officials sometimes impose frivolous or arbitrary rules. Whether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways.

The House Subcommittee on the Constitution heard testimony to this effect from Charles Colson and Patrick Nolan of Prison Fellowship, and in great detail about violations of the rights of Jewish prisoners, from Isaac Jaroslawicz of the Aleph Institute. The Senate Committee on the Judiciary learned of examples in litigated cases: *Mockaitis* v. *Harcleroad,* 104 F.3d 1522 (9th Cir. 1997), in which jail authorities surreptitiously recorded the sacrament of confession between a prisoner and the Roman Catholic chaplain; *Sasnett* v. *Sullivan,* 197 F.3d 290 (7th Cir. 1999), in which a Wisconsin prison rule prevented prisoners from wearing religious jewelry such as crosses, on grounds that Judge Posner found discriminated against Protestants "without the ghost of a reason," *id.* at 292; and *McClellan* v. *Keen* (settled in the District of Colorado in 1994), in which authorities let a prisoner attend Episcopal worship services but forbade him to take communion. This Act can provide a remedy and a neutral forum to such cases if they fall within the reach of the Spending Clause or the Commerce Clause.

The compelling interest test is a standard that responds to facts and context. What the Judiciary Committee said about that standard in its report on RFRA is equally applicable to This Act:

"[T]he committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

"At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." Senate Report 103–111 at 10 (1993).

The Prison Litigation Reform Act is working effectively to control frivolous prisoner litigation across the board, without barring meritorious claims equally with frivolous ones. The Department of Justice reports that RFRA "has not been an unreasonable burden to the Federal prison system,'' and that the federal Bureau of Prisons has experienced only 65 RFRA suits in six years, most of which also alleged other theories and would have been filed anyway. Letter of Robert Raben, Assistant Attorney General, to Senators HATCH and LEAHY (July 19, 2000). Other empirical studies also show that religious liberty claims are a very small percentage of all prisoner claims, that RFRA led to only a very slight increase in the number of such claims, and that on average RFRA claims were more meritorious than most prisoner claims. *See* Lee Boothby & Nicholas P. Miller, *Prisoner Claims for Religious Freedom and State RFRAs,* 32 U.C. Davis L. Rev. 573 (1999).

*Constitutional Authority.* The hearings also intensely examined Congress's constitutional authority to enact this bill in light of recent developments in Supreme Court federalism doctrine. Constitutional authority to enact an earlier and much broader bill is explained in the House Committee Report (No. 106–219) at 14–18, 27, and in the testimony of constitutional scholars to the Senate Committee on the Judiciary. See Statements of Prof. Douglas Laycock 8–23, 54–64 (Sept. 9, 1999); Prof. Jay Bybee (Sept. 9, 1999) (doubting some aspects of the broader bill then proposed, but expressing confidence that the land use provisions were constitutional); Prof. Michael McConnell (June 23, 1998); *See also* Thomas C. Berg, *The Constitutional Future of Religious Freedom Legislation,* 20 U. Ark. Little Rock L.J. 715 (1998).

*Spending Clause.* The Spending Clause provisions are modeled directly on similar provisions in other civil rights laws. Congressional power to attach germane conditions to federal spending has long been upheld. *South Dakota* v. *Dole,* 483 U.S. 203 (1987); *Steward Machine Co.* v. *Davis,* 301 U.S. 548 (1937). The bill's protections are properly confined to each federally assisted "program or activity,'' which is defined by incorporating a subset of the definition of the same phrase in Title VI of the Civil Rights Act of 1964. In most applications, this means the department that administers the challenged land use regulation or the department that administers the institution in which the claimant is housed.

*Commerce Clause.* The Commerce Clause provisions require proof of a "jurisdictional element which would ensure, through case-by-case inquiry, that the [burden on religious exercise] in question affects interstate commerce." *United States* v. *Lopez,* 514 U.S. 549, 561 (1995). The Gun Free Schools Act, struck down in *Lopez,* and the Violence Against Women Act, struck down in *United States* v. *Morrison,* 120 S.Ct. 1740 (2000), were invalid because they regulated non-economic activity and required no proof of such a jurisdictional element. *See id.* at 1750–51; *Lopez,* 514 U.S. at 561–62. But the Court assumes that if such a "jurisdictional element" is proved in each case, the aggregate of all such effects in individual cases will be a substantial effect on commerce. *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,* 520 U.S. 564, 586 (1997) ("although the summer camp involved in this case may have a relatively insignificant impact on the commerce of the entire Nation, the interstate commercial activities of nonprofit entities as a class are unquestionably significant"); *Lopez,* 514 U.S. at 559–60 (1995) (explaining how small volumes of home-grown wheat could, in the aggregate, substantially affect commerce).

The jurisdictional element in this bill is that, in each case, the burden on religious exercise, or removal of that burden, will affect interstate commerce. This will most commonly be proved by showing that the burden prevents a specific economic transaction in commerce, such as a construction project, purchase or rental of a building, or an interstate shipment of religious goods. The aggregate of all such transactions is obviously substantial, and this is confirmed by data presented to the House Subcommittee on the Constitution (testimony of Marc D Stern (June 16, 1998).

*Fourteenth Amendment.* The land use sections of the bill have a third constitutional base: they enforce the Free Exercise and Free Speech Clauses as interpreted by the Supreme Court. Congress may act to enforce the Constitution when it has "reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne* v. *Flores,* 521 U.S. 507, 532 (1997). The standard is not certainty, but "reason to believe" and "significant likelihood." This Act more than satisfies that standard—in two independent ways.

First, the bill satisfies the constitutional standard factually. The hearing record demonstrates a widespread practice of individualized decisions to grant or refuse permission to use property for religious purposes. These individualized assessments readily lend themselves to discrimination, and they also make it difficult to prove discrimination in any individual case. But the committees in each house have examined large numbers of cases, and the hearing record reveals a widespread pattern of discrimination against churches as compared to secular places of assembly, and of discrimination against small and unfamiliar denominations as compared to larger and more familiar ones. This factual record is itself sufficient to support prophylactic rules to simplify the enforcement of constitutional standards in land use regulation of churches.

