1  You guys already know this.  We had this before you
2  last month.  It's to rezone the 3.803 acres from B-2
3  retail to B-2 commercial.  It's located at 6401 Bandera
4  Road, being lot 4CB4429J, Seneca Estates unit 7.  This
5  shows you just a little bit of the location.  As you
6  can see, Bandera Road -- it fronts on Bandera Road.  We
7  have some R-1 to the north.  We have townhomes below
8  it.  Seneca Estates is right there.  The background on
9  this particular zoning case.  In 1963 it was the site
10 of the Seneca Country Club.  Did any -- I just wanted
11 to ask if anybody was a member of that club.  Okay.  I
12 just was curious.  In 1969 the property was zoned R-1
13 to B-2.  In 1996 the SUP was obtained for operating it
14 as the Church on the Rock.  In 1998 an SUP was obtained
15 for operating a school and in 2006 an SUP for a
16 childcare facility.  The 2003 master plan regarding
17 1BCC Bandera Road south corridor.  If I may, Chairman,
18 could you explain what the 1BCC means for the rest of
19 the folks?  Is that just identifying the actual
20 paragraph?  I didn't have time to check that before the
21 meeting.
22             CHAIRMAN GUERRA:  Within the master plan that's
23 the way that particular corridor is --
24             MS. MADISON:  Identified.  Okay.  I just wanted
25 for the purposes of the audience and myself.  I'm still

1  learning.  Addresses the area in general.  Encouraging
2  B-2 retail to a depth of 200 feet along Bandera Road
3  and it discourages rezoning to B-3 commercial.  Again,
4  here is the zoning map.  It kind of shows the location
5  of the area and talks -- and shows, you know, the
6  zoning as well.  Staff comments.  The city attorney
7  reviewed restricted covenants and advised staff that
8  the covenants are not enforceable by the City and the
9  attorney also noted that a variance or special
10 exception from the board of adjustment would not be
11 applicable to this zoning use and our attorney is with
12 us this evening, Frank Onion.  The B-2 district is -- I
13 had asked Christi to do this, put this into the slide
14 presentation, because I wanted the audience, as well as
15 the commission, to be reminded of how they defined both
16 B-2 and B-3 in the zoning ordinance.  The B-2 district
17 is composed of land and structures occupied by or
18 suitable for the furnishing of retail goods and
19 services to surrounding residential areas.  B-2
20 district is intended to allow a limited amount of
21 outside storage of retail merchandise and district
22 regulations are designed to promote the offering of
23 goods and services which are appropriate for the
24 surrounding business districts and protect the
25 surrounding residential districts by requiring certain

1  minimum yard and area standards to be met.  In B-3,
2  basically, it is composed of land and structures used
3  to furnish commercial needs, wholesale services and
4  some light assembling of goods in addition to most of
5  the uses found in the B-2 district.  The B-3 district
6  is intended to allow some regulated outside storage of
7  merchandise and regulations are designed to permit the
8  development of districts for the purpose of providing
9  commercial and wholesale uses and protect surrounding
10 and abutting areas by requiring certain minimum yard
11 and area standards be met.  The considerations.  Is the
12 request consistent and compatible with the master plan
13 of 2003 with site zoning, with surrounding zoning
14 and/or land uses.  Second, does the request protect the
15 health, safety and welfare of the general public; and,
16 finally, does the request protect and preserve the
17 property rights of the owners of all real property
18 affected by the proposed zoning change.  And the
19 commission is well aware that these are the
20 considerations we're looking at this evening.  We did
21 send out 25 letters.  Of those, zero received in favor.
22 We did receive 11 in opposition.  Two were duplicates.
23 We had zero returned undeliverable and we had 34
24 letters outside the 200 foot radius.  As far as
25 questions are concerned, we have -- you can ask any

```
 1  questions you like of staff and the agent is here this
 2  evening, Patrick Christensen, representing the
 3  petitioner.
 4           CHAIRMAN GUERRA:  Thank you, Amy.  Let me open
 5  up the public hearing on this case and, Mr.
 6  Christensen, would you care to make comments.
 7           MR. CHRISTENSEN:  Patrick Christensen of Brown,
 8  PC, 112 East Pecan, Suite 1490.  Let me begin by saying
 9  I thank you and we appreciate you granting the
10  continuance at the last meeting to allow us to explore
11  some possibilities on this case.  As you recall, the
12  last time a number of citizens of Leon Valley spoke in
13  opposition to the B-3 zoning; but they weren't opposed
14  to there being a church there and I had offered to
15  record some deed restrictions restricting out all the
16  bad B-3 uses and I put "bad" in quotes there because
17  that was what people had problems with.  I did record
18  those deed restrictions.  I did send them to the city
19  manager and to the city attorney.  They restrict out
20  every possible B-3 use except for the churches.  Now, I
21  realize that the City of Leon Valley cannot enforce
22  these deed restrictions.  If I could, I would have
23  tried to negotiate something with the City of Leon
24  Valley; but that's considered contract zoning and
25  cities cannot do that.  That's why I -- the enforcing
```

