1 | it's being penalized, you know, because they -- if the

2 | Church on the Rock originally had, you know, con --

3 | they needed to take some step.  I forget what it was,

4 | but they didn't and they could have continued and we

5 | wouldn't even be here discussing it today.  They would

6 | have had the variance.  So, there is some precedent set

7 | for the property already and so I think in -- you know,

8 | in keeping with -- with that, you know, the City is in

9 | a pretty good position, in my estimation, as far as

10 | protecting itself from, you know, any other group that

11 | would come in and want to make some changes; but, you

12 | know, I -- the thing that scares me is that this

13 | property could then be used in -- for something else

14 | along the way and we would have nothing to say about it

15 | if it's zoned to commercial.  So, my leaning very

16 | definitely is keep it the way it is.  The current.

17 | What we changed the zoning to.  That's my leaning right

18 | now.

19 |         CHAIRMAN GUERRA:  Anyone else?

20 |         UNIDENTIFIED FEMALE:  I had a question since I

21 | missed the discussion.  I read the minutes.  About this

22 | non-conforming use rights and it had lapsed.  So, it

23 | was --

24 |         CHAIRMAN GUERRA:  Right.

25 |         UNIDENTIFIED FEMALE:  -- the SUP that they had

1   gotten before or how did they get the non-conforming --

2          UNIDENTIFIED FEMALE:  I don't know.

3          CHAIRMAN GUERRA:  I don't know if Christi

4   briefed you on that or not.

5          MS. MADISON:  I don't want to lead you astray,

6   but I think the chain of events was that you had your

7   master plan, that you came in and the area was zoned

8   B-2.  Changed the zoning ordinance in November, 2006 I

9   believe.

10         UNIDENTIFIED MALE:  Right.

11         MS. MADISON:  The church came in to

12   non-compliance in July, 2007 and it became in compli --

13   I mean, they came --

14         UNIDENTIFIED MALE:  Out of compliance.

15         MS. MADISON:  -- out of compliance or

16   whatever --

17         UNIDENTIFIED MALE:  Six months --

18         MS. MADISON:  -- because of the fact -- there's

19   two factors, basically, that caused them to go into

20   non-compliance and one is -- and help me here, Frank,

21   if I don't get this right -- but one has to do with the

22   change of the use of the building.  If they're a

23   non-conforming use, they are grandfathered as long as

24   they maintain that use or they change ownership.  Those

25   are the two defining factors.  If it changes hands,

1    changes ownership, or if the use changes, then they go

2    into non-compliance and it is revoked.  So, they're

3    grandfathered as long as they use that same use or they

4    do not change the ownership.  And as I understand it,

5    the ownership changed because they became in default

6    and then a new company owned them.  So, that's how they

7    became -- then the new company then had to come back

8    and apply for whatever and by that time the zoning

9    ordinance had been changed.  Of course your master plan

10   was done in 2003.  So, that would be my answer.

11            UNIDENTIFIED FEMALE:  Okay.  Thank you.

12            CHAIRMAN GUERRA:  Hal, did you have a question?

13            MR. BURNSIDE:  I don't want to belabor the

14   point, but I -- we did hold a lot of discussion

15   about -- about the issue concerning the economic

16   viability of the community and the impact on property

17   that was not taxable and churches being one of those

18   categories; and I think everybody understands we are

19   certainly by no means anti-church.  We -- as has been

20   stated before, there are many churches within the city.

21   What we felt as a body we needed to do in our capacity

22   as commissioners and making recommendations to the

23   council, that we needed to begin to address the issue

24   of how do we keep the community as economically viable

25   as possible, at the same time allowing for property

1   within the city to be used by churches; and so while

2   before, if I'm correct and if I'm not somebody, you

3   know, say so, I believe the churches were allowed just

4   about anywhere.

5           MS. MADISON:  That's correct.

6           MR. BURNSIDE:  And we felt that in certain

7   instances, such as right there on Bandera Road.  I

8   mean, to me, that is where you put your business.