Both the "General Rules'' in §2(a)(1), and the specific provisions in §2(b), are proportionate and congruent responses to the problems documented in this factual record. The General Rule does not exempt religious uses from land use regulation; rather, it requires regulators to more fully justify substantial burdens on religious exercise. This duty of justification under a heightened standard of review is proportionate to the widespread discrimination and to the even more widespread individualized assessments, and it is directly responsive to the difficulty of proof in individual cases.

Second, and without regard to the factual record, the land use provisions of this bill satisfy the constitutional standard legally. Each subsection closely tracks the legal standards in one or more Supreme Court opinions, codifying those standards for greater visibility and easier enforceability.

The General Rules in §2(a)(1), requiring that substantial burdens on religious exercise be justified by a compelling interest, applies only to cases within the spending power or the commerce power, or to cases where government has authority to make individualized assessments of the proposed uses to which the property will be put. Where government makes such individualized assessments, permitting some uses and excluding others, it cannot exclude religious uses without compelling justification. *See Church of*

Case 5:08-cv-00907-OLG Document 37-2 Filed 07/20/2009 Page 3 of 8

the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 537–38 (1993); *Employment Division v. Smith,* 494 U.S. 872, 884 (1990).

Sections 2(b)(1) and (2) prohibit various forms of discrimination against or among religious land uses. These sections enforce the Free Exercise Clause rule against laws that burden religion and are not neutral and generally applicable.

Section 2(b)(3), on exclusion or unreasonable limitation of religious uses, enforces the Free Speech Clause as interpreted in *Schad v. Borough of Mount Ephraim,* 425 U.S. 61 (1981), which held that a municipality cannot entirely exclude a category of first amendment activity. Moreover, the Court distinguished zoning laws that burden "a protected liberty" from those that burden only property rights; the former require far more constitutional justification. *Id.* at 68–69. Section 2(b)(3) enforces the right to assembly for worship or other religious exercise under the Free Exercise Clause, and the hybrid free speech and free exercise right to assemble for worship or other religious exercise under *Schad* and *Smith.*

Section 4(a) shifts the burden of persuasion in cases where the claimant shows a prima facie violation of the Free Exercise Clause. There are actual constitutional violations in a higher percentage of the set of cases in which the claimant offers such proof and government cannot rebut it; there is a substantial likelihood of a constitutional violation in every such case.

*Other Constitutional Issues.* The Act does not "compel the States to enact or enforce a federal regulatory program." *Printz v. United States,* 521 U.S. 898, 935 (1997). It preempts certain laws and practices that discriminate against or substantially burden religious exercise, and it leaves all other policy choices to the states. The state may eliminate the discrimination or burden in any way it chooses, so long as the discrimination or substantial burden is actually eliminated.

The Act's protection for religious liberty does not violate the Establishment Clause. It is triggered only by a substantial burden on, a discrimination against, a total exclusion of, or an unreasonable limitation on the free exercise of religion. Regulatory exemptions are constitutional if they lift such government imposed burdens on religious exercise. *Board of Education v. Grumet,* 512 U.S. 687, 705 (1994); *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 335–36 (1987).

ADDITIONAL DISCUSSION ON INTENDED SCOPE ON LAND USE PROVISION

*Not land use immunity*

This Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay.

*Definition of religious exercise*

The definition of "religious exercise" under this Act includes the "use, building, or conversion" of real property for religious exercise. However, not every activity carried out by a religious entity or individual constitutes "religious exercise." In many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions. While recognizing that these activities or facilities may be owned, sponsored or operated by a religious institution, or may permit a religious institution to obtain additional funds to further its religious activities, this alone does not automatically bring these activities or facilities within the bill's definition or "religious exercise." For example, a

burden on a commercial building, which is connected to religious exercise primarily by the fact that the proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on "religious exercise."

*Definition of substantial burden*

The Act does not include a definition of the term "substantial burden" because it is not the intent of this Act to create a new standard for the definition of "substantial burden" on religious exercise. Instead, that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence. Nothing in this Act, including the requirement in Section 5(g) that its terms be broadly construed, is intended to change that principle. The term "substantial burden" as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise.

*Burden of persuasion*

If a claimant proves a substantial burden on its religious exercise, the government shall bear the burden of persuasion that application of the substantial burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. However, the party asserting a violation of this Act shall in all cases bear the burden of proof that the governmental action in question constitutes a substantial burden on religious exercise. In any case in which the government provides prima facie evidence that it has made, or has offered in writing to make, a specific accommodation to relieve such a substantial burden, the claimant has the burden of persuasion that the proposed accommodation is either unreasonable or ineffective in relieving the substantial burden.

ADDITIONAL COMMENT

An earlier draft of this legislation had a subsection that would reversed that result in *Bronx Household of Faith v. Community School District,* 127 F.3d 207 (2nd Cir. 1997), and its progeny. Although that provision did not survive the necessary consensus building that has made possible this bi-partisan bill, the holding in *Bronx Household* is indeed troubling in light of the Supreme Court's counsel in *Widmar v. Vincent,* 454 U.S. 263, 269 n.6, 271 n.9, 272 n.11 (1981), to not set parameters to public forum that require differentiating between religious worship and all other forms of religious speech. We trust that the federal judiciary will revisit this issue at an early opportunity.