1  part of these deed restrictions is basically we went to
2  the Bexar Appraisal District and found every property
3  within a quarter mile radius of this property.  If the
4  zoning case is approved by the City Council and we get
5  the B-3 zoning, if anyone in the future buys the
6  property and wants to change that zoning, they have to
7  come and get 51 percent of those owners of those
8  properties within a quarter mile of this property to
9  vote to change that; and let me tell you, people hire
10 me to try to change deed restrictions all the time.
11 That's -- getting 51 percent of people to agree to that
12 is just impossible.  For something that they probably
13 wouldn't want at that property anyways.  And that's
14 kind of where we are today.  You know, I represent the
15 owners of the property.  They had to foreclose on the
16 previous church that was operating there.  They did not
17 get a non-conforming use application in time, within
18 the six months, because they had to get a new church to
19 go in there and have not been able to locate one except
20 for Pastor Crane who is here today and who will speak
21 after me.  As the representative of the property
22 owners, you know, we're in the unenviable situation of
23 being -- owning a church building and not being allowed
24 to operate a church in the building and that's why
25 we're here today.  You know, we recorded these deed

```
 1   restrictions, the City Council approves the zone
 2   change, the only new use we're getting is the church
 3   use.  Now, I know there's always the answer, well,
 4   these people are not -- you know, have the resources to
 5   hire an attorney, if someone were to come in there and
 6   try to do some kind of a use that was a violation of
 7   these deed restrictions.  The real hammer on these
 8   things is that this is not an inexpensive property.
 9   Whoever buys this property is going to have to go
10   through a bank to get some kind of financing.  Every
11   bank, upon financing a property, requires a title
12   search and these deed restrictions run with the land no
13   matter who owns them; and that bank is going to see --
14   if somebody wanted to do, let's say, an auto shop,
15   which is restricted by these deed restrictions.  If
16   somebody wanted to put a Brake Check there, the bank is
17   going to say, "We can't finance this property for a
18   Brake Check because you can't do that.  There's deed
19   restrictions here.  If you want to do that, you want
20   your financing, go amend those deed restrictions."
21   That's really the hammer on these types of documents.
22   I'd be happy to answer any questions you have.  Like I
23   said, we're just trying to operate a church out of our
24   church building.  Thank you.
25             CHAIRMAN GUERRA:  Any questions?  Lanny.
```

```
 1         MR. LAMBERT:  Sir, what about if you went to
 2   somebody who -- say a hard money lender or something.
 3   Wouldn't be any restrictions on the lending; right?
 4         MR. CHRISTENSEN:  Yeah, that's true.  If
 5   somebody came in, had cash, wanted to buy the property,
 6   then it wouldn't be up to the property owners to try to
 7   enforce those.  The deed restrictions do provide that a
 8   prevailing party is entitled to their attorney's fees.
 9   So, if somebody was in clear violation of the deed
10   restrictions, if another property owner in this quarter
11   mile area filed suit against that, they would probably
12   prevail and they would be entitled to their attorney's
13   fees.
14         MR. LAMBERT:  But they would still have to take
15   it upon themselves to file.
16         MR. CHRISTENSEN:  They would still have to take
17   it upon themselves to file suit, that's correct.  If
18   there's some way I could fix that, I would.  I can't.
19         MR. LAMBERT:  It's in the law already; right?
20         CHAIRMAN GUERRA:  Any other questions?  Pastor,
21   would you like to make any comments?
22         PASTOR CRANE:  There was a situation happening
23   in Texas, I'm sure you may have heard about it, where
24   Las Vegas casinos are contacting the horse track s and
25   they're trying to make deals and some congressmen --
```