9   That's where you begin to concentrate your economic

10  development resources and the use of property that

11  prime in an economic corridor for something other than

12  economic development, I believe in our case, as has

13  been pointed out, we are land locked.  We cannot expand

14  and bring in.  So, we have to really be real careful

15  about the resources we have and how we use them; and so

16  we didn't make our decision and our recommendations

17  lightly.  It was with a lot of consideration and a lot

18  of thought and so that's why the recommendation to

19  locate churches in a B-3 was made.

20          UNIDENTIFIED FEMALE:  It's not just churches,

21  if I'm correct.  It's anyplace where there is a

22  gathering of people.

23          UNIDENTIFIED FEMALE:  No.

24          UNIDENTIFIED FEMALE:  I thought it was.

25          UNIDENTIFIED MALE:  I think -- well, I know we

1  discussed it as churches.  I don't know how --

2          UNIDENTIFIED FEMALE:  Well, we can't just do

3  that against the churches.

4          UNIDENTIFIED FEMALE:  She's correct.  The

5  intent -- and I don't have all the research in front of

6  me, but the intent was that for places of gathering or

7  for assembly was in B-3.

8          UNIDENTIFIED MALE:  Okay.  All right.

9          UNIDENTIFIED FEMALE:  And that was part of the

10  reasoning behind the rezoning.

11          UNIDENTIFIED FEMALE:  Yes.

12          UNIDENTIFIED FEMALE:  I mean that different

13  zoning.

14          UNIDENTIFIED MALE:  It's just not churches.

15          UNIDENTIFIED FEMALE:  It's not just churches

16  because --

17          UNIDENTIFIED MALE:  It's gatherings.

18          UNIDENTIFIED FEMALE:  -- it's gatherings of

19  people.

20          UNIDENTIFIED FEMALE:  Assemblyings.

21          UNIDENTIFIED FEMALE:  Yep, yep, yep.

22          UNIDENTIFIED FEMALE:  Or non-commercial --

23  non-business purposes.

24          UNIDENTIFIED FEMALE:  Okay.

25          CHAIRMAN GUERRA:  A motion, if there's no

1 further discussion, unless someone else has something

2 else.

3        MS. BAIRD:  Well, in zoning case 08-380 we are

4 now considering, I would move that we recommend to the

5 City Council that this request be denied for this

6 zoning change and that it remain just as it is now,

7 B-2; and it not be changed to B-3 and allow commercial

8 anything in there and I believe that that is -- I think

9 it will protect and preserve the property rights of --

10 of real property owners, of other businesses along that

11 corridor, as well as residents in that area and I -- I

12 certainly think -- know that it is consistent and

13 compatible with the master plan and with the

14 surrounding zoning and those would be my reasons for

15 making that recommendation.

16        UNIDENTIFIED MALE:  And I'll second the motion.

17        CHAIRMAN GUERRA:  Okay.  We have a motion and a

18 second for denial of the request.  Any further

19 discussion?  Would you please poll the commission.

20        UNIDENTIFIED FEMALE:  Oh, okay.  Vice chair

21 Wendy Phelps?

22        MS. BAIRD:  Opposed.

23        UNIDENTIFIED FEMALE:  Renee Baird?

24        MS. BAIRD:  In favor of my motion.  Yes.

25        UNIDENTIFIED FEMALE:  Sorry.

1          UNIDENTIFIED MALE:  That's a negative and we

2   rarely do that.

3          MS. BAIRD:  I know.  We hardly ever do that.

4   Yeah.

5          UNIDENTIFIED FEMALE:  Rich Braune?

6          MR. BRAUNE:  I --

7          CHAIRMAN GUERRA:  In favor or oppose the

8   motion?

9          MR. BRAUNE:  In favor.

10          UNIDENTIFIED FEMALE:  Olen Yarnell?

11          MR. YARNELL:  I wish we could do it some other

12   way, but I'm in favor of the motion.  I can't -- I

13   can't go against our master plan.