U.S. DEPARTMENT OF JUSTICE,
OFFICE OF LEGISLATIVE AFFAIRS,
*Washington, DC, July 19, 2000.*
Hon. ORRIN G. HATCH,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: I am writing to express the Department of Justice's strong support for S. 2869, the "Religious Land Use and Institutionalized Persons Act of 2000." The Department of Justice has consistently supported legislative efforts, such as the Religious Freedom Restoration Act ("RFRA"), that are designed to protect religious liberty. The Department is proud to have been able to work closely with staff from the House and Senate Judiciary Committees to refine this important legislation. With this letter, we hope to address certain questions that have been raised about the bill.

We understand that some Members may be concerned about the constitutionality of S. 2869, particularly in light of the Supreme Court's evolving federalism doctrines. Because of the importance of these issues, we

have worked diligently with Senate and House staff, as well as with representatives of a wide array of private groups interested in the legislation, to craft a constitutional bill. In our view, S. 2869 is constitutional under governing Supreme Court precedents.

In addition, apparently there has been some question about the potential effect of S. 2869 on State and local civil rights laws, such as fair housing laws. Although prior legislative proposals implicated civil rights laws in a way that concerned the Department, we believe S. 2869 cannot and should not be construed to require exemptions from such laws.

Finally, we are aware that some Members may be concerned about the effect of S. 2869 on the operations of State prisons. While section 3 of S. 2869 would apply to State prisons, we do not believe it would have an unreasonable impact on prison operations. RFRA has been in effect in the Federal prison system for six years and compliance with that statute has not been an unreasonable burden to the Federal prison system. Since enactment of RFRA in 1994, Federal inmates have filed approximately 65 RFRA lawsuits in Federal court naming the Bureau of Prisons (or its employees) as defendants. Most of these suits have been dismissed on motions by the defendants. Very few, if any, have gone to trial. With respect to RFRA, Congress emphasized that courts should "continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." S. Rep. No. 111, 103d Cong., 1st Sess. 10 (1993); *see also* H.R. Rep. No. 88, 103d Cong., 1st Sess. 8 (1993). We presume the same would be true under section 3 of S. 2869. Moreover, in our experience, RFRA claims almost invariably are joined with other claims, such that the case would have to be litigated even in the absence of the RFRA requirement. In sum, RFRA has not created a substantially increased litigation burden on the Federal Bureau of Prisons, nor has it resulted in any adverse court rulings that have significantly burdened the operation of Federal prisons. Based on our experience at the Federal level, it seems unlikely that section 3 of S. 2869 would impose significant or unjustified burdens on the administration of State prisons.

We note that the proposal contemplates both private and Federal government enforcement. As is generally the case, we urge that increased Federal enforcement responsibilities be accompanied by appropriate resource increases.

Thank you for the opportunity to present our views. Please do not hesitate to call upon us if we may be of additional assistance. The Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to submission of this letter.

Sincerely,

ROBERT RABEN,
*Assistant Attorney General.*

COALITION FOR THE
FREE EXERCISE OF RELIGION,
*Washington, DC, July 14, 2000.*
DEAR REPRESENTATIVE: We urge you to co-sponsor the "Religious Land Use and Institutionalized Persons Act of 2000" (RLUIPA) (H.R. 4862). This legislation will protect important aspects of a right that is foundational in our country—the right to worship free from unnecessary governmental interference. It will provide critical protection for houses of worship and other religious assemblies from restrictive land use regulation that all too often thwarts the practice of faith in our nation. The legislation also will ensure that institutionalized

persons will have the ability to exercise their religion in ways that do not undermine the security, discipline and order of their institutions.

In a series of Congressional hearings beginning in 1997, evidence was presented which indicated that the discretionary, individualized determinations made as a part of local land use regulation result in a pattern of burdensome and discriminatory actions on the activities of houses of worship and other religious assemblies. A study produced by law professors at Brigham Young University and attorneys from the law firm of Mayer, Brown & Platt has shown, for example, that small religious groups and nondenominational churches are greatly overrepresented in reported church zoning cases. Other testimony has documented the fact that some land use regulations intentionally exclude all new houses of worship from an entire city, while others exclude churches except if they are able to secure a special use permit, meaning that zoning authorities hold almost complete discretion in making these determinations. Some testimony presented explicit evidence of religious and racial bias associated with such land use determinations. In a significant number of communities, land use regulation makes it difficult or impossible to build, buy or rent space for a new house of worship, whether large or small.

Testimony from across the nation also has demonstrated that nonreligious assemblies are often treated far better by zoning authorities than religious assemblies. For example, recreation centers, health clubs, backyard barbecues and banquet halls are frequently the subjects of more favorable treatment than a home Bible study, a church's homeless feeding program or a small gathering of individuals for prayer.

After close scrutiny of this nationwide problem, members of Congress have properly chosen to address it through Congress' power under Section 5 of the 14th Amendment as well as through the spending and interstate commerce powers, consistent with recent U.S. Supreme Court decisions. RLUIPA generally provides that the government shall not implement land use regulation in ways that substantially burden religious exercise unless such a burden is justified by a compelling governmental interest that is being implemented in a manner that is least restrictive of religious exercise.

It is important to note that RLUIPA does not provide a religious assembly with immunity from zoning regulation. If the religious claimant cannot demonstrate that the regulation places a substantial burden on sincere religious exercise, then the claim fails without further consideration. If the claimant is successful in demonstrating a substantial burden, the government will still prevail if it can show that the burden is the unavoidable result of its pursuit of a compelling governmental objection. RLUIPA also ensures that the government may not treat religious assemblies and institutions on less than equal terms with a nonreligious assembly, discriminate against any institution on the basis of religion, totally exclude religious assemblies from a jurisdiction or unreasonably limit such uses within a jurisdiction.

RLUIPA also provides a remedy for institutionalized persons who are inappropriately denied the right to practice their faith, including those in state residential facilities (such as homes for the disabled and chronically ill) and correctional facilities. Congressional testimony included descriptions of instances in which a Catholic priest was forced to do battle over bringing a small amount of sacramental wine into prisons, and cases in which prison officials not only refused to purchase matzo (the unleavened bread Jews are required to eat on Passover),

but refused to accept even donated matzo from a Jewish organization.