1  state congressmen are, you know, trying to have cities
2  on the coast that are going to be gamble friendly.
3  Like if you've been to Louisiana or Mississippi, you
4  might be familiar with this.  Our church has decided
5  that we're going to write the congress people to try to
6  stop that because we just don't -- you know, we don't
7  feel comfortable.  Not just because of a vice reason;
8  but it's been proven by study after study that bringing
9  gambling into a community doesn't make anybody money.
10 It's low wage jobs and it actually causes what's called
11 external expenses because you have divorce rates
12 increase, you have child care rates increase, you have
13 organized crime.  Maybe not on the, you know, Corleone
14 family scale; but, you know, just a lot of bad things
15 go in to bringing in an institution like that.  What
16 I'd like to say is it has been proven that a vibrant
17 church helps the economy of a city.  Now, the last
18 thing I want to do -- and please don't hear me
19 threatening because we don't have any finances to back
20 this up; but I just have been listening to the company
21 that employs Mr. Christensen.  When you bring in a
22 church, it does positive things for a community.  The
23 church that was in there before, I knew a little bit
24 about the situation.  There was an adulterous affair,
25 there were financial things going on.  I mean, things

1  like that happen in business; things like that happen
2  in churches as well, sad to say.  The thing that we're
3  looking at here is the assumption that somehow when we
4  go in there, what's going to happen if or when we fail.
5  I would like to state for the record that if and when
6  we could have failed, we would have failed prior to
7  this.  We have been in existence for seven years.  We
8  have strong enough financial statements that have
9  been -- are going to be audited by the company that's
10 going to be loaning us the money that I'm sure you
11 could have copies of.  Where we can afford to pay the
12 price.  And I'd also like to tell the residents that
13 you guys have made some suggestions, you know, in the
14 hallway that -- can you do anything to beautify this
15 building, because it is not the most attractive
16 building to look at, as many of our church people have
17 told me.  So, what we've done is we have secured almost
18 $400,000.00 on top of our purchase price for simply the
19 beautification of that area.  We have.  We're going to
20 put architects, people of that nature, involved in this
21 so it's just not kind of a big cement snow thing that I
22 used to buy.  Those pink ones.  What are those?
23          UNIDENTIFIED MALE:  Snow cone.
24          UNIDENTIFIED FEMALE:  Snow balls.
25          PASTOR CRANE:  Snow ball.  You know, kind of a

1  big cement thing.  So, we're serious about going in
2  there and beautifying the community and I would also
3  like to say that by bringing -- by allowing our church
4  to be in there, it just -- I want to come into Leon
5  Valley in a positive note.  I don't want to come in
6  bending anybody's arms and, you know, after a long,
7  drawn-out situation.  I want to make sure that we
8  benefit you guys and we can do positive things for the
9  community because we've been involved in this community
10 for several years by some of the things that we've done
11 anyway.  We just want to take a more -- a more personal
12 approach to this and we want to come in on a positive
13 note, knowing how we can be of benefit to the community
14 and how the community can benefit by having us here.
15 Does anyone have any questions for me?
16             CHAIRMAN GUERRA:  Any questions?  Thank you,
17 sir.  We had one person who signed up to speak.  Elsie
18 Buchanan.  If you didn't get the chance to sign up, you
19 will be allowed to speak.  Ms. Buchanan.
20             MS. BUCHANAN:  Yes.  I live right across the
21 street at 6232 Rue Marielyne.  I have absolutely no
22 objection to a church going in there.  However,
23 churches fail.  Church on the Rock didn't go in there
24 with the intention of failing and my greatest concern
25 and that of my neighbors is if that one goes belly up,