14          UNIDENTIFIED FEMALE:  Sharon Hendricks?

15          MS. HENDRICKS:  In favor.

16          UNIDENTIFIED FEMALE:  Hal Burnside?

17          MR. BURNSIDE:  In favor.

18          UNIDENTIFIED FEMALE:  Paul Biever?

19          MR. BIEVER:  In favor.

20          UNIDENTIFIED FEMALE:  Motion passes six/one.

21   Chair, do you also vote?

22          CHAIRMAN GUERRA:  In favor.

23          UNIDENTIFIED FEMALE:  In favor.  Okay.

24   Seven/one.

25          UNIDENTIFIED FEMALE:  When does it go before

1 | City Council?

2 |         UNIDENTIFIED FEMALE:  When does it go?

3 |         CHAIRMAN GUERRA:  It will go -- it will be

4 | forwarded to the City Council at their next meeting of

5 | March the --

6 |         UNIDENTIFIED FEMALE:  4th.

7 |         CHAIRMAN GUERRA:  -- 4th.

8 |                     EXCERPT NUMBER 2

9 |         CHAIRMAN:  Thank you, Amy.  The next item for

10 | discussion is staffing concerns.  After our last

11 | meeting we got into a discussion about various matters.

12 | And one of the things that was brought up was staffing

13 | concerns within the community.  I know that I've been

14 | at council meetings where people have spoken about code

15 | enforcement issues and the need for a code enforcement

16 | officer.  If I'm correct I know there was -- it was

17 | mentioned from our last meeting that within the -- the

18 | staff -- the staff that provides assistance to our

19 | commission, we've been working with two people, Melinda

20 | and Christy.  Melinda is gone.  We have Christy.  And

21 | in the meantime Amy was hired.  Initially hired as the

22 | economic development person for the City but through

23 | the city reorganization I -- I see it is taking place.

24 | But what I've mentioned in discussing the item and the

25 | next one with the Mayor and with Lanny and with Christy

1  and with Amy, we -- we felt that we had two people that

2  we working with directly before and now we only have

3  one.  I'm not sure that that's still the case but in

4  discussing this with the Mayor and in trying to figure

5  out a way to talk about these matters that she felt

6  that these were matters that the city manager could

7  best handle and address and that's why Mr. Lambert is

8  here to talk to us about this.  And so, with that,

9  Lanny, I'll turn it over to you.

10          MR. LAMBERT:  Thank you, Claude, Mr. Chairman.

11  Good evening.  Before you leave, the last topic, just

12  as a matter of interest I was sitting there

13  calculating.  When that church became available, when

14  it was available for auction, I approached the City

15  council.  I wanted to buy it.  I would have liked to

16  have bought it for a fire station and for a city hall

17  annex.  And the council told me, "No.  That's too

18  valuable to be removed from the tax roll again for a

19  city function.  So I got nowhere with it, but I did

20  find the price.  They were asking $1.5 million for it.

21  And our tax roll, at 52 cents, that's $75.000.00 a year

22  that we've not received on income from that, for that

23  property.  I just thought that was interesting.  I -- I

24  was not successful in acquiring it for a fire station

25  or a city hall either, but -- in fact, that's a --

1  that's a prime -- prime real estate in our city.  I

2  don't know, if we get something really beneficial at

3  that location.

4          BOARD MEMBER:  I see that thing sitting empty

5  for a long --

6          BOARD MEMBER:  Huh?

7          BOARD MEMBER:  I see that thing sitting empty

8  for a long time.

9          BOARD MEMBER:  It probably will.

10         BOARD MEMBER:  That's not the figure that's on

11 the tax roll.

12         MR. LAMBERT:  That's what they're asking for

13 it.  It's not on the tax roll because it's tax exempt.

14         BOARD MEMBER:  It's tax exempt, yeah.

15         MR. LAMBERT:  I didn't check.  Is tax exempt

16 property on the tax roll?

17         BOARD MEMBER:  Well, BCAD has it listed.

18         MR. LAMBERT:  Does it?

19         BOARD MEMBER:  Yes.

20         MR. LAMBERT:  Oh, I didn't send it to BCAD.

21 Jeff, historically, it's never on the tax roll at it's

22 asking price.  You're right.  So -- but I didn't check

23 to see what it was on the tax roll at.  Chairman Guerra

24 told the Mayor that the zoning board had three issues

25 of importance that they wanted to discuss with the city