RLUIPA used Congress' powers to spend and regulate interstate commerce to address such problems. RLUIPA states that the government may not impose a substantial burden on the religious exercise of an institutionalized person unless that burden is justified by a compelling interest that is furthered by the least restrictive means. It is clear that this standard is applied in a special way in prisons. This provision does not require prison officials to grant religious requests that would undermine prison discipline, order and security. The standard set forth in RLUIPA has been employed by the Federal Bureau of Prisons for many years without negative impact on prison discipline, order and security. Moreover, RLUIPA states on its face that it does not amend or repeal the Prison Litigation Reform Act of 1995. Thus, the courts will continue to be able to reject frivolous lawsuits with ease. We urge you, therefore, to support the legislation as introduced by Representatives Canady, Nadler and Edwards and to reject an amendment thereto.

RLUIPA is supported by groups as different as the American Civil Liberties Union and the Christian Legal Society, Americans United for Separation of Church and State and Family Research Council, People For the American Way and the National Association for Evangelicals. These groups disagree on many issues, but they agree that the fundamental right of individuals and institutions to the free exercise of religion should be protected as RLUIPA does. While RLUIPA is not coextensive with all the free exercise issues about which the we care, it does address two critical areas that are continuing sources of free exercise problems in the wake of the U.S. Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). Thus, we urge you to co-sponsor this critical piece of legislation.

Sincerely,

MELISSA ROGERS,
*General Counsel,*
*Baptist Joint Committee on Public Affairs.*

———

LEADERSHIP CONFERENCE
ON CIVIL RIGHTS,
*Washington, DC, July 14, 2000.*
Senator TRENT LOTT,
*Majority Leader, U.S. Senate,*
*Washington, DC.*
Senator TOM DASCHLE,
*Minority Leader, U.S. Senate*
*Washington, DC.*

DEAR SENATOR LOTT AND SENATOR DASCHLE: The Leadership Conference on Civil Rights (LCCR) is a coalition of over 180 national organizations working to advance civil and human rights laws and policies. The LCCR writes to express our support for the Religious Land Use and Institutionalized Persons Act sponsored by Senators Orrin Hatch (R-UT) and Edward Kennedy (D-MA). We urge the Senate to pass this important legislation without amendment.

In our letter to you of March 17, 2000, we expressed our concern that the Religious Liberty Protection Act (RLPA) could have unintended, yet potentially harmful effects on other civil rights laws. The Religious Land Use and Institutionalized Persons Act is a less sweeping version of RLPA. Based on our careful review of the new legislation, we do not believe that the Hatch-Kennedy bill will have adverse consequences for other civil rights laws.

We greatly appreciate the work of the bill's sponsors in drafting the consensus legislation that will provide important new protections for the freedom of religious exercise without the harmful consequences for civil rights laws. These protections are especially

important to preserve the exercise of religious beliefs by adherents of minority religions, who of often are in a position of having limited ability to influence the political process.

We believe that the new legislation will ensure appropriate safeguards against governmental burdens on the free exercise of religious beliefs in two important areas. The legislation will protect the religious exercise of persons whose beliefs are burdened by zoning or landmarking laws, or by laws affecting persons residing in state or locally run institutions.

Governments have frequently applied zoning and landmarking laws in ways that discriminate against, or severely limit, the ability of houses of worship and individuals to use their houses of worship or homes for religious exercise. The Hatch-Kennedy bill will be particularly useful for those religious groups whose ministries of feeding or housing low-income or homeless persons have been curtailed by zoning laws.

The Hatch-Kennedy bill also provides an important remedy for persons residing in, or confined to, state or local institutions, as defined by the Civil Rights of Institutionalized Persons Act. The new legislation makes clear that, in governmental residential facilities such as state hospitals, nursing homes, group homes, or prisons, the government may not dictate whether, how, or when individuals can practice their religion, unless the government has a compelling interest in enforcing its regulation. The legislation will help ensure that a person will not be stripped of his or her ability to exercise his or her religious beliefs when entering a state or local government-run hospital, nursing home, group home, or prison.

We appreciate your consideration of our views on this issue. We urge the Senate to pass the legislation without any amendments.

Sincerely,

WADE HENDERSON,
*Executive Director.*
DOROTHY I. HEIGHT,
*Chairperson.*

Mr. KENNEDY. Mr. President, religious freedom is a bedrock principle in our Nation. The Religious Land Use and Institutionalized Persons Act of 2000 reflects our commitment to protect religious freedom and our belief that Congress still has the power to enact legislation to enhance that freedom, even after the Supreme Court's decision in 1997 that struck down the broader Religious Freedom Restoration Act that 97 Senators joined in passing in 1993.

Our bill has the support of the Free Exercise Coalition, which represents over 50 diverse and respected groups, including the Family Research Council, the Christian Legal Society, the American Civil Liberties Union, and People for the American Way. The bill also has the endorsement of the Leadership Conference for Civil Rights.

The broad support for this bill by religious groups and the civil rights community is the result of many months of difficult, but important negotiations. We carefully considered ways to strengthen religious liberties in other ways in the wake of the Supreme Court's decision. We were mindful of not undermining existing laws intended to protect other important civil rights and civil liberties. It would have

been counterproductive if this effort to protect religious liberties led to confrontation and conflict between the civil rights community and the religious community, or to a further court decision striking down the new law. We believe that our bill succeeds in avoiding these difficulties by addressing two of the most obvious current threats to religious liberty and by leaving open the question of what future Congressional actions can be taken to protect religious freedom in America.

Our goal in passing this legislation is to reach a reasonable and constitutionally sound balance between respecting the compelling interests of government and protecting the ability of people freely to exercise their religion. We believe that the legislation accomplishes this goal in two areas where infringement of this right has frequently occurred—the application of land use laws, and treatment of persons who are institutionalized. In both of these areas, our bill will protect rights in the Constitution—the right to worship, free from unnecessary government interference.

I commend Senator HATCH for his commitment and diligence in developing this legislation. The consensus bill before us is in large part the product of his skillful leadership. Many others in the Senate also deserve credit for this legislation, including Senators LIEBERMAN, Senator DASCHLE, Senator SCHUMER, Senator REID, Senator BENNETT, Senator HUTCHINSON, and Senator GORDON SMITH.

A broad array of groups also played a central role in crafting this legislation. Among those deserving special recognition are the American Civil Liberties Union, the Baptist Joint Committee, People for the American Way, the Union of Orthodox Congregations, the American Jewish Committee, and the Christian Legal Society. Professor Douglas Laycock of the University of Texas School of Law had an indispensable role in this process. Finally, I commend the White House and the Department of Justice for their guidance and expertise in developing an effective and constitutionally sound bill.

Senator HATCH and I are including in the RECORD a section-by-section summary of the bill along with a joint statement providing a detailed explanation of the need for this important legislation. Numerous committee reports have also described numerous examples of thoughtless and insensitive actions by governments that interfere with religious freedom, even though no valid public purpose is served by the governmental action.

The Religious Land Use and Institutionalized Persons Act of 2000 is an important step forward in protecting religious liberty in America. It reflects the Senate's long tradition of bipartisan support for the Constitution and the nation's fundamental freedoms and I urge the Senate to approve it.

Mr. REID. Mr. President, I rise today in support of S. 2869, the Religious Land Use and Institutionalized Persons Act. Before addressing the substance of this legislation, I would like to thank and congratulate the chairman of the Judiciary Committee, Senator HATCH, as well as the senior Senator from Massachusetts, Senator KENNEDY, for the outstanding, bipartisan efforts they have taken to produce the legislation we are considering today. I am well aware of the various difficulties and interests which had to be addressed, and I believe they did a fine job under such circumstances.

Mr. President, though modified and reduced in scope in order to secure its passage, S. 2869 is the most recent attempt by the Congress to protect the free exercise of religion. Prior to 1990, American courts had generally applied a strict scrutiny test to government actions that imposed substantial burdens on the exercise of religion. As my colleagues know, the strict scrutiny test is the highest standard the courts apply to actions on the part of government. However, in 1990, in Employment Division, Oregon Department of Human Resources, v. Smith, the United States Supreme Court largely eliminated the strict scrutiny test for free exercise cases.

Three years later, in direct response to the Smith decision, the 103rd Congress enacted the Religious Freedom and Restoration Act (RFRA), re-applying and extending the strict scrutiny test to all government actions, including those of state and local governments, that imposed substantial burdens on religious exercise. In 1997, the Supreme Court ruled, in City of Boerne, Texas v. Flores, that RFRA's coverage of state and local governments exceeded Congressional authority.

In response to the City of Boerne ruling, the Religious Liberty Protection Act (RLPA) was introduced during the 106th Congress. RLPA also reapplied a strict scrutiny standard to the actions of state and local governments with respect to religious exercise, but attempted to draw its authority from Congressional powers to attach conditions to federal funding programs and to regulate commerce. While the companion measure passed the House of Representatives overwhelmingly in July 1999, the legislation stalled in the Senate when legitimate concerns were raised that RLPA, as drafted, would supersede certain civil rights, particularly in areas relating to employment and housing. These concerns were most troubling to the gay and lesbian community. Discrimination based upon race, national origin, and to lesser certainty, gender, would have been protected, regardless of RLPA, because the courts have recognized that preventing such discrimination is a sufficient enough compelling government interest to overcome the strict scrutiny standard that RLPA would apply to religious exercise. Sexual orientation and disability discrimination, however, have not been afforded this high level of protection.

Mr. President, as I was considering the merits of the Religious Liberty Protection Act, these concerns weighted heavily upon my mind. I say that because I was a proud supporter of the Religious Freedom Restoration Act, which we passed overwhelmingly during the 103rd Congress only to see the Supreme Court strike it down. I was, and remain, particularly supportive of the Land use provisions contained within RFRA and RLPA, and which constitute the first of the two major sections contained within the Religious Land Use and Institutionalized Persons Act which we are considering today. As my colleagues may know, land use decisions are extremely important to many of the religious organizations which have joined together in the effort to get this legislation passed and signed into law. With some affiliations, legislation affecting land use decisions are the most important aspects of protecting the free exercise of religion. This is especially true for the Church of Jesus Christ of Latter Day Saints. Under current law, the LDS Church maintains serious reservations about non-uniform zoning regulations throughout the country which, though religiously-neutral on their face, have the effect of overly-restricting the size and location, among other things, of churches and temples. Often times, such regulations simply prohibit the construction of any church or temple. Under the legislation which Senators HATCH and KENNEDY have crafted, the strict scrutiny test contained within RLPA would apply to land use decisions. In other words, state and local zoning boards would be required to use the least restrictive means possible to advance a compelling state interest. I recognize that this is a high standard to meet, certainly much higher than current law, where zoning regulations are rarely overturned in court on religious exercise grounds. However, I also believe that the free exercise of religion deserves, in fact demands, such a high level of protection.

As I stated earlier, protecting hard-fought civil rights, including those which prohibit discrimination based upon sexual orientation, played an important role in my desire to pursue a more narrowly-tailored religious freedom measure. I am proud to have had the opportunity to work with Senators HATCH and KENNEDY to accomplish the worthwhile endeavor of protecting legitimate civil rights while at the same time protecting the free exercise of religion involving land use decisions.

While the first section of S. 2869 focuses upon land use, the second concerns the free exercise of religion as applied to institutionalized persons, i.e., prisoners. As my colleagues are well aware, in 1993, during the consideration of the Religious Freedom Restoration Act, I offered an amendment on the Senate floor that would have prohibited the applicability of RFRA to incarcerated individuals. I offered

that amendment for a variety of reasons, not the least of which was my belief, one that I continue to hold, that prisoners in this country have become entirely too litigious. Frivolous lawsuits seem to be the norm, not the exception to the rule. In 1993, more than 1,400 more lawsuits were filed by federal prisoners against the government, whether it was corrections officers, prison wardens, attorneys general, etc., than were filed by the government against criminals. That unbelievable situation within our federal judicial system, coupled with the high costs that my home State of Nevada is incurring defending frivolous prisoner lawsuits, led me to offer the amendment which would have prohibited the applicability of RFRA to prisoners. Regrettably, that effort failed. However, I remained a proud supporter of the underlying legislation.

Seven years later, I am faced with a similar set of circumstances. I support the underlying legislation which protects the free exercise of religion as applied to land use decisions, but I remain concerned that the applicability of the strict scrutiny standard to religious exercise within our federal, state and local prisons will encourage prisoners, and the courts, to second guess the decisions of our corrections employees and other prison officials. Furthermore, I have been contacted by many corrections officers and by the American Federation of State, County and Municipal Employees, AFSCME, which represents more than 60,000 dedicated men and women who are on the front line in our nation's prisons. They have legitimate concerns about what impact this legislation may have on our prison security.

A number of corrections officers have contacted me to relay their own personal experiences. These dedicated men and women have real concerns. In fact, AFSCME recently alerted their corrections officer membership that this legislation was coming up for a vote, and was deluged with phone calls from members expressing their distress about how this bill might affect their ability to maintain security and protect the safety of the public. As you can well imagine, getting inmates to comply with security measures in prison is no easy task. Many prisoners will use any excuse to avoid searches and to evade security measures instituted to protect prison personnel and the general public from harm.

While I continue to believe that we should not extend the privilege of a strict scrutiny standard to restrictions on the free exercise of religion behind the bars of our nation's prisons, I also recognize certain realities. The Prison Litigation Reform Act, PLRA, which we passed during the 104th Congress, has led many Senators to believe that my amendment is no longer necessary. I disagree with this conclusion given that PLRA applied to RFRA from April 1996, through June 1997, and there was no perceivable reduction in the number of prisoner RFRA lawsuits, or their corresponding burden. Furthermore, with specific regard to corrections employees, even when cases are screened and dismissed under the provisions of the Prison Litigation Reform Act, those lawsuits still show up on the public record, making it much more difficult for corrections employees who have been sued to obtain mortgages and car loans.

Mr. President, rather than offer an amendment to strike the provisions of S. 2869 relating to Institutionalized Persons and risk the certainty that this legislation would fail this year, I have decided, in consultation with the managers of this legislation, to pursue a different approach. My distinguished colleague from Utah, the Chairman of the Judiciary Committee, has agreed to hold a hearing next year on the impact of this legislation on our nation's penal institutions and their dedicated employees. I am hopeful that this will provide the opportunity for corrections administrators and other personnel to air their concerns about how this legislation may affect security in these institutions. I would also expect several Attorneys General, including the Nevada State Attorney General who has made limiting frivolous prisoner lawsuits a priority in my home State, to express their opinions. I look forward to this debate, and I would offer my personal gratitude to Chairman HATCH for the commitment.

I also plan on joining with Senator HATCH to request that the General Accounting Office conduct a detailed study as to what effects the Religious Freedom Restoration Act had on our nation's prisons, both before, during and after the application of the Prison Litigation Reform Act, and what effects, at the appropriate time, this legislation will have.

In conclusion, Mr. President, while I retain serious reservations about the inclusion of prisoners in S. 2869, I commend Senators HATCH and KENNEDY for diligently working in a bipartisan fashion to craft a narrowly-tailored religious freedom protection measure that will pass this Senate.

Mr. HATCH. Mr. President, I thank my friend, the assistant Democratic leader and the Senior Senator from Nevada, for his leadership which has allowed us to bring S. 2869 to the floor today. He has worked closely with myself and Senator KENNEDY, and I am sure he joins me in thanking the Senator for his contributions to this important legislation.

I would also say that I recognize his commitment to reducing the number of frivolous lawsuits by prisoners, and that several of our colleagues, particularly Senator THURMOND, have raised serious concerns relating to the Institutionalized Persons section of the bill. I respect these concerns, and, as I have already relayed to the Senator, I am committed to holding a hearing next year in the Judiciary Committee on these matters.

Mr. REID. I thank the distinguished Chairman of the Judiciary Committee and I look forward to that hearing next year.

I also ask if it is the chairman's intention to join with me in requesting that the General Accounting Office conduct a study on the effects that the Religious Freedom and Restoration Act has had, and that the Religious Land Use and Institutionalized Persons Act will have on our nation's prisons, both at the federal and state level, including the dedicated men and women who serve this country as corrections employees.

Mr. HATCH. The Senator is correct to state that I intend to request such a study from the GAO.

Mr. REID. Again, I thank the distinguished chairman. I also reiterate my appreciation and congratulations to him and Senator KENNEDY for the outstanding work they have done on a bipartisan basis to bring this legislation to the floor.

Mr. HATCH. I ask unanimous consent that the bill be read the third time and passed, the motion to reconsider be laid upon the table, and any statements relating to the bill be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (S. 2869) was read the third time and passed, as follows:

S. 2869

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Religious Land Use and Institutionalized Persons Act of 2000".

**SEC. 2. PROTECTION OF LAND USE AS RELIGIOUS EXERCISE.**

(a) SUBSTANTIAL BURDENS.—

(1) GENERAL RULE.—No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) SCOPE OF APPLICATION.—This subsection applies in any case in which—

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

(b) DISCRIMINATION AND EXCLUSION.—

(1) EQUAL TERMS.—No government shall impose or implement a land use regulation

in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) NONDISCRIMINATION.—No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) EXCLUSIONS AND LIMITS.—No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

SEC. 3. PROTECTION OF RELIGIOUS EXERCISE OF INSTITUTIONALIZED PERSONS.

(a) GENERAL RULE.—No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997), even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(b) SCOPE OF APPLICATION.—This section applies in any case in which—

(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

SEC. 4. JUDICIAL RELIEF.

(a) CAUSE OF ACTION.—A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

(b) BURDEN OF PERSUASION.—If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

(c) FULL FAITH AND CREDIT.—Adjudication of a claim of a violation of section 2 in a non-Federal forum shall not be entitled to full faith and credit in a Federal court unless the claimant had a full and fair adjudication of that claim in the non-Federal forum.

(d) ATTORNEYS' FEES.—Section 722(b) of the Revised Statutes (42 U.S.C. 1988(b)) is amended—

(1) by inserting "the Religious Land Use and Institutionalized Persons Act of 2000," after "Religious Freedom Restoration Act of 1993,"; and

(2) by striking the comma that follows a comma.

(e) PRISONERS.—Nothing in this Act shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act).

(f) AUTHORITY OF UNITED STATES TO ENFORCE THIS ACT.—The United States may bring an action for injunctive or declaratory relief to enforce compliance with this Act. Nothing in this subsection shall be construed to deny, impair, or otherwise affect any right or authority of the Attorney General,

the United States, or any agency, officer, or employee of the United States, acting under any law other than this subsection, to institute or intervene in any proceeding.

(g) LIMITATION.—If the only jurisdictional basis for applying a provision of this Act is a claim that a substantial burden by a government on religious exercise affects, or that removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, the provision shall not apply if the government demonstrates that all substantial burdens on, or the removal of all substantial burdens from, similar religious exercise throughout the Nation would not lead in the aggregate to a substantial effect on commerce with foreign nations, among the several States, or with Indian tribes.

SEC. 5. RULES OF CONSTRUCTION.

(a) RELIGIOUS BELIEF UNAFFECTED.—Nothing in this Act shall be construed to authorize any government to burden any religious belief.

(b) RELIGIOUS EXERCISE NOT REGULATED.—Nothing in this Act shall create any basis for restricting or burdening religious exercise or for claims against a religious organization including any religiously affiliated school or university, not acting under color of law.

(c) CLAIMS TO FUNDING UNAFFECTED.—Nothing in this Act shall create or preclude a right of any religious organization to receive funding or other assistance from a government, or of any person to receive government funding for a religious activity, but this Act may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.

(d) OTHER AUTHORITY TO IMPOSE CONDITIONS ON FUNDING UNAFFECTED.—Nothing in this Act shall—

(1) authorize a government to regulate or affect, directly or indirectly, the activities or policies of a person other than a government as a condition of receiving funding or other assistance; or

(2) restrict any authority that may exist under other law to so regulate or affect, except as provided in this Act.

(e) GOVERNMENTAL DISCRETION IN ALLEVIATING BURDENS ON RELIGIOUS EXERCISE.—A government may avoid the preemptive force of any provision of this Act by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

(f) EFFECT ON OTHER LAW.—With respect to a claim brought under this Act, proof that a substantial burden on a person's religious exercise affects, or removal of that burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, shall not establish any inference or presumption that Congress intends that any religious exercise is, or is not, subject to any law other than this Act.

(g) BROAD CONSTRUCTION.—This Act shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution.

(h) NO PREEMPTION OR REPEAL.—Nothing in this Act shall be construed to preempt State law, or repeal Federal law, that is equally as protective of religious exercise as, or more protective of religious exercise than, this Act.

(i) SEVERABILITY.—If any provision of this Act or of an amendment made by this Act, or

any application of such provision to any person or circumstance, is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provision to any other person or circumstance shall not be affected.

SEC. 6. ESTABLISHMENT CLAUSE UNAFFECTED.

Nothing in this Act shall be construed to affect, interpret, or in any way address that portion of the first amendment to the Constitution prohibiting laws respecting an establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this Act. In this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

SEC. 7. AMENDMENTS TO RELIGIOUS FREEDOM RESTORATION ACT.

(a) DEFINITIONS.—Section 5 of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb-2) is amended—

(1) in paragraph (1), by striking "a State, or a subdivision of a State" and inserting "or of a covered entity";

(2) in paragraph (2), by striking "term" and all that follows through "includes" and inserting "term 'covered entity' means"; and

(3) in paragraph (4), by striking all after "means" and inserting "religious exercise, as defined in section 8 of the Religious Land Use and Institutionalized Persons Act of 2000.".

(b) CONFORMING AMENDMENT.—Section 6(a) of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb-3(a)) is amended by striking "and State".

SEC. 8. DEFINITIONS.

In this Act:

(1) CLAIMANT.—The term "claimant" means a person raising a claim or defense under this Act.

(2) DEMONSTRATES.—The term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

(3) FREE EXERCISE CLAUSE.—The term "Free Exercise Clause" means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion.

(4) GOVERNMENT.—The term "government"—

(A) means—

(i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

(iii) any other person acting under color of State law; and

(B) for the purposes of sections 4(b) and 5, includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law.

(5) LAND USE REGULATION.—The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

(6) PROGRAM OR ACTIVITY.—The term "program or activity" means all of the operations of any entity as described in paragraph (1) or (2) of section 606 of the Civil Rights Act of 1964 (42 U.S.C. 2000d-4a).

(7) RELIGIOUS EXERCISE.—

(A) IN GENERAL.—The term "religious exercise" includes any exercise of religion,

whether or not compelled by, or central to, a system of religious belief.

(B) RULE.—The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

## TRAFFICKING VICTIMS PROTECTION ACT OF 2000

Mr. HATCH. I ask unanimous consent that the Senate now proceed to the consideration of Calendar No. 584, H.R. 3244.

The PRESIDING OFFICER. The clerk will report the bill by title.

The assistant legislative clerk read as follows:

A bill (H.R. 3244) to combat trafficking of persons, especially into the sex trade, slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking.

There being no objection, the Senate proceeded to consider the bill.

AMENDMENT NO. 4027

Mr. HATCH. My understanding is Senators BROWNBACK and WELLSTONE have an amendment the desk.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Utah [Mr. HATCH], for Mr. BROWNBACK and Mr. WELLSTONE, proposes an amendment numbered 4027.

Mr. HATCH. Mr. President, I ask unanimous consent unanimous consent reading of the amendment be dispensed with.

(The text of the amendment is printed in today's RECORD under "Amendments Submitted.")

AMENDMENT NO. 4028 TO AMENDMENT NO. 4027

Mr. HATCH. Mr. President, I have a second-degree amendment at the desk, and I ask for its consideration.

The PRESIDING OFFICER. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Utah [Mr. HATCH] proposes an amendment numbered 4028 to amendment No. 4027.

Mr. HATCH. I ask unanimous consent the reading be dispensed.

(The text of the amendment is printed in today's RECORD under "Amendments Submitted.")

Mr. WELLSTONE. I rise today to address the serious and widespread problem of international trafficking in persons, particularly women and children, for the purposes of sexual exploitation and forced labor, and to seek your continued support for legislation aimed at curbing this horrific crime.

Trafficking in persons becomes more insidious and widespread everyday. For example, every year approximately one million women and children are forced into the sex trade against their will. A recent CIA analysis of the international trafficking of women into the United States reports that as many as 50,000 women and children each year are brought into the United States and

forced to work as prostitutes, forced laborers and servants. Others credibly estimate that the number is probably much higher.

Those whose lives have been disrupted by civil wars or fundamental changes in political geography, such as the disintegration of the Soviet Union or the violence in the Balkans, have fallen prey to traffickers. Seeking financial security, many innocent persons are lured by traffickers' false promises of a better life and lucrative jobs abroad. However, upon arrival in destination countries, these victims are often stripped of their passports and held against their will, some in slave-like conditions. Rape, intimidation and violence are commonly employed by traffickers to control their victims and to prevent them from seeking help.

Trafficking rings are often run by criminals operating through nominally reputable agencies. In some cases overseas, police and immigration officials of other nations participate in or benefit from trafficking. In other cases, lack of awareness or complacency among government officials, such as border patrol and consular officers, contributes to the problem. Furthermore, traffickers are rarely punished as official policies often inhibit victims from testifying against their traffickers, making trafficking a highly profitable, low-risk business venture for some.

In April my esteemed colleague from Kansas and I introduced separate bills to combat trafficking in persons. I introduced S. 2414, the Trafficking Victims Protection Act of 2000, and he introduced S. 2449, the International Trafficking Act of 2000. But, although we earlier introduced these separate bills, we would like to relay to you the truly bipartisan effort this has been. This effort is reflected in the bill we passed today.

The Trafficking Victims Protection Act of 2000 is a comprehensive bill that aims to prevent trafficking in persons, provide protection and assistance to those who have been trafficked, and strengthen prosecution and punishment of those responsible for trafficking. It is designed to help federal law enforcement officials expand anti-trafficking efforts here and abroad; to expand domestic anti-trafficking and victim assistance efforts; and to assist non-governmental organizations, governments and others worldwide who are providing critical assistance to victims of trafficking.

The Trafficking Victims Protection Act of 2000 addresses the underlying problems which fuel the trafficking industry by promoting public anti-trafficking awareness campaigns and initiatives to enhance economic opportunity, such as micro-credit lending programs and skills training, for those most susceptible to trafficking. It also increases protections and services for trafficking victims by establishing programs designed to assist in the safe reintegration of victims into their com-

munity, and ensure that such programs address both the physical and mental health needs of trafficking victims. Further, the bills seek to stop the practice of immediately deporting victims back to potentially dangerous situations by providing them interim immigration relief and the time necessary to bring charges against those responsible for their condition. It also toughens current federal trafficking penalties, criminalizing all forms of trafficking in persons and establishing punishment commensurate with the heinous nature of this crime.

This bill requires expanded reporting on trafficking, including a separate list of countries which are not meeting minimum standards for the elimination of trafficking. It authorizes the President to suspend assistance to the worst violators on the list of countries which do not meet these minimum standards. This discretionary approach provides the flexibility needed to combat the complex, multi-faceted, and often multi-jurisdictional nature of this crime, while maintaining the prospect of tough enforcement against governments who persistently ignore, or whose officials are even complicit in, trafficking within their own borders. It allows Congress to monitor closely the progress of countries in their fight against trafficking and gives the Administration flexibility to couple its diplomatic efforts to combat trafficking with targeted action that can be tailored to the individual country involved.

Since we began working on this issue, Senator BROWNBACK and I have met with trafficking victims, aftercare providers, and human rights advocates from around the world who have reminded us again and again of the horrible, widespread and growing nature of this human rights abuse. Today this Chamber has taken an important first step toward the elimination of trafficking in persons. We are thankful for your support.

Mr. HATCH. Mr. President I ask unanimous consent that the amendment be agreed to, the substitute amendment be agreed to as amended, the bill be read the third time and passed, the motion to reconsider be laid upon the table, the Senate then insist on its amendment, request a conference on the part of the Senate, and any statements relating to this action be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendments (Nos. 4027 and 4028) were agreed to.

The bill (H.R. 3244), as amended, was read the third time and passed.

The Presiding Officer (Mr. SMITH of Oregon) appointed from the Committee on the Judiciary, Mr. HATCH, Mr. THURMOND, and Mr. LEAHY; from the Committee on Foreign Relations, Mr. HELMS, Mr. BROWNBACK, Mr. BIDEN, and Mr. WELLSTONE, conferees on the part of the Senate.